**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| JUST ENERGY GROUP INC., *et al* | ) Case No. 21-30823 (MI) |
| | ) |
| Debtors in a Foreign Proceeding,[1] | ) |
| | ) (Joint Administration Requested) |
| | ) (Emergency Hearing Requested) |

**DECLARATION OF SHAWN T. IRVING IN SUPPORT OF**
**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN MAIN**
**PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,**
**AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

I, Shawn T. Irving, hereby declare under penalty of perjury as follows to the best of my knowledge, information, and belief:

1.      I submit this declaration (this "Declaration") in support of the *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition") filed by Just Energy Group Inc., in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors" or "Just Energy"), who are the subject of proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice, Commercial List (the "Canadian Proceedings" and such court, the "Canadian Court").

---

[1]   The identifying four digits of Debtor Just Energy Group Inc.'s local Canada tax identification number are 0469.  Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/justenergy.  The location of the Debtors' service address for purposes of these chapter 15 cases is:  100 King Street West, Suite 2360, Toronto, ON, M5X 1E1.

Concurrently herewith, the Foreign Representative has filed voluntary petitions for relief under chapter 15 of title 11 of the United States Code (the "Bankruptcy Code") for each of the Debtors. All facts set forth in this Declaration are based on: (a) my knowledge; (b) my review of relevant documents; and/or (c) my opinion based upon my experience and knowledge of the Debtors' operations. If I were called upon to testify, I could and would testify competently to the facts set forth herein.[2]

2.      I am a partner in the firm of Osler, Hoskin & Harcourt LLP ("Osler") located in Toronto, Ontario, where my broad-ranging practice focuses on insolvency and restructuring matters. Osler acts as Canadian counsel to the Debtors, whose Canadian Proceedings are pending before the Canadian Court. I appeared before the Canadian Court as counsel of record seeking the CCAA Order (as defined below).

3.      I graduated with a Bachelor of Arts from Queen's University in 2000 and graduated with a Bachelor of Laws from the University of Western Ontario in 2003. I was admitted to the Ontario Bar in 2004.

4.      I have extensive experience in corporate and commercial litigation with a focus on insolvency and restructuring, plans of arrangement under the Companies' Creditors Arrangement Act and corporate statutes, proposals and bankruptcies under the Bankruptcy and Insolvency Act (Canada), complex cross border matters, secured transactions and the enforcement of debtor and creditor rights. Over the course of my career, I have served as counsel to debtor corporations, lending syndicates, bondholders and other creditor groups.

---

[2]      Capitalized terms used but not defined herein shall have the meaning given to them in the Verified Petition.

## I.       CANADIAN PROCEEDINGS.

5.       On March 9, 2021, Just Energy filed an application (the "Application") with the Canadian Court pursuant to sections 9, 11, 11.51, 11.52, and 23 of the CCAA.  On March 9, 2021, the Canadian Court issued a first day initial order (the "CCAA Order"):[3]  (a) declaring that Just Energy are corporations to which the CCAA applies; (b) staying all proceedings and remedies taken or that might be taken in respect of Just Energy or certain related limited partnerships, or any of their property, except as otherwise set forth in the CCAA Order, for an initial period of ten (10) days in accordance with the CCAA; (c) appointing FTI Consulting Canada Inc. as the court appointed monitor of Just Energy in the Canadian Proceedings (the "Monitor"); (d) approving the Debtors' debtor in possession financing; (e) declaring that Ontario is the "*center of main interest*" of Just Energy and authorizing Just Energy to apply, as they may consider necessary or desirable, to any other court, tribunal, regulatory, administrative or other body, wherever located, for orders to recognize and/or to assist in carrying out the terms of the CCAA Order and any subsequent orders rendered by the Canadian Court in the context of the Canadian Proceedings, including, without limitation, orders under chapter 15 of the Bankruptcy Code; and (f) granting other customary relief.

6.       The Monitor, in consultation with its independent counsel, submitted a detailed pre-filing report with the Canadian Court supporting all of the relief the Debtors requested in the Application and are requesting in these chapter 15 cases.  A copy of such report is attached hereto as **Exhibit A**.

---

[3]       In the interest of time, a copy of the entered order is attached as Exhibit A to the *Debtors' Emergency Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code*.  Just Energy will supplement this filing with a certified copy of the order as soon as practicable.

**A.      Overview of the CCAA Restructuring Process**

7.      The CCAA provides for a court-supervised reorganization procedure designed to enable financially distressed companies to avoid foreclosure or seizure of assets while maximizing the company's value as a going concern for the benefit of creditors and other parties in interest.  A CCAA proceeding is a voluntary insolvency proceeding in which a debtor aims to reorganize or liquidate its business and distributes proceeds to creditors pursuant to a plan and under court supervision.  A debtor's assets and affairs are subject to the supervision of the Canadian Court during the pendency of a CCAA proceeding.

8.      In a CCAA proceeding, absent exceptional circumstances, a debtor's management and board of directors remain in place, and the board maintains its power under Canadian law to approve significant actions, including disposing of important assets, borrowing significant amounts, or changing corporate structures, subject to oversight by a court-appointed monitor and approval of the court.

9.      Upon the commencement of a CCAA proceeding, the court will appoint a qualified monitor, who functions as an independent court officer and observer of the CCAA proceeding and the debtor's business and (i) monitors the debtor's ongoing operations, (ii) reports to the court on any major events affecting the debtor, (iii) notifies the debtor's creditors and, if applicable, shareholders of any meetings and tabulates votes at these meetings, if held, (iv) assists with preparing, filing, and holding meetings for voting on the plan of arrangement, (v) approves the disclaimer of contracts and leases, (vi) may prepare reports in conjunction with any interlocutory motions by the company or other stakeholders, and (vii) prepares a report on the plan of arrangement, which is usually included in the mailing of the plan, if one is filed.  Consent of the monitor is generally not required for the debtor to manage its business, including the sale of assets in the ordinary course, but the monitor may request that the court enjoin any actions that may prove

4

harmful to the debtor and/or its creditors. Though the monitor need not formally approve significant transactions such as asset sales outside of the ordinary course, court approval is generally required for such transactions and the court gives weight to the monitor's recommendations concerning such transactions.

10.     Upon the commencement of a CCAA proceeding, all actions against the debtor and its assets are stayed, world-wide.  The stay presumptively applies to all persons who might bring proceedings or take either judicial or extra-judicial steps against the debtor or its property, unless there is an express exemption in the CCAA.  The stay is first granted for a maximum period of ten (10) days, but is typically extended where the debtor can show it continues to act with good faith and due diligence.

11.     There is no prescribed limit on the number or duration of these extensions of the stay. Additionally, subject to limited exceptions, clauses triggering termination rights upon the debtor's commencement of an insolvency proceeding are not enforceable, so contract counterparties may not terminate contracts solely by virtue of the commencement of the CCAA proceeding.

12.     In a CCAA proceeding, a debtor is able to obtain postpetition financing (*i.e.*, DIP financing), subject to a hearing and court approval, after showing that the proposed financing is in the best interests of its estate.  Such borrowings would typically have priority status in the CCAA proceeding and, if unsecured financing is unavailable, the debtor is permitted to borrow on a secured basis.  The Canadian court may approve priority charges against the company's assets, which take priority over existing secured creditors, where notice of the hearing to approve the charge is given to the potentially affected creditors and the court is of the opinion that such charges are appropriate in the circumstances.

13.     For a plan of arrangement to be binding on each class of creditors, a majority of the proven creditors in that class, by number, together with two-thirds (2/3) of the proven creditors in that class, by dollar value, must approve of said plan presented to them.  If a class of creditors approves the plan, it is binding on all creditors within the class, subject to the court's approval of the plan.  If all of the classes of creditors approve the plan, the court must then approve the plan as a final step.  Upon court approval, the debtor continues forward as outlined under the plan until it has satisfied the requirements under the plan.

14.     Throughout a CCAA proceeding, the court retains broad discretion to make any order that it considers appropriate in the circumstances.

## II.     THE CANADIAN PROCEEDINGS ARE FOREIGN MAIN PROCEEDINGS.

15.     To ensure the effective and economic administration of the Debtors' restructuring efforts, I believe that the Debtors require the protection afforded to foreign debtors pursuant to chapter 15 of the Bankruptcy Code in order to prevent disruption of business and recognize the legal effect of the Canadian Proceedings in the United States.

16.     To the best of my information and belief, the Canadian Proceedings are collective judicial proceedings under Canadian law relating to the adjustment of debt of the Debtors in which the purpose is a corporate restructuring.

17.     I believe, to the best of my information and belief, and as identified in the *Declaration of Michael Carter in Support of Emergency Motion for Recognition of Foreign Main Proceeding and Request for Certain Related Relief*, filed contemporaneously herewith, other than these chapter 15 cases, the Canadian Proceedings are the only proceedings related to the adjustment of debts pending for the Debtors and, therefore, are the only "foreign proceedings" with respect to the Debtors within the meaning of section 101(23) of the Bankruptcy Code.

18.     Additionally, I understand that a statement identifying all foreign proceedings with respect to the Debtors has been filed with this Court.

19.     Finally, the Canadian Proceedings provide full due process for impacted creditors, including receipt of notice, an opportunity to retain counsel and to appear, to raise objections, to vote (if a plan is proposed), and to appeal.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my information and belief.

Executed on this 9th day of March, 2021

Ontario, Canada

Shawn T. Irving
Partner
Osler, Hoskin & Harcourt LLP

## Exhibit A

**FTI Pre-Filing Report**

**Court File No.  CV-21-00XXXX-00CL**

# Just Energy Group Inc. et al.

**PRE-FILING REPORT OF FTI CONSULTING CANADA INC., AS THE PROPOSED MONITOR**

**March 9, 2021**



## TABLE OF CONTENTS

INTRODUCTION.................................................................................................. 1

PURPOSE ............................................................................................................ 2

BACKGROUND INFORMATION ...................................................................... 3

*Overview* ........................................................................................................ 3

*Business Operations and the Regulatory Environment* ................................ 4

*Commodity Suppliers and ISO Supplier Relationships*................................. 6

*The Just Energy Group's Capital Structure* ................................................. 7

   *2020 Recapitalization* ............................................................................... 7

   *Capital Structure* ...................................................................................... 7

THE TEXAS WEATHER EVENT ..................................................................... 10

GOING CONCERN DOUBTS AS A RESULT OF THE TEXAS WEATHER
EVENT ............................................................................................................... 14

FTI'S QUALIFICATIONS TO ACT AS MONITOR ........................................ 15

*Engagement of FTI and the Preparation of this Pre-Filing Report*.............. 16

THE JUST ENERGY GROUP'S CASH MANAGEMENT SYSTEM ................ 17

CASH FLOW FORECAST ................................................................................. 18

RELIEF SOUGHT IN INITIAL ORDER .......................................................... 21

*Extending the CCAA protections to the Just Energy LPs* ........................... 21

*Implementing the Stay of Proceedings, including in respect of Regulators* .......... 22

*Proposed debtor-in-possession financing*.................................................... 23

*Engagement of Financial Advisor* ............................................................... 25

*Permitting certain repayments under the Credit Agreement*....................... 26

*Permitting certain pre-filing payments to third parties*.............................. 27

*Certain other relief for Commodity Suppliers*............................................. 27

*Court-ordered charges sought in the proposed Initial Order* ..................... 30

   *(i) Administration Charge*......................................................................... 30

   *(ii) FA Charge*........................................................................................... 31

   *(iii) Directors' Charge* ............................................................................. 31

   *(iv) DIP Charge* ........................................................................................ 32

   *(v) KERP Charge and Employee Bonus* ................................................... 33

   *(vi) Priority Commodity/ISO Suppliers Charge* ....................................... 33

   *Summary of the Proposed Rankings of the Court-Ordered Charges* ........ 34

CHAPTER 15 PROCEEDINGS......................................................................... 34

CONCLUSION ................................................................................................... 35



Court File No. CV-21-00XXXX-00CL

**ONTARIO
SUPERIOR COURT OF JUSTICE
(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT
OF **JUST ENERGY GROUP INC.**, JUST ENERGY CORP., ONTARIO ENERGY
COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST
ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP.,
JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC.,
11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I
INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY
ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST
ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY
MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST
ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY
PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY
SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY
CORP., INTERACTIVE ENERGY GROUP LLC,   HUDSON PARENT
HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED
SOLUTIONS LLC.,  FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL
HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP.,
JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST
SOLAR HOLDINGS CORP., AND JUST ENERGY (FINANCE) HUNGARY ZRT
(collectively, the "**Applicants**").

**PRE-FILING REPORT OF THE PROPOSED MONITOR**

**INTRODUCTION**

1.       FTI Consulting Canada Inc. ("**FTI" or the "Proposed Monitor**") understands that
         Just Energy Group Inc. ("**Just Energy**") and the other applicant companies listed
         in the style of cause above (collectively, the "**Applicants**") intend to make an
         application before the Ontario Superior Court of Justice (Commercial List) (the
         "**Court**") for an initial order (the "**Initial Order**") under the Companies' Creditors
         Arrangement Act (the "**CCAA**") to, among other things, obtain a stay of
         proceedings to allow the Applicants an opportunity to restructure their business and
         affairs.



2.     The Applicants propose that the Court appoint FTI as Monitor in these CCAA proceedings (the "**CCAA Proceedings**").

3.     This Pre-Filing Report of the Proposed Monitor (the "**Pre-Filing Report**") has been prepared by the Proposed Monitor prior to and in contemplation of its appointment as Monitor to provide information to the Court solely in respect of the relief sought by the Applicants at the hearing in respect of the Initial Order.  Should FTI be appointed as Monitor at the initial hearing, FTI intends to file a further report with the Court as Monitor in respect of the relief being sought by the Applicants at the comeback hearing.

4.     Any capitalized terms that are not defined herein have the meanings given to them in the glossary attached as **Schedule "A"** to this Pre-Filing Report (the "**Glossary**"). To assist the Court and other readers, the Glossary includes certain common industry-specific terms that are not used herein but arise in pertinent documents relating to the Applicants' business.

**PURPOSE**

5.     The purpose of this Pre-Filing Report is to inform the Court of:

    (a)     background information with respect to the Applicants;

    (b)     FTI's qualifications to act as Monitor, if appointed;

    (c)     an overview of the Cash Flow Forecast (as defined herein) and the Proposed Monitor's comments regarding the reasonableness thereof;

    (d)     the relief sought by the Applicants in the proposed Initial Order and the Proposed Monitor's recommendation in respect of same, including, among other things:

        (i)     granting a stay of proceedings (the "**Stay of Proceedings**") in favour of the Applicants up to and including March 19, 2021;

        (ii)     extending the Stay of Proceedings to certain foreign and domestic regulators on an interim basis;



    (iii)    extending the protections and stays afforded in the Initial Order to certain limited partnerships that are affiliates of the Applicants;

    (iv)    approving the proposed debtor-in-possession interim financing arrangement;

    (v)    approving the Applicants' engagement of BMO Nesbitt Burns Inc. ("**BMO**") as its financial advisor (in such capacity, the "**Financial Advisor**");

    (vi)    authorizing the Applicants to make certain pre-filing payments;

    (vii)    granting certain protections in favour of the Applicants' critical suppliers; and

    (viii)    granting certain Court-ordered charges sought by the Applicants.

6.    This Pre-Filing Report should be read in conjunction with the Affidavit of Michael Carter, to be sworn March 9, 2021 (the "**Carter Affidavit**"), which describes in more detail the Applicants' operations and the circumstances leading to their current situation.

7.    All references to monetary amounts in this Pre-Filing Report are in Canadian dollars unless otherwise noted.

## BACKGROUND INFORMATION

### *Overview*

8.    Just Energy is incorporated under the *Canada Business Corporations Act*. It maintains dual headquarters in Ontario and Texas, and its shares are listed on the Toronto Stock Exchange and the New York Stock Exchange.

9.    Just Energy is primarily a holding company, with operating subsidiaries situated across Canada and the United States (Just Energy and its subsidiaries collectively, the "**Just Energy Group**"). A copy of the Just Energy Group's corporate organizational chart will be attached as Exhibit "F" to the Carter Affidavit.



10.     As detailed herein, the Just Energy Group faces a material and immediate risk to its ability to continue as a going concern, which is a direct consequence of the unprecedented and catastrophic effects of an extreme weather event that crippled the Texas energy system in February of this year. The Proposed Monitor understands that the Just Energy Group is urgently seeking the Court-ordered relief described herein in order to avoid the near-certain demise of its operations. Specifically, as described herein, as a result of the winter storm and the subsequent regulatory response, the Just Energy Group estimates it may have incurred losses and additional costs totaling over $312 million.  As a result, the Just Energy Group is currently estimating that it will be in a negative liquidity position on March 9, 2021 as certain payments owing by the Just Energy Group become due and owing on such date, including approximately US$96.24 million to Electric Reliability Council of Texas ("**ERCOT**").

*Business Operations and the Regulatory Environment*

11.     Established in 1997, the Just Energy Group is a leading retail energy provider. Its principal line of business consists of purchasing retail energy and natural gas commodities from certain large energy suppliers and re-selling them to residential and commercial customers.

12.     The Just Energy Group services more than 950,000 residential and commercial customers across various jurisdictions in Canada and the United States. Residential customers represent approximately 35% of its residential customer equivalent ("**RCE**")[1] base, with the Just Energy Group's commercial customers making up the balance.  The Proposed Monitor understands that Texas is the single largest market for the Just Energy Group, representing 47% of its revenues in fiscal year 2020. Other significant markets include Ontario, Alberta, Illinois and Pennsylvania. The Just Energy Group has expended significant effort over many years to build a large and geographically-diversified customer base.

---

[1] A unit of measurement equivalent to the approximate amount of gas and electricity used by a typical household in Ontario.

- 5 -

13.     According to the Just Energy Group's consolidated financial statements, for the nine-months ending December 2020, despite a challenging operating environment because of the COVID-19 pandemic, revenues were approximately $1.7 billion. During the same period, the Just Energy Group had positive cash flow of approximately $27 million. Its reported Embedded Gross Margin[2] for residential and commercial customers for the same period was approximately $1 billion and $360 million, respectively.

14.     The Just Energy Group collectively employs approximately 979 full-time, non-unionized employees. A geographic breakdown of the employees is set out in the Carter Affidavit. Most employees are located in one of three jurisdictions: Ontario, Texas and India.

15.     The Just Energy Group operates in highly regulated markets. The Just Energy Group is subject to numerous different regulatory regimes in Canada and the U.S. overseen by various provincial and state regulators.  The Carter Affidavit provides an overview of the complex regulatory environment and details the licenses and other permissions granted in favour of the Just Energy Group in respect of the various jurisdictions in which it operates.

16.     Certain of Just Energy's operating subsidiaries set out in **Schedule "B"** hereto are limited partnerships (collectively, the "**Just Energy LPs**"). The Just Energy LPs hold most of the regulatory licenses pursuant to which the Just Energy Group conducts business.  The Just Energy LPs are not applicants in these CCAA proceedings as they are not "companies" to which the CCAA applies. Nevertheless, as the business and operations of the Just Energy LPs are heavily intertwined with that of the Applicants, the Applicants seek to have all of the protections and authorizations under the Initial Order extended to the Just Energy LPs, including the Stay of Proceedings.

---

[2] The gross margin expected to be realized over the next five years from existing customers.

17.    Complying with the various regulatory regimes creates direct and indirect financial, legal and operational obligations for the Just Energy Group. Among other things, certain regulators require substantial financial collateral to be posted by entities in the Just Energy Group. Any non-compliance with the regulatory regimes, including the failure to provide sufficient collateral by a specified deadline can lead to the suspension or cancellation of the Just Energy Group's ability to operate in a particular market and, in some jurisdictions, the transfer of the Just Energy Group's customers to another energy provider. The amount of collateral required can vary depending on a number of factors including the current commodity market environment and the financial health of the Just Energy Group and, as a result, can be difficult to forecast.

18.    In certain circumstances, the Just Energy Group entities have posted collateral with the regulators themselves; in other circumstances, they have arranged for collateral to be posted by third-party bonding companies (the "**Bonding Companies**").  In such circumstances, a breach of the agreement with the Bonding Companies, including failing to post additional collateral with the Bonding Companies on demand, can lead to non-compliance with the regulator's demands and consequently, the suspension or cancellation of the Just Energy Group's ability to operate in a particular market. The Proposed Monitor understands that the Bonding Companies have recently demanded over $30 million in additional collateral be posted by the Just Energy Group as a result of, among other things, the Texas weather event. The Just Energy Group estimates as much as $10 million remains outstanding and could be demanded upon filing.

*Commodity Suppliers and ISO Supplier Relationships*

19.    As noted earlier, the Just Energy Group transacts with various suppliers of natural gas and electricity (collectively, the "**Commodity Suppliers**"). As detailed in the Carter Affidavit, a small group of suppliers including Shell, BP, Exelon, and Bruce Power, provides the majority of such supplies. Any disruption to continued supply by the Commodity Suppliers would materially impact the Just Energy Group's ability to carry on its business operations. Such disruption would prevent the Just



Energy Group from entering into any further sales contracts with customers as it would be unable to properly backstop and hedge the obligations. The obligations owing to the Commodity Suppliers by the Just Energy Group are secured by security granted by Just Energy and other members of the Just Energy Group.

20. In addition to supply agreements, the Just Energy Group is also party to independent system operator ("**ISO**") services agreements (the "**ISO Agreements**") with certain of its Commodity Suppliers (in such capacity, the "**ISO Suppliers**"). Pursuant to the ISO Agreements, the contracting counterparty (for reasons of administrative efficiency) provides certain scheduling services as well as working capital and credit support to the Just Energy Group by making payments on its behalf to the independent system operator.

*The Just Energy Group's Capital Structure*

**2020 Recapitalization**

21. As detailed in the Carter Affidavit, the Just Energy Group underwent a balance sheet recapitalization in 2020 (the "**Recapitalization**") pursuant to section 192 of the *Canada Business Corporations Act* under the supervision of this Court. The Recapitalization was the culmination of extensive discussions with stakeholders over the span of a year and put the Just Energy Group on a strong financial footing.

**Capital Structure**

22. The Just Energy Group's capital structure is described in detail in the Carter Affidavit. As at December 31, 2020, the aggregate book value of the Just Energy Group's assets was approximately $1.069 billion, and the aggregate book value of its liabilities was approximately $1.28 billion.

23. The Just Energy Group's debt obligations include: (i) secured obligations to its Commodity Suppliers in the approximate amount of $198.96 million as at January 31, 2021 (the "**Trade Debt**"); and (ii) significant non-trade obligations. Below is

a chart setting out the relative priorities of the Justice Energy Groups' debt obligations, which are detailed below.

| Tier | Items | Date | Approximate Amount |
|------|-------|------|--------------------|
| Tier 1 | Secured Suppliers AP | March 31, 2021 | $244 million |
| Tier 2 | Credit Facility Lenders | March 5, 2021 | $331.82 million |
| | Suppliers MTM (Liability Only) | March 1, 2021 | $146.17 million |
| | ISO Service Obligations (Subject to Cap) | March 5, 2021 | $94.5 million |
| Tier 3 | ISO Service Obligations (In Excess of Cap) | March 5, 2021 | $77.66 million |
| Tier 4 | Term Loan (unsecured) | December 31, 2020 | $273.48 million |
| Tier 5 | Subordinated Notes (unsecured) | December 31, 2020 | $13.2 million |

    (a)    <u>Trade Debt</u>

24.    The Proposed Monitor understands that the Commodity Suppliers and the agent for the lenders under the Credit Agreement (as defined below) are party to an intercreditor agreement (the "**Intercreditor Agreement**") that sets out the relative priorities of the parties' security interests. In accordance with the terms of the Intercreditor Agreement, the secured Commodity Suppliers rank *pari passu* with the lenders under the Credit Agreement subject to the following waterfall as set out in the above chart: (i) accounts payable owing to the secured Commodity Suppliers rank first, (ii) the following amounts rank second and *pari passu* amongst themselves: (A) the mark-to-market ("**MTM**") liability to the secured Commodity Suppliers, (B) amounts owing to the lenders under the Credit Agreement, and (C) amounts owing to Commodity Suppliers under the ISO Agreements up to a cap of $94.5 million (the "**Cap**"); and (iii) ranking third, amounts owing to providers under the ISO Agreements above the Cap.

25.    The significant non-trade debt obligations of the Just Energy Group are summarized as follows:



| | **Type** | **Borrower(s)** | **Maturity Date** | **Approximate Outstanding Amount as of December 31, 2020** |
|---|---|---|---|---|
| Secured Credit Facility | Revolving credit facilities available on borrowing base | Just Energy Ontario L.P. and Just Energy (U.S.) Corp. | December 31, 2023 | $232.62 million in principal<br><br>$77.8 million in letters of credit |
| Term Loan | Non-revolving, multi-draw senior unsecured term loan facility | Just Energy Group Inc. | March 31, 2024 | $273.48 million |
| Subordinated Notes | Unsecured subordinated notes | Just Energy Group Inc. | September 27, 2026 | $13.2 million |

(b)    Credit Facility

26.    Just Energy Ontario L.P. and Just Energy (U.S.) Corp. are borrowers under a ninth amended and restated credit agreement (the "**Credit Agreement**") dated as of September 28, 2020 with a syndicate of lenders that includes CIBC, National Bank of Canada, HSBC, JPMorgan, Alberta Treasury Branches, Canadian Western Bank, and Morgan Stanley Senior Funding, Inc., a subsidiary of Morgan Stanley Bank N.A.

27.    The Credit Agreement provides for certain scheduled mandatory commitment reductions over time.

28.    As at March 5, 2021, there was approximately $227.86 million in principal outstanding under the Credit Agreement, plus outstanding letters of credit amounting to approximately $103.96 million.

(c)     <u>Term Loan</u>

29.     Just Energy is a borrower under a $205.9 million unsecured principal note (the "**Term Loan Agreement**") in favour of Sagard Credit Partners, LP and certain funds managed by a leading U.S.-based global fixed income asset manager. The Term Loan matures on March 31, 2024.

30.     Pursuant to the Term Loan Agreement, interest payments are capitalized with payment of principal and accrued interest due on March 31, 2024.

31.     As at December 31, 2020, approximately $273.48 million was outstanding under the Term Loan.

(d)     <u>Subordinated Notes</u>

32.     Just Energy is also a borrower under certain subordinated unsecured notes ("**Subordinated Notes**"). As at October 19, 2020, the Subordinated Notes had a principal amount of $13.2 million outstanding.

**THE TEXAS WEATHER EVENT**

33.     As noted earlier herein, Texas is the Just Energy Group's single largest market. The Texas energy market is subject to regulatory oversight by ERCOT. ERCOT's operations, in turn, are overseen by the Public Utility Commission of Texas ("**PUCT**").

34.     The Proposed Monitor understands that the Just Energy Group's Texas-based operating subsidiaries, in addition to purchasing supply directly from the Commodity Suppliers, purchase energy products (for subsequent resale to customers) in Texas through an ERCOT-operated wholesale electricity market. The Texas subsidiaries are directly liable to ERCOT for such electricity purchases, pursuant to and in accordance with the terms of the ERCOT protocols (the "**Protocols**") and certain governing agreements that implement such Protocols.[3]

---

[3] The Protocols are accessible at the following link: http://www.ercot.com/mktrules/nprotocols/current.



35.    As described in greater detail in the Carter Affidavit, beginning on February 13, 2021, Texas experienced an unprecedented and catastrophic energy crisis when a powerful winter storm impacted the entire state.  Being a warm-weather state, (i) the colder temperatures had the effect of causing demand for electricity to spike as residents sought to heat their homes and businesses,[4] and (ii) certain of the state's electricity generating sources were not sufficiently winterized to withstand the cold temperatures or were unable to secure fuel with which to operate their plants and suffered critical operational shut-downs.

36.    The Proposed Monitor understands that the Just Energy Group diligently hedges against potential weather risks based on historical data. For February 2021, the Just Energy Group had weather hedges in place to cover an incremental 50% increase in customer usage above the normal February consumption, which in any other year would have provided sufficient cushion against extreme weather. However, the extreme Texas weather event meant energy use on February 14, 2021 was 200% higher than the week earlier, substantially above the hedge estimates.

37.    The Texas' electricity grid, by design, is largely separate from neighbouring states, so generating sources that were unable to operate could not be easily substituted by importing electricity from neighbouring markets. The combination of the spike in demand and plummeting supply pushed Texas' electric system to the brink of collapse. The Carter Affidavit details ERCOT and PUCT's hurried response to this event in order to avoid a complete shutdown of the entire grid and the operational and financial repercussions for the entire Texas electric grid that otherwise could have lasted several months.

38.    The effects of ERCOT and PUCT's actions on the Texas wholesale energy market during the Texas weather event are described in detail in the Carter Affidavit. In brief, PUCT adopted an order instructing ERCOT to set wholesale energy prices at the maximum price allowed, being US$9,000 per megawatt hour, for over 100 consecutive hours.  By way of comparison, the real time electricity price did not hit

---

[4] To note, most of Texas uses electric heating.

FTI CONSULTING

US$9,000/MWh for even one 15-minute interval in 2020.  The winter storm and regulators' actions caused wholesale buyers to incur additional costs of approximately US$55 billion during the 7-day period of the winter storm, equivalent to the amount the wholesale market would ordinarily incur over a four-year period.

39.     The Proposed Monitor understands, as set out in the Carter Affidavit, that ERCOT and PUCT's decision to sustain an artificially high wholesale price may have contravened the Protocols and has been challenged by numerous stakeholders. The Proposed Monitor understands that there have been several appeals to PUCT and ERCOT to provide accommodations to energy providers affected by the ERCOT wholesale market price surges, including appeals by the Just Energy Group to suspend ERCOT's usual protocols.  The Proposed Monitor understands that such appeals have not been successful to date.

40.     In the meantime, ERCOT has issued invoices to wholesale energy purchasers, including the Just Energy Group's Texas subsidiaries, for the entire US$55 billion amount in additional costs. The Proposed Monitor understands that the Just Energy Group's portion of such obligation is estimated to be approximately US$250 million. The magnitude of this financial burden has had a ripple effect through a myriad of market participants including retail energy providers, electric cooperatives and municipalities, independent power producers, and natural gas local distribution companies across the state.

41.     The Proposed Monitor understands that the Just Energy Group is disputing the amount of ERCOT's issued invoices. Nevertheless, in accordance with the Protocols, invoices issued by ERCOT must be paid in full within two days, even if the energy provider is actively disputing the invoice.

42.     ERCOT has several remedies available to it when an energy provider fails to pay in full the amount of any invoice within two days of it being issued. Principal among such remedies is ERCOT's ability to revoke all of the right of such energy provider to operate in the Texas market and to mass-transition all of such energy

provider's Texas customers to another energy provider of last resort  (a "**POLR**") on five days' notice to the energy provider (the mass-transition being, the "**POLR Process**").

43.    The Proposed Monitor understands that the Just Energy Group does not have sufficient liquidity to cover its remaining unpaid obligation to ERCOT of approximately US$123.21 million, of which approximately US$96.24 million is required to be paid by the end of day on March 9, 2021.  Additionally, on March 8, 2021, the Just Energy Group received from ERCOT (i) a notice that it must post approximately US$25.7 million of additional collateral within two business days; and (ii) invoices totalling approximately US$25.46 million, of which approximately US$18.86 million is due by March 10, 2021.

44.    The Proposed Monitor understands that the Just Energy Group is unable, as a legal and practical matter, to charge and collect this unprecedented amount from its Texas customers given the fixed-rate customer billing arrangements with most of its customers.

45.    As at the date of this Report, and as described in the Carter Affidavit, the Proposed Monitor understands that one large Texas-based energy provider, Brazos Electric Power Cooperative, Inc., has already filed for relief under chapter 11 of title 11 of the United States Code, after incurring an estimated US$2.1 billion in charges over seven days during the Texas weather event.

46.    The Proposed Monitor also understands that ERCOT (i) revoked all of the rights of two other energy providers, Griddy Energy LLC and Entrust Energy Inc., to operate in the Texas energy market after they failed to pay to ERCOT their portion of the additional US$55 billion liability; and (ii) implemented the POLR Process in respect of both such energy providers. Without the protection afforded by the proposed Initial Order being sought by the Just Energy Group, the Just Energy Group could face similar consequences. If granted, Just Energy intends to initiate a case under Chapter 15 of Title 11 of the United States Code seeking to recognize and enforce the proposed Initial Order in the U.S.

## GOING CONCERN DOUBTS AS A RESULT OF THE TEXAS WEATHER EVENT

47.     As noted above, the Just Energy Group may be liable to ERCOT for an estimated US$250 million. The Just Energy Group is disputing amounts that are owing to ERCOT. Nevertheless, if payment in full is not made to ERCOT within two days of invoices being issued, ERCOT may decide to implement a POLR Process that, the Proposed Monitor understands, would cause nearly half of the Just Energy Group's Embedded Gross Margin to dissipate and would pose significant risk to the Just Energy Group's ability to maintain going concern operations.

48.     The Proposed Monitor understands that the Just Energy Group does not have sufficient liquidity to cover the amount of its estimated obligations, including the full amount of the estimated liability to ERCOT. The Just Energy Group is forecast to have negative liquidity as of March 9, 2021 primarily due to one of the aforementioned payments due to ERCOT on that date of approximately $121.2 million.

49.     In addition, on March 22, 2021, approximately $270 million will become owing to counterparties under the ISO Agreements. This amount has increased significantly from normal levels, which is a direct result of the Texas weather event.

50.     The Proposed Monitor further understands that an event of insolvency constitutes an event of default under the Just Energy Group's licences with various Canadian and U.S. regulators, as detailed in the Carter Affidavit, which causes serious concerns about the Just Energy Group's ability to continue to operate in key markets outside of Texas.

51.     Likewise, upon an insolvency event, there are other material concerns about the continued supply of energy commodities from the Commodity Suppliers and immediate demands for additional collateral from the Bonding Agencies (in addition to the collateral that has already been demanded by the Bonding Companies, as noted earlier in this report).  The Proposed Monitor understands that any one of these events (i.e. the loss of continuing supply or a request for additional



collateral that cannot be satisfied) could trigger cascading materially adverse results for the Just Energy Group by virtue of cross-default provisions under a number of governing agreements.

**FTI'S QUALIFICATIONS TO ACT AS MONITOR**

52.     Paul Bishop, who will lead the FTI team and have primary carriage of this matter, is a trustee within the meaning of subsection 2(1) of the *Bankruptcy and Insolvency Act* (Canada).

53.     Since becoming engaged by the Just Energy Group, FTI has acquired knowledge of the business and operations of the Just Energy Group, including its personnel, stakeholders and the key issues in the proposed CCAA Proceedings. As a result, FTI is in a position to immediately act as Monitor in the CCAA Proceedings if appointed by this Court.

54.     In September 2020, FTI was engaged by the Applicant, Just Energy Inc., to assist in assessing the quantification of potential damages relating to certain securities class actions against the company.  This work is ongoing, and an ethical wall has been put in place between the FTI members assisting with the preparation of the these CCAA Proceedings and those members assisting Just Energy Inc. with the claim quantification engagement.

55.     Neither FTI, nor any of its representatives, has been, at any time in the two preceding years:

(a)     a director, officer or employee of the Just Energy Group;

(b)     related to the Just Energy Group or to any director or officer of the Just Energy Group; or

(c)     the auditor, accountant or legal counsel, or a partner or an employee of the auditor, accountant or legal counsel, of the Just Energy Group.

*Engagement of FTI and the Preparation of this Pre-Filing Report*

56.    FTI was initially engaged by the Applicants in July 2020 to assist in preparing for a potential filing under the CCAA, on a contingency basis, as they sought, successfully, to conclude the Recapitalization under the CBCA.

57.    Pursuant to an engagement letter dated February 26, 2021, FTI was engaged to assist the Just Energy Group with a review of its financial position, business plan, financial projections and liquidity requirements and, if required, to assist the Just Energy Group in preparation for a filing under each of the Canadian and U.S. insolvency regimes. For the purpose of this mandate, FTI has, among other things:

    (a)    participated in numerous meetings and discussions with the Just Energy Group's senior management and legal advisors in connection with the Just Energy Group's business and financial affairs generally and in connection with the preparation of the Cash Flow Forecast (as defined herein);

    (b)    participated in numerous meetings and discussions with the Just Energy Group and its counsel in connection with the requested relief in these CCAA Proceedings;

    (c)    engaged legal counsel in Canada and the U.S, who have also participated in certain of the aforementioned meetings;

    (d)    obtained and reviewed financial and other information produced by the Just Energy Group relating to its operations, cash flow forecasts and current financial situation;

    (e)    assisted the Just Energy Group in the preparation of its cashflow forecasts;

    (f)    assisted the Just Energy Group in assessing the quantum of potential claims against its directors and officers; and

    (g)    prepared this Pre-Filing Report.

58.    Although this Pre-Filing Report has been prepared in anticipation of FTI's appointment as Monitor of the Just Energy Group, it has been prepared with the



same duty, care and level of diligence that FTI would have utilized had it already been appointed as Monitor.

59.     In preparing this Pre-Filing Report, the Proposed Monitor has relied upon unaudited financial information of the Just Energy Group, the books and records of the Just Energy Group, certain financial information prepared by the Just Energy Group and discussions with the Just Energy Group's management. Other than as described in this section of the Pre-Filing Report, the Proposed Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information. Accordingly, the Proposed Monitor expresses no opinion or other form of assurance on the information contained in Pre-Filing Report or relied on in its preparation. Future oriented financial information reported or relied on in preparing this Pre-Filing Report is based on the Just Energy Group's management's assumptions regarding future events; actual results may vary from the forecast and such variations may be material.

## THE JUST ENERGY GROUP'S CASH MANAGEMENT SYSTEM

60.     The Just Energy Group maintains a centralized cash management system in Canada and the United States to consolidate and track funds generated by the operations of the Just Energy Group, as described more fully in the Carter Affidavit.

61.     The Proposed Monitor has reviewed the Just Energy Group's cash management arrangements and confirms the importance of these systems for the continuation of the Just Energy Group's business and operations.   Replacement of the cash management systems would be costly, unviable from a short-term operational perspective, and excessively time consuming. Accordingly, the Proposed Monitor supports the Just Energy Group's request to continue to operate its existing cash management systems throughout these CCAA Proceedings and supports the Just Energy Group's request to temporarily restrict the right of set-off by the lenders in order to ensure that the cash management system continues to function properly.

FTI CONSULTING

**CASH FLOW FORECAST**

62.     The Just Energy Group, with the assistance of the Proposed Monitor, has prepared
(i) a consolidated 13-week cash-flow forecast of its receipts and disbursements (the
"**Weekly Forecast**"), and (ii) a daily cash flow forecast for the 13-day period
following the filing of these CCAA Proceedings ending March 21, 2021 (the "**Daily
Forecast**", and together with the Weekly Forecast, the "**Cash Flow Forecast**").
The Cash Flow Forecast and the management's report on the cash-flow statement
as required by section 10(2)(b) of the CCAA are attached hereto as **Appendix "A"**.
The Weekly Forecast and Daily Forecast are summarized as follows:

| (CAD$ in millions) | 13-Day period ending March 21, 2021 | 13-Week period ending June 6, 2021 |
|---|---|---|
| Forecast Week | Total | Total |
| **RECEIPTS** | | |
| Sales Receipts | $77.1 | $608.5 |
| Miscellaneous Receipts | - | 8.0 |
| *Total Receipts* | $77.1 | $616.5 |
| **DISBURSEMENTS** | | |
| *Operating Disbursements* | | |
| Energy and Delivery Costs | ($224.6) | ($574.1) |
| Payroll | - | (22.3) |
| Taxes | (5.4) | (36.6) |
| Commissions | (6.3) | (27.8) |
| Selling and Other Costs | (6.6) | (48.4) |
| *Total Operating Disbursements* | ($242.8) | ($709.1) |
| **OPERATING CASH FLOWS** | ($165.7) | ($92.6) |
| *Financing Disbursements* | | |
| Credit Facility - Borrowings / (Repayments) | $126.0 | $157.5 |
| Interest Expense & Fees | (3.2) | (7.2) |
| *Restructuring Disbursements* | | |
| Professional Fees | (1.4) | (14.4) |
| **NET CASH FLOWS** | **($44.3)** | **$43.3** |
| **CASH** | | |
| Beginning Balance | $77.3 | $77.3 |
| Net Cash Inflows / (Outflows) | (44.3) | 43.3 |
| Other (FX) | - | - |
| **ENDING CASH** | **$33.0** | **$120.7** |

FTI CONSULTING

63.    The Just Energy Group's Daily Forecast indicates that during the 13-day period ending March 21, 2021, the Just Energy Group will have net cash outflows from operating activities of approximately $165.7 million with total receipts of approximately $77.1 million and total disbursements of approximately $242.8 million, before borrowings of approximately $126.0 million and professional fees of approximately $1.4 million such that the net cash outflows are forecast to be approximately $44.3 million.

64.    The Just Energy Group's Weekly Forecast indicates that, during the 13-week cash flow period ending June 6, 2021, the Just Energy Group will have net cash outflows from operating activities of approximately $92.6 million with total receipts of approximately $616.5 million and total disbursements of approximately $709.1 million, before borrowings of approximately $157.5 million and professional fees of approximately $14.4 million such that the net cash flows are forecast to be approximately $43.3 million.

65.    The Cash Flow Forecast incorporates the following key assumptions:

(a)    Payment to ERCOT of approximately $151.3 million with respect to the Texas weather event due during the week ending March 14, 2021;

(b)    Payment of certain pre-filing amounts outstanding, pending Monitor consent, including with respect to commodity delivery-related services;

(c)    Payment of pre-filing amounts outstanding, owing to or in respect of workers providing sales and sales support for the Just Energy Group;

(d)    An initial drawdown on the DIP Facility of approximately $126 million on March 9, 2021 to satisfy the liquidity requirements of the Just Energy Group through to the comeback hearing; and

(e)    Cash receipts of the Just Energy Group contemplates the ongoing collection of receivables from its customers.

F T I
CONSULTING

- 20 -

66.     Section 23(1)(b) of the CCAA states that the Proposed Monitor shall, "review the company's cash-flow statement as to its reasonableness and file a report with the court on the Proposed Monitor's findings".

67.     Pursuant to section 23(1)(b) of the CCAA and in accordance with the Canadian Association of Insolvency and Restructuring Professionals Standard of Practice 09-1, the Proposed Monitor hereby reports as follows:

(a)     the Cash Flow Forecast has been prepared by management of the Just Energy Group for the purpose described in notes to the Cash Flow Forecast, using the probable and hypothetical assumptions set out therein;

(b)     the Proposed Monitor's review consisted of inquiries, analytical procedures and discussion related to information supplied by certain of the management and employees of the Just Energy Group. Since hypothetical assumptions need not be supported, the Proposed Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purposes of the Forecast. The Proposed Monitor has also reviewed the support provided by management of the Just Energy Group for the probable assumptions, and the preparation and presentation of the Cash Flow Forecast;

(c)     based on its review, and as at the date of this Pre-Filing Report, nothing has come to the attention of the Proposed Monitor that causes it to believe that, in all material respects:

(i)     the hypothetical assumptions are not consistent with the purposes of the Cash Flow Forecast;

(ii)     the probable assumptions developed by management are not suitably supported and consistent with the plans of the Just Energy Group or do not provide a reasonable basis for the Cash Flow Forecast, given the hypothetical assumptions; or

(iii)     the Cash Flow Forecast does not reflect the probable and hypothetical assumptions;



(d)     Since the Cash Flow Forecast is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, the Proposed Monitor expresses no assurance as to whether the Cash Flow Forecast will be achieved. The Proposed Monitor expresses no opinion or other form of assurance with respect to the accuracy of any financial information presented in this Pre-Filing Report, or relied upon by the Proposed Monitor in preparing this Pre-Filing Report; and

(e)     The Cash Flow Forecast has been prepared solely for the purpose of estimating the liquidity requirements of the Just Energy Group during the forecast period. The Cash Flow Forecast should not be relied upon for any other purpose.

## RELIEF SOUGHT IN INITIAL ORDER

*Extending the CCAA protections to the Just Energy LPs*

68.     The Initial Order provides that the Just Energy LPs be granted all of the same protections and authorizations provided to the Applicants under the Initial Order, notwithstanding that the Just Energy LPs are not "companies" within the meaning of the CCAA.

69.     The Proposed Monitor understands that the Just Energy LPs hold many of the permits, licenses and other regulatory permissions that permit the Just Energy Group to conduct business operations in particular jurisdictions.  The Proposed Monitor further understands that the business and operations of the Applicants and the Just Energy LPs are heavily intertwined, including on a day-to-day basis.

70.     If such entities are not granted protection under the proposed Initial Order, including in respect of any enforcement proceedings by regulators (as described below), the regulators may proceed to cancel such permits, licences or other regulatory permissions as a result of the filing of these CCAA Proceedings, which the Proposed Monitor understands would be within their rights. The effect of any

FTI CONSULTING

such regulator actions would have material adverse effects for the Just Energy Group, including the loss of customers or an inability to operate in a particular market.

71.    For the above reasons and to ensure the stability of the Just Energy Group's operations during these CCAA Proceedings, the Proposed Monitor is of the view that the protections and other authorizations permitted to the Applicants under the Initial Order should be extended to the Just Energy LPs.

_Implementing the Stay of Proceedings, including in respect of Regulators_

72.    The Just Energy Group is seeking the Stay of Proceedings up to and including March 19, 2021 in respect of the Just Energy Group.

73.    The Just Energy Group requires the Stay of Proceedings and other protections provided by the CCAA given that the Just Energy Group is insolvent. The Stay of Proceedings is needed to maintain the _status quo_ and provide time for the Just Energy Group to consider its strategic alternatives.

74.    The proposed Initial Order provides that, notwithstanding section 11.1 of the CCAA, the Stay of Proceedings should apply to provincial energy regulators and provincial regulators of consumer sales that have authority with respect to energy sales (collectively, the "**Provincial Regulators**"), except with the written consent of the Just Energy Group and the Proposed Monitor, or leave of the Court.

75.    As described in the Carter Affidavit, the Just Energy Group believes that an insolvency event or the filing of these CCAA Proceedings may cause the Provincial Regulators and U.S. Regulators (together, the "**Regulators**") to enforce certain of their rights and remedies, notwithstanding that the proposed interim financing will allow the Just Energy Group to pay the Regulators everything as and when due in the ordinary course of business.  Any such enforcement would have material adverse effects for the Just Energy Group. This includes requiring additional collateral to be posted, revoking Just Energy Group's rights to operate in a particular market, or transitioning the Just Energy Group's customers in that

particular market to a competitor. Any such actions by any one Regulator could severely harm existing operations. If such actions are implemented by a group of Regulators however, or by a Regulator in respect of a particularly important market for the Just Energy Group's business, this could impair the Just Energy Group's viability to continue as a going concern.

76.    Given the unique circumstances facing the Just Energy Group and the severe repercussions that could result if a Stay of Proceedings is not extended to the Regulators, the Proposed Monitor is of the view that the Regulators should be temporarily stayed from exercising their rights and remedies in accordance with the Initial Order, provided they are paid amounts owing to them in the ordinary course as planned, to provide the Just Energy Group with a stable environment in which it can seek to restructure. If necessary, this matter can be revisited at the subsequent comeback hearing.

*Proposed debtor-in-possession financing*

77.    The Applicants are seeking approval of a term sheet (the "**DIP Agreement**") between Just Energy L.P., Just Energy Group Inc. and Just Energy (U.S.) Corp. (collectively, the "**Borrowers**") and Alter Domus (US) LLC, as administrative agent for the lenders (the "**DIP Lenders**"), pursuant to which the DIP Lenders will make a debtor-in-possession facility (the "**DIP Facility**") available to the Borrowers, subject to the terms and conditions set out in the DIP Agreement, in the maximum principal amount of US$125 million.  The obligations owing to the DIP Lenders under the DIP Facility will be guaranteed by each of the remaining Applicants (the "**Guarantors**").  The Proposed Monitor cautions that, at the current time, the DIP Agreement is still under negotiation and has not been finalized.

78.    Terms not otherwise defined in this section have the meanings ascribed to them in the DIP Agreement, a copy of which will be appended as an exhibit to the Carter Affidavit.

79.    The Proposed Monitor understands that the salient terms of the DIP Agreement are as follows:



(a) **DIP Charge**: The DIP Charge (as defined below) shall have been granted in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise, subject to the Permitted Priority Liens;

(b) **Term**: The DIP Facility shall be available until the earlier of (i) December 31, 2021; (ii) the CCAA Plan Implementation Date; (iii) the expiry of the stay of proceedings; (iv) the termination of the CCAA proceedings; or (v) the acceleration of the DIP Facility in accordance with the terms of the DIP Agreement upon the occurrence and during the continuation of an Event of Default;

(c) **Interest**: Interest accrued on the principal amounts outstanding under the DIP Facility at a rate equal to 13% per annum (which will automatically increase by an additional 2% per annum upon the occurrence of any Event of Default);

(d) **Additional Fees**: A commitment fee in an amount equal to 1% of the Maximum Amount, along with an origination fee in an amount equal to 1% of the Maximum Amount, shall each be fully earned and payable in cash on the Closing Date;

(e) **Use of proceeds**: The Borrowers shall use the DIP Facility solely for the purposes set out in the DIP Agreement, in each case in accordance with the CCAA Orders and Cash Flow Statements, subject to the Permitted Variance, which includes funding the general corporate and working capital requirements of the Borrowers and Guarantors. Once every four weeks, the Borrowers are required to deliver a new rolling 13-week cash flow forecast to the DIP Lenders, which shall be subject to the approval of the DIP Lenders;

(f) **Initial Draw:** The Borrowers are required to make an initial draw under the DIP Facility in the minimum aggregate amount of US$100 million. This amount will enable them to pay specified amounts that are known to be due

during the first 10 days of the CCAA proceedings, which are detailed in the Cash Flow Forecast; and

(g)   **Events of Default**:   The DIP Agreement sets Events of Default, which include, among other things, failure to abide by specified milestones in the Loan Parties' CCAA proceedings.

80.   The Just Energy Group requires such interim financing to provide stability, continue going concern operations and to restructure its business.  The Applicants initially solicited interim financing terms from its five largest stakeholders, which ultimately culminated in the Just Energy Group entering into the DIP Agreement with the DIP Lenders.

*Engagement of Financial Advisor*

81.   The Just Energy Group has engaged BMO as its Financial Advisor pursuant to an engagement letter dated February 20, 2021 (the "**Financial Advisor Engagement Letter**") which will be attached as a confidential exhibit to the Carter Affidavit. The Financial Advisor's mandate is to assist the Just Energy Group with assessing its liquidity and capital needs and reviewing potential strategic opportunities and transactions.

82.   The proposed Initial Order provides that the FA Charge (as defined and described below) shall secure the Financial Advisor's post-filing fees, including any success fees in connection with finalizing a DIP loan transaction and the successful closing of a strategic transaction in accordance with the terms of the Financial Advisor Engagement Letter.

83.   The Proposed Monitor has discussed with the Financial Advisor the scope, allocation and complexity of the work already undertaken by it, as well as the work remaining to be completed. The Proposed Monitor understands that the Financial Advisor does not foresee the need for any out of scope work and that post-filing fees are not duplicated for services already rendered.

84.   Given the scope, nature and complexity of the Financial Advisor's role and fees charged by financial advisors in similar circumstances, the Proposed Monitor is of the view that the fees charged by the Financial Advisor are reasonable in the circumstances.

85.   The Proposed Monitor supports the approval of the (i) Financial Advisor Engagement Letter, and (ii) permitting the FA Charge to secure the Financial Advisor's post-filing fees (including its work fee and success fees), subject to review by the Proposed Monitor of any invoices and the services provided by the Financial Advisor. The FA Charge is proposed to rank *pari passu* with the Administration Charge and have first priority over all other charges.

*Permitting certain repayments under the Credit Agreement*

86.   The proposed Initial Order provides that the Just Energy Group be permitted to repay advances under the Credit Agreement for the purpose of creating availability under the LC Facility (as defined in the Credit Agreement) (an "**Advance Repayment**"), and that the Just Energy Group may utilize such availability to allow letters of credit to be issued under the Credit Agreement in order to maintain ordinary business operations. The proposed Initial Order provides that the foregoing shall be subject (i) to the consent of the Proposed Monitor with respect to any letter of credit issuance, and (ii) written confirmation from the applicable lender under the Credit Agreement that they shall issue a letter of credit of equal value to an Advance Repayment.

87.   Subject to the Proposed Monitor's review and prior consent with respect to any Advance Repayment and letter of credit to be issued and the respective confirmations from lenders, the Proposed Monitor is of the view that it is reasonable and appropriate for the Just Energy Group to be permitted to make Advance Repayments and obtain letters of credit in order to sustain its business operations.

*Permitting certain pre-filing payments to third parties*

88.     Pursuant to paragraph 7(d) of the proposed Initial Order, the Just Energy Group is entitled, but not required, to pay certain pre-filing amounts to third parties for goods or services provided to the Just Energy Group prior to these CCAA Proceedings with the consent of the Proposed Monitor and provided that such third parties are critical to the business operations of the Just Energy Group.

89.     In accordance with the above, the Proposed Monitor intends to review on a case-by-case basis any pre-filing payments and will only approve such payments to be made if it decides that payment of such amounts is critical to the Just Energy Group's operations. The Proposed Monitor is of the view that these conditions are sufficient in the circumstances to permit the Just Energy Group to make pre-filing payments that satisfy these conditions.

*Certain other relief for Commodity Suppliers*

90.     The proposed Initial Order provides that any counterparty to a Commodity Agreement[5] or ISO Agreement[6] that has executed or executes a Qualified Support Agreement (as defined in the proposed Initial Order) with an entity in the Just Energy Group and refrained from exercising termination rights under the Commodity Agreement as a result of the commencement of the Proceedings (as defined in the proposed Initial Order) absent an event of default under such Qualified Support Agreement (each, a "**Qualified Commodity/ISO Supplier**"), shall be entitled to a charge that secures the Just Energy Group's obligations to the Qualified Commodity/ISO Supplier.

---

[5] As defined in the Initial Order: a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas or electricity.

[6] As defined in the Initial Order: an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

91.  Specifically, each Qualified Commodity/ISO Supplier shall be entitled to the benefit of a charge (the "**Priority Commodity/ISO Charge**") on the Property in an amount equal to the value of the amounts that are due and payable, at the applicable time, for: (i)(A) the physical supply of electricity or gas that has been delivered on or after March 9, 2021; (B) financial settlements on or after March 9, 2021; and (C) amounts owing under a confirmation or transaction that was executed on or after March 9, 2021 pursuant to a Commodity Agreement as a result of the termination thereof in accordance with the applicable Qualified Support Agreement; and (ii) for services actually delivered by a Qualified Commodity/ISO Supplier on or after March 9, 2021 pursuant to an ISO Agreement (but for greater certainty, excluding any amount owing for ISO services provided under the ISO Agreement on or before the date of the Initial Order, whether or not yet due).

92.  The proposed Initial Order does not specify a limit for the Priority Commodity/ISO Charge. Instead, such charge shall secure the actual quantum of supplies provided by the Qualified Commodity/ISO Suppliers that it is intended to secure.  The proposed Initial Order further provides that if a Qualified Commodity/ISO Supplier ceases to be a Qualified Commodity/ISO Supplier, it shall no longer benefit from such charge.

93.  The proposed Initial Order also provides that those Qualified Support Agreements that may be entered into among the Qualified Commodity/ISO Suppliers and the Just Energy Group confirming the terms for the continued supply by the Qualified Commodity/ISO Suppliers are to be approved. The Proposed Monitor understands that certain Qualified Support Agreements are under negotiation but have not yet been finalized.

94.  Pursuant to the proposed Initial Order, the Proposed Monitor, if appointed, will post a report on its website, on a monthly basis, setting out the total value of obligations to the Qualified Commodity/ISO Suppliers, thereby allowing any stakeholder concerned about the size of the secured obligation to seek an appropriate remedy at that time.

95.    As the Proposed Monitor has indicated herein, the Just Energy Group relies on a small group of Commodity Suppliers and ISO Suppliers to provide critical services, including the supply of electricity that the Just Energy Group resells to customers. If any such supply or services are stopped, delayed or otherwise impaired, the Proposed Monitor believes that such actions will have a material adverse effect on the operations of the Just Energy Group.

96.    Further, certain of the Commodity Agreements or ISO Agreements may be eligible financial contracts that would be subject to termination, which is why the Just Energy Group is requesting this particular relief in order to encourage the counterparties under such contracts to continue to do business with it.

97.    In agreeing to continue to supply commodities and provide services under the Commodity Agreements and ISO Agreements, the counterparties are providing new value to the Applicants that will allow them to continue operating in the ordinary course of business after the date of the Initial Order.  In order to protect that continued supply of goods and services, the Priority Commodity/ISO Charge secures the payment for such post-filing provision of goods and services.

98.    As outlined above, there is an Intercreditor Agreement that governs the priority for payments made by the Applicants to certain counterparties and lenders.  We understand that various parties may wish to seek to have the court determine the application of such Intercreditor Agreement to payments and priorities as part of these proceedings.  While the Intercreditor Agreement may be relevant with respect to certain pre-filing obligations of the Applicants, given that the Commodity Agreement and ISO Agreement counterparties could terminate their existing arrangements (requiring the Applicants to attempt to find replacement suppliers which may not be practically possible), the Proposed Monitor views the continued supply and provision of services as fresh, post-filing consideration.

99.    As such, the Proposed Monitor is of the view that, at least until any potential dispute on the point is properly presented for a determination by this Court:

- 30 -

(a)     post-filing supply of goods and services pursuant to the Commodity Agreements and ISO Agreements should be governed only by the Initial Order and should be treated as separate and apart from the certain pre-filing amounts governed by the Intercreditor Agreement; and

(b)     entitlement to the consideration for such newly supplied goods and services under the Commodity Agreements and ISO Agreements should be for the exclusive benefit of the actual counterparty delivering such post-filing goods and services and governed by the Priority Commodity/ISO Charge.

100.   For the foregoing reasons, the Proposed Monitor is of the view that the Qualified Support Agreements consistent with the terms hereof should be approved and the Priority Commodity/ISO Charge be granted.

*Court-ordered charges sought in the proposed Initial Order*

**(i) Administration Charge**

101.   The Initial Order provides for a charge in the amount of up to $2.2 million (the "**Administration Charge**"), covering the period until the comeback hearing, in favour of the Proposed Monitor, the Proposed Monitor's Canadian and U.S. counsel, and the Just Energy Group's Canadian and U.S. counsel as security for their professional fees and disbursements incurred both before and after the making of the Initial Order in respect of these CCAA Proceedings.

102.   The Administration Charge currently only secures the fees expected to be incurred by the foregoing professionals prior to and during the initial 10-day stay period prior to the comeback hearing. The quantum of the Administration Charge has been established based on the various professionals' previous history and experience with cross-border restructurings of similar scope and complexity. The Proposed Monitor believes that such a charge is required and reasonable in the circumstances. The Proposed Monitor will comment on the proposed amendment to increase the amount of the Administration Charge at the comeback hearing as part of a further report to this Court.

FTI CONSULTING

**(ii) FA Charge**

103.    The Initial Order provides for a charge in the amount of up to $1.8 million (the "**FA Charge**"), covering the period until the comeback hearing, in favour of the Financial Advisor as security for (i) its professional fees and disbursements incurred both before and after the making of the Initial Order in respect of these CCAA Proceedings, and (ii) any success fees earned by the Financial Advisor in accordance with the terms of the Financial Advisor Engagement Letter. The FA Charge is intended to have an equal ranking to the Administration Charge.

104.    The FA Charge currently only secures the fees earned prior to and during the initial 10-day stay period prior to the comeback hearing. The Proposed Monitor will comment on the proposed amendment to increase the amount of the FA Charge at the comeback hearing as part of a further report to this Court.

105.    Given the Financial Advisor's critical role in these restructuring proceedings and in exploring strategic transaction opportunities, the Proposed Monitor is of the view that such a charge is reasonable in the circumstances.

**(iii) Directors' Charge**

106.    The Proposed Monitor understands that the Just Energy Group's present and former directors and officers are among the potential beneficiaries under liability insurance policies (the "**D&O Insurance**") that cover an aggregate annual limit of approximately $38.5 million. The Proposed Monitor understands that there may not be sufficient coverage under the D&O Insurance, given various exceptions and exclusions thereunder and as result of claims having been made thereunder.

107.    The Just Energy Group is seeking the Directors' Charge in the amount of $30 million with priority over all encumbrances on the Just Energy Group's property other than the Administration Charge and the FA Charge.  The Proposed Monitor was involved in determining the quantum of the Directors' Charge.

108.    The proposed Directors' Charge represents the amount applicable during the initial 10-day stay period prior to the comeback hearing. The Proposed Monitor will comment on the proposed amendment to increase the amount of the Directors' Charge at the comeback hearing as part of a further report to this Court.

109.    The Proposed Monitor is of the view that the amount of the Directors' Charge is reasonable in relation to the quantum of the estimated potential liability of the Just Energy Group's directors and officers, which includes significant potential director and officer liabilities under U.S. laws, including (i) approximately $10.2 million potential liability under U.S. laws in respect of sales taxes, and (ii) approximately $2.9 million potential liability under U.S. laws in respect of wages, source deductions and accrued vacation. The Just Energy Group's directors and officers are only entitled to the benefit of the Directors' Charge to the extent that coverage under the D&O Insurance is insufficient.

110.    The Just Energy Group's directors have the necessary background and knowledge, particularly with respect to the complex regulatory environment in which the Just Energy Group operates, to steer it through these CCAA Proceedings.  The Proposed Monitor also understands that the Just Energy Group's directors have insisted on the protection of the Directors' Charge in order to remain on the board during the course of the CCAA Proceedings.  For the foregoing reasons, the Proposed Monitor is of the view that the Directors' Charge is necessary to ensure that the directors stay with the Just Energy Group and assist it through these CCAA Proceedings.

### (iv) DIP Charge

111.    The Applicants are seeking an Order granting the DIP Lender a charge (the "**DIP Charge**") over all of the present and future assets, property and undertaking of the Applicants, in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise, subject to the Administration Charge, FA Charge, Directors' Charge, KERP Charge, and shall rank *pari passu* with the Priority Commodity/ISO Charge.  The DIP Charge will secure all Obligations owing to the DIP Lenders under the DIP Facility.

112.   The Monitor is of the view that the DIP Facility represents the necessary financing which allows the Just Energy Group to pay certain critical payables, including to ERCOT to prevent the application of ERCOT's POLR rights, and maintain the Just Energy Groups' ongoing operations.  The requested DIP Charge does not secure any advances made to the Applicants prior to the commencement of the CCAA proceedings.

113.   The Monitor recommends that the Court approve the DIP Agreement, DIP Facility and accordingly, also supports the granting of the DIP Charge.

### (v) KERP Charge and Employee Bonus

114.   The Just Energy Group will be seeking a key employee retention plan charge (the "**KERP Charge**") as part of an amended and restated initial order to be requested at the subsequent comeback hearing.  The Proposed Monitor intends to review and comment on the KERP Charge as part of a further report to the Court.

115.   The Just Energy Group will also be seeking the authority to pay certain employee bonuses in the amount of approximately $3.2 million on April 2, 2021 (the "**Employee Bonus**"). The Proposed Monitor intends to review and comment on the Employee Bonus as part of a further report to the Court.

### (vi) Priority Commodity/ISO Suppliers Charge

116.   As noted above, the proposed Initial Order provides for a Priority Commodity/ISO Charge in favour of Qualified Commodity/ISO Suppliers, which is intended to ensure the continuing supply of critical goods and services to the Just Energy Group. Such charge does not have a set limit. Instead, it secures the actual amounts of the obligations to the Qualified Commodity/ISO Suppliers as described earlier herein, and in strict accordance with the terms of the Initial Order.

117.   Just Energy's ongoing relationship with its Commodity Suppliers and ISO Suppliers is critical to these CCAA Proceedings and the long-term viability of Just

Energy Group's operations. For this reason, the Proposed Monitor is of the view that the Priority Commodity/ISO Charge is necessary and should be granted.

**Summary of the Proposed Rankings of the Court-Ordered Charges**

118.   If the proposed Initial Order is granted, the proposed Court-ordered charges would have the following ranking:

(a)   First  – the Administration Charge in the amount of $2.2 million and the FA Charge in the amount of $1.8 million on a *pari passu* basis;

(b)   Second – the Directors' Charge in the amount of $30 million; and

(c)   Third – the DIP Charge in in the amount of funds actually advanced under the DIP Facility and the Priority Commodity/ISO Charge on a *pari passu* basis.

119.   The Proposed Monitor believes that the proposed Court-ordered charges and rankings are required and reasonable in the circumstances of these CCAA Proceedings in order to preserve the going concern operations of the Just Energy Group and maintain its enterprise value, and accordingly, supports the granting of and the proposed ranking of the charges.

## CHAPTER 15 PROCEEDINGS

120.   The Just Energy Group seeks authorization under the proposed Initial Order to apply for foreign recognition and approval of these CCAA proceedings in foreign jurisdictions, including the United States pursuant to the chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**").  The Initial Order provides that the Applicant, Just Energy Group Inc., is authorized to act as the foreign representative for the purpose of the Chapter 15 Proceedings.

121.   The Proposed Monitor agrees that recognition of the proposed Initial Order in the United States, including the Stay of Proceedings, is necessary to preserve the going concern value of the Just Energy Group's business and further agrees that the Chapter 15 proceedings should be commenced immediately. The Proposed Monitor



has reviewed the circumstances, including facts set out in the Carter Affidavit, and agrees that Canada is the centre of main interest for the Just Energy Group.

**CONCLUSION**

122.   The Proposed Monitor is of the view that the relief requested by the Just Energy Group pursuant to the proposed Initial Order is necessary, reasonable and justified, particularly in the context of the unprecedent challenges that have resulted from the Texas weather event. The Proposed Monitor is also of the view that granting the relief requested will provide the Just Energy Group the best opportunity to preserve value and maximize recoveries for its stakeholders.

123.   The Proposed Monitor believes that the requested relief is justified by the exceptional circumstances confronting the Just Energy Group and is of the view that the Just Energy Group faces significant risks to its going concern operations if the requested relief is not granted.

124.   Accordingly, the Proposed Monitor respectfully recommends that the Just Energy Group's request for the proposed Initial Order be granted.

The Proposed Monitor respectfully submits to the Court this Pre-Filing Report dated this 9th day of March, 2021.

**FTI Consulting Canada Inc.,** in its capacity as proposed Monitor of Just Energy Group Inc. et al. and not in its personal or corporate capacity



_____

Per: Paul Bishop
        Senior Managing Director

## Schedule "A"

**Commodity Agreement**" means a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas or electricity.

**"Embedded gross margin**" is a standard industry term that means the gross margin expected to be realized over the next five years from existing customers.

"**ERCOT**" means the Electric Reliability Council of Texas, an ISO.

"**FERC**" means the U.S. Federal Energy Regulatory Commission.

"**ISO**" means an independent system operator; an independent, regulated entity established to coordinate regional transmission and ensure the safety and reliability of the electric system.

"**ISO Servicing Agreement**" means an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

"**LDC**" means a local distribution company; the natural gas or electricity distributor for a regulatory or governmentally defined geographic area.

"**POLR**" means a provider of last resort, an energy retailer that has been selected by ERCOT to take over customers from another energy retailer that has been removed from the Texas electricity market by ERCOT.

"**Protocols**" means the ERCOT rules for market participants in the Texas energy market.

"**PUCT**" means the Public Utility Commission of Texas, a public body that oversees the ERCOT and otherwise manages the Texas utilities system.

"**RCE**" means residential customer equivalent, which is a unit of measurement equivalent to a customer using 2,815 m3 (or 106 GJs or 1,000 Therms or 1,025 CCFs) of natural gas on an annual basis or 10 MWh (or 10,000 kWh) of electricity on an annual basis, which represents the approximate amount of gas and electricity, respectively, used by a typical household in Ontario, Canada



**Schedule "B"**
**Just Energy LPs**

- Just Energy Ontario L.P.
- Just Energy Manitoba L.P.
- Just Energy (B.C.) Limited Partnership
- Just Energy Québec L.P.
- Just Energy Trading L.P.
- Just Energy Alberta L.P.
- Just Green L.P.
- Just Energy Prairies L.P.
- JEBPO Services LLP
- Just Energy Texas LP



**Appendix "A"**

**Cash Flow Forecast**

## Just Energy Group Inc. et al
CCAA 13-Week Cash Flow Forecast
March 9, 2021

*(CAD$ in millions)*

| Weeks Ending (Sunday)[1] | | 3/14/21 | 3/21/21 | 3/28/21 | 4/4/21 | 4/11/21 | 4/18/21 | 4/25/21 | 5/2/21 | 5/9/21 | 5/16/21 | 5/23/21 | 5/30/21 | 6/6/21 | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Sales Receipts | [2] | $28.6 | $48.5 | $46.3 | $35.2 | $44.4 | $41.8 | $67.1 | $48.3 | $48.4 | $42.6 | $60.5 | $55.1 | $41.8 | $608.5 |
| Miscellaneous Receipts | [3] | - | - | - | 2.4 | - | - | - | 5.6 | - | - | - | - | - | 8.0 |
| Total Receipts | | $28.6 | $48.5 | $46.3 | $37.6 | $44.4 | $41.8 | $67.1 | $53.9 | $48.4 | $42.6 | $60.5 | $55.1 | $41.8 | $616.5 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Energy and Delivery Costs | [4] | ($172.1) | ($52.5) | ($9.7) | ($25.0) | ($13.2) | ($16.0) | ($79.8) | ($26.8) | ($13.6) | ($14.6) | ($103.2) | ($36.9) | ($10.8) | ($574.1) |
| Payroll | [5] | - | - | (2.5) | (3.2) | (2.5) | - | (2.5) | - | (2.5) | - | (2.5) | - | (6.5) | (22.3) |
| Taxes | [6] | (0.1) | (5.3) | (6.0) | (0.0) | (0.1) | - | (5.0) | (12.6) | - | (0.2) | (4.7) | (2.4) | (0.1) | (36.6) |
| Commissions | [7] | (2.2) | (4.0) | (4.5) | (0.6) | (2.5) | (0.7) | (4.8) | (0.7) | (1.4) | (0.4) | (4.5) | (0.7) | (0.6) | (27.8) |
| Selling and Other Costs | [8] | (3.2) | (3.4) | (3.5) | (4.5) | (5.0) | (3.5) | (3.3) | (4.1) | (4.7) | (2.9) | (3.5) | (2.9) | (4.0) | (48.4) |
| Total Operating Disbursements | | ($177.6) | ($65.2) | ($26.3) | ($33.4) | ($23.3) | ($20.2) | ($95.4) | ($44.1) | ($22.1) | ($18.0) | ($118.5) | ($42.9) | ($22.0) | ($709.1) |
| **OPERATING CASH FLOWS** | | ($149.0) | ($16.7) | $19.9 | $4.2 | $21.1 | $21.6 | ($28.4) | $9.7 | $26.3 | $24.6 | ($57.9) | $12.2 | $19.8 | ($92.6) |
| *Financing Disbursements* | | | | | | | | | | | | | | | |
| Credit Facility - Borrowings / (Repayments) | [9] | $126.0 | $ - | $31.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $157.5 |
| Interest Expense & Fees | [10] | (3.2) | - | - | (1.4) | - | - | - | (1.3) | - | - | - | - | (1.4) | (7.2) |
| *Restructuring Disbursements* | | | | | | | | | | | | | | | |
| Professional Fees | [11] | - | (1.4) | (2.6) | (1.3) | (1.6) | (1.1) | (1.1) | (0.8) | (1.1) | (0.8) | (0.9) | (0.9) | (0.9) | (14.4) |
| **NET CASH FLOWS** | | ($26.2) | ($18.1) | $48.9 | $1.6 | $19.5 | $20.5 | ($29.5) | $7.6 | $25.2 | $23.8 | ($58.9) | $11.3 | $17.6 | $43.3 |
| **CASH** | | | | | | | | | | | | | | | |
| Beginning Balance | | $77.3 | $51.2 | $33.0 | $81.9 | $83.5 | $103.0 | $123.5 | $94.0 | $101.6 | $126.9 | $150.6 | $91.8 | $103.1 | $77.3 |
| Net Cash Inflows / (Outflows) | | (26.2) | (18.1) | 48.9 | 1.6 | 19.5 | 20.5 | (29.5) | 7.6 | 25.2 | 23.8 | (58.9) | 11.3 | 17.6 | 43.3 |
| Other (FX) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING CASH** | | $51.2 | $33.0 | $81.9 | $83.5 | $103.0 | $123.5 | $94.0 | $101.6 | $126.9 | $150.6 | $91.8 | $103.1 | $120.7 | $120.7 |
| **BORROWING SUMMARY** | | | | | | | | | | | | | | | |
| DIP Facility Credit Limit | | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | |
| DIP Draws | | 126.0 | - | 31.5 | - | - | - | - | - | - | - | - | - | - | |
| DIP Principal Outstanding | | 126.0 | 126.0 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | |
| DIP Availability | | $31.5 | $31.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |

1. The week shown as ending March 14, 2021 reflects a 6-day stub week from March 9 (the filing date) to 3/14/21.
2. Sales Receipts include collections from the Company's residential and commercial customers for the sale of energy, which primarily consists of electricity and natural gas, inclusive of sales tax. The sales forecast is based on historical sales patterns, seasonality, and management's current expectations.
3. Miscellaneous receipts reflect forecasted tax refunds and other receipts not sent from customers.
4. Energy & Delivery costs reflect the purchase energy from suppliers and the cost of delivery and transmission to the Company's customers.
5. Payroll disbursements reflect the current staffing levels and recent payroll amounts, inclusive of any payments associated with the Company's bonus programs.
6. Taxes reflect the remittance of sales taxes collected from customers and the Company's corporate income taxes.
7. Commissions include fees paid to customer acquisition contractors and suppliers.
8. Selling and Other Costs include selling, general, administrative and interest payments.
9. The Credit Facility Borrowings / (Repayments) assume USD$ 100 million of the DIP is drawn immediately, with a subsequent draw for the remainder of the facility within the first few weeks of the proceedings.
10. Interest expenses & fees include interest and fees on the Company's credit facilities.
11. Professional Fees include fees for the Company's counsel and investment banker, the Monitor, the Monitor's Counsel, and the DIP lenders' professionals.

**Just Energy Group Inc. et al**

CCAA 13-Day Cash Flow Forecast

March 9, 2021

*(CAD$ in millions)*

| | | 3/9/21 | 3/10/21 | 3/11/21 | 3/12/21 | 3/13/21 | 3/14/21 | 3/15/21 | 3/16/21 | 3/17/21 | 3/18/21 | 3/19/21 | 3/20/21 | 3/21/21 | 13-Day |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Sales Receipts | [1] | $8.7 | $6.3 | $6.9 | $6.7 | $ - | $ - | $8.2 | $9.8 | $8.0 | $10.1 | $12.4 | $ - | $ - | $77.1 |
| Miscellaneous Receipts | [2] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Total Receipts* | | $8.7 | $6.3 | $6.9 | $6.7 | $ - | $ - | $8.2 | $9.8 | $8.0 | $10.1 | $12.4 | $ - | $ - | $77.1 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Energy and Delivery Costs | [3] | ($121.2) | ($45.8) | ($7.9) | $2.7 | $ - | $ - | ($1.8) | ($7.0) | ($22.6) | ($6.1) | ($15.0) | $ - | $ - | ($224.6) |
| Payroll | [4] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | [5] | - | (0.1) | - | - | - | - | (5.3) | - | - | - | - | - | - | (5.4) |
| Commissions | [6] | (0.0) | - | - | (2.2) | - | - | - | (0.3) | (3.2) | - | (0.6) | - | - | (6.3) |
| Selling and Other Costs | [7] | (1.0) | (1.0) | (0.0) | (1.0) | - | - | (0.0) | (1.1) | (1.1) | (0.0) | (1.1) | - | - | (6.6) |
| *Total Operating Disbursements* | | ($122.2) | ($46.9) | ($7.9) | ($0.5) | $ - | $ - | ($7.1) | ($8.4) | ($26.9) | ($6.2) | ($16.7) | $ - | $ - | ($242.8) |
| **OPERATING CASH FLOWS** | | ($113.5) | ($40.6) | ($1.0) | $6.1 | $ - | $ - | $1.1 | $1.4 | ($18.8) | $3.9 | ($4.3) | $ - | $ - | ($165.7) |
| *Financing Disbursements* | | | | | | | | | | | | | | | |
| Credit Facility - Borrowings / (Repayments) | [8] | $126.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $126.0 |
| Interest Expense & Fees | [9] | (3.2) | - | - | - | - | - | - | - | - | - | - | - | - | (3.2) |
| *Restructuring Disbursements* | | | | | | | | | | | | | | | |
| Professional Fees | [10] | - | - | - | - | - | (1.4) | - | - | - | - | - | - | - | (1.4) |
| **NET CASH FLOWS** | | $9.3 | ($40.6) | ($1.0) | $6.1 | $ - | $ - | ($0.4) | $1.4 | ($18.8) | $3.9 | ($4.3) | $ - | $ - | ($44.3) |
| **CASH** | | | | | | | | | | | | | | | |
| Beginning Balance | | $77.3 | $86.7 | $46.1 | $45.0 | $51.2 | $51.2 | $51.2 | $50.8 | $52.2 | $33.4 | $37.3 | $33.0 | $33.0 | $77.3 |
| Net Cash Inflows / (Outflows) | | 9.3 | (40.6) | (1.0) | 6.1 | - | - | (0.4) | 1.4 | (18.8) | 3.9 | (4.3) | - | - | (44.3) |
| Other (FX) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING CASH** | | $86.7 | $46.1 | $45.0 | $51.2 | $51.2 | $51.2 | $50.8 | $52.2 | $33.4 | $37.3 | $33.0 | $33.0 | $33.0 | $33.0 |
| **BORROWING SUMMARY** | | | | | | | | | | | | | | | |
| DIP Facility Credit Limit | | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $ - |
| DIP Draws | | 126.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Principal Outstanding | | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | - |
| DIP Availability | | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $ - |

1. Sales Receipts include collections from the Company's residential and commercial customers for the sale of energy, which primarily consists of electricity and natural gas, inclusive of sales tax. The sales forecast is based on historical sales patterns, seasonality, and management's current expectations.

2. Miscellaneous receipts reflect forecasted tax refunds and other receipts not sent from customers.

3. Energy & Delivery costs reflect the purchased energy from suppliers and the cost of delivery and transmission to the Company's customers.

4. Payroll disbursements reflect the current staffing levels and recent payroll amounts, inclusive of any payments associated with the Company's bonus or programs.

5. Taxes reflect the remittance of sales taxes collected from customers and the Company's corporate income taxes.

6. Commissions include fees paid to customer acquisition contractors and suppliers.

7. Selling and Other Costs include selling, general, administrative and interest payments.

8. The Credit Facility Borrowings / (Repayments) assume USD$ 100 million of the DIP is drawn immediately, with a subsequent draw for the remainder of the facility within the first few weeks of the proceedings.

9. Interest expenses & fees include interest and fees on the Company's credit facilities.

10. Professional Fees include fees for the Company's counsel and investment banker, the Monitor, the Monitor's Counsel, and the DIP lenders' professionals.

Court File No. _____

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.,** JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC. JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC, HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS INC., FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP., JUST ENERGY (FINANCE) HUNGARY ZRT. (the "**Applicants**")

### March 9, 2021

### REPORT ON CASH FLOW STATEMENT

### (Paragraph 10.2(b) of the CCAA)

The management of the Applicants has developed the assumptions and prepared the attached statement of projected cash flow as of March 9, 2021 consisting of (i) a 13-week cash flow forecast for the period March 9, 2021 to June 6, 2021 and (ii) a daily cash flow forecast for the 14-day period from March 9, 2021 to March 21, 2021 (together, the "**Forecasts**").

The purpose of the Forecasts is to estimate the liquidity requirements of the Applicants during the respective forecast periods.  The hypothetical assumptions are reasonable and consistent with the purpose of the projections, and the probable assumptions are suitably supported and consistent with the plans of the Applicants and provide a reasonable basis for the Forecasts.

Since the Forecasts are based on future events, actual results will vary from the information presented and the variations may be material.

The Forecasts have been prepared solely for the purpose outlined above, using the probable and hypothetical assumptions set out in notes to the Forecasts. Consequently, readers are cautioned that the Forecasts may not be suitable for other purposes.

Dated at Houston, Texas, this 8th day of March 2021.

_____

Michael Carter
Chief Financial Officer
Just Energy Group Inc.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC. et al** (Applicants)

Court File No. CV-21-00_____-00CL

---

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

Proceedings commenced at Toronto

---

**PRE-FILING REPORT OF THE PROPOSED MONITOR**

---

**Thornton Grout Finnigan LLP**
TD West Tower, Toronto-Dominion Centre
100 Wellington Street West, Suite 3200
Toronto, ON   M5K 1K7
Tel:     (416) 304-1616 / Fax: (416) 304-1313

**Robert I. Thornton** (LSO# 24266B)
Email: rthornton@tgf.ca / Tel: (416) 304-0560

**Rebecca L. Kennedy** (LSO# 61146S)
Email: rkennedy@tgf.ca / Tel: (416) 304-0603

**Rachel Bengino** (LSO# 68348V)
Email: rbengino@tgf.ca / Tel: (416) 304-1153

**Puya Fesharaki** (LSO# 70588L)
Email: pfesharaki@tgf.ca / Tel: (416) 304-7979

Lawyers for the proposed Monitor,
FTI Consulting Canada Inc.