**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| JUST ENERGY GROUP INC., *et al* | ) | Case No. 21-30823 (MI) |
| | ) | |
| Debtors in a Foreign Proceeding,[1] | ) | |
| | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' <u>EMERGENCY</u> MOTION FOR PROVISIONAL**
**RELIEF PURSUANT TO SECTION 1519 OF THE BANKRUPTCY CODE**

---

**Emergency relief has been requested. A hearing will be conducted on this matter on March 9, 2021 at 12:00 p.m. in Courtroom 400, 4th floor, 515 Rusk Avenue, Houston, Texas 77002. You may participate in the hearing either in person or by audio/video connection.**

**Audio communication will be by use of the Court's dial-in facility. You may access the facility at (832) 917-1510. You will be responsible for your own long distance charges. Once connected, you will be asked to enter the conference room number. Judge Isgur's conference room number is 954554.**

**You may view video via GoToMeeting. To use GoToMeeting, the Court recommends that you download the free GoToMeeting application. To connect, you should enter the meeting code "JudgeIsgur" in the GoToMeeting app or click the link on Judge Isgur's home page on the Southern District of Texas website. Once connected, click the settings icon in the upper right corner and enter your name under the personal information setting.**

**Hearing appearances must be made electronically in advance of the hearing. To make your electronic appearance, go to the Southern District of Texas website and select "Bankruptcy Court" from the top menu. Select "Judges' Procedures," then "View Home Page" for Judge Isgur. Under "Electronic Appearance" select "Click here to submit Electronic Appearance". Select the case name, complete the required fields and click "Submit" to complete your appearance.**

**If you object to the relief requested or you believe that emergency consideration is not warranted, you must either appear at the hearing or file a written response prior to the hearing. Otherwise, the Court may treat the pleading as unopposed and grant the relief requested.**

**Relief is requested not later than March 9, 2021.**

---

[1] The identifying four digits of Debtor Just Energy Group Inc.'s local Canada tax identification number are 0469. Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/justenergy. The location of the Debtors' service address for purposes of these chapter 15 cases is: 100 King Street West, Suite 2360, Toronto, ON, M5X 1E1.

Just Energy Group, Inc. in its capacity as the authorized foreign representative (the "<u>Foreign Representative</u>") of the above-captioned debtors (collectively, the "<u>Debtors</u>" or "<u>Just Energy</u>"), which are the subject of proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "<u>CCAA</u>") in the Ontario Superior Court of Justice, Commercial List (the "<u>Canadian Proceedings</u>" and such court, the "<u>Canadian Court</u>"), respectfully requests entry of an order, substantially in the attached form (the "<u>Order</u>"), granting provisional relief under the Bankruptcy Code to protect the Debtors and their property within the territorial jurisdiction of the United States pending recognition of the Canadian Proceedings.

## Preliminary Statement

1.      Just Energy and its subsidiaries are retail energy providers specializing in delivering electricity and natural gas, as well as energy-efficient solutions and renewable energy options, to consumer and commercial customers.  Just Energy currently serves over 950,000 customers, mostly in the United States and Canada through its nearly 1,000 employees (approximately 350 of which are located in Texas).  Just Energy is the largest independent Retail Energy Provider ("<u>REP</u>") and is licensed by the Public Utility Commission of Texas ("<u>PUCT</u>").  The Texas market is Just Energy's largest market, and the Company is registered as a market participant with the Electric Reliability Council of Texas, Inc. ("<u>ERCOT</u>"), an independent system operator.  If Just Energy is unable to pay its invoices when due, ERCOT can revoke the Company's right to conduct activities in the ERCOT market,[2] and transition Just Energy's customers—Just Energy's most

---

[2]    Similarly, outside of Texas, Just Energy's financial situation may create grounds for revocation or suspension of the Company's right to participate in ISO markets in other states in which Just Energy operates—including New York, California, Illinois, Maryland and Ohio.

valuable asset—to a Provider of Last Resort ("POLR").[3]  Such a result would be catastrophic for the Company and its creditors, lenders, employees, sureties, public shareholders, and customers.

2.      Just Energy entered 2021 on strong financial and operational footing.  On September 4, 2020, Just Energy commenced a chapter 15 proceeding—styled *In re Just Energy Group Inc.*, Case No. 20-34442 (DRJ)—in this Court to recognize a balance sheet recapitalization transaction (the "Recapitalization") through a plan of arrangement under section 192 of the Canada Business Corporations Act (the "CBCA").  Less than one week later, on September 10, 2020, Judge David R. Jones entered the recognition order.  The Recapitalization closed on September 28, 2020, and the chapter 15 cases closed shortly thereafter on October 29, 2020.  The culmination of a 15-month-long strategic review process and comprehensive plan to strengthen Just Energy's business, the Recapitalization allowed the Company to shed debt from its balance sheet (and extended loan maturities), positioning Just Energy for sustainable growth as an independent industry leader.

3.      However, like many of its industry peers, Just Energy's economic landscape fundamentally changed as a result of the unprecedented winter storm that blanketed the state of Texas on or about February 13, 2021, and maintained its grip of historically sub-freezing temperatures for days.  Electric generation equipment and natural gas pipeline equipment froze, causing the available generation within ERCOT's grid to dramatically decline.[4]  At the same time,

---

[3]     ERCOT has already barred two electricity sellers (Entrust Energy Inc. and Griddy Energy LLC) from Texas's power market for failing to make payments, and transitioned all of their customers to POLRs.

[4]     "If we hadn't taken action, it was seconds and minutes (away from a total system failure)" said ERCOT's CEO Bill Magness after almost losing power across the entire ERCOT grid early in the morning of February 15, 2021, and forcing rotating outages across Texas.  Wall Street Journal article "*Amid Blackouts, Texas Scrapped Its Power Market and Raised Prices. It Didn't Work.*"

Texans sought to heat their homes and businesses against the shocking cold and demand for electricity skyrocketed, pushing Texas's power grid to a new winter peak demand record.

4.        In the early hours of February 15, with the ERCOT system facing unprecedented winter demand and gigawatts of generation forced offline, ERCOT ordered transmission operators to implement rotating outages to reduce the strain on the grid and avoid complete collapse.  Later that day, after learning that energy prices were clearing at less than the maximum price for electricity in the ERCOT market, the PUCT instructed ERCOT to set prices for electricity at the maximum price of $9,000 per megawatt hour (or MWh).[5]  As justification for this decision, the PUCT cited the fact that "[e]nergy prices should reflect scarcity of the supply" and "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."  In response, ERCOT manually set the price for electricity to the maximum price of $9,000/MWh.  ERCOT left this artificially established price in place for more than four straight days, until 9:00 am prevailing Central Time on Friday February 19, even though firm load was no longer being shed as of 1:05 am prevailing Central Time on February 18. In addition, the price for ancillary services, which is impacted by the $9,000/MWh price for electricity, reached previously unseen levels, at times exceeding $25,000 per MWh.

5.        ERCOT has now presented Just Energy with invoices for the seven-day winter event, which, when combined, amounted to over $280 million,[6] payment of which was required

---

[5]    All dollar amounts in this Declaration are in USD unless otherwise noted and many of the financial figures presented are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

[6]    On March 5, 2021, Just Energy received three invoices for approximately $123.21 million from ERCOT, of which approximately $96.24 million must be paid by end of day on March 9, 2021.  On March 8, 2021, Just Energy received another three invoices for approximately $25.46 million, of which approximately $18.86 million is due by March 10, 2021.  The remaining amounts will be due to BP under the ISO Services Agreement (described herein) on March 22, 2021.

within days, even if Just Energy disputed such amounts. As a result, Just Energy suddenly found itself caught in an unforeseeable liquidity trap that even its recently restructured balance sheet could not address.[7]

6.     In short order, Just Energy snapped into action to evaluate the unprecedented situation and to explore all value-maximizing alternatives. On March 3, 2021, Just Energy filed a Petition for Emergency Relief with the PUCT.[8] In the Petition for Emergency Relief, Just Energy, through its subsidiaries Just Energy Texas LP, Fulcrum Retail Energy, LLC, and Hudson Energy Services LLC, requested that the PUCT order ERCOT to deviate from the deadlines and timing in its Protocols and Market Guides related to settlements, collateral obligations, and invoice payments and suspend the execution or issuance of invoices or settlements for intervals during the dates of February 14, 2021 through February 19, 2021, until issues related to the catastrophic winter storm raised by executive and legislative branches of Texas are investigated, addressed, and resolved. Alternatively, Just Energy requested that the PUCT grant a waiver of certain ERCOT Protocols to allow Just Energy to delay payment while exercising its rights under the ERCOT Protocols to dispute the invoiced payment amounts.

7.     Because the PUCT's order directing ERCOT to set prices at the system wide offer cap was tied to firm load being shed, a number of market participants and consumer groups filed petitions with the PUCT requesting that the PUCT order ERCOT to correct the real-time prices

---

[7]     Throughout this quickly evolving process, Just Energy remained focused on keeping its customer base and stakeholders informed, including by issuing five separate press releases and public disclosures between February 16 and February 26, 2021. In such press releases, Just Energy disclosed the potential impact of the Texas storm on pricing and the fact that such pricing may result in losses that could be materially adverse to Just Energy's liquidity and ability to continue as a going concern. As part of such disclosures, Just Energy also provided estimated ranges of payments expected to be owed to ERCOT and the potential ramifications of making such payments on its liquidity outlook.

[8]     Just Energy's petition is attached to the Order as Exhibit A.

for the period after load was no longer being shed from the ERCOT system.  On March 4, 2021, Potomac Economics, the Independent Market Monitor ("IMM") for the PUCT, issued a letter echoing this position, recommending that the PUCT direct ERCOT to correct the real-time prices for the period after the grid emergency ended (and prices should have been reset) to remove the inappropriate pricing intervention that occurred during that time period.  Notably, the IMM concluded that *$16 billion* in additional costs had been improperly charged by ERCOT and that ERCOT's actions "will result in substantial and unjustified economic harm" if left unaddressed.[9] In its March 5 open meeting, the PUCT did not act on the IMM's recommendation to order ERCOT to correct the real-time prices.  Notably, on March 8, Texas Lieutenant Governor Dan Patrick called on the PUCT and ERCOT to correct the "$16 billion error" in pricing that continued after the power shortage ended and the grid emergency passed.[10]

8.  Just Energy's financial condition was further exacerbated because certain business partners following the weather event have issued demands or taken actions in response to concerns about Just Energy's liquidity and significant amounts owing to trade creditors that are coming due:

(a) demand for more than CAD $30 million in additional collateral demands from certain of its bonding companies.  Over CAD $20 million of additional collateral has already been provided and the rest is expected to be provided by March 17, 2021;[11]

(b) request for payment from a transmission and distribution service provider on February 24, 2021, stating that Just Energy was delinquent on invoices totaling

---

[9]   Letter from the Independent Market Monitor, PUC Project No. 51812 (Mar. 4, 2021).

[10]  Office of the Lieutenant Governor, *Lt. Gov. Dan Patrick Calls on ERCOT to Correct $16 Billion Error During Storm*,   https://www.ltgov.texas.gov/2021/03/08/lt-gov-dan-patrick-calls-on-ercot-to-correct-16-billion-error-during-storm (8 March 2021).

[11]  The bonding companies had either threatened to start the process of cancelling bonds issued by them if Just Energy did not post additional collateral or had already started the process of cancelling the bonds they had issued and agreed to issue rescission notices upon the receipt of the additional collateral.  The cancellation of the bonds may have resulted in the revocation of licenses necessary for Just Energy to carry on business in certain jurisdictions.

$141,745 that had an original due date of February 23, 2021 (*i.e.*, one day earlier), that Just Energy would be in default if the delinquent balance was not received within ten days, and that the supplier would exercise its remedies in the event of default. Just Energy paid all outstanding amounts due to such service providers on March 1, 2021, to protect against an event of default for non-payment, which may result in ERCOT transferring customers to a POLR; and

(c) amounts of approximately CAD $270 million owing to counterparties under the ISO Services Agreements (as defined herein) will come due. This amount has increased significantly from what Just Energy would normally expect, which increase is a direct result of the Texas winter storm. In addition, more than $200 million in payables owing to commodity suppliers will also come due by March 22, 2021.

9.      Undeterred by the adverse PUCT ruling and the financial demands of Just Energy's other stakeholders, Just Energy continued to proactively engage with stakeholders across its capital structure to assess all available strategic alternatives, including:

(a) <u>DIP Financing</u>: Just Energy contacted its five largest stakeholders and provided them with a term sheet and information necessary to assess and evaluate an opportunity to provide debtor-in-possession financing. The information provided included a situation update presentation and access to a virtual data room. Just Energy also responded to numerous information requests and management held virtual meetings with the stakeholders to answer questions about Just Energy's financial forecast. In addition, Just Energy engaged with four other parties who had interest in considering the debtor in possession financing ("<u>DIP Financing</u>") opportunity. The DIP Term Sheet is attached to the Order as <u>Exhibit B</u>.

(b) <u>Payments to ERCOT</u>: On Friday, March 5, Just Energy made $64.9 million of payments to ERCOT in the ordinary course, and expects to make an additional $96.3 million of resettlement payments to ERCOT on Tuesday, March 9. On March 8, Just Energy received from ERCOT (i) a notice that it must post approximately $25.7 million of additional collateral within two business days, and (ii) three invoices for approximately $25.46 million, of which Just Energy expects to make a payment of $18.9 million to ERCOT on March 10, 2021. Just Energy does not have enough liquidity to pay these invoices without access to the debtor in possession facility ("<u>DIP Facility</u>").

(c) <u>Engagement with its Prepetition Lenders</u>: Just Energy engaged directly with its Credit Facility Lenders to ensure the status quo maintenance of its cash management facility and ability to continue to use available liquidity to operate its business in the ordinary course.

(d) <u>Engagement with Shell and BP</u>:  Just Energy maintains a number of agreements with Shell and BP that are integral to its ongoing day-to-day operations. Because non-payment of certain obligations under these agreements would endanger Just Energy's ability to operate as a going concern, Just Energy engaged directly with Shell and BP to ensure their ongoing support of the business.  As a result and to ensure Shell and BP continue trading with Just Energy in the ordinary course, Just Energy is directly engaged with these parties around the terms of support agreements, whereby Just Energy will continue to perform under the agreements in exchange for Shell's and BP's ongoing commitment to support the business and continue trading.   The support agreements are attached to the Order as <u>Exhibit C</u> and <u>Exhibit D</u>, respectively.

10.     On March 9, 2021, after thoroughly evaluating all other available options, Just Energy commenced the Canadian Proceedings and, shortly thereafter, these chapter 15 cases to maintain the stability and integrity of its otherwise financially steady and operationally reliable enterprise, and to protect its 950,000 customers and protect the overall value of Just Energy.[12]  This morning (March 9, 2021), the Canadian Court entered an interim order (the "<u>CCAA Order</u>"),[13] granting vital relief to maintain Just Energy as a going concern, including, but not limited to:[14]

(a) a stay of proceedings against Just Energy that would otherwise undermine its ability to restructure its business and meaningfully engage with the regulators with respect to a viable path forward; and

(b) approval of DIP Financing sufficient for Just Energy to continue making all payments to ERCOT and other critical parties as required to protect the overall value of Just Energy.

11.     Additionally, pursuant to the CCAA Order, the Canadian Court appointed FTI Consulting Canada Inc. ("<u>FTI</u>") as the Canadian Court's independent monitor to monitor Just Energy's business and financial affairs with the powers and obligations set out in the CCAA and

---

[12]    The resolutions of Just Energy's board of directors approving the CCAA and chapter 15 filing are attached to the Verified Petition as <u>Exhibit B</u>.

[13]    In the interest of time, a copy of the entered order is attached as **Exhibit A**.  Just Energy will file with a certified copy of the order as soon as practicable.

[14]    The CCAA Order is attached to the Verified Petition as <u>Exhibit D</u>.

the CCAA Order. *See* CCAA Order, ¶ 26. FTI, in consultation with its independent counsel, submitted a detailed pre-filing report with the Canadian Court supporting all of the relief the Debtors requested in the Canadian Proceeding and are requesting in these chapter 15 cases. A copy of such report is attached hereto as **Exhibit B**.

12.     To provide Just Energy with the breathing room and stability necessary to administer the Canadian Proceedings and implement the restructuring transactions to be described in Just Energy's plan of arrangement, the Foreign Representative seeks a stay of creditor and regulator actions against Just Energy and its property pending this Court's ruling on the Debtors' chapter 15 petition. Just Energy has substantial assets in the United States and serves customers in fourteen states including, as a key participant in, the Texas electricity market. Just Energy requires relief to, *inter alia*, avoid creditors within the territorial jurisdiction of the United States from "racing to the courthouse" and seeking to obtain and enforce judgments against Just Energy's assets. This temporary stay will, in turn, facilitate the success of the Canadian Proceedings and remedy Just Energy's liquidity challenges for the benefit of all stakeholders, especially its customers.

## Jurisdiction and Venue

13.     The Foreign Representative has properly commenced these chapter 15 cases under sections 1504 and 1509 of the Bankruptcy Code by the filing of a petition for recognition of the Canadian Proceeding under section 1515 of title 11 of the United States Code (the "Bankruptcy Code").

14.     The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

15.     Venue is proper pursuant to 28 U.S.C. §§ 1410(1) and (3).

16.     The statutory bases for the relief requested herein are sections 105(a), 362, 365, 525, 1519, and 1521 of the Bankruptcy Code, and rules 1075-1 and 9013-1(i) of the Local Bankruptcy Rules for the Southern District of Texas (the "<u>Local Rules</u>").

**Relief Requested**

17.     Pursuant to sections 105(a), 1519, and 1521 of the Bankruptcy Code, the Foreign Representative respectfully requests that the Court enter the Order, substantially in the form attached hereto, granting the following provisional relief pending recognition of the Canadian Proceedings:

    a.    the Foreign Representative is recognized as, and shall be the representative of, the Debtors with full authority to administer the Debtors' assets and affairs in the United States ("<u>U.S.</u>") and may operate the Debtors' business and exercise the rights and powers of a trustee unless otherwise specified in the CCAA Order;

    b.    section 362 of the Bankruptcy Code shall apply with respect to the Debtors and the Debtors' property that is within the territorial jurisdiction of the U.S. For the avoidance of doubt and without limiting the generality of the foregoing, the Order shall impose a stay within the territorial jurisdiction of the U.S. of:

        i.    the commencement or continuation, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Debtors or their assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien or arbitration award against the Debtors or their assets or proceeds thereof, or to transfer, assign, or exercise any control over the Debtors' assets located in the U.S., particularly including the Debtors' retail electricity contracts and customers located in the territorial U.S., except as authorized by the Debtors in writing and in their sole discretion;

        ii.    except as permitted in the CCAA Order, the creation, perfection, seizure, attachment, enforcement, or execution of liens or judgments against the Debtors' property in the U.S. or from transferring, encumbering, or otherwise disposing of or interfering with the Debtors' assets or agreements in the U.S. without the express written consent of the Foreign Representative, after notice and hearing in conformance with this Court's procedures and rules;

        iii.     any act to collect, assess, or recover a claim against the Debtors that arose before the commencement of the Debtors' chapter 15 case; and

        iv.     the setoff of any debt owing to the Debtors that arose before the commencement of the Debtors' chapter 15 case against any claim of the Debtors.

In the event of any conflict between the scope of the stays and/or injunctions set forth in the CCAA Order and those contained in this Order, the language of the CCAA Order shall prevail, subject to further order of this Court.

    c.     section 365(e) of the Bankruptcy Code shall apply with respect to the Debtors' executory contracts and unexpired leases such that, notwithstanding any provision in any such contract or lease or under applicable law, no executory contract or unexpired lease with any of the Debtors may be terminated, cancelled, or modified (and any rights or obligations in such leases or contracts cannot be terminated or modified) solely because of a provision in any contract or lease of the kind described in sections 365(e)(1)(A), (B), or (C) of the Bankruptcy Code, and all contract and lease counterparties located within the U.S. shall be prohibited from taking any steps to terminate, modify, or cancel any contracts or leases with the Debtors arising from or relating in any way to any so-called "ipso facto" or similar clauses; *provided* that the Order does not impair or affect the rights of any person under sections 559 through 561 of the Bankruptcy Code, subject to the terms of the CCAA Order;

    d.     the Foreign Representative shall have the rights and protections to which the Foreign Representative is entitled under chapter 15 of the Bankruptcy Code, including, but not limited to, the protections limiting the jurisdiction of U.S. Courts over the Foreign Representative in accordance with section 1510 of the Bankruptcy Code and the granting of additional relief in accordance with sections 1519(a) and 1521 of the Bankruptcy Code;

    e.     until the conclusion of the recognition hearing to be held by this Court, no U.S. Chapter 15 Party may file an involuntary petition or similar relief against one or all of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code;

    f.     notwithstanding any provision in the Bankruptcy Rules to the contrary, (i) this Order shall be effective immediately and enforceable upon entry, (ii) the Foreign Representative and the debtor in possession lenders (the "DIP Lenders") are not subject to any stay in the implementation, enforcement, or realization of the relief granted in this Order, and (iii) the Foreign Representative is authorized and empowered, and may, in his

discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order;

g.     effective upon entry of this Order, section 525 of the Bankruptcy Code shall be in full force and effect in these chapter 15 cases and with respect to each of the Debtors, and this Court shall retain exclusive jurisdiction to hear any purported violations thereof, which requests may be brought by way of an expedited emergency motion;

h.     any and all landlords or other parties with a lease of premises to the Debtors located within the United States are hereby prohibited from: taking any steps to cancel, terminate, or modify any lease for any reason, including non-payment of rent and/or due to any ipso facto clause described by section 365(e)(1) of the Bankruptcy Code; enforcing any "landlord lien", possessory lien or similar lien against any property of the Debtor; changing the locks or codes on any of the Debtors' premises; or commencing or continuing any eviction or similar proceedings;

i.     pending entry of the Recognition Order, the Foreign Representative and the Debtors are entitled to the benefits of, and may comply with, the terms and conditions of the DIP Financing, including but not limited to, the payment of associated fees and expenses as they come due without further notice or order of this Court.  The CCAA Order provides, "that the DIP Agent and the DIP Lenders shall be entitled to the benefit of and are hereby granted a charge (the "**DIP Lenders' Charge**") on the Property,[15] which DIP Lenders' Charge shall not secure an obligation that exists before this Order is made" and "that the filing, registration or perfection of . . . the DIP Lenders' Charge . . . shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect." *See* CCAA Order, ¶¶ 38, 44.  To the extent authorized under the CCAA Order, the Court recognizes, on a provisional basis, the DIP Lenders' Charge, as defined in the CCAA Order, granted in the CCAA Order which applies to all of the Debtors' assets located in the U.S., subject to the priorities, terms, and conditions of the CCAA Order, to secure current and future amounts outstanding under the DIP Facility;

j.     to the extent provided in the CCAA Order, and based on the finding therein and to promote cooperation between jurisdictions in cross-border insolvencies, the Debtors are authorized to execute and deliver such term sheets, credit agreements, mortgages, charges, hypothecs and security documents, guarantees, and other definitive documents as are contemplated

---

[15] "Property" means Just Energy's current and future assets, licenses, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof.  *See* CCAA Order, ¶ 4.

by the DIP Facility or as may be reasonably required by the DIP Lenders pursuant to the terms thereof, and the Debtors are authorized to pay and perform all of its indebtedness, interest, fees, liabilities, and obligations to the DIP Lenders under and pursuant to the DIP Facility without any need for further approval from this Court;

k.    in accordance with the CCAA Order, the Foreign Representative and the Debtors, as applicable, are authorized to pay or remit (a) any taxes (including, without limitation, sales, use, withholding, unemployment, and excise) the nonpayment of which by any Just Energy entity could result in a responsible person associated with a Just Energy entity being held personally liable for such nonpayment and (b) taxes related to income or operations incurred or collected by a Just Energy entity in the ordinary course of business; and

l.    such other relief as may be just and proper.

18.    In support of the relief requested, the Foreign Representative respectfully incorporates the following herein by reference:  (a) *Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "Verified Petition");[16] (b) *Declaration of Michael Carter in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code*; and (c) *Declaration of Shawn T. Irving in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code*.

## Basis for Relief

I.    **Section 1519 of the Bankruptcy Code Authorizes the Requested Provisional Relief.**

19.    The Foreign Representative has filed this chapter 15 proceeding seeking recognition of the Canadian Proceedings (commenced contemporaneously herewith) as foreign

---

[16]    Capitalized terms used but not defined herein shall have the meaning given to them in the Verified Petition.

main proceedings under section 1517 of the Bankruptcy Code.   Section 1519 of the Bankruptcy Code permits the Court "from the time of filing a petition for recognition until [it] rules on the petition" to grant broad provisional relief pending recognition of the foreign proceeding where such relief is "urgently needed to protect the assets of the debtor or the interests of the creditors."   11 U.S.C. § 1519(a).   Section 1519(a) of the Bankruptcy Code describes the scope of available provisional relief, which includes, without limitation:

      a.    staying execution of the Debtors' assets;

      b.    entrusting the administration or realization of all or part of the Debtors' assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

      c.    any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

11 U.S.C. § 1519(a).[17]

      20.    The Foreign Representative seeks provisional relief under sections 105(a) and 1519 of the Bankruptcy Code.   Among other things, the Foreign Representative seeks imposition of sections 361, 362, 365(e), and 525 of the Bankruptcy Code for the purposes of maintaining the *status quo* until the Court rules on the Debtors' chapter 15 petition.   The Foreign Representative intends to seek, among other things, continuation of the automatic stay pursuant to section 1521(a)(1) of the Bankruptcy Code upon the granting of foreign main recognition.

      21.    The provisional relief requested here is an "effective mechanism" to implement the chapter 15 policies of promoting cooperation between courts of the U.S. and courts of foreign

---

[17]   *See also* 11 U.S.C. § 1501, which sets forth the Congressional intent to be used to, among other things, "create greater legal certainty for trade and investment," and allow for the "facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment."

countries involved in cross-border restructuring cases, the "fair and efficient administration of cross border [cases] that protects the interest of all creditors, and other interested entities," including the Debtor, and the "protection and maximization of the value of the [Debtors'] assets." 11 U.S.C. § 1501(a)(3) and (4).

22.     The provisional relief sought herein is of a type frequently granted in chapter 15 cases.   Bankruptcy courts in this district and others have routinely imposed the stay under section 362 of the Bankruptcy Code or ordered similar relief to maintain the *status quo* pending recognition or disposition of foreign proceedings in ancillary cases under both chapter 15 and section 304 of the Bankruptcy Code, including in respect of recognition proceedings that relate to corporate restructurings of non-insolvent corporations.

## II.     Provisional Relief Is Needed to Protect the Debtors' Assets and Restructuring Efforts.

23.     Provisional relief is needed here to protect the Debtors' assets and the interests of all stakeholders.  *See* 11 U.S.C. § 1519(a).  Although a "petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time," there is necessarily a gap between the time the petition for recognition is filed and the time the court makes a decision on whether a proceeding should be recognized.  11 U.S.C. § 1517(c).  Prior to recognition, a chapter 15 debtor is not automatically entitled to the automatic stay or any other provisions of the Bankruptcy Code, which, in this case, necessitates an order granting provisional relief.  Provisional relief should be granted "where relief is urgently needed to protect the assets of the debtor or the interests of the creditors."  11 U.S.C. § 1519(a).

24.     Absent provisional relief, individual actions brought by creditors or other parties in interest could threaten to interfere with the orderly proceedings underway in the Canadian Court and may place at risk the Debtors' ability to successfully reorganize at risk.  *See, e.g., In re Garcia Avila*, 296 B.R. 95, 114 (Bankr. S.D.N.Y. 2003) (former section 304 case finding that irreparable

harm would exist by "permitting the [creditors] to execute their judgments against the bond proceeds, [which would] diminish the recovery available to other creditors and possibly wreck the reorganization efforts").  Here, the Debtors have substantial assets in the U.S. and serves customers in fourteen states, including as a key participant in the Texas electricity market.  The Debtors face the significant risk that one or more creditors within the territorial jurisdiction of the U.S. may "race to the courthouse" to obtain and enforce a judgment against the Debtors' assets, which would allow such creditors to circumvent the effective administration of the Canadian Proceedings in the U.S. to the detriment of the Debtors as well as all other creditors and parties in interest.

26.    The Debtors require the requested provisional relief to preserve and maintain their strong and faithful customer base and to continue to be an otherwise financially sound enterprise. Just Energy is the largest independent REP and is licensed by the PUCT.  The Texas market is Just Energy's largest market, where the Company is a market participant with ERCOT, an independent system operator. If Just Energy is unable to pay its invoices when due, ERCOT can revoke the Company's right to conduct activities in the ERCOT market,[18] and transition Just Energy's customers—Just Energy's most valuable asset—to a POLR.[19]  Such a result would be catastrophic for the Company and its creditors, lenders, employees, sureties, public shareholders, and customers.

### III.    The Requested Relief Meets the Standards for a Preliminary Injunction.

26.    Provisional relief under chapter 15 of the Bankruptcy Code is conditioned on a foreign representative demonstrating that a debtor meets the standards applicable to an injunction.

---

[18]    Similarly, outside of Texas, Just Energy's financial situation may create grounds for revocation or suspension of the Company's right to participate in ISO markets in other states in which Just Energy operates—including California, Illinois, Maryland and Ohio.

[19]    ERCOT has already barred two electricity sellers (Entrust Energy Inc. and Griddy Energy LLC) from Texas's power market for failing to make payments, and transitioned all of their customers to POLRs.

*See* 11 U.S.C. § 1519(e) ("[t]he standards, procedures, and limitations applicable to an injunction shall apply to relief under this section.").  In the Fifth Circuit, the general standards for injunctive relief requires a showing of the following elements:

> (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is not issued; (3) that the threatened injury to the movant outweighs any damage the injunction might cause the opponent; and (4) that the injunction will not disserve the public interest.

*Palmer ex rel. Palmer v. Waxahachie Indep. Sch. Dist.,* 579 F.3d 502, 506 (5th Cir. 2009) (quoting *Byrum v. Landreth,* 566 F.3d 442, 445 (5th Cir. 2009)); *Blue Bell Bio-Medical v. Cin-Bad, Inc.*, 864 F.2d 1253, 1256 (5th Cir. 1989); *see also Dallas Cowboy Cheerleaders, Inc. v. Scoreboard Posters, Inc.*, 600 F.2d 1184, 1187 (5th Cir. 1979).  In evaluating these four factors, courts take a "flexible approach and no one factor is determinative."  *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (internal citations omitted) (citing *Haw. Structural Ironworkers Pension Trust Fund v. Calpine Corp.*, 2006 WL 3755175, at *4 (S.D.N.Y. Dec. 20, 2006)).  These four factors are met here.

### A.    The Foreign Representative Has a Substantial Likelihood of Success on the Merits.

27.    The Foreign Representative has a substantial likelihood to succeed on the merits and obtain recognition of the Canadian Proceedings under chapter 15.  For the reasons set forth in the Verified Petition, the Foreign Representative has demonstrated that the Canadian Proceedings are foreign main proceedings as defined in section 1502(4) of the Bankruptcy Code, and that the Foreign Representative is the proper foreign representative, as defined in section 101(24) of the Bankruptcy Code.  Canadian insolvency proceedings, as well as similar proceedings in other jurisdictions with insolvency laws that derive from Canadian law, have been recognized as foreign

proceedings by this Court[20] as well as other courts nationwide within the meaning of chapter 15 of the Bankruptcy Code.  Thus, the likelihood of success on the underlying merits here is high.

28.     Upon recognition of a foreign proceeding, section 1521(a) of the Bankruptcy Code authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors[,]" including:

    a.    staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;

    b.    staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) of the Bankruptcy Code;

    c.    suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and

    d.    granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

11 U.S.C. § 1521(a).

29.     The Court may grant relief under section 1521 of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  In the Verified Petition, the Debtor requested that the Court exercise its discretion to grant relief similar to the provisional relief on a final basis.

---

[20]    In fact, just a few months ago in Just Energy's prior Chapter 15 case, this Court made nearly identical findings.  *See Order Granting Recognition of Foreign Main Proceeding and Certain Related Relief* [Docket No. 15], *In re Just Energy Grp., Inc.*, Case No. 20-34442 (DRJ) (Bankr. S.D. Tex. Sept. 10, 2020).

The granting of additional relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is necessary to administer the Canadian Proceedings.

30.     Comity is a central tenet of chapter 15.  *Firefighters' Retirement Sys. v. Citco Grp. Ltd.*, 796 F.3d 520, 525 (5th Cir. 2015); *Ad Hoc Group of Vitro Noteholders v. Vitro SAB de CV* (*In re Vitro SAB de CV*), 701 F.3d 1031, 1053 (5th Cir. 2012).  The United States Supreme Court defines comity as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws."  *Hilton v. Guyot*, 159 U.S. 113, 143 (1895).

31.     The extension of comity to orders issued in Canadian insolvency proceedings is common in this Court as well as other courts across the country.  Indeed, the Canadian Proceedings are similar to "pre-packaged" proceedings under chapter 11 of the Bankruptcy Code, as both are statutory regimes intended to facilitate the reorganization of a debtor through the implementation of a court-sanctioned arrangement with the Debtors' creditors and parties in interests.

32.     There is a substantial likelihood that relief under section 1521(a)(1) of the Bankruptcy Code will be ordered, thereby resulting in the application of relief similar to the provisional relief requested herein on a final basis.

33.     Courts within the Fifth Circuit have granted provisional and final relief substantially similar to the provisional relief sought by this Motion.  Moreover, the Court has recognized the importance of comity in chapter 15 proceedings.  *See* Guidelines for Communication and Cooperation between Courts in Cross-Border Insolvency Matters, General Order 2019-2 (the "Cross-Border Guidelines").  For example, the Cross-Border Guidelines provide

that: "The overarching objective of these Guidelines is to improve in the interests of all stakeholders the efficiency and effectiveness of cross-border proceedings relating to insolvency . . . by enhancing coordination and cooperation among courts under whose supervision such proceedings are being conducted." The Cross-Border Guidelines then include a non-exhaustive list of guidelines to promote efficient coordination with the foreign court, protect stakeholders' interests, preserve the Debtors' assets, and to share information to reduce costs, among others.

> **B.    There Is a Substantial Threat of Irreparable Injury if the Interim Relief is Not Granted.**

34.    The Order provides for a stay against seizure of assets and litigation in the U.S. akin to the CCAA Order, which the Canadian Court has determined that the commencement or continuation of any action or proceeding in Canada against the Debtors or their assets should be enjoined pursuant to applicable Canadian law to permit the expeditious and economical administration of the Canadian Proceedings.[21]   It is the Foreign Representative's intention to continue operations of the Debtor for a period of time so that the assets may be used for a stand-alone reorganization of the Debtor as a going concern.  As such, the Foreign Representative needs to stabilize operations and operate in the normal course, including paying employees and ongoing expenses.  In the reorganization context, courts generally have found irreparable harm to exist when failing to enjoin conduct would interfere with the reorganization process of a foreign debtor. *See In re Calpine Corp.*, 354 B.R. 45, 48–50 (Bankr. S.D.N.Y. 2006) (finding debtor would suffer irreparable harm to its reorganization if litigation was not stayed); *Garcia Avila*, 296 B.R. at 114

---

[21]    Debtors have requested herein that in the event of any conflict between the scopes of the stays and/or injunctions set forth in the CCAA Order and those contained in the Order, the language of the CCAA Order shall prevail, subject to further order of this Court.

(finding debtors would suffer irreparable harm if local creditors sought to interfere with the reorganization process).

35.     If the Foreign Representative's authority is not honored in the U.S., or if creditors or parties in interest take collection actions, the ordinary course operations of the Debtors and the Foreign Representative's ability to conduct and effectuate the reorganization could be jeopardized. *See, e.g.*, *In re Netia Holdings S.A.*, 278 B.R. 344, 352 (Bankr. S.D.N.Y. 2002) ("It is well established . . . that the dissipation of the finite resources of an insolvent estate constitutes irreparable injury."); *In re MMG, LLC*, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred positions to the detriment of other creditors.").

36.     Furthermore, protections that were approved by the Canadian Court are necessary to the Foreign Representative's uninterrupted operation of the Debtors' business.  Simply put, entry of (and full compliance with) the CCAA Order is a condition to any draw on the DIP Financing.  Consequently, absent these adoption of the CCCA Order in the U.S., the Foreign Representative will be unable to fund the Debtors' operations and maintain the Debtors' employees, resulting in a shutdown and liquidation of the Debtors' business.  Furthermore, absent these protections, the Debtors may lose their REP certificate and customer base.  If ERCOT is concerned about the Debtors' financial reliability, it can order the Debtors to provide collateral or other forms of financial comfort.  If the Debtors are unable to pay its invoices when due, ERCOT can revoke the Debtors' REP certificate and auction off the Debtors' customers on five days' notice.  The provisional relief is necessary on an immediate basis to protect against potential destruction of asset value, disruption to business operations, and interference with the Foreign Representative restructuring efforts that would result from the Debtors' liquidity constraints and

the exercise of remedies by lenders, contract counterparties, and others pending entry of a final order; absent this relief, the Debtors' estates will suffer irreparable harm.

       **C.**    **The Threatened Injury to the Debtors Outweighs Any Damage the Interim Relief Would Cause to a Creditor.**

    37.    The provisional relief sought hereunder will benefit the Debtors' creditors by ensuring an equitable and orderly distribution of assets and facilitate administration of the Canadian Proceedings.  In contrast, the harm to any particular creditor by the temporary imposition of the automatic stay and related relief pending final relief is minimal and is always subject to the right of such creditor to request relief from the provisional relief that may be granted in the proposed Order.  Thus, the purported harm to any particular creditor by the temporary imposition of the automatic stay is greatly outweighed by the severe harm caused to all of the Debtors' other stakeholders (including without limitation, customers, trade creditors, employees, and tax agencies), if the Debtors' ability to remain a viable enterprise was in any way compromised.

    38.    Similarly, since the Debtors have been—and will remain—current on all payments to regulators, and the Debtors' liquidity problems have been solved by the DIP Financing, the harm to regulators is minimal (*i.e.*, payments will continue to be timely made and their right to take action for reasons other than mere status as a "debtor" is fully preserved).

       **D.**    **The Provisional Relief Will Not Disserve the Public Interest.**

    39.    The provisional relief sought hereunder will not disserve the public interest because it is *in* the public interest for the provisional relief to be granted.  *Cornfeld v. Invs. Overseas Servs., Ltd.*, 471 F.Supp. 1255, 1259 (S.D.N.Y. 1979), *aff'd* 614 F.2d 1286 (2d Cir. 1979) ("American public policy would be furthered, for the firm policy of American courts is the staying of actions against a corporation which is the subject of a bankruptcy proceeding in another jurisdiction."); *see also Rehabworks, Inc. v. Lee* (*In re Integrated Health Servs., Inc.*), 281 B.R. 231, 239 (Bankr.

D. Del. 2002) ("In the context of a bankruptcy case, promoting a successful reorganization is one of the most important public interests.").  At this stage, parties in interest will have an opportunity to participate in the Canadian Proceedings, which are designed to take account of and balance the needs of the various creditor constituencies in a collective orderly process, as well as to participate in any hearing on the granting of final relief in this Court.

40.     Further, the provisional relief would cause little, if any, harm to creditors as the Debtors are continuing to pay all obligations as they come due. Indeed, the provisional relief would only further enable the Debtors to continue to pay all obligations on a go-forward basis as they work towards consummating the CCAA plan of arrangement that will resolve their temporary liquidity crisis.  The provisional relief would be temporary, pending the hearing on recognition, and will not hamper the ability of creditors to assert their rights in the Canadian Proceedings.  Even so, certain creditors "may be denied an advantage over the Debtors' other . . . creditors is not a valid reason to deny relief to the foreign representative." *In re Atlas Shipping A/S*, 404 B.R. 726, 742 (Bankr. S.D.N.Y. 2009).  The harm to the Debtor and its assets that would occur absent granting the provisional relief would be far greater than any potential prejudice to stakeholders that might wish to pursue their individual remedies in the U.S. in disregard of the Canadian Proceedings.

41.     Finally, it is in the "public" interest for the over 950,000 customers of Just Energy to continue uninterrupted services.

## IV.    Additional Relief is Appropriate.

42.     Section 1519(a) of the Bankruptcy Code allows for the granting of provisional relief, including pursuant to 11 U.S.C. § 1521(a)(7).  Section 1521(a)(7) in turn provides that, with certain exceptions, the Court may grant any additional relief that may be available to a trustee. 11 U.S.C. § 1521(a)(7).  This provision does not require the application of injunction standards.

11 U.S.C. § 1521(e). The Debtor is party to numerous executory contracts and unexpired leases, some of which may contain bankruptcy or insolvency "*ipso facto*" clauses. If counterparties to these agreements can unilaterally terminate or modify those agreements, the Debtors' ability to administer this proceeding could be severely jeopardized. Furthermore, ERCOT may seek to revoke the Debtors' retail energy provider certificate merely because of the Debtors' Canadian Proceedings and these chapter 15 cases, thereby frustrating the Debtors' restructuring efforts and Congress' intent to provide a debtor with a "fresh start." As a result, pursuant to § 1521(a)(7), the Foreign Representative requests that this Court order that subsection 365(e) of the Bankruptcy Code shall immediately apply with respect to the termination or modification of any executory contracts or unexpired leases of the Debtor and that section 525 of the Bankruptcy Code shall immediately apply to protect the Debtors pending the hearing on recognition of the Canadian Proceedings. The requested relief is necessary to effectuate the purpose of chapter 15 and to protect the assets of the Debtors or the interests of the creditors. *See* 11 U.S.C. § 1521(a).

## **Basis for Emergency Relief**

43.     Pursuant to Bankruptcy Rule 6003, the Foreign Representative requests emergency consideration of this motion. The Foreign Representative seeks emergency provisional relief under sections 105(a) and 1519 of the Bankruptcy Code, staying execution against the Debtors' assets until and through the Court's consideration of the Foreign Representative's chapter 15 petition filed contemporaneously with this motion. Prior to entry of a recognition order, the Debtor does not automatically have the protections of the Bankruptcy Code, including the automatic stay provisions. Emergency provisional relief is necessary to prevent creditors and other parties from continuing litigation or taking action against the Debtors' assets in the U.S. that could prejudice

and disrupt the Canadian Proceedings, thereby interfering with the Foreign Representative's ability to conduct operations and the reorganization of the Debtor.

### Notice

44.     The Foreign Representative will provide notice of this motion to:  (a) the Office of the United States Trustee; (b) the United States Attorney's Office for the Southern District of Texas; (c) administrative agent to the prepetition credit agreement and counsel hereto; (d) the Provisional Relief Parties;[22] (e) all persons or bodies authorized to administer the Canadian Proceedings; (f) any other parties of which the Foreign Representative becomes aware that are required to receive notice pursuant to Bankruptcy Rule 2002(q); and (g) such other entities as this Court may direct (collectively, the "Notice Parties") satisfies the requirements of Bankruptcy Rule 2002(q).  The Foreign Representative submits that, in light of the nature of the relief requested, no other or further notice need be given.

### Waiver of Federal Rule of Civil Procedure 65(c)

45.     Bankruptcy Rule 7065 expressly provides that "a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)."   To the extent Rule 65 of the Federal Rules of Civil Procedure applies, the Foreign Representative believes that the security requirements imposed by Rule 65(c) are unwarranted under the circumstances and requests a waiver of such requirements pursuant to Bankruptcy Rule 7065.

---

[22]     The provisional relief parties shall include BP Energy Company, BP Canada Energy Marketing Corp., BP Canada Energy Group ULC, BP Corporation North America Inc., and any other related affiliate with which Just Energy contracts (collectively, "BP"), Shell Energy North America (Canada) Inc., Shell Energy North America (U.S.) L.P., and any other related affiliate with which Just Energy contracts (collectively, "Shell"), any hedging counterparty, PUCT, ERCOT, and any relevant regulator in the states which Just Energy operates including Texas, Maryland, New Jersey, New York, Ohio, and Pennsylvania (collectively, the "Provisional Relief Parties").

### **Conclusion**

46.     The Foreign Representative requests the Court enter the proposed order, substantially in the form attached hereto, granting the relief requested herein and such other and further relief as may be just and proper.

Houston, Texas
March 9, 2021

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:      (713) 752-4221
Email:          mcavenaugh@jw.com
                ggraham@jw.com

*Co-Counsel to the Debtors and Debtors*
*in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Facsimile:      (713) 836-3601
Email:          brian.schartz@kirkland.com

-and-

Neil E. Herman ( *pro hac vice* admission pending )
Allyson B. Smith ( *pro hac vice* admission pending )
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:      (212) 446-4900
Email:          neil.herman@kirkland.com
                allyson.smith@kirkland.com

*Co-Counsel for the Debtors and Debtors in Possession*

## **Certificate of Service**

I certify that on March 9, 2021, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Matthew D. Cavenaugh*
Matthew D. Cavenaugh

## Exhibit A

**CCAA Order**

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETÜE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _9TH_ DAY OF _MARCH_ 20 _21_

FAIT A TORONTO LE _____ JOUR DE _____

REGISTRAR          GREFFIER

Court File No. CV-21-00658423-00CL

## ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | TUESDAY, THE 9TH |
| | ) | |
| JUSTICE KOEHNEN | ) | DAY OF MARCH, 2021 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.**, JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC, HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS LLC, FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP. AND JUST ENERGY (FINANCE) HUNGARY ZRT.
(each, an "**Applicant**", and collectively, the "**Applicants**")

### INITIAL ORDER

**THIS APPLICATION**, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), was heard this day by judicial videoconference via Zoom in Toronto, Ontario due to the COVID-19 pandemic.

**ON READING** the affidavit of Michael Carter sworn March 9, 2021 and the Exhibits thereto (the "**Carter Affidavit**"), the pre-filing report of the proposed monitor,  FTI Consulting

LEGAL_1:65800321.17

2

Canada Inc. ("**FTI**"), dated March 9, 2021  (the "**Pre-Filing Report**"), and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicants and the partnerships listed in Schedule "A" hereto (the "**JE Partnerships**", and collectively with the Applicants, the "**Just Energy Entities**"), FTI, Alter Domus (US) LLC (the "**DIP Agent**"), as administrative agent for the lenders (the "**DIP Lenders**") under the DIP Term Sheet (as defined below) and such other counsel who were present, and on reading the consent of FTI to act as the monitor (the "**Monitor**"),

**SERVICE**

1.     **THIS COURT ORDERS** that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**DEFINED TERMS**

2.     **THIS COURT ORDERS** that capitalized terms that are used in this Order shall have the meanings ascribed to them in Schedule "B" hereto or the Carter Affidavit, as applicable, if they are not otherwise defined herein.

**APPLICATION**

3.     **THIS COURT ORDERS AND DECLARES** that the Applicants are companies to which the CCAA applies. Although not Applicants, the JE Partnerships shall enjoy the benefits of the protections and authorizations provided by this Order.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.     **THIS COURT ORDERS** that the Just Energy Entities shall remain in possession and control of their respective current and future assets, licenses, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"). Subject to further Order of this Court, the Just Energy Entities shall continue to carry on business in a manner consistent with the preservation of their business (the "**Business**") and Property. The Just Energy Entities shall each be authorized and empowered to continue to retain and employ the employees, contractors, staffing agencies, consultants, agents, experts, accountants, counsel and

I HEREBY CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS
DAY OF
AT TORONTO, ON

JE ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

9TH
MARCH       20 21

GREFFIER

such other persons (collectively "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

5.     **THIS COURT ORDERS** that:

(a)     the Just Energy Entities shall be entitled to continue to utilize the central cash management system currently in place as described in the Carter Affidavit or, with the consent of the DIP Agent, replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System (a "**Cash Management Bank**") shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Just Energy Entities of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Just Energy Entities, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under any  plan of compromise or arrangement with regard to Cash Management Obligations. All present and future indebtedness, liabilities and obligations of any and every kind, nature or description whatsoever to a Cash Management Bank under, in connection with, relating to or with respect to any and all agreements evidencing treasury facilities and cash management products (including, for greater certainty, all pre-authorized debit banking services, electronic funds transfer services and overdraft balances) provided by a Cash Management Bank to any Just Energy Entity, and any unpaid balance thereof, are collectively referred to herein as the "**Cash Management Obligations**";

(b)     during the Stay Period (as defined below), no Cash Management Bank shall, without leave of this Court: (i) exercise any sweep remedy under any applicable documentation (provided, for greater certainty, that the cash pooling and zero-balancing account services provided with respect to the JPMorgan accounts held by the U.S. Bank

4

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 9TH DAY OF MARCH 20 21

FAIT À TORONTO LE 9 JOUR DE

REGISTRAR

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

GREFFIER

Account Holders (as defined in the Carter Affidavit) may continue in the ordinary course); or (ii) exercise or claim any right of set-off against any account included in the Cash Management System;

(c)    any of the Cash Management Banks may rely on the representations of the applicable Just Energy Entities with respect to whether any cheques or other payment order drawn or issued by the applicable Just Energy Entity prior to the date of this Order should be honoured pursuant to this or any other order of this Court, and such Cash Management Bank shall not have any liability to any party for relying on such representations by the applicable Just Energy Entities as provided for herein; and

(d)    (i) those certain existing deposit agreements between the Just Energy Entities and the Cash Management Banks shall continue to govern the post-filing cash management relationship between the Just Energy Entities and the Cash Management Banks, and that all of the provisions of such agreements shall remain in full force and effect, (ii) either any of the Just Energy Entities, with the consent of the Monitor, the DIP Agent and the Cash Management Banks may, without further Order of this Court, implement changes to the Cash Management System and procedures in the ordinary course of business pursuant to the terms of those certain existing deposit agreements, including, without limitation, the opening and closing of bank accounts, and (iii) all control agreements in existence prior to the date of this Order shall apply.

6.    **THIS COURT ORDERS** that, except as specifically permitted herein, the Just Energy Entities are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by any of the Just Energy Entities to any of their respective creditors as of this date; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of the Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business; provided, however, that the Just Energy Entities, until further order of this Court, are hereby permitted, subject to the terms of the Definitive Documents: (i) to reimburse the reasonable documented fees and disbursements of legal counsel and one financial advisor to the agent under the Credit Agreement, whether incurred before or after the date of this Order; (ii) to pay all non-default interest and fees to the agent and the lenders under the Credit Agreement in accordance with its terms; and (iii) to repay advances under the Credit

5

Agreement for the purpose of creating availability under the Revolving Facilities in order for the Just Energy Entities to request the issuance of Letters of Credit under the Revolving Facilities to continue to operate the Business in the ordinary course during these proceedings, subject to: (A) obtaining the consent of the Monitor with respect to the issuance of the Letters of Credit under the Revolving Facilities; and (B) receipt of written confirmation from the applicable lender(s) under the Credit Agreement that such lender(s) will issue a Letter of Credit of equal value within one (1) Business Day thereafter. Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed thereto in the Credit Agreement.

7.     **THIS COURT ORDERS** that, subject to the terms of the Definitive Documents (as hereinafter defined), the Just Energy Entities shall be entitled but not required to pay the following amounts whether incurred prior to, on or after the date of this Order:

(a)     all outstanding and future wages, salaries, commissions, employee benefits, contributions in respect of retirement or other benefit arrangements, vacation pay and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)     all outstanding and future amounts owing to or in respect of other workers providing services in connection with the Business and payable on or after the date of this Order, incurred in the ordinary course of business and consistent with existing arrangements;

(c)     the fees and disbursements of any Assistants retained or employed by the Just Energy Entities in respect of these proceedings at their standard rates and charges, which, in the case of the Financial Advisor (as defined below) shall be the amounts payable in accordance with the Financial Advisor Agreement (as defined below);

(d)     with the consent of the Monitor in consultation with the agent under the Credit Agreement (or its advisors), amounts owing for goods or services actually provided to any of the Just Energy Entities prior to the date of this Order by third parties, if, in the opinion of the Just Energy Entities, such third party is critical to the Business and ongoing operations of the Just Energy Entities;

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _MARCH_ 20_21_
FAIT A TORONTO LE _____ JOUR DE _____

REGISTRAR
GREFFIER

6

(e)     any taxes (including, without limitation, sales, use, withholding, unemployment, and excise) not covered by paragraph 9 of this Order, and whereby the nonpayment of which by any Just Energy Entity could result in a responsible person associated with a Just Energy Entity being held personally liable for such nonpayment; and

(f)     taxes related to revenue, State income or operations incurred or collected by a Just Energy Entity in the ordinary course of business.

8.     **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein and subject to the terms of the Definitive Documents, the Just Energy Entities shall be entitled but not required to pay all reasonable expenses incurred by the Just Energy Entities in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers' insurance), maintenance and security services; and

(b)     payment for goods or services actually supplied to the Just Energy Entities following the date of this Order.

9.     **THIS COURT ORDERS** that the Just Energy Entities shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Just Energy Entities in connection with the sale of goods and services by the Just Energy Entities, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or

I HEREBY CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

JE CERTIFIE PAR LES PRÉSENTES QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _MARCH_ 20 _21_
FAIT À TORONTO LE _____ JOUR DE

REGISTRAR      GREFFIER

7

collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Just Energy Entities.

**RESTRUCTURING**

10.     **THIS COURT ORDERS** that the Just Energy Entities shall, subject to such requirements as are imposed by the CCAA and subject to the terms of the Definitive Documents, have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their Business or operations; and

(b)     pursue all avenues of refinancing, restructuring, selling and reorganizing the Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing, restructuring, sale or reorganization,

all of the foregoing to permit the Just Energy Entities to proceed with an orderly restructuring of the Just Energy Entities and/or the Business (the "**Restructuring**").

**NO PROCEEDINGS AGAINST THE JUST ENERGY ENTITIES, THE BUSINESS OR THE PROPERTY**

11.     **THIS COURT ORDERS** that until and including March 19, 2021 or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process before any court, tribunal, agency or other legal or, subject to paragraph 12, regulatory body (each, a "**Proceeding**") shall be commenced or continued against or in respect of any of the Just Energy Entities or the Monitor or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, except with the prior written consent of the Just Energy Entities and

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE.

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU.

DATED AT TORONTO THIS 9TH DAY OF MARCH 20 21
FAIT A TORONTO LE     JOUR DE

8

the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Just Energy Entities or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

12.    **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental unit, body or agency, foreign regulatory body or agency or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Just Energy Entities or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Just Energy Entities and the Monitor, or leave of this Court, provided that nothing in this Order shall: (i) empower the Just Energy Entities to carry on any business which the Just Energy Entities are not lawfully entitled to carry on, (ii) subject to paragraph 13, affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

13.    **THIS COURT ORDERS** that notwithstanding Section 11.1 of the CCAA, all rights and remedies of provincial energy regulators and provincial regulators of consumer sales that have authority with respect to energy sales against or in respect of the Just Energy Entities or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended during the Stay Period except with the written consent of the Just Energy Entities and the Monitor, or leave of this Court on notice to the Service List.

**NO INTERFERENCE WITH RIGHTS**

14.    **THIS COURT ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Just Energy Entities except with the written consent of the Just Energy Entities and the Monitor, leave of this Court or as permitted under any Commodity ISO/Supplier Support Agreement.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS    DAY OF MARCH    20 21
FAIT À TORONTO LE    JOUR DE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVETUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

REGISTRAR    GREFFIER

9

**CONTINUATION OF SERVICES**

15.    **THIS COURT ORDERS** that during the Stay Period, except as permitted under any Commodity ISO/Supplier Support Agreement, all Persons having oral or written agreements with any Just Energy Entity or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Just Energy Entities or the Business, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Just Energy Entities, and that the Just Energy Entities shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case, that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Just Energy Entities in accordance with normal payment practices of the Just Energy Entities or such other practices as may be agreed upon by the supplier or service provider and the applicable Just Energy Entity and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

16.    **THIS COURT ORDERS** that, subject to paragraph 20 but notwithstanding any other paragraphs of this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to any of the Just Energy Entities. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**COMMODITY SUPPLIERS**

17.    **THIS COURT ORDERS** that each Qualified Commodity/ISO Supplier shall be entitled to the benefit of and is hereby granted a charge (together, the "**Priority Commodity/ISO Charge**") on the Property in an amount equal to the value of the Priority Commodity/ISO Obligations. The value of the Priority Commodity/ISO Obligations shall be determined in accordance with the terms of the existing agreements or arrangements between the applicable Just

I ATTEST QUE CE
DOCUMENT, EACH PAGE OF        DOCUMENT, DONT CHACUNE
WHICH IS STAMPED WITH THE      DES PAGES EST REVÊTUE DU
SEAL OF THE SUPERIOR COURT    SCEAU DE LA COUR SUPÉRIEURE
OF JUSTICE AT TORONTO, IS A    DE JUSTICE A TORONTO, EST UNE
TRUE COPY OF THE DOCUMENT    COPIE CONFORME DU DOCUMENT
ON FILE IN THIS OFFICE         CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS        DAY OF                20
FAIT A TORONTO LE            JOUR DE

10

Energy Entity and the Qualified Commodity/ISO Supplier or, in the event of any dispute, by the Court. The Priority Commodity/ISO Charge shall have the priority set out in paragraphs 43-45 herein.

18.    **THIS COURT ORDERS** that the Commodity/ISO Supplier Support Agreements are hereby ratified, approved and deemed to be Qualified Support Agreements.

19.    **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to execute and deliver Qualified Support Agreements with any counterparty to a Commodity Agreement.

20.    **THIS COURT ORDERS** that upon the occurrence of an event of default under a Qualified Support Agreement, the applicable Qualified Commodity/ISO Supplier may exercise the rights and remedies available to it under its Qualified Support Agreement, or upon five (5) days' notice to the Just Energy Entities, the Monitor and the Service List, may apply to this Court to seek the Court's authorization to exercise any and all of its other rights and remedies against the Just Energy Entities or the Property under or pursuant to its Commodity Agreement or ISO Agreement and the Priority Commodity/ISO Charge, including without limitation, for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Just Energy Entities and for the appointment of a trustee in bankruptcy of the Just Energy Entities.

21.    **THIS COURT ORDERS** that the Monitor shall provide a report on the value of the Priority Commodity/ISO Obligations as of the last day of each calendar month by posting such report on the Monitor's Website (as defined below) within three (3) Business Days of such calendar month end.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

22.    **THIS COURT ORDERS** that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Just Energy Entities with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Just Energy Entities whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Just Energy Entities, if one

I HEREBY CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH BEARS THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF MARCH 20 21
FAIT A TORONTO LE    JOUR DE

11

filed, is sanctioned by this Court or is refused by the creditors of the Just Energy Entities or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

23.      **THIS COURT ORDERS** that each of the Just Energy Entities shall jointly and severally indemnify their respective directors and officers against obligations and liabilities that they may incur as directors or officers of the Just Energy Entities after the commencement of the within proceedings, except to the extent that, with respect to any officer or director, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

24.      **THIS COURT ORDERS** that the directors and officers of the Just Energy Entities shall be entitled to the benefit of and are hereby granted a charge (the **"Directors' Charge"**) on the Property, which charge shall not exceed an aggregate amount of C$30,000,000, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 43-45 herein.

25.      **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (i) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (ii) the Just Energy Entities' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23.

**APPOINTMENT OF MONITOR**

26.      **THIS COURT ORDERS** that FTI is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Just Energy Entities with the powers and obligations set out in the CCAA or set forth herein and that the Just Energy Entities and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Just Energy Entities pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRESENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS ___ DAY OF _MARCH_ 20_21_
FAIT A TORONTO LE ___ JOUR DE

_____
REGISTRAR                    GREFFIER

12

27.      **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

    (a)      monitor the Just Energy Entities' receipts and disbursements;

    (b)      report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

    (c)      assist the Just Energy Entities, to the extent required by the Just Energy Entities, in their dissemination to the DIP Agent, the DIP Lenders and their counsel of financial and other information in accordance with the Definitive Documents;

    (d)      advise the Just Energy Entities in their preparation of the Just Energy Entities' cash flow statements and reporting required by the DIP Agent and DIP Lenders, which information shall be reviewed with the Monitor and delivered to the DIP Agent and DIP Lenders and their counsel in accordance with the Definitive Documents;

    (e)      have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Just Energy Entities, wherever located and to the extent that is necessary to adequately assess the Just Energy Entities' business and financial affairs or to perform its duties arising under this Order;

    (f)      be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

    (g)      perform such other duties as are required by this Order or by this Court from time to time.

28.      **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS 9TH DAY OF MARCH 20 21.
FAIT A TORONTO LE                JOUR DE

N. Majcak

REGISTRAR                                    GREFFIER

LA PRÉSENTE ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

13

29.    **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.    **THIS COURT ORDERS** that the Monitor shall provide any creditor of the Just Energy Entities and the DIP Agent and the DIP Lenders with information provided by the Just Energy Entities in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Just Energy Entities is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may agree.

31.    **THIS COURT ORDERS** that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

32.    **THIS COURT ORDERS** that the Monitor, counsel to the Monitor (including both U.S. and Canadian counsel for all purposes of this Order), and counsel to the Just Energy Entities (including both U.S. and Canadian counsel for all purposes of this Order) shall be paid their

14

reasonable fees and disbursements, in each case at their standard rates and charges, whether incurred prior to, on, or subsequent to the date of this Order, by the Just Energy Entities as part of the costs of these proceedings. The Just Energy Entities are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor, and the Just Energy Entities' counsel on a weekly basis.

33.    **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

**ADMINISTRATION CHARGE**

34.    **THIS COURT ORDERS** that the Monitor, counsel to the Monitor and counsel to the Just Energy Entities shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of C$2,200,000 as security for their professional fees and disbursements incurred at their standard rates and charges, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 43-45 herein.

**DIP FINANCING**

35.    **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to obtain and borrow or guarantee, as applicable, pursuant a credit facility from the DIP Agent and the DIP Lenders in order to finance the Just Energy Entities' working capital requirements and other general corporate purposes, all in accordance with the Cash Flow Statements (as defined in the DIP Term Sheet, which term is defined below) and Definitive Documents, provided that borrowings under such credit facility shall not exceed US$125,000,000 unless permitted by further Order of this Court.

36.    **THIS COURT ORDERS** that such credit facility shall be on the terms and subject to the conditions set forth in the CCAA Interim Debtor-in-Possession Financing Term Sheet between the Just Energy Entities, the DIP Agent and the DIP Lenders dated as of March 9, 2021 and attached as Appendix "DD" to the Carter Affidavit (as may be amended or amended and restated from time to time, the "**DIP Term Sheet**").

37.     **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to execute and deliver such mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively with the DIP Term Sheet and the Cash Flow Statements, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the DIP Agent and the DIP Lenders pursuant to the terms thereof, and the Just Energy Entities are hereby authorized and directed to pay and perform all of the indebtedness, interest, fees, liabilities and obligations to the DIP Agent and the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order. Notwithstanding any other provision in this Order, all payments and other expenditures to be made by any of the Just Energy Entities to any Person (except the Monitor and its counsel) shall be in accordance with the terms of the Definitive Documents, including in respect of payments in satisfaction of Priority Commodity/ISO Obligations.

38.     **THIS COURT ORDERS** that the DIP Agent and the DIP Lenders shall be entitled to the benefit of and are hereby granted a charge (the "**DIP Lenders' Charge**") on the Property, which DIP Lenders' Charge shall not secure an obligation that exists before this Order is made.  The DIP Lenders' Charge shall have the priority set out in paragraphs  43-45 hereof.

39.     **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

(a)     the DIP Agent on behalf of the DIP Lenders may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;



(b)     upon the occurrence of an event of default under any of the Definitive Documents or the DIP Lenders' Charge, the DIP Agent or the DIP Lenders, as applicable, may immediately cease making advances or providing any credit to the Just Energy Entities and shall be permitted to set off and/or consolidate any amounts owing by the DIP Agent or the DIP Lenders to the Just Energy Entities against the obligations of the Just Energy Entities to the DIP Agent and the DIP Lenders under the Definitive Documents or the DIP Lenders' Charge, make demand, accelerate payment and give other notices with respect to the obligations of the Just Energy Entities to the DIP Agent or the DIP Lenders under the Definitive Documents or the DIP Lenders' Charge, or to apply to

16

this Court on five (5) days' notice to the Just Energy Entities, the Monitor and the Service List to seek the Court's authorization to exercise any and all of its other rights and remedies against the Just Energy Entities or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Just Energy Entities and for the appointment of a trustee in bankruptcy of the Just Energy Entities; and

(c)   the foregoing rights and remedies of the DIP Agent and the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Just Energy Entities or the Property.

40.   **THIS COURT ORDERS AND DECLARES** that the DIP Agent, the DIP Lenders and the Qualified Commodity/ISO Suppliers shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicants or any of them under the CCAA, or any proposal filed by the Applicants or any of them under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**APPROVAL OF FINANCIAL ADVISOR AGREEMENT**

41.   **THIS COURT ORDERS** that the agreement dated February 20, 2021 engaging BMO Nesbitt Burns Inc. (the "**Financial Advisor**") as financial advisor to the Just Energy Entities and attached as Confidential Appendix "FF" to the Carter Affidavit (the "**Financial Advisor Agreement**"), and the retention of the Financial Advisor under the terms thereof, is hereby ratified and approved and the Just Energy Entities are authorized and directed *nunc pro tunc* to make the payments contemplated thereunder in accordance with the terms and conditions of the Financial Advisor Agreement.

42.   **THIS COURT ORDERS** that the Financial Advisor shall be entitled to the benefit of and is hereby granted a charge (the "**FA Charge**") on the Property, which charge shall not exceed an aggregate amount of C$1,800,000 as security for the fees and disbursements and other amounts payable under the Financial Advisor Agreement, both before and after the making of this Order in respect of these proceedings. The FA Charge shall have the priority set out in paragraphs 43-45 herein.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS _____ DAY OF _MARCH_ 20 _21_
FAIT A TORONTO LE           JOUR DE

REGISTRAR                              GREFFIER

I CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _____ DAY OF _____ 20___

REGISTRAR

JE LE PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

FAIT À TORONTO CE _____ JOUR DE _____

GREFFIER

17

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

43.      **THIS COURT ORDERS** that the priorities of the Administration Charge, the FA Charge, the Directors' Charge, the DIP Lenders' Charge and the Priority Commodity/ISO Charge, as among them, shall be as follows:

> First – Administration Charge and FA Charge (to the maximum amount of C$2,200,000 and C$1,800,000, respectively), on a *pari passu* basis;

> Second – Directors' Charge (to the maximum amount of C$30,000,000); and

> Third – DIP Lenders' Charge (to the maximum amount of the Obligations (as defined in the DIP Term Sheet) owing thereunder at the relevant time) and the Priority Commodity/ISO Charge, on a *pari passu* basis.

44.      **THIS COURT ORDERS** that the filing, registration or perfection of the Administration Charge, the FA Charge, the Directors' Charge, the DIP Lenders' Charge or the Priority Commodity/ISO Charge (collectively, the "**Charges**") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

45.      **THIS COURT ORDERS** that each of the Charges shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person (including those commodity suppliers listed in Schedule "A" hereto), other than any Person with a properly perfected purchase money security interest under the *Personal Property Security Act* (Ontario) or such other applicable legislation that has not been served with notice of this Order.

46.      **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court on notice to parties in interest, the Just Energy Entities shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges unless the Just Energy Entities also obtain the prior written consent of the Monitor, the DIP Agent on behalf of the DIP Lenders and the beneficiaries of the Administration Charge, the

18

FA Charge, the Directors' Charge and the Priority Commodity/ISO Charge, or further Order of this Court.

47.     **THIS COURT ORDERS** that the Charges, the agreements and other documents governing or otherwise relating to the obligations secured by the Charges, and the Definitive Documents shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Agent or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan document, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds any of the Just Energy Entities and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by any Just Energy Entity of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Just Energy Entities entering into the DIP Term Sheet, the creation of the Charges or the execution, delivery or performance of any of the other Definitive Documents; and

(c)     the payments made by the Just Energy Entities pursuant to this Order or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

48.     **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Just Energy Entities' interest in such real property leases.

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DATED AT TORONTO THIS          DAY OF  MARCH      20 21
FAIT A TORONTO LE                JOUR DE

REGISTRAR                                                           GREFFIER

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE
DATED AT TORONTO THIS
FAIT A TORONTO LE
REGISTRAR

LA PRÉSENTE ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU
DAY OF
JOUR DE
20
GREFFIER

**SERVICE AND NOTICE**

49.     **THIS COURT ORDERS** that the Monitor shall (i) without delay, publish in The Globe and Mail (National Edition) and the Wall Street Journal a notice containing the information prescribed under the CCAA, (ii) within five days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, or cause to be sent, in the prescribed manner or by electronic message to the e-mail addresses as last shown on the records of the Just Energy Entities, a notice to every known creditor who has a claim against the Just Energy Entities of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder, provided that the Monitor shall not make the claims, names and addresses of the individuals who are creditors publicly available.

50.     **THIS COURT ORDERS** that the Monitor shall create, maintain and update as necessary a list of all Persons appearing in person or by counsel in this proceeding (the "**Service List**"). The Monitor shall post the Service List, as may be updated from time to time, on the Monitor's website as part of the public materials to be recorded thereon in relation to this proceeding. Notwithstanding the foregoing, the Monitor shall haven no liability in respect of the accuracy of or the timeliness of making any changes to the Service List.

51.     **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at http://www.ontariocourts.ca//scj/practice/practice-directions/toronto/eservice-commercial/) shall be valid and effective service. Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission. This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL - http://cfcanada.fticonsulting.com/justenergy (the "**Monitor's Website**").

52.     **THIS COURT ORDERS** that the Just Energy Entities, the DIP Agent or the DIP Lenders and the Monitor and their respective counsel are at liberty to serve or distribute this Order, any

THIS IS TO CERTIFY THAT THIS
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS
FAIT À TORONTO LE

REGISTRAR

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVÉ DANS CE BUREAU

DAY OF
JOUR DE

GREFFIER

9TH
MARCH 20 21

other materials and orders as may be reasonably required in these proceedings, including any notices, or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal deliver, facsimile or other electronic transmission to the Just Energy Entities' creditors or other interested parties and their advisors and that any such service, distribution or notice shall be deemed to be received: (a) if sent by courier, on the next business day following the date of forwarding thereof, (b) if delivered by personal delivery or facsimile or other electronic transmission, on the day so delivered, and (c) if sent by ordinary mail, on the third business day after mailing. For greater certainty, any such distribution or service shall be deemed to be in satisfaction of a legal or judicial obligation, and notice requirements within the meaning of clause 3(c) of the *Electronic Commerce Protection Regulations*, Reg. 81000-2-175 (SOR/DORS).

**FOREIGN PROCEEDINGS**

53.     **THIS COURT ORDERS** that the Applicant, Just Energy Group Inc. ("**JEGI**") is hereby authorized and empowered, but not required, to act as the foreign representative (in such capacity, the "**Foreign Representative**") in respect of the within proceedings for the purpose of having these proceedings recognized and approved in a jurisdiction outside of Canada.

54.     **THIS COURT ORDERS** that the Foreign Representative is hereby authorized to apply for foreign recognition and approval of these proceedings, as necessary, in any jurisdiction outside of Canada, including in the United States pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

**GENERAL**

55.     **THIS COURT ORDERS** that any interested party that wishes to amend or vary this Order shall be entitled to appear or bring a motion before this Court on a date to be set by this Court upon the granting of this Order (the "**Comeback Date**"), and any such interested party shall give not less than two (2) business days' notice to the Service List and any other party or parties likely to be affected by the Order sought in advance of the Comeback Date; provided, however, that the Chargees, the DIP Agent and the DIP Lenders shall be entitled to rely on this Order as issued and entered and on the Charges and priorities set out in paragraphs 43-45 hereof, including with respect to any fees, expenses and disbursements incurred and in respect of advances made under the Definitive Documents or pursuant to the Qualified Support Agreement, as applicable, until the

21

date this Order may be amended, varied or stayed. For the avoidance of doubt, no payment in respect of any obligations secured by the Priority Commodity/ISO Charge shall be subject to the terms of any intercreditor agreement, including any "turnover" or "waterfall" provision(s) therein.

56.     **THIS COURT ORDERS** that, notwithstanding paragraph 55 of this Order, the Just Energy Entities or the Monitor may from time to time apply to this Court to amend, vary or supplement this Order or for advice and directions in the discharge of their powers and duties under this Order or in the interpretation or application of this Order.

57.     **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Just Energy Entities, the Business or the Property.

58.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body or agency having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Just Energy Entities, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies and agencies are hereby respectfully requested to make such orders and to provide such assistance to the Just Energy Entities and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to JEGI, in any foreign proceeding, or to assist the Just Energy Entities and the Monitor and their respective agents in carrying out the terms of this Order.

59.     **THIS COURT ORDERS** that each of the Just Energy Entities and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body or agency, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that JEGI is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

60.     **THIS COURT ORDERS** that Confidential Appendices "FF" and "GG" to the Carter Affidavit shall be and are hereby sealed, kept confidential and shall not form part of the public record pending further Order of this Court.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU.

DATED AT TORONTO THIS _____ DAY OF _MARCH_ 20 _21_
FAIT À TORONTO LE     JOUR DE

REGISTRAR                    GREFFIER

22

61.   **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU

DATED AT TORONTO THIS 9TH DAY OF MARCH 20 21
FAIT À TORONTO LE                    JOUR DE

REGISTRAR                           GREFFIER

## SCHEDULE "A"

### JE Partnerships

**Partnerships:**

- JUST ENERGY ONTARIO L.P.

- JUST ENERGY MANITOBA L.P.

- JUST ENERGY (B.C.) LIMITED PARTNERSHIP

- JUST ENERGY QUÉBEC L.P.

- JUST ENERGY TRADING L.P.

- JUST ENERGY ALBERTA L.P.

- JUST GREEN L.P.

- JUST ENERGY PRAIRIES L.P.

- JEBPO SERVICES LLP

- JUST ENERGY TEXAS LP

**Commodity Suppliers:**

- EXELON GENERATION COMPANY, LLC

- BRUCE POWER L.P.

- SOCIÉTÉ GÉNÉRALE

- EDF TRADING NORTH AMERICA, LLC

- NEXTERA ENERGY POWER MARKETING, LLC

- MACQUARIE BANK LIMITED

- MACQUARIE ENERGY CANADA LTD.

- MACQUARIE ENERGY LLC

- MORGAN STANLEY CAPITAL GROUP

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _____ DAY OF _____ 20___
FAIT À TORONTO LE

REGISTRAR

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE À TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVÉ DANS CE BUREAU

JOUR DE

GREFFIER

THIS IS TO CERTIFY THAT THIS
DOCUMENT, EACH PAGE OF
WHICH IS STAMPED WITH THE
SEAL OF THE SUPERIOR COURT
OF JUSTICE AT TORONTO, IS A
TRUE COPY OF THE DOCUMENT
ON FILE IN THIS OFFICE

DATED AT TORONTO THIS _____ DAY OF _____ 20__
FAIT A TORONTO LE

REGISTRAR

LA PRÉSENT ATTEST QUE CE
DOCUMENT, DONT CHACUNE
DES PAGES EST REVÊTUE DU
SCEAU DE LA COUR SUPÉRIEURE
DE JUSTICE A TORONTO, EST UNE
COPIE CONFORME DU DOCUMENT
CONSERVE DANS CE BUREAU

JOUR DE

GREFFIER

## SCHEDULE "B"

## DEFINITIONS

"**Commodity Agreement**" means a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas, electricity or environmental derivative products.

"**ISO Agreement**" means an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

"**Priority Commodity/ISO Obligation**" amounts that are due and payable, at the applicable time, for: (i)(A) the physical supply of electricity or gas that has been delivered on or after March 9, 2021; (B) financial settlements on or after March 9, 2021; and (C) amounts owing under a confirmation or transaction that was executed on or after March 9, 2021 pursuant to a Commodity Agreement as a result of the termination thereof in accordance with the applicable Qualified Support Agreement; and (ii) for services actually delivered by a Qualified Commodity/ISO Supplier on or after March 9, 2021 pursuant to an ISO Agreement (but for greater certainty, excluding any amount owing for ISO services provided under an ISO Agreement on or before the date of this Order, whether or not yet due).

"**Qualified Commodity/ISO Supplier**" means any counterparty to a Commodity Agreement or ISO Agreement as of March 9, 2021 that has executed or executes a Qualfied Support Agreement with a Just Energy Entity and refrained from exercising termination rights under the Commodity Agreement as a result of the commencement of the Proceedings absent an event of default under such Qualfied Support Agreement.

"**Qualified Support Agreement**" means a support agreement between a Just Energy Entity and a counterparty to a Commodity Agreement, in form and substance satisfactory to the Just Energy Entities and the DIP Lenders, acting reasonably, which includes, among other things: (i) that such counterparty shall apply to the Court on five (5) days' notice to the Just Energy Entities, the Monitor and the Service List prior to exercising any termination rights under a Qualified Support Agreement; (ii) the obligation to supply physical and financial power and natural gas and other

25

related services pursuant to any confirmations or transactions executed pursuant to a Commodity Agreement; and (iii) an agreement to refrain from exercising termination rights as a result of the commencement of the Proceedings absent an event of default under such support agreement.

THIS IS TO CERTIFY THAT THIS DOCUMENT, EACH PAGE OF WHICH IS STAMPED WITH THE SEAL OF THE SUPERIOR COURT OF JUSTICE AT TORONTO, IS A TRUE COPY OF THE DOCUMENT ON FILE IN THIS OFFICE

LA PRÉSENT ATTEST QUE CE DOCUMENT, DONT CHACUNE DES PAGES EST REVÊTUE DU SCEAU DE LA COUR SUPÉRIEURE DE JUSTICE A TORONTO, EST UNE COPIE CONFORME DU DOCUMENT CONSERVE DANS CE BUREAU.

DATED AT TORONTO THIS _____ DAY OF MARCH 20 __
FAIT A TORONTO LE _____ JOUR DE

REGISTRAR

GREFFIER

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*,
R.S.C. 1985, C. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF JUST ENERGY GROUP INC., et al

(collectively, the "**Applicants**")

Court File No: CV-21-00658423-00CL

---

*Ontario*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

---

**INITIAL ORDER**

---

**OSLER, HOSKIN & HARCOURT, LLP**
P.O. Box 50, 1 First Canadian Place
Toronto, ON M5X 1B8

Marc Wasserman (LSO# 44066M)
Michael De Lellis (LSO# 48038U)
Jeremy Dacks (LSO# 41851R)

Tel: (416) 362-2111
Fax: (416) 862-6666

Lawyers for the Applicants

LEGAL_1:65800321.17

**<u>Exhibit B</u>**

**FTI Pre-Filing Report**

**Court File No.  CV-21-00XXXX-00CL**

# Just Energy Group Inc. et al.

**PRE-FILING REPORT OF FTI CONSULTING CANADA INC., AS THE PROPOSED MONITOR**

**March 9, 2021**



# TABLE OF CONTENTS

**INTRODUCTION**......................................................................................................... **1**

**PURPOSE** ..................................................................................................................... **2**

**BACKGROUND INFORMATION** ............................................................................ **3**

*Overview* ...................................................................................................................... *3*

*Business Operations and the Regulatory Environment* ............................................ *4*

*Commodity Suppliers and ISO Supplier Relationships* ............................................ *6*

*The Just Energy Group's Capital Structure* ............................................................. *7*

    *2020 Recapitalization* ......................................................................................... *7*

    *Capital Structure* ................................................................................................ *7*

**THE TEXAS WEATHER EVENT** ............................................................................. **10**

**GOING CONCERN DOUBTS AS A RESULT OF THE TEXAS WEATHER
EVENT** ....................................................................................................................... **14**

**FTI'S QUALIFICATIONS TO ACT AS MONITOR** ............................................ **15**

    *Engagement of FTI and the Preparation of this Pre-Filing Report* ...................... *16*

**THE JUST ENERGY GROUP'S CASH MANAGEMENT SYSTEM** .................... **17**

**CASH FLOW FORECAST** ........................................................................................ **18**

**RELIEF SOUGHT IN INITIAL ORDER** ............................................................... **21**

    *Extending the CCAA protections to the Just Energy LPs* ...................................... *21*

    *Implementing the Stay of Proceedings, including in respect of Regulators* .......... *22*

    *Proposed debtor-in-possession financing* ............................................................. *23*

    *Engagement of Financial Advisor* ......................................................................... *25*

    *Permitting certain repayments under the Credit Agreement* ................................. *26*

    *Permitting certain pre-filing payments to third parties* ........................................ *27*

    *Certain other relief for Commodity Suppliers* ...................................................... *27*

    *Court-ordered charges sought in the proposed Initial Order* ............................... *30*

        *(i) Administration Charge* ................................................................................ *30*

        *(ii) FA Charge* ................................................................................................. *31*

        *(iii) Directors' Charge* ..................................................................................... *31*

        *(iv) DIP Charge* ................................................................................................ *32*

        *(v) KERP Charge and Employee Bonus* ........................................................... *33*

        *(vi) Priority Commodity/ISO Suppliers Charge* ............................................... *33*

        *Summary of the Proposed Rankings of the Court-Ordered Charges* ............... *34*

**CHAPTER 15 PROCEEDINGS**................................................................................ **34**

**CONCLUSION** .......................................................................................................... **35**



Court File No. CV-21-00XXXX-00CL

### ONTARIO
### SUPERIOR COURT OF JUSTICE
### (COMMERCIAL LIST)

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.**, JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC,  HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS LLC.,  FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP., AND JUST ENERGY (FINANCE) HUNGARY ZRT (collectively, the "**Applicants**").

### PRE-FILING REPORT OF THE PROPOSED MONITOR

## INTRODUCTION

1.      FTI Consulting Canada Inc. ("**FTI" or the "Proposed Monitor**") understands that Just Energy Group Inc. ("**Just Energy**") and the other applicant companies listed in the style of cause above (collectively, the "**Applicants**") intend to make an application before the Ontario Superior Court of Justice (Commercial List) (the "**Court**") for an initial order (the "**Initial Order**") under the Companies' Creditors Arrangement Act (the "**CCAA**") to, among other things, obtain a stay of proceedings to allow the Applicants an opportunity to restructure their business and affairs.



2.      The Applicants propose that the Court appoint FTI as Monitor in these CCAA proceedings (the "**CCAA Proceedings**").

3.      This Pre-Filing Report of the Proposed Monitor (the "**Pre-Filing Report**") has been prepared by the Proposed Monitor prior to and in contemplation of its appointment as Monitor to provide information to the Court solely in respect of the relief sought by the Applicants at the hearing in respect of the Initial Order.  Should FTI be appointed as Monitor at the initial hearing, FTI intends to file a further report with the Court as Monitor in respect of the relief being sought by the Applicants at the comeback hearing.

4.      Any capitalized terms that are not defined herein have the meanings given to them in the glossary attached as **Schedule "A"** to this Pre-Filing Report (the "**Glossary**"). To assist the Court and other readers, the Glossary includes certain common industry-specific terms that are not used herein but arise in pertinent documents relating to the Applicants' business.

**PURPOSE**

5.      The purpose of this Pre-Filing Report is to inform the Court of:

(a)     background information with respect to the Applicants;

(b)     FTI's qualifications to act as Monitor, if appointed;

(c)     an overview of the Cash Flow Forecast (as defined herein) and the Proposed Monitor's comments regarding the reasonableness thereof;

(d)     the relief sought by the Applicants in the proposed Initial Order and the Proposed Monitor's recommendation in respect of same, including, among other things:

(i)      granting a stay of proceedings (the "**Stay of Proceedings**") in favour of the Applicants up to and including March 19, 2021;

(ii)     extending the Stay of Proceedings to certain foreign and domestic regulators on an interim basis;



- 3 -

<ol type="i" start="3">
<li>extending the protections and stays afforded in the Initial Order to certain limited partnerships that are affiliates of the Applicants;</li>
<li>approving the proposed debtor-in-possession interim financing arrangement;</li>
<li>approving the Applicants' engagement of BMO Nesbitt Burns Inc. ("**BMO**") as its financial advisor (in such capacity, the "**Financial Advisor**");</li>
<li>authorizing the Applicants to make certain pre-filing payments;</li>
<li>granting certain protections in favour of the Applicants' critical suppliers; and</li>
<li>granting certain Court-ordered charges sought by the Applicants.</li>
</ol>

6.  This Pre-Filing Report should be read in conjunction with the Affidavit of Michael Carter, to be sworn March 9, 2021 (the "**Carter Affidavit**"), which describes in more detail the Applicants' operations and the circumstances leading to their current situation.

7.  All references to monetary amounts in this Pre-Filing Report are in Canadian dollars unless otherwise noted.

## BACKGROUND INFORMATION

### *Overview*

8.  Just Energy is incorporated under the *Canada Business Corporations Act*. It maintains dual headquarters in Ontario and Texas, and its shares are listed on the Toronto Stock Exchange and the New York Stock Exchange.

9.  Just Energy is primarily a holding company, with operating subsidiaries situated across Canada and the United States (Just Energy and its subsidiaries collectively, the "**Just Energy Group**"). A copy of the Just Energy Group's corporate organizational chart will be attached as Exhibit "F" to the Carter Affidavit.



10.     As detailed herein, the Just Energy Group faces a material and immediate risk to its ability to continue as a going concern, which is a direct consequence of the unprecedented and catastrophic effects of an extreme weather event that crippled the Texas energy system in February of this year. The Proposed Monitor understands that the Just Energy Group is urgently seeking the Court-ordered relief described herein in order to avoid the near-certain demise of its operations. Specifically, as described herein, as a result of the winter storm and the subsequent regulatory response, the Just Energy Group estimates it may have incurred losses and additional costs totaling over $312 million.  As a result, the Just Energy Group is currently estimating that it will be in a negative liquidity position on March 9, 2021 as certain payments owing by the Just Energy Group become due and owing on such date, including approximately US$96.24 million to Electric Reliability Council of Texas ("**ERCOT**").

*Business Operations and the Regulatory Environment*

11.     Established in 1997, the Just Energy Group is a leading retail energy provider. Its principal line of business consists of purchasing retail energy and natural gas commodities from certain large energy suppliers and re-selling them to residential and commercial customers.

12.     The Just Energy Group services more than 950,000 residential and commercial customers across various jurisdictions in Canada and the United States. Residential customers represent approximately 35% of its residential customer equivalent ("**RCE**")[1] base, with the Just Energy Group's commercial customers making up the balance.  The Proposed Monitor understands that Texas is the single largest market for the Just Energy Group, representing 47% of its revenues in fiscal year 2020. Other significant markets include Ontario, Alberta, Illinois and Pennsylvania. The Just Energy Group has expended significant effort over many years to build a large and geographically-diversified customer base.

---

[1] A unit of measurement equivalent to the approximate amount of gas and electricity used by a typical household in Ontario.



- 5 -

13.     According to the Just Energy Group's consolidated financial statements, for the nine-months ending December 2020, despite a challenging operating environment because of the COVID-19 pandemic, revenues were approximately $1.7 billion. During the same period, the Just Energy Group had positive cash flow of approximately $27 million. Its reported Embedded Gross Margin[2] for residential and commercial customers for the same period was approximately $1 billion and $360 million, respectively.

14.     The Just Energy Group collectively employs approximately 979 full-time, non-unionized employees. A geographic breakdown of the employees is set out in the Carter Affidavit. Most employees are located in one of three jurisdictions: Ontario, Texas and India.

15.     The Just Energy Group operates in highly regulated markets. The Just Energy Group is subject to numerous different regulatory regimes in Canada and the U.S. overseen by various provincial and state regulators.  The Carter Affidavit provides an overview of the complex regulatory environment and details the licenses and other permissions granted in favour of the Just Energy Group in respect of the various jurisdictions in which it operates.

16.     Certain of Just Energy's operating subsidiaries set out in **Schedule "B"** hereto are limited partnerships (collectively, the "**Just Energy LPs**"). The Just Energy LPs hold most of the regulatory licenses pursuant to which the Just Energy Group conducts business.  The Just Energy LPs are not applicants in these CCAA proceedings as they are not "companies" to which the CCAA applies. Nevertheless, as the business and operations of the Just Energy LPs are heavily intertwined with that of the Applicants, the Applicants seek to have all of the protections and authorizations under the Initial Order extended to the Just Energy LPs, including the Stay of Proceedings.

---

[2] The gross margin expected to be realized over the next five years from existing customers.

17.    Complying with the various regulatory regimes creates direct and indirect financial, legal and operational obligations for the Just Energy Group. Among other things, certain regulators require substantial financial collateral to be posted by entities in the Just Energy Group. Any non-compliance with the regulatory regimes, including the failure to provide sufficient collateral by a specified deadline can lead to the suspension or cancellation of the Just Energy Group's ability to operate in a particular market and, in some jurisdictions, the transfer of the Just Energy Group's customers to another energy provider. The amount of collateral required can vary depending on a number of factors including the current commodity market environment and the financial health of the Just Energy Group and, as a result, can be difficult to forecast.

18.    In certain circumstances, the Just Energy Group entities have posted collateral with the regulators themselves; in other circumstances, they have arranged for collateral to be posted by third-party bonding companies (the "**Bonding Companies**"). In such circumstances, a breach of the agreement with the Bonding Companies, including failing to post additional collateral with the Bonding Companies on demand, can lead to non-compliance with the regulator's demands and consequently, the suspension or cancellation of the Just Energy Group's ability to operate in a particular market. The Proposed Monitor understands that the Bonding Companies have recently demanded over $30 million in additional collateral be posted by the Just Energy Group as a result of, among other things, the Texas weather event. The Just Energy Group estimates as much as $10 million remains outstanding and could be demanded upon filing.

*Commodity Suppliers and ISO Supplier Relationships*

19.    As noted earlier, the Just Energy Group transacts with various suppliers of natural gas and electricity (collectively, the "**Commodity Suppliers**"). As detailed in the Carter Affidavit, a small group of suppliers including Shell, BP, Exelon, and Bruce Power, provides the majority of such supplies. Any disruption to continued supply by the Commodity Suppliers would materially impact the Just Energy Group's ability to carry on its business operations. Such disruption would prevent the Just

Energy Group from entering into any further sales contracts with customers as it would be unable to properly backstop and hedge the obligations. The obligations owing to the Commodity Suppliers by the Just Energy Group are secured by security granted by Just Energy and other members of the Just Energy Group.

20.    In addition to supply agreements, the Just Energy Group is also party to independent system operator ("**ISO**") services agreements (the "**ISO Agreements**") with certain of its Commodity Suppliers (in such capacity, the "**ISO Suppliers**"). Pursuant to the ISO Agreements, the contracting counterparty (for reasons of administrative efficiency) provides certain scheduling services as well as working capital and credit support to the Just Energy Group by making payments on its behalf to the independent system operator.

*The Just Energy Group's Capital Structure*

**2020 Recapitalization**

21.    As detailed in the Carter Affidavit, the Just Energy Group underwent a balance sheet recapitalization in 2020 (the "**Recapitalization**") pursuant to section 192 of the *Canada Business Corporations Act* under the supervision of this Court.  The Recapitalization was the culmination of extensive discussions with stakeholders over the span of a year and put the Just Energy Group on a strong financial footing.

**Capital Structure**

22.    The Just Energy Group's capital structure is described in detail in the Carter Affidavit. As at December 31, 2020, the aggregate book value of the Just Energy Group's assets was approximately $1.069 billion, and the aggregate book value of its liabilities was approximately $1.28 billion.

23.    The Just Energy Group's debt obligations include: (i) secured obligations to its Commodity Suppliers in the approximate amount of $198.96 million as at January 31, 2021 (the "**Trade Debt**"); and (ii) significant non-trade obligations.  Below is

a chart setting out the relative priorities of the Justice Energy Groups' debt obligations, which are detailed below.

| Tier | Items | Date | Approximate Amount |
|------|-------|------|--------------------|
| Tier 1 | Secured Suppliers AP | March 31, 2021 | $244 million |
| Tier 2 | Credit Facility Lenders | March 5, 2021 | $331.82 million |
| | Suppliers MTM (Liability Only) | March 1, 2021 | $146.17 million |
| | ISO Service Obligations (Subject to Cap) | March 5, 2021 | $94.5 million |
| Tier 3 | ISO Service Obligations (In Excess of Cap) | March 5, 2021 | $77.66 million |
| Tier 4 | Term Loan (unsecured) | December 31, 2020 | $273.48 million |
| Tier 5 | Subordinated Notes (unsecured) | December 31, 2020 | $13.2 million |

(a)    Trade Debt

24.    The Proposed Monitor understands that the Commodity Suppliers and the agent for the lenders under the Credit Agreement (as defined below) are party to an intercreditor agreement (the "**Intercreditor Agreement**") that sets out the relative priorities of the parties' security interests. In accordance with the terms of the Intercreditor Agreement, the secured Commodity Suppliers rank *pari passu* with the lenders under the Credit Agreement subject to the following waterfall as set out in the above chart: (i) accounts payable owing to the secured Commodity Suppliers rank first, (ii) the following amounts rank second and *pari passu* amongst themselves: (A) the mark-to-market ("**MTM**") liability to the secured Commodity Suppliers, (B) amounts owing to the lenders under the Credit Agreement, and (C) amounts owing to Commodity Suppliers under the ISO Agreements up to a cap of $94.5 million (the "**Cap**"); and (iii) ranking third, amounts owing to providers under the ISO Agreements above the Cap.

25.    The significant non-trade debt obligations of the Just Energy Group are summarized as follows:



| | Type | Borrower(s) | Maturity Date | Approximate Outstanding Amount as of December 31, 2020 |
|---|---|---|---|---|
| Secured Credit Facility | Revolving credit facilities available on borrowing base | Just Energy Ontario L.P. and Just Energy (U.S.) Corp. | December 31, 2023 | $232.62 million in principal<br><br>$77.8 million in letters of credit |
| Term Loan | Non-revolving, multi-draw senior unsecured term loan facility | Just Energy Group Inc. | March 31, 2024 | $273.48 million |
| Subordinated Notes | Unsecured subordinated notes | Just Energy Group Inc. | September 27, 2026 | $13.2 million |

(b)     Credit Facility

26.     Just Energy Ontario L.P. and Just Energy (U.S.) Corp. are borrowers under a ninth amended and restated credit agreement (the "**Credit Agreement**") dated as of September 28, 2020 with a syndicate of lenders that includes CIBC, National Bank of Canada, HSBC, JPMorgan, Alberta Treasury Branches, Canadian Western Bank, and Morgan Stanley Senior Funding, Inc., a subsidiary of Morgan Stanley Bank N.A.

27.     The Credit Agreement provides for certain scheduled mandatory commitment reductions over time.

28.     As at March 5, 2021, there was approximately $227.86 million in principal outstanding under the Credit Agreement, plus outstanding letters of credit amounting to approximately $103.96 million.

FTI CONSULTING

     (c)     <u>Term Loan</u>

29.     Just Energy is a borrower under a $205.9 million unsecured principal note (the "**Term Loan Agreement**") in favour of Sagard Credit Partners, LP and certain funds managed by a leading U.S.-based global fixed income asset manager. The Term Loan matures on March 31, 2024.

30.     Pursuant to the Term Loan Agreement, interest payments are capitalized with payment of principal and accrued interest due on March 31, 2024.

31.     As at December 31, 2020, approximately $273.48 million was outstanding under the Term Loan.

     (d)     <u>Subordinated Notes</u>

32.     Just Energy is also a borrower under certain subordinated unsecured notes ("**Subordinated Notes**"). As at October 19, 2020, the Subordinated Notes had a principal amount of $13.2 million outstanding.

**THE TEXAS WEATHER EVENT**

33.     As noted earlier herein, Texas is the Just Energy Group's single largest market. The Texas energy market is subject to regulatory oversight by ERCOT. ERCOT's operations, in turn, are overseen by the Public Utility Commission of Texas ("**PUCT**").

34.     The Proposed Monitor understands that the Just Energy Group's Texas-based operating subsidiaries, in addition to purchasing supply directly from the Commodity Suppliers, purchase energy products (for subsequent resale to customers) in Texas through an ERCOT-operated wholesale electricity market. The Texas subsidiaries are directly liable to ERCOT for such electricity purchases, pursuant to and in accordance with the terms of the ERCOT protocols (the "**Protocols**") and certain governing agreements that implement such Protocols.[3]

---

[3] The Protocols are accessible at the following link: http://www.ercot.com/mktrules/nprotocols/current.



35.     As described in greater detail in the Carter Affidavit, beginning on February 13, 2021, Texas experienced an unprecedented and catastrophic energy crisis when a powerful winter storm impacted the entire state.  Being a warm-weather state, (i) the colder temperatures had the effect of causing demand for electricity to spike as residents sought to heat their homes and businesses,[4] and (ii) certain of the state's electricity generating sources were not sufficiently winterized to withstand the cold temperatures or were unable to secure fuel with which to operate their plants and suffered critical operational shut-downs.

36.     The Proposed Monitor understands that the Just Energy Group diligently hedges against potential weather risks based on historical data. For February 2021, the Just Energy Group had weather hedges in place to cover an incremental 50% increase in customer usage above the normal February consumption, which in any other year would have provided sufficient cushion against extreme weather. However, the extreme Texas weather event meant energy use on February 14, 2021 was 200% higher than the week earlier, substantially above the hedge estimates.

37.     The Texas' electricity grid, by design, is largely separate from neighbouring states, so generating sources that were unable to operate could not be easily substituted by importing electricity from neighbouring markets. The combination of the spike in demand and plummeting supply pushed Texas' electric system to the brink of collapse. The Carter Affidavit details ERCOT and PUCT's hurried response to this event in order to avoid a complete shutdown of the entire grid and the operational and financial repercussions for the entire Texas electric grid that otherwise could have lasted several months.

38.     The effects of ERCOT and PUCT's actions on the Texas wholesale energy market during the Texas weather event are described in detail in the Carter Affidavit. In brief, PUCT adopted an order instructing ERCOT to set wholesale energy prices at the maximum price allowed, being US$9,000 per megawatt hour, for over 100 consecutive hours.  By way of comparison, the real time electricity price did not hit

---

[4] To note, most of Texas uses electric heating.

US$9,000/MWh for even one 15-minute interval in 2020. The winter storm and regulators' actions caused wholesale buyers to incur additional costs of approximately US$55 billion during the 7-day period of the winter storm, equivalent to the amount the wholesale market would ordinarily incur over a four-year period.

39.     The Proposed Monitor understands, as set out in the Carter Affidavit, that ERCOT and PUCT's decision to sustain an artificially high wholesale price may have contravened the Protocols and has been challenged by numerous stakeholders. The Proposed Monitor understands that there have been several appeals to PUCT and ERCOT to provide accommodations to energy providers affected by the ERCOT wholesale market price surges, including appeals by the Just Energy Group to suspend ERCOT's usual protocols. The Proposed Monitor understands that such appeals have not been successful to date.

40.     In the meantime, ERCOT has issued invoices to wholesale energy purchasers, including the Just Energy Group's Texas subsidiaries, for the entire US$55 billion amount in additional costs. The Proposed Monitor understands that the Just Energy Group's portion of such obligation is estimated to be approximately US$250 million. The magnitude of this financial burden has had a ripple effect through a myriad of market participants including retail energy providers, electric cooperatives and municipalities, independent power producers, and natural gas local distribution companies across the state.

41.     The Proposed Monitor understands that the Just Energy Group is disputing the amount of ERCOT's issued invoices. Nevertheless, in accordance with the Protocols, invoices issued by ERCOT must be paid in full within two days, even if the energy provider is actively disputing the invoice.

42.     ERCOT has several remedies available to it when an energy provider fails to pay in full the amount of any invoice within two days of it being issued. Principal among such remedies is ERCOT's ability to revoke all of the right of such energy provider to operate in the Texas market and to mass-transition all of such energy

- 13 -

provider's Texas customers to another energy provider of last resort  (a "**POLR**") on five days' notice to the energy provider (the mass-transition being, the "**POLR Process**").

43.  The Proposed Monitor understands that the Just Energy Group does not have sufficient liquidity to cover its remaining unpaid obligation to ERCOT of approximately US$123.21 million, of which approximately US$96.24 million is required to be paid by the end of day on March 9, 2021.  Additionally, on March 8, 2021, the Just Energy Group received from ERCOT (i) a notice that it must post approximately US$25.7 million of additional collateral within two business days; and (ii) invoices totalling approximately US$25.46 million, of which approximately US$18.86 million is due by March 10, 2021.

44.  The Proposed Monitor understands that the Just Energy Group is unable, as a legal and practical matter, to charge and collect this unprecedented amount from its Texas customers given the fixed-rate customer billing arrangements with most of its customers.

45.  As at the date of this Report, and as described in the Carter Affidavit, the Proposed Monitor understands that one large Texas-based energy provider, Brazos Electric Power Cooperative, Inc., has already filed for relief under chapter 11 of title 11 of the United States Code, after incurring an estimated US$2.1 billion in charges over seven days during the Texas weather event.

46.  The Proposed Monitor also understands that ERCOT (i) revoked all of the rights of two other energy providers, Griddy Energy LLC and Entrust Energy Inc., to operate in the Texas energy market after they failed to pay to ERCOT their portion of the additional US$55 billion liability; and (ii) implemented the POLR Process in respect of both such energy providers. Without the protection afforded by the proposed Initial Order being sought by the Just Energy Group, the Just Energy Group could face similar consequences. If granted, Just Energy intends to initiate a case under Chapter 15 of Title 11 of the United States Code seeking to recognize and enforce the proposed Initial Order in the U.S.

- 14 -

**GOING CONCERN DOUBTS AS A RESULT OF THE TEXAS WEATHER EVENT**

47.     As noted above, the Just Energy Group may be liable to ERCOT for an estimated US$250 million. The Just Energy Group is disputing amounts that are owing to ERCOT. Nevertheless, if payment in full is not made to ERCOT within two days of invoices being issued, ERCOT may decide to implement a POLR Process that, the Proposed Monitor understands, would cause nearly half of the Just Energy Group's Embedded Gross Margin to dissipate and would pose significant risk to the Just Energy Group's ability to maintain going concern operations.

48.     The Proposed Monitor understands that the Just Energy Group does not have sufficient liquidity to cover the amount of its estimated obligations, including the full amount of the estimated liability to ERCOT. The Just Energy Group is forecast to have negative liquidity as of March 9, 2021 primarily due to one of the aforementioned payments due to ERCOT on that date of approximately $121.2 million.

49.     In addition, on March 22, 2021, approximately $270 million will become owing to counterparties under the ISO Agreements. This amount has increased significantly from normal levels, which is a direct result of the Texas weather event.

50.     The Proposed Monitor further understands that an event of insolvency constitutes an event of default under the Just Energy Group's licences with various Canadian and U.S. regulators, as detailed in the Carter Affidavit, which causes serious concerns about the Just Energy Group's ability to continue to operate in key markets outside of Texas.

51.     Likewise, upon an insolvency event, there are other material concerns about the continued supply of energy commodities from the Commodity Suppliers and immediate demands for additional collateral from the Bonding Agencies (in addition to the collateral that has already been demanded by the Bonding Companies, as noted earlier in this report).  The Proposed Monitor understands that any one of these events (i.e. the loss of continuing supply or a request for additional



- 15 -

collateral that cannot be satisfied) could trigger cascading materially adverse results for the Just Energy Group by virtue of cross-default provisions under a number of governing agreements.

**FTI'S QUALIFICATIONS TO ACT AS MONITOR**

52.     Paul Bishop, who will lead the FTI team and have primary carriage of this matter, is a trustee within the meaning of subsection 2(1) of the *Bankruptcy and Insolvency Act* (Canada).

53.     Since becoming engaged by the Just Energy Group, FTI has acquired knowledge of the business and operations of the Just Energy Group, including its personnel, stakeholders and the key issues in the proposed CCAA Proceedings. As a result, FTI is in a position to immediately act as Monitor in the CCAA Proceedings if appointed by this Court.

54.     In September 2020, FTI was engaged by the Applicant, Just Energy Inc., to assist in assessing the quantification of potential damages relating to certain securities class actions against the company.  This work is ongoing, and an ethical wall has been put in place between the FTI members assisting with the preparation of the these CCAA Proceedings and those members assisting Just Energy Inc. with the claim quantification engagement.

55.     Neither FTI, nor any of its representatives, has been, at any time in the two preceding years:

(a)     a director, officer or employee of the Just Energy Group;

(b)     related to the Just Energy Group or to any director or officer of the Just Energy Group; or

(c)     the auditor, accountant or legal counsel, or a partner or an employee of the auditor, accountant or legal counsel, of the Just Energy Group.

*Engagement of FTI and the Preparation of this Pre-Filing Report*

56.    FTI was initially engaged by the Applicants in July 2020 to assist in preparing for a potential filing under the CCAA, on a contingency basis, as they sought, successfully, to conclude the Recapitalization under the CBCA.

57.    Pursuant to an engagement letter dated February 26, 2021, FTI was engaged to assist the Just Energy Group with a review of its financial position, business plan, financial projections and liquidity requirements and, if required, to assist the Just Energy Group in preparation for a filing under each of the Canadian and U.S. insolvency regimes. For the purpose of this mandate, FTI has, among other things:

(a)    participated in numerous meetings and discussions with the Just Energy Group's senior management and legal advisors in connection with the Just Energy Group's business and financial affairs generally and in connection with the preparation of the Cash Flow Forecast (as defined herein);

(b)    participated in numerous meetings and discussions with the Just Energy Group and its counsel in connection with the requested relief in these CCAA Proceedings;

(c)    engaged legal counsel in Canada and the U.S, who have also participated in certain of the aforementioned meetings;

(d)    obtained and reviewed financial and other information produced by the Just Energy Group relating to its operations, cash flow forecasts and current financial situation;

(e)    assisted the Just Energy Group in the preparation of its cashflow forecasts;

(f)    assisted the Just Energy Group in assessing the quantum of potential claims against its directors and officers; and

(g)    prepared this Pre-Filing Report.

58.    Although this Pre-Filing Report has been prepared in anticipation of FTI's appointment as Monitor of the Just Energy Group, it has been prepared with the



same duty, care and level of diligence that FTI would have utilized had it already been appointed as Monitor.

59.     In preparing this Pre-Filing Report, the Proposed Monitor has relied upon unaudited financial information of the Just Energy Group, the books and records of the Just Energy Group, certain financial information prepared by the Just Energy Group and discussions with the Just Energy Group's management. Other than as described in this section of the Pre-Filing Report, the Proposed Monitor has not audited, reviewed or otherwise attempted to verify the accuracy or completeness of the information. Accordingly, the Proposed Monitor expresses no opinion or other form of assurance on the information contained in Pre-Filing Report or relied on in its preparation. Future oriented financial information reported or relied on in preparing this Pre-Filing Report is based on the Just Energy Group's management's assumptions regarding future events; actual results may vary from the forecast and such variations may be material.

## THE JUST ENERGY GROUP'S CASH MANAGEMENT SYSTEM

60.     The Just Energy Group maintains a centralized cash management system in Canada and the United States to consolidate and track funds generated by the operations of the Just Energy Group, as described more fully in the Carter Affidavit.

61.     The Proposed Monitor has reviewed the Just Energy Group's cash management arrangements and confirms the importance of these systems for the continuation of the Just Energy Group's business and operations.   Replacement of the cash management systems would be costly, unviable from a short-term operational perspective, and excessively time consuming. Accordingly, the Proposed Monitor supports the Just Energy Group's request to continue to operate its existing cash management systems throughout these CCAA Proceedings and supports the Just Energy Group's request to temporarily restrict the right of set-off by the lenders in order to ensure that the cash management system continues to function properly.

FTI CONSULTING

**CASH FLOW FORECAST**

62.    The Just Energy Group, with the assistance of the Proposed Monitor, has prepared
(i) a consolidated 13-week cash-flow forecast of its receipts and disbursements (the
"**Weekly Forecast**"), and (ii) a daily cash flow forecast for the 13-day period
following the filing of these CCAA Proceedings ending March 21, 2021 (the "**Daily
Forecast**", and together with the Weekly Forecast, the "**Cash Flow Forecast**").
The Cash Flow Forecast and the management's report on the cash-flow statement
as required by section 10(2)(b) of the CCAA are attached hereto as **Appendix "A"**.
The Weekly Forecast and Daily Forecast are summarized as follows:

| (CAD$ in millions) | 13-Day period ending March 21, 2021 | 13-Week period ending June 6, 2021 |
|---|---|---|
| Forecast Week | Total | Total |
| **RECEIPTS** | | |
| Sales Receipts | $77.1 | $608.5 |
| Miscellaneous Receipts | - | 8.0 |
| *Total Receipts* | $77.1 | $616.5 |
| **DISBURSEMENTS** | | |
| *Operating Disbursements* | | |
| Energy and Delivery Costs | ($224.6) | ($574.1) |
| Payroll | - | (22.3) |
| Taxes | (5.4) | (36.6) |
| Commissions | (6.3) | (27.8) |
| Selling and Other Costs | (6.6) | (48.4) |
| *Total Operating Disbursements* | ($242.8) | ($709.1) |
| **OPERATING CASH FLOWS** | ($165.7) | ($92.6) |
| *Financing Disbursements* | | |
| Credit Facility - Borrowings / (Repayments) | $126.0 | $157.5 |
| Interest Expense & Fees | (3.2) | (7.2) |
| *Restructuring Disbursements* | | |
| Professional Fees | (1.4) | (14.4) |
| **NET CASH FLOWS** | **($44.3)** | **$43.3** |
| **CASH** | | |
| Beginning Balance | $77.3 | $77.3 |
| Net Cash Inflows / (Outflows) | (44.3) | 43.3 |
| Other (FX) | - | - |
| **ENDING CASH** | **$33.0** | **$120.7** |

FTI CONSULTING

- 19 -

63.     The Just Energy Group's Daily Forecast indicates that during the 13-day period ending March 21, 2021, the Just Energy Group will have net cash outflows from operating activities of approximately $165.7 million with total receipts of approximately $77.1 million and total disbursements of approximately $242.8 million, before borrowings of approximately $126.0 million and professional fees of approximately $1.4 million such that the net cash outflows are forecast to be approximately $44.3 million.

64.     The Just Energy Group's Weekly Forecast indicates that, during the 13-week cash flow period ending June 6, 2021, the Just Energy Group will have net cash outflows from operating activities of approximately $92.6 million with total receipts of approximately $616.5 million and total disbursements of approximately $709.1 million, before borrowings of approximately $157.5 million and professional fees of approximately $14.4 million such that the net cash flows are forecast to be approximately $43.3 million.

65.     The Cash Flow Forecast incorporates the following key assumptions:

(a)     Payment to ERCOT of approximately $151.3 million with respect to the Texas weather event due during the week ending March 14, 2021;

(b)     Payment of certain pre-filing amounts outstanding, pending Monitor consent, including with respect to commodity delivery-related services;

(c)     Payment of pre-filing amounts outstanding, owing to or in respect of workers providing sales and sales support for the Just Energy Group;

(d)     An initial drawdown on the DIP Facility of approximately $126 million on March 9, 2021 to satisfy the liquidity requirements of the Just Energy Group through to the comeback hearing; and

(e)     Cash receipts of the Just Energy Group contemplates the ongoing collection of receivables from its customers.

F T I
CONSULTING

66.    Section 23(1)(b) of the CCAA states that the Proposed Monitor shall, "review the company's cash-flow statement as to its reasonableness and file a report with the court on the Proposed Monitor's findings".

67.    Pursuant to section 23(1)(b) of the CCAA and in accordance with the Canadian Association of Insolvency and Restructuring Professionals Standard of Practice 09-1, the Proposed Monitor hereby reports as follows:

(a)    the Cash Flow Forecast has been prepared by management of the Just Energy Group for the purpose described in notes to the Cash Flow Forecast, using the probable and hypothetical assumptions set out therein;

(b)    the Proposed Monitor's review consisted of inquiries, analytical procedures and discussion related to information supplied by certain of the management and employees of the Just Energy Group. Since hypothetical assumptions need not be supported, the Proposed Monitor's procedures with respect to them were limited to evaluating whether they were consistent with the purposes of the Forecast. The Proposed Monitor has also reviewed the support provided by management of the Just Energy Group for the probable assumptions, and the preparation and presentation of the Cash Flow Forecast;

(c)    based on its review, and as at the date of this Pre-Filing Report, nothing has come to the attention of the Proposed Monitor that causes it to believe that, in all material respects:

(i)    the hypothetical assumptions are not consistent with the purposes of the Cash Flow Forecast;

(ii)    the probable assumptions developed by management are not suitably supported and consistent with the plans of the Just Energy Group or do not provide a reasonable basis for the Cash Flow Forecast, given the hypothetical assumptions; or

(iii)    the Cash Flow Forecast does not reflect the probable and hypothetical assumptions;



- 21 -

(d)     Since the Cash Flow Forecast is based on assumptions regarding future events, actual results will vary from the information presented even if the hypothetical assumptions occur, and the variations may be material. Accordingly, the Proposed Monitor expresses no assurance as to whether the Cash Flow Forecast will be achieved. The Proposed Monitor expresses no opinion or other form of assurance with respect to the accuracy of any financial information presented in this Pre-Filing Report, or relied upon by the Proposed Monitor in preparing this Pre-Filing Report; and

(e)     The Cash Flow Forecast has been prepared solely for the purpose of estimating the liquidity requirements of the Just Energy Group during the forecast period. The Cash Flow Forecast should not be relied upon for any other purpose.

## RELIEF SOUGHT IN INITIAL ORDER

### *Extending the CCAA protections to the Just Energy LPs*

68.     The Initial Order provides that the Just Energy LPs be granted all of the same protections and authorizations provided to the Applicants under the Initial Order, notwithstanding that the Just Energy LPs are not "companies" within the meaning of the CCAA.

69.     The Proposed Monitor understands that the Just Energy LPs hold many of the permits, licenses and other regulatory permissions that permit the Just Energy Group to conduct business operations in particular jurisdictions.  The Proposed Monitor further understands that the business and operations of the Applicants and the Just Energy LPs are heavily intertwined, including on a day-to-day basis.

70.     If such entities are not granted protection under the proposed Initial Order, including in respect of any enforcement proceedings by regulators (as described below), the regulators may proceed to cancel such permits, licences or other regulatory permissions as a result of the filing of these CCAA Proceedings, which the Proposed Monitor understands would be within their rights. The effect of any

such regulator actions would have material adverse effects for the Just Energy Group, including the loss of customers or an inability to operate in a particular market.

71.    For the above reasons and to ensure the stability of the Just Energy Group's operations during these CCAA Proceedings, the Proposed Monitor is of the view that the protections and other authorizations permitted to the Applicants under the Initial Order should be extended to the Just Energy LPs.

*Implementing the Stay of Proceedings, including in respect of Regulators*

72.    The Just Energy Group is seeking the Stay of Proceedings up to and including March 19, 2021 in respect of the Just Energy Group.

73.    The Just Energy Group requires the Stay of Proceedings and other protections provided by the CCAA given that the Just Energy Group is insolvent. The Stay of Proceedings is needed to maintain the *status quo* and provide time for the Just Energy Group to consider its strategic alternatives.

74.    The proposed Initial Order provides that, notwithstanding section 11.1 of the CCAA, the Stay of Proceedings should apply to provincial energy regulators and provincial regulators of consumer sales that have authority with respect to energy sales (collectively, the "**Provincial Regulators**"), except with the written consent of the Just Energy Group and the Proposed Monitor, or leave of the Court.

75.    As described in the Carter Affidavit, the Just Energy Group believes that an insolvency event or the filing of these CCAA Proceedings may cause the Provincial Regulators and U.S. Regulators (together, the "**Regulators**") to enforce certain of their rights and remedies, notwithstanding that the proposed interim financing will allow the Just Energy Group to pay the Regulators everything as and when due in the ordinary course of business.  Any such enforcement would have material adverse effects for the Just Energy Group. This includes requiring additional collateral to be posted, revoking Just Energy Group's rights to operate in a particular market, or transitioning the Just Energy Group's customers in that

particular market to a competitor. Any such actions by any one Regulator could severely harm existing operations. If such actions are implemented by a group of Regulators however, or by a Regulator in respect of a particularly important market for the Just Energy Group's business, this could impair the Just Energy Group's viability to continue as a going concern.

76.     Given the unique circumstances facing the Just Energy Group and the severe repercussions that could result if a Stay of Proceedings is not extended to the Regulators, the Proposed Monitor is of the view that the Regulators should be temporarily stayed from exercising their rights and remedies in accordance with the Initial Order, provided they are paid amounts owing to them in the ordinary course as planned, to provide the Just Energy Group with a stable environment in which it can seek to restructure. If necessary, this matter can be revisited at the subsequent comeback hearing.

*Proposed debtor-in-possession financing*

77.     The Applicants are seeking approval of a term sheet (the "**DIP Agreement**") between Just Energy L.P., Just Energy Group Inc. and Just Energy (U.S.) Corp. (collectively, the "**Borrowers**") and Alter Domus (US) LLC, as administrative agent for the lenders (the "**DIP Lenders**"), pursuant to which the DIP Lenders will make a debtor-in-possession facility (the "**DIP Facility**") available to the Borrowers, subject to the terms and conditions set out in the DIP Agreement, in the maximum principal amount of US$125 million.  The obligations owing to the DIP Lenders under the DIP Facility will be guaranteed by each of the remaining Applicants (the "**Guarantors**").  The Proposed Monitor cautions that, at the current time, the DIP Agreement is still under negotiation and has not been finalized.

78.     Terms not otherwise defined in this section have the meanings ascribed to them in the DIP Agreement, a copy of which will be appended as an exhibit to the Carter Affidavit.

79.     The Proposed Monitor understands that the salient terms of the DIP Agreement are as follows:



(a)    **DIP Charge**: The DIP Charge (as defined below) shall have been granted in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise, subject to the Permitted Priority Liens;

(b)    **Term**: The DIP Facility shall be available until the earlier of (i) December 31, 2021; (ii) the CCAA Plan Implementation Date; (iii) the expiry of the stay of proceedings; (iv) the termination of the CCAA proceedings; or (v) the acceleration of the DIP Facility in accordance with the terms of the DIP Agreement upon the occurrence and during the continuation of an Event of Default;

(c)    **Interest**: Interest accrued on the principal amounts outstanding under the DIP Facility at a rate equal to 13% per annum (which will automatically increase by an additional 2% per annum upon the occurrence of any Event of Default);

(d)    **Additional Fees**: A commitment fee in an amount equal to 1% of the Maximum Amount, along with an origination fee in an amount equal to 1% of the Maximum Amount, shall each be fully earned and payable in cash on the Closing Date;

(e)    **Use of proceeds**: The Borrowers shall use the DIP Facility solely for the purposes set out in the DIP Agreement, in each case in accordance with the CCAA Orders and Cash Flow Statements, subject to the Permitted Variance, which includes funding the general corporate and working capital requirements of the Borrowers and Guarantors.  Once every four weeks, the Borrowers are required to deliver a new rolling 13-week cash flow forecast to the DIP Lenders, which shall be subject to the approval of the DIP Lenders;

(f)    **Initial Draw:** The Borrowers are required to make an initial draw under the DIP Facility in the minimum aggregate amount of US$100 million.  This amount will enable them to pay specified amounts that are known to be due

during the first 10 days of the CCAA proceedings, which are detailed in the Cash Flow Forecast; and

(g)   **Events of Default**:   The DIP Agreement sets Events of Default, which include, among other things, failure to abide by specified milestones in the Loan Parties' CCAA proceedings.

80.   The Just Energy Group requires such interim financing to provide stability, continue going concern operations and to restructure its business.  The Applicants initially solicited interim financing terms from its five largest stakeholders, which ultimately culminated in the Just Energy Group entering into the DIP Agreement with the DIP Lenders.

*Engagement of Financial Advisor*

81.   The Just Energy Group has engaged BMO as its Financial Advisor pursuant to an engagement letter dated February 20, 2021 (the "**Financial Advisor Engagement Letter**") which will be attached as a confidential exhibit to the Carter Affidavit. The Financial Advisor's mandate is to assist the Just Energy Group with assessing its liquidity and capital needs and reviewing potential strategic opportunities and transactions.

82.   The proposed Initial Order provides that the FA Charge (as defined and described below) shall secure the Financial Advisor's post-filing fees, including any success fees in connection with finalizing a DIP loan transaction and the successful closing of a strategic transaction in accordance with the terms of the Financial Advisor Engagement Letter.

83.   The Proposed Monitor has discussed with the Financial Advisor the scope, allocation and complexity of the work already undertaken by it, as well as the work remaining to be completed. The Proposed Monitor understands that the Financial Advisor does not foresee the need for any out of scope work and that post-filing fees are not duplicated for services already rendered.

84.     Given the scope, nature and complexity of the Financial Advisor's role and fees charged by financial advisors in similar circumstances, the Proposed Monitor is of the view that the fees charged by the Financial Advisor are reasonable in the circumstances.

85.     The Proposed Monitor supports the approval of the (i) Financial Advisor Engagement Letter, and (ii) permitting the FA Charge to secure the Financial Advisor's post-filing fees (including its work fee and success fees), subject to review by the Proposed Monitor of any invoices and the services provided by the Financial Advisor. The FA Charge is proposed to rank *pari passu* with the Administration Charge and have first priority over all other charges.

### *Permitting certain repayments under the Credit Agreement*

86.     The proposed Initial Order provides that the Just Energy Group be permitted to repay advances under the Credit Agreement for the purpose of creating availability under the LC Facility (as defined in the Credit Agreement) (an "**Advance Repayment**"), and that the Just Energy Group may utilize such availability to allow letters of credit to be issued under the Credit Agreement in order to maintain ordinary business operations. The proposed Initial Order provides that the foregoing shall be subject (i) to the consent of the Proposed Monitor with respect to any letter of credit issuance, and (ii) written confirmation from the applicable lender under the Credit Agreement that they shall issue a letter of credit of equal value to an Advance Repayment.

87.     Subject to the Proposed Monitor's review and prior consent with respect to any Advance Repayment and letter of credit to be issued and the respective confirmations from lenders, the Proposed Monitor is of the view that it is reasonable and appropriate for the Just Energy Group to be permitted to make Advance Repayments and obtain letters of credit in order to sustain its business operations.

*Permitting certain pre-filing payments to third parties*

88.     Pursuant to paragraph 7(d) of the proposed Initial Order, the Just Energy Group is entitled, but not required, to pay certain pre-filing amounts to third parties for goods or services provided to the Just Energy Group prior to these CCAA Proceedings with the consent of the Proposed Monitor and provided that such third parties are critical to the business operations of the Just Energy Group.

89.     In accordance with the above, the Proposed Monitor intends to review on a case-by-case basis any pre-filing payments and will only approve such payments to be made if it decides that payment of such amounts is critical to the Just Energy Group's operations. The Proposed Monitor is of the view that these conditions are sufficient in the circumstances to permit the Just Energy Group to make pre-filing payments that satisfy these conditions.

*Certain other relief for Commodity Suppliers*

90.     The proposed Initial Order provides that any counterparty to a Commodity Agreement[5] or ISO Agreement[6] that has executed or executes a Qualified Support Agreement (as defined in the proposed Initial Order) with an entity in the Just Energy Group and refrained from exercising termination rights under the Commodity Agreement as a result of the commencement of the Proceedings (as defined in the proposed Initial Order) absent an event of default under such Qualified Support Agreement (each, a "**Qualified Commodity/ISO Supplier**"), shall be entitled to a charge that secures the Just Energy Group's obligations to the Qualified Commodity/ISO Supplier.

---

[5] As defined in the Initial Order: a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas or electricity.

[6] As defined in the Initial Order: an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

91.     Specifically, each Qualified Commodity/ISO Supplier shall be entitled to the
        benefit of a charge (the "**Priority Commodity/ISO Charge**") on the Property in
        an amount equal to the value of the amounts that are due and payable, at the
        applicable time, for: (i)(A) the physical supply of electricity or gas that has been
        delivered on or after March 9, 2021; (B) financial settlements on or after March 9,
        2021; and (C) amounts owing under a confirmation or transaction that was executed
        on or after March 9, 2021 pursuant to a Commodity Agreement as a result of the
        termination thereof in accordance with the applicable Qualified Support
        Agreement; and (ii) for services actually delivered by a Qualified Commodity/ISO
        Supplier on or after March 9, 2021 pursuant to an ISO Agreement (but for greater
        certainty, excluding any amount owing for ISO services provided under the ISO
        Agreement on or before the date of the Initial Order, whether or not yet due).

92.     The proposed Initial Order does not specify a limit for the Priority Commodity/ISO
        Charge. Instead, such charge shall secure the actual quantum of supplies provided
        by the Qualified Commodity/ISO Suppliers that it is intended to secure.   The
        proposed Initial Order further provides that if a Qualified Commodity/ISO Supplier
        ceases to be a Qualified Commodity/ISO Supplier, it shall no longer benefit from
        such charge.

93.     The proposed Initial Order also provides that those Qualified Support Agreements
        that may be entered into among the Qualified Commodity/ISO Suppliers and the
        Just Energy Group confirming the terms for the continued supply by the Qualified
        Commodity/ISO Suppliers are to be approved. The Proposed Monitor understands
        that certain Qualified Support Agreements are under negotiation but have not yet
        been finalized.

94.     Pursuant to the proposed Initial Order, the Proposed Monitor, if appointed, will post
        a report on its website, on a monthly basis, setting out the total value of obligations
        to the Qualified Commodity/ISO Suppliers, thereby allowing any stakeholder
        concerned about the size of the secured obligation to seek an appropriate remedy at
        that time.

95.     As the Proposed Monitor has indicated herein, the Just Energy Group relies on a small group of Commodity Suppliers and ISO Suppliers to provide critical services, including the supply of electricity that the Just Energy Group resells to customers. If any such supply or services are stopped, delayed or otherwise impaired, the Proposed Monitor believes that such actions will have a material adverse effect on the operations of the Just Energy Group.

96.     Further, certain of the Commodity Agreements or ISO Agreements may be eligible financial contracts that would be subject to termination, which is why the Just Energy Group is requesting this particular relief in order to encourage the counterparties under such contracts to continue to do business with it.

97.     In agreeing to continue to supply commodities and provide services under the Commodity Agreements and ISO Agreements, the counterparties are providing new value to the Applicants that will allow them to continue operating in the ordinary course of business after the date of the Initial Order.  In order to protect that continued supply of goods and services, the Priority Commodity/ISO Charge secures the payment for such post-filing provision of goods and services.

98.     As outlined above, there is an Intercreditor Agreement that governs the priority for payments made by the Applicants to certain counterparties and lenders.  We understand that various parties may wish to seek to have the court determine the application of such Intercreditor Agreement to payments and priorities as part of these proceedings.  While the Intercreditor Agreement may be relevant with respect to certain pre-filing obligations of the Applicants, given that the Commodity Agreement and ISO Agreement counterparties could terminate their existing arrangements (requiring the Applicants to attempt to find replacement suppliers which may not be practically possible), the Proposed Monitor views the continued supply and provision of services as fresh, post-filing consideration.

99.     As such, the Proposed Monitor is of the view that, at least until any potential dispute on the point is properly presented for a determination by this Court:

FTI CONSULTING

(a)     post-filing supply of goods and services pursuant to the Commodity Agreements and ISO Agreements should be governed only by the Initial Order and should be treated as separate and apart from the certain pre-filing amounts governed by the Intercreditor Agreement; and

(b)     entitlement to the consideration for such newly supplied goods and services under the Commodity Agreements and ISO Agreements should be for the exclusive benefit of the actual counterparty delivering such post-filing goods and services and governed by the Priority Commodity/ISO Charge.

100.    For the foregoing reasons, the Proposed Monitor is of the view that the Qualified Support Agreements consistent with the terms hereof should be approved and the Priority Commodity/ISO Charge be granted.

*Court-ordered charges sought in the proposed Initial Order*

**(i) Administration Charge**

101.    The Initial Order provides for a charge in the amount of up to $2.2 million (the "**Administration Charge**"), covering the period until the comeback hearing, in favour of the Proposed Monitor, the Proposed Monitor's Canadian and U.S. counsel, and the Just Energy Group's Canadian and U.S. counsel as security for their professional fees and disbursements incurred both before and after the making of the Initial Order in respect of these CCAA Proceedings.

102.    The Administration Charge currently only secures the fees expected to be incurred by the foregoing professionals prior to and during the initial 10-day stay period prior to the comeback hearing. The quantum of the Administration Charge has been established based on the various professionals' previous history and experience with cross-border restructurings of similar scope and complexity. The Proposed Monitor believes that such a charge is required and reasonable in the circumstances. The Proposed Monitor will comment on the proposed amendment to increase the amount of the Administration Charge at the comeback hearing as part of a further report to this Court.

F T I
CONSULTING

**(ii) FA Charge**

103.  The Initial Order provides for a charge in the amount of up to $1.8 million (the "**FA Charge**"), covering the period until the comeback hearing, in favour of the Financial Advisor as security for (i) its professional fees and disbursements incurred both before and after the making of the Initial Order in respect of these CCAA Proceedings, and (ii) any success fees earned by the Financial Advisor in accordance with the terms of the Financial Advisor Engagement Letter. The FA Charge is intended to have an equal ranking to the Administration Charge.

104.  The FA Charge currently only secures the fees earned prior to and during the initial 10-day stay period prior to the comeback hearing. The Proposed Monitor will comment on the proposed amendment to increase the amount of the FA Charge at the comeback hearing as part of a further report to this Court.

105.  Given the Financial Advisor's critical role in these restructuring proceedings and in exploring strategic transaction opportunities, the Proposed Monitor is of the view that such a charge is reasonable in the circumstances.

**(iii) Directors' Charge**

106.  The Proposed Monitor understands that the Just Energy Group's present and former directors and officers are among the potential beneficiaries under liability insurance policies (the "**D&O Insurance**") that cover an aggregate annual limit of approximately $38.5 million. The Proposed Monitor understands that there may not be sufficient coverage under the D&O Insurance, given various exceptions and exclusions thereunder and as result of claims having been made thereunder.

107.  The Just Energy Group is seeking the Directors' Charge in the amount of $30 million with priority over all encumbrances on the Just Energy Group's property other than the Administration Charge and the FA Charge.  The Proposed Monitor was involved in determining the quantum of the Directors' Charge.

F T I
CONSULTING

108.    The proposed Directors' Charge represents the amount applicable during the initial 10-day stay period prior to the comeback hearing. The Proposed Monitor will comment on the proposed amendment to increase the amount of the Directors' Charge at the comeback hearing as part of a further report to this Court.

109.    The Proposed Monitor is of the view that the amount of the Directors' Charge is reasonable in relation to the quantum of the estimated potential liability of the Just Energy Group's directors and officers, which includes significant potential director and officer liabilities under U.S. laws, including (i) approximately $10.2 million potential liability under U.S. laws in respect of sales taxes, and (ii) approximately $2.9 million potential liability under U.S. laws in respect of wages, source deductions and accrued vacation. The Just Energy Group's directors and officers are only entitled to the benefit of the Directors' Charge to the extent that coverage under the D&O Insurance is insufficient.

110.    The Just Energy Group's directors have the necessary background and knowledge, particularly with respect to the complex regulatory environment in which the Just Energy Group operates, to steer it through these CCAA Proceedings. The Proposed Monitor also understands that the Just Energy Group's directors have insisted on the protection of the Directors' Charge in order to remain on the board during the course of the CCAA Proceedings. For the foregoing reasons, the Proposed Monitor is of the view that the Directors' Charge is necessary to ensure that the directors stay with the Just Energy Group and assist it through these CCAA Proceedings.

### (iv) DIP Charge

111.    The Applicants are seeking an Order granting the DIP Lender a charge (the "**DIP Charge**") over all of the present and future assets, property and undertaking of the Applicants, in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise, subject to the Administration Charge, FA Charge, Directors' Charge, KERP Charge, and shall rank *pari passu* with the Priority Commodity/ISO Charge. The DIP Charge will secure all Obligations owing to the DIP Lenders under the DIP Facility.

112.    The Monitor is of the view that the DIP Facility represents the necessary financing which allows the Just Energy Group to pay certain critical payables, including to ERCOT to prevent the application of ERCOT's POLR rights, and maintain the Just Energy Groups' ongoing operations.  The requested DIP Charge does not secure any advances made to the Applicants prior to the commencement of the CCAA proceedings.

113.    The Monitor recommends that the Court approve the DIP Agreement, DIP Facility and accordingly, also supports the granting of the DIP Charge.

**(v) KERP Charge and Employee Bonus**

114.    The Just Energy Group will be seeking a key employee retention plan charge (the "**KERP Charge**") as part of an amended and restated initial order to be requested at the subsequent comeback hearing.  The Proposed Monitor intends to review and comment on the KERP Charge as part of a further report to the Court.

115.    The Just Energy Group will also be seeking the authority to pay certain employee bonuses in the amount of approximately $3.2 million on April 2, 2021 (the "**Employee Bonus**"). The Proposed Monitor intends to review and comment on the Employee Bonus as part of a further report to the Court.

**(vi) Priority Commodity/ISO Suppliers Charge**

116.    As noted above, the proposed Initial Order provides for a Priority Commodity/ISO Charge in favour of Qualified Commodity/ISO Suppliers, which is intended to ensure the continuing supply of critical goods and services to the Just Energy Group. Such charge does not have a set limit. Instead, it secures the actual amounts of the obligations to the Qualified Commodity/ISO Suppliers as described earlier herein, and in strict accordance with the terms of the Initial Order.

117.    Just Energy's ongoing relationship with its Commodity Suppliers and ISO Suppliers is critical to these CCAA Proceedings and the long-term viability of Just

Energy Group's operations. For this reason, the Proposed Monitor is of the view that the Priority Commodity/ISO Charge is necessary and should be granted.

**Summary of the Proposed Rankings of the Court-Ordered Charges**

118.    If the proposed Initial Order is granted, the proposed Court-ordered charges would have the following ranking:

(a)    First  – the Administration Charge in the amount of $2.2 million and the FA Charge in the amount of $1.8 million on a *pari passu* basis;

(b)    Second – the Directors' Charge in the amount of $30 million; and

(c)    Third – the DIP Charge in in the amount of funds actually advanced under the DIP Facility and the Priority Commodity/ISO Charge on a *pari passu* basis.

119.    The Proposed Monitor believes that the proposed Court-ordered charges and rankings are required and reasonable in the circumstances of these CCAA Proceedings in order to preserve the going concern operations of the Just Energy Group and maintain its enterprise value, and accordingly, supports the granting of and the proposed ranking of the charges.

## CHAPTER 15 PROCEEDINGS

120.    The Just Energy Group seeks authorization under the proposed Initial Order to apply for foreign recognition and approval of these CCAA proceedings in foreign jurisdictions, including the United States pursuant to the chapter 15 of Title 11 of the United States Code (the "**Chapter 15 Proceedings**").  The Initial Order provides that the Applicant, Just Energy Group Inc., is authorized to act as the foreign representative for the purpose of the Chapter 15 Proceedings.

121.    The Proposed Monitor agrees that recognition of the proposed Initial Order in the United States, including the Stay of Proceedings, is necessary to preserve the going concern value of the Just Energy Group's business and further agrees that the Chapter 15 proceedings should be commenced immediately. The Proposed Monitor



has reviewed the circumstances, including facts set out in the Carter Affidavit, and agrees that Canada is the centre of main interest for the Just Energy Group.

**CONCLUSION**

122. The Proposed Monitor is of the view that the relief requested by the Just Energy Group pursuant to the proposed Initial Order is necessary, reasonable and justified, particularly in the context of the unprecedent challenges that have resulted from the Texas weather event. The Proposed Monitor is also of the view that granting the relief requested will provide the Just Energy Group the best opportunity to preserve value and maximize recoveries for its stakeholders.

123. The Proposed Monitor believes that the requested relief is justified by the exceptional circumstances confronting the Just Energy Group and is of the view that the Just Energy Group faces significant risks to its going concern operations if the requested relief is not granted.

124. Accordingly, the Proposed Monitor respectfully recommends that the Just Energy Group's request for the proposed Initial Order be granted.

The Proposed Monitor respectfully submits to the Court this Pre-Filing Report dated this 9th day of March, 2021.

**FTI Consulting Canada Inc.,** in its capacity as proposed Monitor of Just Energy Group Inc. et al. and not in its personal or corporate capacity

_____

Per: Paul Bishop
        Senior Managing Director



## Schedule "A"

**Commodity Agreement**" means a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas or electricity.

**"Embedded gross margin"** is a standard industry term that means the gross margin expected to be realized over the next five years from existing customers.

"**ERCOT**" means the Electric Reliability Council of Texas, an ISO.

"**FERC**" means the U.S. Federal Energy Regulatory Commission.

"**ISO**" means an independent system operator; an independent, regulated entity established to coordinate regional transmission and ensure the safety and reliability of the electric system.

"**ISO Servicing Agreement**" means an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

"**LDC**" means a local distribution company; the natural gas or electricity distributor for a regulatory or governmentally defined geographic area.

"**POLR**" means a provider of last resort, an energy retailer that has been selected by ERCOT to take over customers from another energy retailer that has been removed from the Texas electricity market by ERCOT.

"**Protocols**" means the ERCOT rules for market participants in the Texas energy market.

"**PUCT**" means the Public Utility Commission of Texas, a public body that oversees the ERCOT and otherwise manages the Texas utilities system.

"**RCE**" means residential customer equivalent, which is a unit of measurement equivalent to a customer using 2,815 m3 (or 106 GJs or 1,000 Therms or 1,025 CCFs) of natural gas on an annual basis or 10 MWh (or 10,000 kWh) of electricity on an annual basis, which represents the approximate amount of gas and electricity, respectively, used by a typical household in Ontario, Canada



**Schedule "B"**
**Just Energy LPs**

- Just Energy Ontario L.P.
- Just Energy Manitoba L.P.
- Just Energy (B.C.) Limited Partnership
- Just Energy Québec L.P.
- Just Energy Trading L.P.
- Just Energy Alberta L.P.
- Just Green L.P.
- Just Energy Prairies L.P.
- JEBPO Services LLP
- Just Energy Texas LP



**Appendix "A"**

**Cash Flow Forecast**

**Just Energy Group Inc. et al**

CCAA 13-Week Cash Flow Forecast
March 9, 2021

*(CAD$ in millions)*

| Weeks Ending (Sunday)[1] | | 3/14/21 | 3/21/21 | 3/28/21 | 4/4/21 | 4/11/21 | 4/18/21 | 4/25/21 | 5/2/21 | 5/9/21 | 5/16/21 | 5/23/21 | 5/30/21 | 6/6/21 | 13-Week |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Sales Receipts | [2] | $28.6 | $48.5 | $46.3 | $35.2 | $44.4 | $41.8 | $67.1 | $48.3 | $48.4 | $42.6 | $60.5 | $55.1 | $41.8 | $608.5 |
| Miscellaneous Receipts | [3] | - | - | - | 2.4 | - | - | - | 5.6 | - | - | - | - | - | 8.0 |
| Total Receipts | | $28.6 | $48.5 | $46.3 | $37.6 | $44.4 | $41.8 | $67.1 | $53.9 | $48.4 | $42.6 | $60.5 | $55.1 | $41.8 | $616.5 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Energy and Delivery Costs | [4] | ($172.1) | ($52.5) | ($9.7) | ($25.0) | ($13.2) | ($16.0) | ($79.8) | ($26.8) | ($13.6) | ($14.6) | ($103.2) | ($36.9) | ($10.8) | ($574.1) |
| Payroll | [5] | - | - | (2.5) | (3.2) | (2.5) | - | (2.5) | - | (2.5) | - | (2.5) | - | (6.5) | (22.3) |
| Taxes | [6] | (0.1) | (5.3) | (6.0) | (0.0) | (0.1) | - | (5.0) | (12.6) | - | (0.2) | (4.7) | (2.4) | (0.1) | (36.6) |
| Commissions | [7] | (2.2) | (4.0) | (4.5) | (0.6) | (2.5) | (0.7) | (4.8) | (0.7) | (1.4) | (0.4) | (4.5) | (0.7) | (0.6) | (27.8) |
| Selling and Other Costs | [8] | (3.2) | (3.4) | (3.5) | (4.5) | (5.0) | (3.5) | (3.3) | (4.1) | (4.7) | (2.9) | (3.5) | (2.9) | (4.0) | (48.4) |
| Total Operating Disbursements | | ($177.6) | ($65.2) | ($26.3) | ($33.4) | ($23.3) | ($20.2) | ($95.4) | ($44.1) | ($22.1) | ($18.0) | ($118.5) | ($42.9) | ($22.0) | ($709.1) |
| **OPERATING CASH FLOWS** | | ($149.0) | ($16.7) | $19.9 | $4.2 | $21.1 | $21.6 | ($28.4) | $9.7 | $26.3 | $24.6 | ($57.9) | $12.2 | $19.8 | ($92.6) |
| *Financing Disbursements* | | | | | | | | | | | | | | | |
| Credit Facility - Borrowings / (Repayments) | [9] | $126.0 | $ - | $31.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $157.5 |
| Interest Expense & Fees | [10] | (3.2) | - | - | (1.4) | - | - | - | (1.3) | - | - | - | - | (1.4) | (7.2) |
| *Restructuring Disbursements* | | | | | | | | | | | | | | | |
| Professional Fees | [11] | - | (1.4) | (2.6) | (1.3) | (1.6) | (1.1) | (1.1) | (0.8) | (1.1) | (0.8) | (0.9) | (0.9) | (0.9) | (14.4) |
| **NET CASH FLOWS** | | ($26.2) | ($18.1) | $48.9 | $1.6 | $19.5 | $20.5 | ($29.5) | $7.6 | $25.2 | $23.8 | ($58.9) | $11.3 | $17.6 | $43.3 |
| **CASH** | | | | | | | | | | | | | | | |
| Beginning Balance | | $77.3 | $51.2 | $33.0 | $81.9 | $83.5 | $103.0 | $123.5 | $94.0 | $101.6 | $126.9 | $150.6 | $91.8 | $103.1 | $77.3 |
| Net Cash Inflows / (Outflows) | | (26.2) | (18.1) | 48.9 | 1.6 | 19.5 | 20.5 | (29.5) | 7.6 | 25.2 | 23.8 | (58.9) | 11.3 | 17.6 | 43.3 |
| Other (FX) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING CASH** | | $51.2 | $33.0 | $81.9 | $83.5 | $103.0 | $123.5 | $94.0 | $101.6 | $126.9 | $150.6 | $91.8 | $103.1 | $120.7 | $120.7 |
| **BORROWING SUMMARY** | | | | | | | | | | | | | | | |
| DIP Facility Credit Limit | | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | |
| DIP Draws | | 126.0 | - | 31.5 | - | - | - | - | - | - | - | - | - | - | |
| DIP Principal Outstanding | | 126.0 | 126.0 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | |
| DIP Availability | | $31.5 | $31.5 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | |

1. The week shown as ending March 14, 2021 reflects a 6-day stub week from March 9 (the filing date) to 3/14/21.
2. Sales Receipts include collections from the Company's residential and commercial customers for the sale of energy, which primarily consists of electricity and natural gas, inclusive of sales tax. The sales forecast is based on historical sales patterns, seasonality, and management's current expectations.
3. Miscellaneous receipts reflect forecasted tax refunds and other receipts not sent from customers.
4. Energy & Delivery costs reflect the purchase energy from suppliers and the cost of delivery and transmission to the Company's customers.
5. Payroll disbursements reflect the current staffing levels and recent payroll amounts, inclusive of any payments associated with the Company's bonus programs.
6. Taxes reflect the remittance of sales taxes collected from customers and the Company's corporate income taxes.
7. Commissions include fees paid to customer acquisition contractors and suppliers.
8. Selling and Other Costs include selling, general, administrative and interest payments.
9. The Credit Facility Borrowings / (Repayments) assume USD$ 100 million of the DIP is drawn immediately, with a subsequent draw for the remainder of the facility within the first few weeks of the proceedings.
10. Interest expenses & fees include interest and fees on the Company's credit facilities.
11. Professional Fees include fees for the Company's counsel and investment banker, the Monitor, the Monitor's Counsel, and the DIP lenders' professionals.

**Just Energy Group Inc. et al**

CCAA 13-Day Cash Flow Forecast

March 9, 2021

*(CAD$ in millions)*

| | | 3/9/21 | 3/10/21 | 3/11/21 | 3/12/21 | 3/13/21 | 3/14/21 | 3/15/21 | 3/16/21 | 3/17/21 | 3/18/21 | 3/19/21 | 3/20/21 | 3/21/21 | 13-Day |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Sales Receipts | [1] | $8.7 | $6.3 | $6.9 | $6.7 | $ - | $ - | $8.2 | $9.8 | $8.0 | $10.1 | $12.4 | $ - | $ - | $77.1 |
| Miscellaneous Receipts | [2] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Total Receipts* | | $8.7 | $6.3 | $6.9 | $6.7 | $ - | $ - | $8.2 | $9.8 | $8.0 | $10.1 | $12.4 | $ - | $ - | $77.1 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Energy and Delivery Costs | [3] | ($121.2) | ($45.8) | ($7.9) | $2.7 | $ - | $ - | ($1.8) | ($7.0) | ($22.6) | ($6.1) | ($15.0) | $ - | $ - | ($224.6) |
| Payroll | [4] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Taxes | [5] | - | (0.1) | - | - | - | - | (5.3) | - | - | - | - | - | - | (5.4) |
| Commissions | [6] | (0.0) | - | - | (2.2) | - | - | - | (0.3) | (3.2) | - | (0.6) | - | - | (6.3) |
| Selling and Other Costs | [7] | (1.0) | (1.0) | (0.0) | (1.0) | - | - | (0.0) | (1.1) | (1.1) | (0.0) | (1.1) | - | - | (6.6) |
| *Total Operating Disbursements* | | ($122.2) | ($46.9) | ($7.9) | ($0.5) | $ - | $ - | ($7.1) | ($8.4) | ($26.9) | ($6.2) | ($16.7) | $ - | $ - | ($242.8) |
| **OPERATING CASH FLOWS** | | ($113.5) | ($40.6) | ($1.0) | $6.1 | $ - | $ - | $1.1 | $1.4 | ($18.8) | $3.9 | ($4.3) | $ - | $ - | ($165.7) |
| *Financing Disbursements* | | | | | | | | | | | | | | | |
| Credit Facility - Borrowings / (Repayments) | [8] | $126.0 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $126.0 |
| Interest Expense & Fees | [9] | (3.2) | - | - | - | - | - | - | - | - | - | - | - | - | (3.2) |
| *Restructuring Disbursements* | | | | | | | | | | | | | | | |
| Professional Fees | [10] | - | - | - | - | - | - | (1.4) | - | - | - | - | - | - | (1.4) |
| **NET CASH FLOWS** | | $9.3 | ($40.6) | ($1.0) | $6.1 | $ - | $ - | ($0.4) | $1.4 | ($18.8) | $3.9 | ($4.3) | $ - | $ - | ($44.3) |
| **CASH** | | | | | | | | | | | | | | | |
| Beginning Balance | | $77.3 | $86.7 | $46.1 | $45.0 | $51.2 | $51.2 | $51.2 | $50.8 | $52.2 | $33.4 | $37.3 | $33.0 | $33.0 | $77.3 |
| Net Cash Inflows / (Outflows) | | 9.3 | (40.6) | (1.0) | 6.1 | - | - | (0.4) | 1.4 | (18.8) | 3.9 | (4.3) | - | - | (44.3) |
| Other (FX) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING CASH** | | $86.7 | $46.1 | $45.0 | $51.2 | $51.2 | $51.2 | $50.8 | $52.2 | $33.4 | $37.3 | $33.0 | $33.0 | $33.0 | $33.0 |
| **BORROWING SUMMARY** | | | | | | | | | | | | | | | |
| DIP Facility Credit Limit | | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $ - |
| DIP Draws | | 126.0 | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Principal Outstanding | | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | - |
| DIP Availability | | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $31.5 | $ - |

1. Sales Receipts include collections from the Company's residential and commercial customers for the sale of energy, which primarily consists of electricity and natural gas, inclusive of sales tax. The sales forecast is based on historical sales patterns, seasonality, and management's current expectations.

2. Miscellaneous receipts reflect forecasted tax refunds and other receipts not sent from customers.

3. Energy & Delivery costs reflect the purchased energy from suppliers and the cost of delivery and transmission to the Company's customers.

4. Payroll disbursements reflect the current staffing levels and recent payroll amounts, inclusive of any payments associated with the Company's bonus or programs.

5. Taxes reflect the remittance of sales taxes collected from customers and the Company's corporate income taxes.

6. Commissions include fees paid to customer acquisition contractors and suppliers.

7. Selling and Other Costs include selling, general, administrative and interest payments.

8. The Credit Facility Borrowings / (Repayments) assume USD$ 100 million of the DIP is drawn immediately, with a subsequent draw for the remainder of the facility within the first few weeks of the proceedings.

9. Interest expenses & fees include interest and fees on the Company's credit facilities.

10. Professional Fees include fees for the Company's counsel and investment banker, the Monitor, the Monitor's Counsel, and the DIP lenders' professionals.

Court File No. _____

### *ONTARIO*
### SUPERIOR COURT OF JUSTICE
### COMMERCIAL LIST

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.,** JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC. JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC,  HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS INC.,   FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP., JUST ENERGY (FINANCE) HUNGARY ZRT. (the "**Applicants**")

**March 9, 2021**

### REPORT ON CASH FLOW STATEMENT

### (Paragraph 10.2(b) of the CCAA)

The management of the Applicants has developed the assumptions and prepared the attached statement of projected cash flow as of March 9, 2021 consisting of (i) a 13-week cash flow forecast for the period March 9, 2021 to June 6, 2021 and (ii) a daily cash flow forecast for the 14-day period from March 9, 2021 to March 21, 2021 (together, the "**Forecasts**").

The purpose of the Forecasts is to estimate the liquidity requirements of the Applicants during the respective forecast periods.  The hypothetical assumptions are reasonable and consistent with the purpose of the projections, and the probable assumptions are suitably supported and consistent with the plans of the Applicants and provide a reasonable basis for the Forecasts.

Since the Forecasts are based on future events, actual results will vary from the information presented and the variations may be material.

The Forecasts have been prepared solely for the purpose outlined above, using the probable and hypothetical assumptions set out in notes to the Forecasts. Consequently, readers are cautioned that the Forecasts may not be suitable for other purposes.

Dated at Houston, Texas, this 8th day of March 2021.

_____

Michael Carter
Chief Financial Officer
Just Energy Group Inc.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.** *et al* (Applicants)

Court File No. CV-21-00_____-00CL

| | |
|---|---|
| | ***ONTARIO*** <br> **SUPERIOR COURT OF JUSTICE** <br> **(COMMERCIAL LIST)** <br><br> Proceedings commenced at Toronto |
| | **PRE-FILING REPORT OF THE PROPOSED MONITOR** |
| | **Thornton Grout Finnigan LLP** <br> TD West Tower, Toronto-Dominion Centre <br> 100 Wellington Street West, Suite 3200 <br> Toronto, ON   M5K 1K7 <br> Tel:    (416) 304-1616 / Fax: (416) 304-1313 <br><br> **Robert I. Thornton** (LSO# 24266B) <br> Email: rthornton@tgf.ca / Tel: (416) 304-0560 <br><br> **Rebecca L. Kennedy** (LSO# 61146S) <br> Email: rkennedy@tgf.ca / Tel: (416) 304-0603 <br><br> **Rachel Bengino** (LSO# 68348V) <br> Email: rbengino@tgf.ca / Tel: (416) 304-1153 <br><br> **Puya Fesharaki** (LSO# 70588L) <br> Email: pfesharaki@tgf.ca / Tel: (416) 304-7979 <br><br> Lawyers for the proposed Monitor, <br> FTI Consulting Canada Inc. |