**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| JUST ENERGY GROUP INC., *et al.*, | ) | Case No. 21-30823 (MI) |
| | ) | |
| Debtors in a Foreign Proceeding,[1] | ) | |
| | ) | (Joint Administration Requested) |
| | ) | |

**VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

Just Energy Group Inc. ("Just Energy" or the "Company"), in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors" or "Just Energy Group"), which are the subject of proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice (the "Canadian Proceedings"), submits this verified petition (together with the form petitions filed concurrently herewith, the "Verified Petition") for recognition of the Canadian Proceedings with respect to each of the Debtors as "foreign main proceedings" and certain related relief pursuant to sections 105(a), 1507, 1510, 1515, 1517, and 1521 of title 11 of the United States Code (the "Bankruptcy Code").

In support of the Verified Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Michael Carter in Support of Verified*

---

[1]   The identifying four digits of Debtor Just Energy Group Inc.'s local Canada tax identification number are 0469.  Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/justenergy.  The location of the Debtors' service address for purposes of these chapter 15 cases is:  100 King Street West, Suite 2360, Toronto, ON, M5X 1E1.

*Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "<u>Carter Declaration</u>") and (b) *the Declaration of Shawn T. Irving in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "<u>Irving Declaration</u>"), each of which are incorporated herein by reference.

## **Preliminary Statement**

1.      Just Energy and its subsidiaries are retail energy providers specializing in delivering electricity and natural gas as well as energy-efficient solutions and renewable energy options, to consumer and commercial customers.  The Just Energy Group currently serves over 950,000 customers, mostly in the United States and Canada through its nearly 1,000 employees (approximately 350 of which are located in Texas).  Just Energy is the largest independent Retail Energy Provider ("<u>REP</u>") and is licensed by the Public Utility Commission in Texas ("<u>PUCT</u>").  The Texas market is Just Energy's largest market, and the Company is registered as a market participant with the Electric Reliability Council of Texas, Inc. ("<u>ERCOT</u>"), an Independent System Operator (as described below).  If Just Energy is unable to pay its invoices when due, ERCOT can revoke the Company's right to conduct activities in the ERCOT market,[2] and transition Just Energy's customers—Just Energy's most valuable asset—to a Provider of Last Resort ("<u>POLR</u>").[3]  Such a result would be catastrophic for the Company and its creditors, lenders, employees, sureties, public shareholders, and customers.

---

[2]   Similarly, outside of Texas, Just Energy's financial situation may create grounds for revocation or suspension of the Company's right to participate in ISO markets in other states in which Just Energy operates—including New York, California, Illinois, Maryland and Ohio.

[3]   ERCOT has already barred two electricity sellers (Entrust Energy Inc. and Griddy Energy LLC) from Texas's power market for failing to make payments, and transitioned all of their customers to POLRs.

2.      Just Energy entered 2021 on strong financial and operational footing.   On September 4, 2020, Just Energy commenced a chapter 15 proceeding—styled *In re Just Energy Group Inc.*, Case No. 20-34442 (DRJ)—in this Court to recognize a balance sheet recapitalization transaction (the "Recapitalization") through a plan of arrangement under section 192 of the Canada Business Corporations Act (the "CBCA").   Less than one week later, on September 10, 2020, Judge David R. Jones entered the recognition order.   The Recapitalization closed on September 28, 2020, and the chapter 15 cases closed shortly thereafter on October 29, 2020.   The culmination of a 15 month-long strategic review process and comprehensive plan to strengthen Just Energy's business, the Recapitalization allowed the Company to shed significant debt from its balance sheet (and extended loan maturities), positioning Just Energy for sustainable growth as an independent industry leader.

3.      However, like many of its industry peers, Just Energy's economic landscape fundamentally changed as a result of the unprecedented winter storm that blanketed the state of Texas on or about February 13, 2021, and maintained its grip of historically sub-freezing temperatures for days.   Electric generation equipment and natural gas pipeline equipment froze, causing the available generation within ERCOT's grid to dramatically decline.[4]   At the same time, Texans sought to heat their homes and businesses against the shocking cold and demand for electricity skyrocketed, pushing Texas's power grid to a new winter peak demand record.

4.      In the early hours of February 15, with the ERCOT system facing unprecedented winter demand and gigawatts of generation forced offline, ERCOT ordered transmission operators to implement rotating outages to reduce the strain on the grid and avoid complete

---

[4]   "If we hadn't taken action, it was seconds and minutes (away from a total system failure)" said ERCOT's CEO Bill Magness after almost losing power across the entire ERCOT grid early in the morning of February 15, 2021, and forcing rotating outages across Texas.   Wall Street Journal article "*Amid Blackouts, Texas Scrapped Its Power Market and Raised Prices. It Didn't Work.*"

collapse.  Later that day, after learning that energy prices were clearing at less than the maximum price for electricity in the ERCOT market, the PUCT instructed ERCOT to set prices for electricity at the maximum price of $9,000 per megawatt hour (or MWh).[5]   As justification for this decision, the PUCT cited the fact that "[e]nergy prices should reflect scarcity of the supply" and "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."  In response, ERCOT manually set the price for electricity to the maximum price of $9,000/MWh.  ERCOT left this artificially established price in place for more than four straight days, until 9:00 am prevailing Central Time on Friday February 19, even though firm load was no longer being shed as of 1:05 am prevailing Central Time on February 18.  In addition, the price for ancillary services, which is impacted by the $9,000/MWh price for electricity, reached previously unseen levels, at times exceeding $25,000 per MWh.

5.     As described in more detail below, ERCOT has now presented Just Energy with invoices for the seven-day winter event, which, when combined, amounted to over $280 million,[6] payment of which was required within days, even if Just Energy disputed such amounts.  As a result, Just Energy suddenly found itself caught in an unforeseeable liquidity trap that even its recently restructured balance sheet could not address.[7]

---

[5]   All dollar amounts in this Declaration are in USD unless otherwise noted and many of the financial figures presented are unaudited and potentially subject to change, but reflect the Debtors' most recent review of their businesses.  The Debtors reserve all rights to revise and supplement the figures presented herein.

[6]   On March 5, 2021, Just Energy received three invoices for approximately $123.21 million from ERCOT, of which approximately $96.24 million must be paid by end of day on March 9, 2021.  On March 8, 2021, Just Energy received another three invoices for approximately $25.46 million, of which approximately $18.86 million is due by March 10, 2021.  The remaining amounts will be due to BP under the ISO Services Agreement (described herein) on March 22, 2021.

[7]   Throughout this quickly evolving process, Just Energy remained focused on keeping its customer base and stakeholders informed, including by issuing five separate press releases and public disclosures between February 16 and February 26, 2021.  In such press releases, Just Energy disclosed the potential impact of the Texas storm on pricing and the fact that such pricing may result in losses that could be materially adverse to

6.     In short order, Just Energy snapped into action to evaluate the unprecedented situation and to explore all value-maximizing alternatives.  On March 3, 2021, Just Energy filed a Petition for Emergency Relief with the PUCT.[8]  In the Petition for Emergency Relief, Just Energy, through its subsidiaries Just Energy Texas LP, Fulcrum Retail Energy, LLC, and Hudson Energy Services LLC, requested that the PUCT order ERCOT to deviate from the deadlines and timing in its Protocols and Market Guides related to settlements, collateral obligations, and invoice payments and suspend the execution or issuance of invoices or settlements for intervals during the dates of February 14, 2021 through February 19, 2021, until issues related to the catastrophic winter storm raised by executive and legislative branches of Texas are investigated, addressed, and resolved.  Alternatively, Just Energy requested that the PUCT grant a waiver of certain ERCOT Protocols to allow Just Energy to delay payment while exercising its rights under the ERCOT Protocols to dispute the invoiced payment amounts.

7.     Because the PUCT's order directing ERCOT to set prices at the system wide offer cap was tied to firm load being shed, a number of market participants and consumer groups filed petitions with the PUCT requesting that the PUCT order ERCOT to correct the real-time prices for the period after load was no longer being shed from the ERCOT system.  On March 4, 2021, Potomac Economics, the Independent Market Monitor ("IMM") for the PUCT, issued a letter echoing this position, recommending that the PUCT direct ERCOT to correct the real-time prices for the period after the grid emergency ended (and prices should have been reset) to remove the inappropriate pricing intervention that occurred during that time period.  Notably, the IMM

---

Just Energy's liquidity and ability to continue as a going concern.  As part of such disclosures, Just Energy also provided estimated ranges of payments expected to be owed to ERCOT and the potential ramifications of making such payments on its liquidity outlook.

[8]     Just Energy's petition is attached to the *Debtors' Emergency Motion for Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion") as Exhibit A.

concluded that **$16 billion** in additional costs had been improperly charged by ERCOT and that ERCOT's actions "will result in substantial and unjustified economic harm" if left unaddressed.[9] In its March 5 open meeting, the PUCT did not act on the IMM's recommendation to order ERCOT to correct the real-time prices. Notably, on March 8, Texas Lieutenant Governor Dan Patrick called on the PUCT and ERCOT to correct the "$16 billion error" in pricing that continued after the power shortage ended and the grid emergency passed.[10]

8. In addition, Just Energy's financial condition was further exacerbated because certain business partners following the weather event have issued demands or taken actions in response to concerns about Just Energy's liquidity and significant amounts owing to trade creditors that are coming due:

    (a) demand for more than CAD $30 million in additional collateral demands from certain of its bonding companies. Over CAD $20 million of additional collateral has already been provided and the rest is expected to be provided by March 17, 2021;[11]

    (b) request for payment from a transmission and distribution service provider on February 24, 2021, stating that Just Energy was delinquent on invoices totaling $141,745 that had an original due date of February 23, 2021 (*i.e.*, one day earlier), that the Just Energy Group would be in default if the delinquent balance was not received within ten days, and that the supplier would exercise its remedies in the event of default. Just Energy paid all outstanding amounts due to such service providers on March 1, 2021, to protect against an event of default for non-payment, which may result in ERCOT transferring customers to a POLR; and

---

[9]    Letter from the Independent Market Monitor, PUC Project No. 51812 (Mar. 4, 2021).

[10]    Office of the Lieutenant Governor, *Lt. Gov. Dan Patrick Calls on ERCOT to Correct $16 Billion Error During Storm*, https://www.ltgov.texas.gov/2021/03/08/lt-gov-dan-patrick-calls-on-ercot-to-correct-16-billion-error-during-storm (8 March 2021).

[11]    The bonding companies had either threatened to start the process of cancelling bonds issued by them if Just Energy did not post additional collateral or had already started the process of cancelling the bonds they had issued and agreed to issue rescission notices upon the receipt of the additional collateral. The cancellation of the bonds may have resulted in the revocation of licenses necessary for Just Energy to carry on business in certain jurisdictions.

(c) amounts of approximately CAD $270 million owing to counterparties under the ISO Services Agreements (as defined herein) will come due. This amount has increased significantly from what Just Energy would normally expect, which increase is a direct result of the Texas winter storm. In addition, more than CAD $75 million in payables owing to Commodity Suppliers (as defined herein) will also come due by March 22, 2021.

9.      Notwithstanding these additional demands, as of the date hereof, Just Energy believe it is current on all financial obligations to all system operators, regulators, and other overnight entities.

10.     Undeterred by PUCT's non-decision and the financial demands of Just Energy's other stakeholders, Just Energy continued to proactively engage with stakeholders across its capital structure to assess all available strategic alternatives, including:

(a) DIP Financing:   Just Energy contacted its five largest stakeholders and provided them with a term sheet and information necessary to assess and evaluate an opportunity to provide debtor-in-possession financing. The information provided included a situation update presentation and access to a virtual data room.   Just Energy also responded to numerous information requests and management held virtual meetings with the stakeholders to answer questions about Just Energy's financial forecast.   In addition, Just Energy engaged with four other parties who had interest in considering the DIP financing opportunity.   The DIP Term Sheet is attached to the Provisional Relief Order as Exhibit B and the DIP Budget is attached to the Carter Declaration as Exhibit A.

(b) Payments to ERCOT:   On Friday, March 5, Just Energy made $64.9 million of payments to ERCOT in the ordinary course, and expects to make an additional $96.3 million of resettlement payments to ERCOT on Tuesday, March 9.   On March 8, Just Energy received from ERCOT (i) a notice that it must post approximately $25.7 million of additional collateral within two business days, and (ii) three invoices for approximately $25.46 million, of which Just Energy expects to make a payment of $18.9 million to ERCOT on March 10, 2021.   Just Energy does not have enough liquidity to pay these invoices without access to the DIP Facility (as defined below).

(c) Engagement with its Prepetition Lenders:  Just Energy engaged directly with its Credit Facility Lenders to ensure the status quo maintenance of its cash management facility and ability to continue to use available liquidity to operate its business in the ordinary course.

(d) <u>Engagement with Shell and BP</u>:   Just Energy maintains a number of agreements with Shell and BP that are integral to its ongoing day-to-day operations.   Because non-payment of certain obligations under these agreements would endanger Just Energy's ability to operate as a going concern, Just Energy engaged directly with Shell and BP to ensure their ongoing support of the business.   As a result and to ensure Shell and BP continue trading with Just Energy in the ordinary course, Just Energy is directly engaged with these parties around the terms of support agreements, whereby Just Energy will continue to perform under the agreements in exchange for Shell's and BP's ongoing commitment to support the business and continue trading.   The support agreements are attached to the Provisional Relief Order as <u>Exhibit C</u> and <u>Exhibit D</u>, respectively.

A.      **Canadian Proceeding Status/Summary**

11.      After thoroughly evaluating all other available options, Just Energy commenced the Canadian Proceedings and, shortly thereafter, these chapter 15 cases to maintain the stability and integrity of its otherwise financially steady and operationally reliable enterprise, and to protect its 950,000 customers and protect the overall value of Just Energy.[12]   At approximately 9:30 a.m. ET this morning (March 9, 2021), the court in the Canadian Proceedings granted vital relief to maintain Just Energy as a going concern, including, but not limited to:[13]

(a) a stay of proceedings against Just Energy that would otherwise undermine its ability to restructure its business and meaningfully engage with the regulators with respect to a viable path forward; and

(b) approval of DIP Financing (as defined herein) sufficient for Just Energy to continue making all payments to ERCOT and other critical parties as required to protect the overall value of Just Energy.

12.      The Debtors have now commenced these chapter 15 cases to facilitate the fair and efficient administration of the Canadian Proceedings.   These chapter 15 cases serve a critical role in maintaining the stability and integrity of the Debtors otherwise financially steady and operationally reliable enterprise, and protecting its 950,000 customers and its public

---

[12]   The resolutions of Just Energy's board of directors approving the CCAA and chapter 15 filing are attached hereto as **Exhibit B**.

[13]   A copy of the certified CCAA Order is attached as **Exhibit D**.

shareholders. Specifically, these chapter 15 cases will provide the Debtors with the breathing room and stability necessary to administer the Canadian Proceedings and implement the restructuring transactions to be described in Just Energy's plan of arrangement.

13. Just Energy has substantial assets in the United States and serves customers in fourteen states, including as a key participant in the Texas electricity market. Recognition of the Canadian Proceedings will, among other things, avoid creditors within the territorial jurisdiction of the United States from "racing to the courthouse" and seeking to obtain and enforce judgments against Just Energy's assets. On a provisional basis, Just Energy simply requests that this Court recognize and enforce the terms of the CCAA interim order, and approve the stay imposed thereby and authorizing the Debtors to comply with the terms of the DIP Financing approved pursuant to such CCAA order, until such time as this Court holds a hearing to recognize the CCAA order on a final basis.[14] Once the DIP Financing is made available and the Company is able to return to ordinary course operations, it intends to work productively with its financial stakeholders to reach a consensual exit to the Canadian Proceedings. For the reasons set forth herein, the relief requested in this Verified Petition is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

### Relief Requested

14. The Foreign Representative respectfully requests entry of an order (the "Order"): (a) granting the Verified Petition and recognizing the Canadian Proceedings as "foreign main proceedings," pursuant to section 1517 of the Bankruptcy Code; (b) recognizing the Foreign Representative as a "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code; (c) recognizing and enforcing the CCAA interim order (the "CCAA Interim

---

[14]   *See Order Granting Provisional Relief Pursuant to Section 1519 of the Bankruptcy Code* (the "Provisional Relief Order"), filed contemporaneously herewith.

Order") and approving the stay imposed thereby and the terms of the DIP Financing approved pursuant to such order, until such time as this Court holds a hearing to recognize the CCAA order (as it may be amended at a so-called "Come Back" hearing to be held in the Canadian Proceedings in ten days days, the "CCAA Final Order) on a final basis; (d) finding that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; (e) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Canadian Proceedings, any order entered in respect of this Verified Petition, these chapter 15 cases, any further order for additional relief in these chapter 15 cases, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code; and (f) granting such other relief as the Court deems just and proper.[15]   A proposed form of the Order is attached hereto as **Exhibit A**.

## Jurisdiction and Venue

15.    The United States Bankruptcy Court for the Southern District of Texas (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with the Verified Petition to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

---

[15]    The Foreign Representative has also filed the Provisional Relief Motion concurrently herewith.

16.     These chapter 15 cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition of the Canadian Proceedings under section 1515 of the Bankruptcy Code.

17.     Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).

18.     The statutory bases for the relief requested herein are sections 105(a), 1504, 1507, 1510, 1515, 1517, 1519, and 1521 of the Bankruptcy Code.

**Background**

**I.      Events Leading to These Chapter 15 Cases.**

    **A.      The Texas Electricity Market and ERCOT.**

19.     Texas is one of the largest electricity markets in the United States—and a key electricity market for Just Energy, accounting for approximately 47% of the Company's embedded gross margin ("EGM").[16]  Texas's grid is one of the three main grids in the United States, known as the Eastern Interconnection, the Western Interconnection, and the Texas Interconnection.  ERCOT is an independent system operator ("ISO") that is solely responsible for managing the Texas Interconnection, which covers 213 of the 254 Texas counties. Generally, reliability regions within the Eastern and Western Interconnections are subject to regulation by the Federal Energy Regulatory Commission ("FERC") and various regional reliability agencies.  The ERCOT reliability region, by contrast, is its own standalone interconnection, and it has limited export and import capability.

20.     Texas is the only one of the contiguous 48 U.S. states with its own standalone electricity grid.  As an ISO, ERCOT is responsible for scheduling power on the transmission system, and maintaining the reliable operation of the transmission system.  ERCOT also

---

[16]   EGM is a rolling five-year measure of management's estimate of future contracted energy and product gross margin.

performs financial settlements for the competitive wholesale electricity market and enforces certain credit requirements, including collateral-posting requirements, to ensure market participants' creditworthiness for ERCOT-facilitated transactions. ERCOT schedules power for more than 26 million people on an electric grid that connects more than 46,500 miles of transmission lines and more than 680 generation units, comprising approximately 84,500 megawatts of installed generation capacity. Of the total installed capacity, approximately 51% is natural gas-fueled generation, 25% is fueled by wind and other renewable resources, and 24% is lignite/coal and nuclear fueled generation.

21.     The delivery of electricity in the ERCOT market operates similarly to other electricity markets in the United States. Market participants buy and sell electricity using both the Real-Time Market (*i.e.*, electricity for current transmission/distribution and use by consumers) and the Day-Ahead Market, both of which are facilitated by ERCOT in its role as the ISO, and through bilateral contracts that indirectly facilitate the majority of wholesale electricity sales in the ERCOT market. These markets allow ERCOT, in conjunction with the qualified scheduling entities that transact directly in the Day-Ahead and Real-Time Markets (facilitated by the bilateral contracts entered into between electricity generators/wholesalers, retailers, and the qualified scheduling entities), to ensure that electricity is reliably delivered to all market participants. ERCOT and its operations are overseen by the PUCT, which enforces compliance with Texas utility laws and regulates electric utility rates and retail electric providers such as Just Energy. Thus, the PUCT is ultimately responsible for ERCOT's operations and overall electricity regulation in Texas.

**B.     The Weather Event.**

22.     Beginning on February 13, 2021, the state of Texas experienced an unprecedented and catastrophic energy crisis when a powerful winter storm (the "Weather Event") moved over

and blanketed the entire state, resulting in temperatures well below 20°F in a state where many homes (which are not sufficiently insulated for extreme cold weather) and businesses rely on electricity for heating.  Price shocks in Texas were felt as early as February 12 when natural gas prices jumped from $3 to over $150/MMBtu in anticipation of short gas supply.  Customer demand for power grew from February 13 and throughout the day on February 14, pushing Texas's power grid to a new winter peak demand record, topping 69,000 megawatts between 6:00 p.m. and 7:00 p.m., prevailing Central Time—more than 3,200 megawatts higher than the previous winter peak set in January 2018.  At the same time, demand for gas for heating grew.

23.     In the early hours of February 15, ERCOT declared an Energy Emergency Alert Level 1, urging consumers to conserve power.  Within an hour, ERCOT elevated to an Energy Emergency Alert Level 2, and only 13 minutes later, at 1:25 a.m., prevailing Central Time, ERCOT elevated to an Energy Emergency Alert Level 3.  With the grid stressed to within minutes of a catastrophic failure, ERCOT ordered transmission operators to implement deep cuts in load in the form of rotating outages to reduce the strain and avoid a complete collapse.  In the peak of the controlled outage event, more than 3 million households were without electricity.  While demand soared, supply plummeted as power plants tripped offline and demand threatened to exceed supply.  Natural gas prices spiked in response to falling supply as lines froze up; as a result, the cost to produce electricity from gas-fueled power plants increased dramatically.

24.     On February 15 (and amended on the 16th), the PUCT directed ERCOT to adjust prices "to ensure that firm load that is being shed in [Energy Emergency Alert 3] is accounted for in ERCOT's scarcity pricing signals . . ." noting that, "[i]f customer load is being shed, scarcity is at its maximum, and the market price to serve that load should also be at its highest[.]"[17]

---

[17]   *Oversight of the Electric Reliability Council of Texas, Docket No. 51617,* Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 16, 2021).

Based on this order, ERCOT set prices at the System Wide Offer Cap ($9,000 per MWh). Although load stopped being shed as of 1:05 a.m. on the morning of February 18, 2021, ERCOT continued to set prices at the System Wide Offer Cap until 9:00 a.m., prevailing Central Time, on February 19 when it formally declared that the system was no longer in Energy Emergency Alert Level 3. The Weather Event caused the ERCOT wholesale market to incur charges of $55 billion over a seven-day period—an amount equal to what it ordinarily incurs over *four years*.

        **C.**      **The Impact on Just Energy.**

      25.     In addition to exponentially high electricity costs during the Weather Event, the Company was exposed to significantly increased ancillary services costs, which are charges associated with maintaining the reliability of the grid that are spread to all Market Participants daily based on that day's load ratio share. During the Weather Event, ancillary service costs have been estimated to be approximately *600 times* the normal price. While the Company had hedges in place to cover its normal load level ancillary services costs (which are based on the Company's normal load share of electricity in ERCOT), during the Weather Event, the Company's load share disproportionally increased. The Company's load share increase, combined with the significantly higher ancillary service prices, resulted in significant additional costs. As a result, Just Energy quickly engaged advisors to assist Just Energy with analyzing the its liquidity and financing needs and begin exploring solutions and alternatives.

      26.     On March 1, 2021, representatives of Just Energy held a teleconference with ERCOT personnel to discuss the charges from the Weather Event. During the conference, participating ERCOT personnel were unable to explain the dramatic departure from historical charges, instead stating that the decision was protocol driven. Just Energy then wrote to ERCOT to initiate the dispute process regarding certain charges being invoiced. As an initial matter,

Just Energy disputes the application of the $9,000 MWh System Wide Offer Cap to any time period after the ERCOT grid ceased shedding load at 1:05 a.m., prevailing Central Time, on February 18, 2021, as applying the System Wide Offer Cap after that time contravenes the language of the PUCT's February 15 and February 16 orders.  In its March 4 letter, the IMM took the same position, recommending that the PUCT direct ERCOT to correct prices for the period after the grid emergency ended:

> ERCOT recalled the last of the firm load shed instructions at 23:55 on February 17, 2021.  Therefore, in order to comply with the Commission Order, the pricing intervention that raised prices to VOLL should have ended immediately at that time.  However, ERCOT continued to hold prices at VOLL by inflating the Real-Time On-Line Reliability Deployment Price Adder for an additional 32 hours through the morning of February 19.  **This decision resulted in $16 billion in additional costs to ERCOT's market**, of which roughly $1.5 billion was uplifted to load-serving entities to provide make-whole payments to generators for energy that was not needed or produced. . . . Therefore, the IMM recommends that the Commission direct ERCOT to correct the real-time prices from 0:00 February 18, 2021, to 09:00 February 19, 2021, to remove the inappropriate pricing intervention that occurred during that time period.[18]

Further, the IMM notes that ERCOT's actions were inconsistent with the organization's own protocols, as well as the PUCT's orders, and will result in "substantial and unjustified economic harm" if left unaddressed.[19]

27.     As the pleadings of other parties and the comments of the IMM[20] make clear, the manner in which ancillary services charges were calculated and assessed during the Weather Event is concerning and inconsistent with past practice.  Just Energy's invoices include ancillary services charges that may have been either erroneously calculated or are an unreasonable application of ERCOT's Protocols.  For example, typically Just Energy's invoices

---

[18]   Letter from the Independent Market Monitor, PUC Project No. 51812 (Mar. 4, 2021) (emphasis added).

[19]   *Id.*

[20]   Comments of the Independent Market Monitor, PUC Project No. 51812 (Mar. 1, 2021).

include a charge for Reliability Deployment Ancillary Service Imbalance Revenue Neutrality that historically ranges from $0 to $23,500 per day.  Between June 2015 and February 16, 2021 the Just Energy Group paid approximately $504,000 in respect of this charge.  In contrast, for the three settlement dates of February 17, 18 and 19, 2021, the aggregate charge is over $61 million. This is approximately ***121 times higher*** than the last 5 years of charges combined.  Just Energy understands that this charge is a load-based allocation for incremental revenue provided to online generation during a period of scarcity, which is then paid out based on online generation capacity net of generating volume and net of generation procured for ancillary service multiplied by real time Operating Reserve Demand Curve ("<u>ORDC</u>") adders.  The ORDC adders for Operating Day 18th and 19th in particular were artificially set and do not reflect available capacity on the system.  As such, strict application of the ERCOT Protocols would mean that generators would receive a reliability revenue when there was no scarcity.  Considering that Just Energy's load share is less than 2.5%, ***this would mean that Market Participants were paying approximately $1.9 billion when there was no scarcity***.

28.     On March 3, 2021, Just Energy filed a petition with the PUCT requesting that the PUCT order ERCOT to deviate from the deadlines and timing in its Protocols and Market Guides related to settlements, collateral obligations, and invoice payments and suspend the execution or issuance of invoices or settlements for intervals during the dates of February 14, 2021 through February 19, 2021, until issues related to the catastrophic Weather Event raised by executive and legislative branches of the Texas authorities are investigated, addressed, and resolved.  Alternatively, Just Energy requested that the PUCT grant a waiver of certain ERCOT Protocols to allow Just Energy to delay payment while exercising its rights under the ERCOT Protocols to dispute the invoiced payment amounts.  Notably, the requested waiver does not

require that the PUCT make a determination as to whether Just Energy should be relieved of its payment obligations, as Just Energy intends to address these disputes with ERCOT through the dispute resolution procedures set out in the ERCOT Nodal Protocols.

29.     Neither ERCOT nor the PUCT have taken any actions in response to Just Energy's requests for relief.  As such, Just Energy has no choice but to continue to pay its ERCOT invoices, even while disputing them.  Otherwise, ERCOT can suspend Just Energy's market participation and transfer its customers to a POLR.  The PUCT also has not taken any action on the requests of many parties, and declined to adopt the recommendation of the IMM, that prices be resettled to remove the artificial price adders as of 1:05 a.m. on February 18. Notably, on March 8, Texas Lieutenant Governor Dan Patrick called on the PUCT and ERCOT to correct the "$16 billion error" in pricing that continued after the power shortage ended and the grid emergency passed.[21]

30.     In addition to ERCOT, Just Energy's liquidity challenges have been further exacerbated by the demands of certain business partners and regulators following the Weather Event:

      a.     Just Energy received demands from certain of its bonding companies for more than CAD $30 million in additional collateral.  Over CAD $20 million of additional collateral has already been provided and the rest is expected to be provided by March 17, 2021.  The bonding companies had either threatened to start the process of cancelling bonds issued by them if Just Energy did not post additional collateral or had already started the process of cancelling bonds they issued and agreed to issue rescission notices upon receipt of the additional collateral.  The cancelation of the bonds may have resulted in the revocation of licenses necessary for Just Energy to carry on business in certain jurisdictions.

---

[21]  Office of the Lieutenant Governor, *Lt. Gov. Dan Patrick Calls on ERCOT to Correct $16 Billion Error During Storm*, https://www.ltgov.texas.gov/2021/03/08/lt-gov-dan-patrick-calls-on-ercot-to-correct-16-billion-error-during-storm (8 March 2021).

b.      On February 24, 2021, Just Energy received a letter from a transmission and distribution service provider stating that the Company was delinquent on invoices totaling USD $141,745 that had an original due date of February 23, 2021, that the Company would be in default if the delinquent balance was not received within ten days, and that the supplier would exercise its remedies in the event of default. Just Energy paid all outstanding amounts due to transmission and distribution service providers on March 1, 2021, as an event of default for non-payment results in the PUCT transferring customers to a POLR.

c.      On March 22, 2021, approximately CAD $270 million owing to counterparties under the ISO Services Agreements will come due. This amount has increased significantly from what the Company would normally expect, which increase is a direct result of the Weather Event. In addition, more than CAD $75 million in payables owing to Commodity Suppliers (as defined herein) will also come due by March 22, 2021.

31.    After exhausting all alternatives, Just Energy and its Board of Directors determined that the commencement of the Canadian Proceedings and these chapter 15 proceedings were inevitable. Leading up to the commencement of these cases, Just Energy contacted its five largest stakeholders and provided them with a term sheet and information necessary to assess and evaluate an opportunity to provide debtor-in-possession financing. The information provided included a situation update presentation and access to a virtual data room. Just Energy also responded to numerous information requests and management held virtual meetings with the stakeholders to answer questions about Just Energy's financial forecast. In addition, Just Energy engaged with four other parties who had interest in considering the DIP financing opportunity. Just Energy negotiated the form of non-disclosure agreement ("NDA") with two of these parties. However, due to the short timeframe in which Just Energy needed to secure DIP financing, there was not sufficient time for the parties to finalize NDAs or conduct the necessary due diligence. As a result of this process, subject to certain terms and conditions, the financial institutions from time to time party thereto (the "DIP Lenders"), and Alter Domus

(US) LLC, as administrative agent for the DIP Lenders, have agreed to provide a debtor-in-possession facility (the "DIP Facility") in the amount of USD $125 million.

32.     Just Energy will provide all relevant regulators in the states in which the Company operates—including Texas, Maryland, New Jersey, New York, Ohio and Pennsylvania—with notice of the commencement of the Canadian Proceedings and these chapter 15 cases.    Additionally, despite challenging the quantum of such payments as appropriate, Just Energy will continue to satisfy ERCOT obligations as they come due.

33.     In connection with the Canadian Proceedings, the Canadian Court approved FTI Consulting Canada, Inc. ("FTI") as the Canadian Court's independent monitor (the "Monitor"). In its capacity as Monitor, FTI, in consultation with its independent counsel, submitted a detailed report to the Canadian Court supporting all of the relief requested in the Canadian Proceedings and in these chapter 15 cases.[22]

34.     Notwithstanding the catastrophic financial fallout from the Weather Event, Just Energy and its Board of Directors firmly believe in its business model, its strong management team, its dedicated, hardworking employees, and its strong, faithful consumer base and fully intend to use the bankruptcy process to preserve its business and maximize value for all stakeholders, including the thousands of Texans who, now more than ever, rely on Just Energy to meet its energy needs every day.

## II.    General Background.

### A.    The Debtors' Corporate History.

35.     Established in 1997, Just Energy is a leading retail consumer company specializing in electricity and natural gas commodities, energy efficiency solutions, and

---

[22]    A copy of such report is attached as Exhibit A to the Irving Declaration.

renewable energy options.  A Canadian corporation with head offices in Mississauga, Ontario and Houston, Texas, Just Energy serves over 950,000 consumer and commercial customers, providing homes and businesses with a broad range of energy solutions.

36.     The Company primarily supplies electricity and natural gas commodities to both consumer and commercial customers.  These sales are made under various arrangements, mainly under long-term fixed price contracts with some customers remaining on month-to-month variable-price after their long-term contract expired.  In addition, the Company provides various "green" products.  Customers can choose an appropriate "JustGreen" program to supplement their natural gas and electricity contracts and offset their carbon footprint, or purchase high quality environmental products through "TerraPass," which supports projects throughout North America that destroy greenhouse gases, produce renewable energy, and restore freshwater ecosystems through the purchase of renewable energy credits and carbon offsets.

37.     Just Energy's common shares (the "Common Shares") are listed on the Toronto Stock Exchange ("TSX") and the New York Stock Exchange ("NYSE") and trade under the symbol "JE."[23]

### B.     The Debtors' Assets and Operations.

#### 1.     The Debtors' Products and Services.

38.     Just Energy offers products and services to address customers' essential needs, including electricity and natural gas commodities, health and well-being products such as water quality and filtration devices, and utility conservation products which bring energy efficient solutions and renewable energy options to customers.

---

[23]   Just Energy's current corporate structure chart is attached hereto as Exhibit E.

### a. *Natural Gas.*

39.    Just Energy offers natural gas customers a variety of products, mainly under long-term fixed price contracts.  Gas supply is purchased from market counterparties based on forecasted consumer and small commercial RCEs.[24]  For larger commercial customers, gas supply is generally purchased concurrently with the execution of a contract.

### b. *Electricity.*

40.    Just Energy services various territories in Canada and the U.S. with electricity.  A variety of electricity solutions are offered, including fixed-price, flat-bill and variable-price products on both short-term and longer-term contracts.  Most of these products provide customers with price-protection programs for the majority of their electricity requirements.  Just Energy uses historical usage data for all enrolled customers to predict future customer consumption and to help with long-term supply procurement decisions.  Just Energy purchases power supply from market counterparties for consumer and commercial customers based on forecasted customer aggregation.  Power supply is generally purchased concurrently with the execution of a contract for larger commercial customers.

### c. *JustGreen.*

41.    Many customers have the ability to choose an appropriate JustGreen program to supplement their natural gas and electricity contracts, providing an effective method to offset their carbon footprint associated with the respective commodity consumption.  JustGreen programs for gas customers involve the purchase of carbon offsets from carbon capture and reduction projects.  JustGreen's electricity products offer customers the option of having all or a

---

[24]    "RCE" means residential customer equivalent, which is a unit of measurement equivalent to a customer using 2,815 $m^3$ (or 106 GJs or 1,000 Therms or 1,025 CCFs) of natural gas on an annual basis or 10 MWh (or 10,000 kWh) of electricity on an annual basis, which represents the approximate amount of gas and electricity, respectively, used by a typical household in Ontario, Canada.

portion of the volume of their electricity usage sourced from renewable green sources such as wind, solar, hydropower or biomass, via power purchase agreements and renewable energy certificates. Just Energy currently sells JustGreen gas and electricity in eligible markets across North America.

### d. TerraPass.

42.     Through TerraPass, customers can offset their environmental impact by purchasing high quality environmental products. Terrapass supports projects throughout North America that destroy greenhouse gases, produce renewable energy and restore freshwater ecosystems. Each project is made possible through the purchase of renewable energy credits and carbon offsets. Terrapass offers various purchase options for residential or commercial customers, depending on the impact the customer wishes to make.

### e. Filter Group.

43.     The Company also offers water filtration systems through Filter Group Inc. ("Filter Group") in Canada and through its subsidiary Filter Group US Inc. in the United States.

### 2.     The Debtors' Markets.

#### a. Divestitures: Refocusing on North America.

44.     In March 2019, Just Energy formally approved and commenced a process to dispose of its businesses in Germany, Ireland and Japan. In June 2019, Just Energy also formally approved and commenced a process to dispose of its business in the United Kingdom ("U.K."), as part of the Company's Strategic Review (as defined herein). These divestitures were part of a strategic transition to focus on Just Energy's core business in North America.

45.     In addition, as part of its portfolio optimization process, Just Energy sold its subsidiary EdgePower on November 30, 2020, resulting in a gain of $1.5 million. The Company

also sold its California power portfolio for a nominal amount in a transaction that closed in December 2020.

### b. The Company's New Footprint.

46.     Following its strategic divestitures, Just Energy now serves several states and provinces across North America.  As discussed above, the State of Texas is a key electricity market for the Company.

### 3. **The Debtors' Employees.**

47.     As of March 1, 2021, Just Energy employed approximately 979 full-time employees and five part-time employees.  The geographic distribution of the Company's employees is as follows:

| Province / Territory | Number of Employees |
|---|---|
| **Canada** | |
| Ontario | 324 |
| Alberta | 6 |
| British Columbia | 1 |
| New Brunswick | 1 |
| Saskatchewan | 1 |
| *Total (Canada)* | 333 |
| **United States** | |
| Texas | 351 |
| Other states | 30 |
| *Total (United States)* | 381 |
| **Other** | |
| India | 265 |
| ***Total (overall)*** | **979** |

48.     In addition, as of March 1, 2021, Just Energy contracts with twenty-three independent contractors.  Just Energy's employees are all non-unionized, and there are no applicable collective agreements.

4.    **The Debtors' Suppliers.**

49.    Just Energy purchases the majority of the gas and electricity delivered to its customers through long-term contracts entered into with various suppliers.  The Company transacts with various suppliers to purchase gas and electricity (the "<u>Commodity Suppliers</u>"), which typically purchase gas and electricity for larger commercial customers when they execute the contract for those customers.  For remaining customers, supplies are purchased based on forecasted consumption.  Commodity and volume forecasts are developed using historical data and current market conditions.

50.    In addition to agreements for the physical supply of gas and electricity, the Company also enters into hedge contracts with Commodity Suppliers in order to minimize commodity and volume risk.  These include derivative instruments such as physical forward contracts and options and financial swap contracts and options that are designed to fix the price of supply for estimated customer commodity demand.  The Company also purchases various weather derivatives to mitigate its exposure to variances in customer requirements that are driven by changes in expected weather conditions.

51.    Just Energy evaluates and manages weather related conditions by analyzing historically observed weather and commodity scarcity scenarios in its various markets.  Just Energy's current portfolio and forecasts are stress tested against multiple scenarios to estimate a range of revenue and supply outcomes.  Scenarios are constructed using historical consumption, weather, load, and price patterns adjusted for known and expected market changes.  Scenarios include events such as a polar vortex, the Texas 2011 heat wave, El-Nino winters, and other extreme weather events.  Based on these forecasts, Just Energy will then layer in its hedging strategy under its risk management policy.  In its planning for the current winter season

(November 2020–March 2021), Just Energy positioned its portfolio under all known historical weather and commodity scarcity scenarios to avoid exposure exceeding CAD $10 million in the aggregate.

52.     In addition to supply agreements, Just Energy is also party to ISO services agreements with certain Commodity Suppliers (the "ISO Services Agreements").  The most significant is an Independent Electricity System Operator Scheduling Agreement (the "BP Agreement") with BP Energy Company ("BP") pursuant to which BP provides a variety of services as well as working capital and credit support:  *First*, BP provides all services and takes all actions required for the scheduling and arranging for the delivery of all physical sales of energy by Hudson Energy Services, LLC.  *Second*, BP makes certain payments to ISOs monitoring the electrical power system in certain jurisdictions on behalf of the Company.  The payments to the ISOs must be made daily, but BP provides Just Energy on average 35 days to repay these amounts.  *Third*, BP posts collateral and provides credit support for Just Energy with ISOs, which relieves the Company of the obligation to post the collateral related to its load requirements.

  5.     **The Debtors' Sureties.**

53.     Just Energy has issued over 100 separate surety bonds to various counterparties including States, regulatory bodies, utilities and various other surety bond holders in return for a fee and/or meeting certain collateral posting requirements.  Such surety bond postings are required in order to operate in certain states or markets.  The total surety bonds issued as of December 31, 2020 were CAD $46.3 million.

C. **Strategic Review and Recapitalization.**

54.     In May 2020, after a review of strategic alternatives (the "Strategic Review"), Just Energy concluded that the Recapitalization was the only viable option short of an insolvency proceeding that provided a long-term solution to its financial challenges.  Following multiple rounds of negotiations with key stakeholders, Just Energy secured approval of an amended plan of arrangement.  The Company sought final approval of the plan with the Canadian court on September 2, 2020, which order was entered the following day.

55.     On September 4, 2020, the Company sought recognition of the Canadian proceeding under chapter 15 of the Bankruptcy Code in this Court.  On September 28, 2020, the Company completed its comprehensive plan to strengthen and de-risk the business, positioning the Company for sustainable growth as an independent industry leader.  The chapter 15 cases closed shortly thereafter on October 29, 2020.

56.     The Recapitalization was undertaken through a plan of arrangement under the CBCA and included:

- The consolidation of the Company's common shares on a 1-for-33 basis;

- Exchange of the 6.75% CAD $100 million convertible debentures and the 6.75% CAD $160 million convertible debentures for common shares and CAD $15 million principal amount of new 7.0% CAD $13 million subordinated notes.  The subordinated notes had a principal amount of CAD $15 million as of September 28, 2020, which was reduced to CAD $13.2 million through a tender offer for no consideration on October 19, 2020;

- Extension of CAD $335 million of the Company's senior secured credit facilities to December 2023, with revised covenants and a schedule of commitment reductions throughout the term;

- Existing 8.75% loan and the remaining convertible bonds due December 31, 2020 were exchanged for a new 10.25% term loan due March 2024 and common shares, with interest on the new term loan to be initially paid-in-kind until certain financial measures are achieved;

- Exchange of all of the 8.50%, fixed-to-floating rate, cumulative, redeemable, perpetual preferred shares for common shares;

- Accrued and unpaid interest paid in cash on the subordinated convertible debentures until September 28, 2020;

- The payment of certain expenses of the ad hoc group of convertible debenture holders;

- The issuance of approximately CAD $3.7 million of common shares by way of an additional private placement to the Company's term loan lenders at the same subscription price available to all security holders pursuant to the new equity subscription offering, proceeds of which partially offset the incremental cash costs to the ad hoc group noted above;

- The entitlement of holders of Just Energy's existing 8.75% loan, 6.5% convertible bonds, the subordinated convertible debentures, preferred shares and common shares as of July 23, 2020 to subscribe for post-consolidation common shares at a price per share of CAD $3.412, with subscriptions totaling 15,174,950 common shares resulting in cash proceeds for Just Energy of approximately CAD $51.8 million;

- Pursuant to certain backstop commitments, the acquisition of 14,137,580 common shares by the backstop parties, on a post-consolidation basis resulting in cash proceeds for Just Energy of approximately CAD $48.2 million; for a total aggregate proceeds from the equity subscription option of approximately CAD $100.0 million, which was used to reduce debt and for general corporate purposes; and

- The settlement of litigation related to the 2018 acquisition of Filter Group Inc. pursuant to which shareholders of the Filter Group received an aggregate of CAD $1.8 million in cash and 429,958 common shares.

**III.    The Debtors' Prepetition Capital Structure.**

57.    The following table summarizes Just Energy's significant non-trade debt.   The debts are listed by priority of payment:

| | Type | Borrower(s) | Maturity Date | Approximate Outstanding Amount as of December 31, 2020 |
|---|---|---|---|---|
| Senior Secured Credit Facility | Revolving credit facilities on borrowing base | Just Energy Ontario L.P. and Just Energy (U.S.) Corp. | December 31, 2023 | CAD $232.62 million in principal[25] <br><br> CAD $77.8 million in letters of credit[26] |
| Term Loan | Non-revolving, senior unsecured term loan facility | Just Energy Group Inc. | March 31, 2024 | CAD $273.48 million |
| Subordinated Notes | Unsecured subordinated notes | Just Energy Group Inc. | September 27, 2026 | CAD $13.2 million |

Just Energy's trade and non-trade obligations are described in more detail below.

**A.    Senior Secured Credit Facility.**

58.    Just Energy Ontario L.P. and Just Energy (U.S.) Corp. (collectively, the "Senior Secured Credit Facility Borrowers") are borrowers under a ninth amended and restated credit agreement (as amended from time to time, the "Senior Secured Credit Facility Agreement") made as of September 28, 2020 with a syndicate of lenders that includes CIBC, National Bank of Canada, HSBC, JPMorgan, Alberta Treasury Branches, Canadian Western Bank, and Morgan Stanley Senior Funding, Inc., a subsidiary of Morgan Stanley Bank N.A. (collectively, the "Senior Secured Credit Facility Lenders").   Under the Senior Secured Credit Facility Agreement,

---

[25]    CAD $227.86 million as of March 5, 2021.

[26]    CAD $103.96 million as of March 5, 2021.

the Senior Secured Credit Facility Lenders agreed to extend a three tranche credit facility in a maximum aggregate amount of up to CAD $335 million consisting of (i) a Canadian revolving credit facility with commitments of CAD $110 million, (ii) a U.S. revolving credit facility with commitments of CAD $166 million, and (iii) a letter of credit facility with commitments of CAD $59 million, with scheduled mandatory commitment reductions during the term of the Senior Secured Credit Facility Agreement (the "Senior Secured Credit Facility").   As part of the Recapitalization, Just Energy extended the Senior Secured Credit Facility, which was previously scheduled to mature in December 2020, to December 31, 2023.

59.    As of December 31, 2020, there was approximately CAD $232.62 million in principal outstanding under the Senior Secured Credit Facility Agreement, including outstanding letters of credit amounting to CAD $77.8 million.   The letters of credit are issued to various counterparties, primarily utilities and suppliers.   Certain principal amounts outstanding under the letter of credit facility is guaranteed by Export Development Canada under its Account Performance Security Guarantee Program.   Just Energy's obligations under the Senior Secured Credit Facility are supported by guarantees of certain subsidiaries and affiliates and secured by a general security agreement and a pledge of the assets and securities of Just Energy and the majority of its operating subsidiaries and affiliates excluding, primarily, Filter Group and German operations.   As of December 31, 2020, the Company was compliant with all of its covenants under the Senior Secured Credit Facility Agreement.

60.    Interest is payable on outstanding loans at rates that vary with bankers' acceptance rates, London Interbank Offered Rate, Canadian bank prime rate or U.S. prime rate. Interest rates are adjusted quarterly based on certain financial performance indicators.

**B.      Secured Supplier and Hedge Obligations.**

61.      Just Energy's financial obligations to its primary Commodity Suppliers in North America, which include Shell, BP, Exelon, Generation Company LLC, Bruce Power, L.P., Société Générale, EDF Trading North America, LLC, National Bank of Canada, Nextera Energy Marketing, LLC and Macquarie (collectively, the "Secured Suppliers"), are secured by security granted by Just Energy and its affiliates pursuant to general security agreements, pledges of securities, and other security documents on the same collateral that secures the Senior Secured Credit Facility Agreement.

62.      The Secured Suppliers, the agent for the Senior Secured Credit Facility Lenders (together with the Secured Suppliers, collectively, the "Senior Creditors"), the Senior Secured Credit Facility Borrowers, certain subsidiaries and affiliates of the Senior Secured Credit Facility Borrowers (including Just Energy), and CIBC, in its capacity as collateral agent for the benefit of the Senior Creditors (the "Collateral Agent"), are also party to an intercreditor agreement (the "Intercreditor Agreement") setting out the relative priority of the parties' security interests.[27] The security is granted in favor of the Collateral Agent under the Intercreditor Agreement for the benefit of the Senior Secured Credit Facility Lenders and the Secured Suppliers.  Pursuant to the Intercreditor Agreement, the Secured Suppliers rank *pari passu* with the Senior Secured Credit Facility Lenders in terms of lien priority, subject to a payment waterfall set out in the agreement. The waterfall provides for the following payment priority with respect to respective Senior Secured Credit Facility Lenders and the Secured Suppliers:   (i) first, to Collateral Agent

---

[27]      Attached as **Exhibit B** to the Carter Declaration is a letter dated March 4, 2021 that Just Energy received from BP in the context of ongoing discussions regarding the effect of the Texas weather event on the Company.  The letter advises that BP disagrees with the proposed priority of amounts due from Just Energy.  On March 5, 2021, Just Energy responded to the BP letter stating that the Company is happy to look into the matter but believes it is largely an intercreditor issue that will be resolved over time.  Just Energy does not intend to take a position on this intercreditor issue as part of this proceeding or otherwise.  Attached as **Exhibit C** to the Carter Declaration is a copy of Just Energy's responding letter.

administrative expenses; (ii) second, on a *pro rata* basis, to (A) Collateral Agent fees and (B) expenses in respect of other amounts payable to the agent or trustee with respect to any Senior Creditor obligations; (iii) third, on a *pro rata* basis, to costs and expenses of the Senior Creditors in respect of the collateral or any enforcement of the Senior Creditor obligations; (iv) fourth, on a *pro rata* basis, to (A) unpaid interest on the obligations under the Senior Secured Credit Facility, (B) all payments to the hedge providers who are Senior Secured Credit Facility Lenders in respect of hedging agreements allocable to past periods and (C) all payments for physical supply of electricity or gas that has been delivered and all payments for financial settlements allocable to past periods; (v) fifth, on a *pro rata* basis, to (A) obligations under the Senior Secured Credit Facility up to USD $370 million, (B) amounts owing to the hedge providers who are Senior Secured Credit Facility Lenders in respect of hedging agreements arising upon termination thereof or default thereunder, (C) amounts owing to the Secured Suppliers in respect of commodity supply agreements arising upon termination thereof or default thereunder up to an amount equal to three times the amounts described in (v)(A) and (B) above and (D) all amounts owing to a Senior Creditor in respect of ISO services obligations up to CAD $94.5 million; (vi) sixth, on a *pro rata* basis, to (A) other obligations under the Senior Secured Credit Facility to the extent not paid above and (B) amounts owing to the Secured Suppliers in respect of commodity supply agreements arising upon termination thereof or default thereunder to the extent not paid above; (vii) seventh, on a *pro rata* basis, to all other obligations under the obligations owing to the Senior Creditors; and (viii) eighth, to the Debtors.

63.    As of January 31, 2021, Just Energy owed its Secured Suppliers approximately CAD $198.96 million.

### C.    Term Loan.

64.    As part of the Recapitalization, Just Energy issued a USD $205.9 million principal note (the "Term Loan") maturing on March 31, 2024 to Sagard Credit Partners, LP and certain funds managed by a leading U.S.-based global fixed income asset manager (the "Term Loan Lenders").  The Term Loan bears interest at 10.25% and payments will be capitalized into the note.  The interest is capitalized on a semi-annual basis on September 30 and March 31.  The balance at December 31, 2020 includes an accrual of CAD $7.1 million for capitalized interest payable on the notes.  Upon achieving certain financial measures, the Company will pay either 50% or 100% of the interest in cash at a 9.75% rate on a semi-annual basis.  The Term Loan requires compliance with certain senior debt to EBITDA ratios as well as minimum EBITDA requirements, each on a trailing four quarter period.  Voluntary prepayments in minimum increments of USD $5,000,000 are permitted subject to a concurrent payment to the Term Loan Lenders of a prepayment penalty of 5.0%.

65.    As of December 31, 2020, approximately CAD $273.48 million was outstanding on the Term Loan.

### D.    Subordinated Notes.

66.    As part of the Recapitalization, Just Energy issued CAD $15 million principal of subordinated notes (the "Subordinated Notes") to holders of certain subordinated convertible debentures that were extinguished as part of the Recapitalization.  The Subordinated Notes bear an annual interest rate of 7% payable in-kind semi-annually on March 15 and September 15.  A CAD $2 million fee related to the issuance of the notes was capitalized at inception to be amortized over the term of the notes.  The Subordinated Notes had a principal amount of CAD $15 million as of September 28, 2020, which was reduced to CAD $13.2 million through a tender offer for no consideration on October 19, 2020.

### E.      Filter Group Loan.

67.     In addition, Filter Group[28] is the borrower under a CAD $5.5 million outstanding loan (the "Filter Group Loan") payable to Home Trust Company ("HTC").  The loan is a result of factoring receivables to finance the cost of rental equipment over a period of three to five years with HTC and bears interest at 8.99% per annum.  Payments on the loan are made monthly as Filter Group receives payment from the customer and continue up to the end date of the customer contract term on the factored receivable.  The Filter Group Loan was not a part of the Recapitalization.

68.     As of December 31, 2020, there was approximately CAD $5.5 million outstanding under the Filter Group Loan.

### F.      Equity.

69.     Just Energy's authorized share capital consists of an unlimited number of Common Shares and 50,000,000 preference shares (the "Preferred Shares").  As of March 1, 2021, there were 48,078,637 Common Shares and no Preferred Shares issued and outstanding. The Common Shares are listed on the TSX and the NYSE.

## IV.   The Canadian Proceedings.

70.     On March 9, 2021, Just Energy Group commenced the Canadian Proceedings with the Canadian Court pursuant to sections 9, 11, 11.51, 11.52, and 23 of the CCAA with the goal of pursuing the restructuring operations under the protections offered by the CCAA. On March 9, 2021, the Canadian Order entered the CCAA Order, which expressly authorizes Just Energy to seek recognition of the Canadian Proceedings in the United States to aid and assist

---

[28]    Filter Group is not a restricted subsidiary and is not a part of the Canadian Proceedings.

the Canadian Court in carrying out the terms of the CCAA Order.  Paragraphs 53 and 54 of the

CCAA Order provides, in relevant part:

> Just Energy Group Inc. ("**JEGI**") is hereby authorized and empowered, but not required, to act as the foreign representative (in such capacity, the "**Foreign Representative**") in respect of the within proceedings for the purpose of having these proceedings recognized and approved in a jurisdiction outside of Canada. [T]he Foreign Representative is hereby authorized to apply for foreign recognition and approval of these proceedings, as necessary, in any jurisdiction outside of Canada, including in the United States pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

First Day CCAA Order, ¶¶ 53–54.

71.     Following entry of the CCAA Order, the Debtors will seek entry by the Canadian

Court of the CCAA Final Order approximately ten days from the date hereof.

72.     Although each Debtor's respective management remains in place, each Debtor's

assets and affairs are subject to the supervision of the Canadian Court during the pendency of the

Canadian Proceedings.

73.     Recognition of the Canadian Proceedings will not undermine the rights that

United States creditors typically enjoy in a chapter 11 proceeding, as affected creditors will have

the opportunity to the participate in the Canadian Proceedings under the supervision of the

Canadian Court, as well as the opportunity to be heard in this Court.

**V.      The Canadian Proceedings Are Foreign Main Proceedings.**

74.     To ensure the effective and economic administration of the Debtors' restructuring

efforts, prevent the disruption of business, and recognize the legal effect of the Canadian

Proceedings in the United States, the Debtors require the protection afforded to foreign debtors

pursuant to chapter 15 of the Bankruptcy Code.

**Basis For Relief**

75.     Chapter 15 of the Bankruptcy Code is designed to promote cooperation and comity between courts in the United States and foreign courts, to protect and maximize the value of a debtor's assets, and to facilitate the rehabilitation and reorganization of businesses. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

76.     Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the Canadian Proceedings, and certain related relief.  The Foreign Representative believes that these chapter 15 cases will complement the Debtors' primary proceedings in Canada to ensure the effective and economic administration of the Debtors' restructuring efforts and prevent adverse actions in the United States.

**I.      The Debtors Are Eligible for Chapter 15 Relief.**

77.     Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  Courts have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility. *See, e.g.*, *Drawbridge Special Opp. Fund LP v. Barnett (In re Barnett)*, 737 F.3d 238, 247 (2d Cir. 2013).  Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States.  *See GMAM Inv. Funds Trust I v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 253, 249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (citing *In re Aerovias Nacionales de*

*Colombia S.A. (In re Avianca)*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003)); *see also In re Global Ocean Carriers Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 15 purposes). Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

78.     The Debtors satisfy section 109(a) of the Bankruptcy Code because they have property in the United States in the form of tangible assets, corporation stock, and interests in limited liability companies. Specifically, twenty-four of the Debtors are entities incorporated in the United States and operating in the United States with their principal assets located in the United States. The Debtors have additional property in the United States, including offices, equipment, bank accounts, receivables, and personal property. For these reasons, the Debtors satisfy the requirements under section 109(a) of the Bankruptcy Code.

## II.     The Canadian Proceedings Should Be Recognized as Foreign Main Proceedings.

79.     Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter the Order recognizing a foreign proceeding as a foreign main proceeding if (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517. As explained below, the Canadian Proceedings, the Foreign Representative, and the Verified Petition satisfy all of the foregoing requirements.

### A.     The Canadian Proceedings Are Foreign Proceedings.

80.     Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign
> country, including an interim proceeding, under a law relating to
> insolvency or adjustment of debt in which proceeding the assets

36

and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

81.     Courts have held that a "foreign proceeding" is one:

    a.     in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

    b.     that has either a judicial or an administrative character;

    c.     that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

    d.     that is located in a foreign country;

    e.     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

    f.     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

    g.     which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight and Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors).  The Canadian Proceedings satisfy such requirements and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy Code.

82.     *First*, the Canadian Proceedings are proceedings commenced pursuant to the CCAA, a Canadian law that governs corporate reorganizations and provides for an arrangement of a company's financial obligations.  *See* CCAA § 44(a–e).  For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets."  *Betcorp*, 400

B.R. at 278.   Because the Canadian Proceedings operate under such statutory framework, they satisfy the first factor of section 101(23) of the Bankruptcy Code.

83.     **Second**, the Canadian Proceedings are judicial in character.   A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010).   In the Debtors' Canadian Proceeding, the Canadian Court has jurisdiction and the Company's assets and affairs are subject to the supervision of the justice who, among other things, has imposed the Stay Period (as defined in the CCAA Order) pursuant to the CCAA Order, precluding the specified parties from exercising any potential rights with respect to the Debtors or the Debtors' assets.

84.     **Third**, the Canadian Proceedings are collective in nature in that all affected creditors are allowed to participate.   In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor."   *See* 400 B.R. at 281. The CCAA Order takes into account the rights of the various stakeholders and creditors of the Company.   This is evident by the Canadian Court's discussion regarding the certain rights held by interested parties, the temporary nature of the Stay Period, and the notice requirements in the Order.

85.     **Fourth**, the Canadian Proceedings, including the Canadian Court, are located in a foreign country, namely Ontario, Canada.

86.     **Fifth**, as described above, the CCAA, which governs the Canadian Proceedings, relates to the adjustment of debt.

87.     **Sixth**, the Canadian Proceedings subject the Debtors' assets and affairs to the supervision of the Canadian Court during the pendency of the proceedings.

88.     **Finally**, the objective of the Canadian Proceeding is the reorganization of the Company.  The principal objective of the Canadian Proceeding is to facilitate the recapitalization of a business through a plan of arrangement in order that the Debtors' business operations may be continued, the employment of its personnel maintained, and its applicable liabilities restructured.  The Debtors require immediate CCAA protection to ensure that they can continue as a going concern, service its significant customer base, and maintain employment and enterprise value.  The Debtors have significant liabilities coming due in the near future that it cannot currently pay.  Therefore, the Authorized Representative submits that the Company has commenced the Canadian Proceeding for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.  *Cf. In re Oversight and Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) ("a bankruptcy reorganization commonly means a financial restructuring").

89.     Since the Canadian Proceeding satisfies all of the criteria required by section 101(23) of the Bankruptcy Code, they are foreign proceedings entitled to recognition under chapter 15 of the Bankruptcy Code.

**B.      The Canadian Proceeding is a Foreign Main Proceeding.**

90.     The Canadian Proceeding should be recognized as "foreign main proceeding" as defined in section 1502(4) of the Bankruptcy Code.  A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests.  11 U.S.C. § 1517(b).  The term "center of main interests" ("COMI") is not defined in the Bankruptcy Code.  COMI, however, has been equated to a debtor's principal place of business.  *See In re Stanford Int'l Bank, Ltd.*, Civil Action No. 3:09-CV-0721-N, 2012 WL

13093940, at *10 (N.D. Tex. July 30, 2012) ("[T]he COMI analysis is essentially a principal place of business analysis."); *see also In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008).   Courts have identified certain factors that are relevant in determining a debtor's COMI, including:  (a) the location of the debtor's headquarters; (b) the location of those persons or entities that actually manage the debtor (which, in certain instances, could be the headquarters of a holding company); (c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case.  *See Lavie v. Ran* (*In re Ran*), 607 F.3d 1017, 1023 (5th Cir. 2010) (quoting *In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006)).   In the absence of evidence to the contrary, a debtor's registered office is presumed to be the debtor's COMI.  *See* 11 U.S.C. § 1516(c).

91.     Here, under all the relevant criteria, Canada is the Company's COMI.  As set forth in the Carter Declaration, the Company is a corporation formed under the CBCA.  It has two head offices, one of which is at 80 Courtneypark Drive, Suites 3 and 4, Mississauga, Ontario.  Its registered office is First Canadian Place, 100 King Street West, Suite 2630, Toronto, Ontario.  Its common shares are also listed on the Toronto Stock Exchange and the New York Stock Exchange.  Furthermore, prior to COVID, Board meetings were regularly held at the Toronto office and the officers of the Company regularly conduct business functions in the Canadian office.  In addition, Canada is where the Company is managing the restructuring.

92.     Courts have found COMI in other chapter 15 cases that had fewer connections than those present here.  *See, e.g., In re Gandi Innovations Holdings, LLC*, No. 09-51782-C, 2009 WL 2916908, at *2 (Bankr. W.D. Tex. June 5, 2009) (finding Canada to be debtor's COMI

despite mixed results, for example, senior management was located in Ontario, but assets, employees, and operations were both in Texas and Ontario); *In re Ernst & Young, Inc.*, 383 B.R. 773, 780–81 (Bankr. D. Colo. 2008) (finding COMI in Canada notwithstanding the fact that two of the factors— the location of the debtors' creditors and applicable law—yielded inconclusive and possibly contrary results).

93.     Moreover, just a few months ago in the Debtors' prior chapter 15 cases, this Court found Canada to be the Debtors' COMI:

> The Canadian Proceeding is pending before the Canadian Court in Canada, where the Debtors have their "center of main interests" as referred to in 11 U.S.C. § 1517(b)(1) and, as such, the Canadian Proceeding is entitled to recognition as a "foreign main proceeding" pursuant to 11 U.S.C. § 1502(4) and 1517(b)(1).

*See In re Just Energy Group, Inc.*, Case No. 20-34442 (DRJ) [Docket No. 15, ¶ 11].

94.     Based on foregoing factors, the Company's COMI is in Canada and, as such, the Canadian Proceeding should be recognized as a foreign main proceeding.

**C.     The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative.**

95.     Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  Section 1516(a) of the Bankruptcy Code provides that "[i]f the decision [commencing the foreign proceeding] … indicates … that the person or body is a foreign representative, the court is entitled to so presume."  11 U.S.C. § 1516(a).

96.     Pursuant to the CCAA Order, the Court authorized the appointment of Just Energy Group Inc. as the Foreign Representative, authorized and empowered the Foreign Representative to act as a foreign representative in respect of the Canadian Proceeding, and authorized the Foreign Representative to file the chapter 15 cases in the United States for the purpose of having the Canadian Proceeding recognized.  First Day CCAA Order, ¶¶ 53–54.

97.     Additionally, on March 8, 2021, the Board authorized the appointment of the Foreign Representative for purposes of these chapter 15 cases.  The Board also authorized the Foreign Representative to commence the Canadian Proceedings and these chapter 15 cases. Bankruptcy courts have held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding.  *See In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1047 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) (recognizing that the board of directors of a corporation could authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 553 (Bankr. S.D.N.Y. 2017) (agreeing with the Fifth Circuit's analysis and conclusion that "section 101(24) does not require that a foreign representative be judicially appointed" and "that a board of directors may authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding").  Copies of the resolutions appointing the Foreign Representative are attached hereto as **Exhibit B**.    Accordingly, the Foreign Representative is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

## III.    The Verified Petition Satisfies the Requirements under Section 1515 of the Bankruptcy Code.

98.     These chapter 15 cases were duly and properly commenced by filing the Verified Petition, accompanied by all fees, documents, and information required by the Bankruptcy Code

and the Federal Rules of Bankruptcy Procedure, including:  (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the commencement of the chapter 15 cases, attached hereto as **Exhibit C**, and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtors' foreign proceedings that are known to the Foreign Representative; (d) a certified copy of the CCAA Order;[29] and (e) resolutions of the Board appointing the Foreign Representative, attached hereto as **Exhibit B**. Such information is attached as an exhibit to each chapter 15 petition, the Verified Petition or is included in the Carter Declaration.

99. Because the Verified Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the Canadian Proceedings in these chapter 15 cases.  Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.   Thus, these circumstances satisfy the conditions for mandatory recognition of the Canadian Proceedings under section 1517 of the Bankruptcy Code.

## IV. The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring Transactions and Should Be Granted.

100. In connection with recognition of the Canadian Proceedings, the Foreign Representative seeks certain related relief, including enforcement of the CCAA Order in the United States, and application of sections 525 and 362 of the Bankruptcy Code in these chapter

---

[29]    A certified copy of the CCAA Order is attached as Exhibit D.

15 cases.  The Foreign Representative respectfully submits that such relief is warranted under sections 105(a), 1507, and 1521 of the Bankruptcy Code and the general principles of comity that underpin chapter 15.

> ### A.   The Fifth Circuit's Framework and Application of Relief under Sections 1507 and 1521 of the Bankruptcy Code.

101.    Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  Such relief may include:

> a.  staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;
>
> b.  staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) of the Bankruptcy Code;
>
> c.  suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and
>
> d.  granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

*Id.* at 1055 (quoting 11 U.S.C. § 1521(a)).

102.    The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States."   11 U.S.C.  § 1507.   Finally,

section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

103.    As it relates to relief provided for under section 1507, however, the Court may provide "additional assistance" to a foreign representative where such assistance (i) is "consistent with the principles of comity" and (ii) satisfies the specific considerations set forth in section 1507(b).  11 U.S.C. § 1507.  The "additional assistance" language in section 1507 is starkly different from the "any appropriate relief" language found in section 1521.  *In re Vitro S.A.B. de C.V.*, 701 F.3d at 1055.  Indeed, "[s]ection 1507 was added to the Bankruptcy Code because Congress recognized that Chapter 15 may not anticipate all of the types of relief that a foreign representative may require and which would otherwise be available to such foreign representative."  *Id.* (internal quotation marks and citation omitted).  When determining whether to provide additional assistance under section 1507, a court will consider the following factors:

- just treatment of all holders of claims against or interests in the debtor's property;

- protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

- prevention of preferential or fraudulent dispositions of property of the debtor;

- distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by [title 11]; and

- if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

*Id.* at 1055–56 (quoting 11 U.S.C. § 1507(b)).

104.    When weighing the "expansive relief" provided for under sections 1521 and 1507 of the Bankruptcy Code, the Fifth Circuit follows a set framework.  "First, because § 1521 lists specific forms of relief, a court should initially consider whether the relief requested falls under one of these explicit provisions."  *Id.* at 1056.  "Second, if § 1521(a)(1)-(7) and (b) does not list

the requested relief, a court should decide whether it can be considered 'appropriate relief' under § 1521(a).  This, in turn, requires consideration of whether such relief has previously been provided under § 304 …. A court should also consider whether the requested relief would otherwise be available in the United States." *Id.* at 1056–57.  "Third, only if the requested relief appears to go beyond the relief previously available under § 304 or currently provided for under United States law … should a court consider § 1507." *Id.* at 1057.  Indeed, section 1507's "broad grant of assistance is intended to be a 'catch-all,'" but it cannot circumvent restrictions present in other parts of Chapter 15. *Id.*

105.    The Foreign Representative requests the Court exercise its discretion under sections 105, 1507, and 1521 to grant the relief requested insofar as such relief exceeds that which is available by recognizing the Canadian Proceedings as a foreign main proceeding and the Foreign Representative as a "foreign representative" as specified in the Bankruptcy Code. The granting of such relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is a necessary to effect the Canadian Proceedings.  If granted, such relief would promote all of the legislatively enumerated objectives of section 1501(a) of the Bankruptcy Code.

106.    Indeed, by the CCAA Order, the Canadian Court expressly requested the assistance of the courts in the United States in the following provision:

> [The Canadian Court] requests the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Just Energy Entities, the Monitor and their respective agents in carrying out the terms of [the CCAA] Order. All courts, tribunals, regulatory and administrative bodies are hereby respectfully requested to make such orders and to provide such assistance to the Just Energy Entities and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to [the CCAA] Order, to grant representative status to JEGI,

in any foreign proceeding, or to assist the Just Energy Entities and the Monitor and their respective agents in carrying out the terms of [the CCAA] Order.

CCAA Order ¶ 58.  Thus, in addition to the reasons set forth above, this Court should give full force and effect in the United States to the CCAA Order in the United States under well-established principles of international comity and specifically pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code.

### Conclusion

107.    The Foreign Representative respectfully submits that the Verified Petition satisfies the requirements for the recognition of Just Energy Group Inc. as the Debtors' "foreign representative" and the Canadian Proceedings as the Debtors' "foreign main proceedings" and further requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein.

### Notice

108.    The Foreign Representative will provide notice of this Motion to:  (a) the Office of the United States Trustee; (b) the United States Attorney's Office for the Southern District of Texas; (c) administrative agent to the Senior Secured Credit Facility, and counsel thereto; (d) administrative agent to the Unsecured Term Loan due 2024, and counsel thereto; (e) the administrative agent to the Subordinated Notes due 2026, and counsel thereto; (f) the Provisional Relief Parties; (g) all persons or bodies authorized to administer the Canadian Proceedings; (h) any other parties of which the Foreign Representative becomes aware that are required to receive notice pursuant to Bankruptcy Rule 2002(q); and (i) such other entities as this Court may direct satisfies the requirements of Bankruptcy Rule 2002(q).  In light of the nature of the relief requested, the Foreign Representative submits that no further notice is required.

WHEREFORE, the Foreign Representative respectfully requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

Houston, Texas
March 9, 2021

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:       (713) 752-4200
Facsimile:       (713) 752-4221
Email:           mcavenaugh@jw.com
                 ggraham@jw.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:       (713) 836-3600
Facsimile:       (713) 836-3601
Email:           brian.schartz@kirkland.com

-and-

Neil E. Herman ( *pro hac vice* admission pending )
Allyson B. Smith ( *pro hac vice* admission pending )
601 Lexington Avenue
New York, New York 10022
Telephone:       (212) 446-4800
Facsimile:       (212) 446-4900
Email:           neil.herman@kirkland.com
                 allyson.smith@kirkland.com

*Co-Counsel to the Debtors and*
*Debtors in Possession*

## <u>VERIFICATION OF PETITION</u>

I, Michael Carter, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am the Chief Financial Officer of Just Energy Group Inc., the authorized foreign representative for the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: March 9, 2021                          /s/ *Michael Carter*
Ontario, Canada                               By:  Michael Carter
                                              Title:  Chief Financial Officer
                                              Just Energy Group Inc.