**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
03/09/2021

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| JUST ENERGY GROUP INC., *et al* | ) Case No. 21-30823 (MI) |
| | ) |
| Debtors in a Foreign Proceeding,[1] | ) |
| | ) (Joint Administration Requested) |
| | ) **Re Docket No.** |

**ORDER GRANTING PROVISIONAL RELIEF**
**PURSUANT TO SECTION 1519 OF THE BANKRUPTCY CODE**

Upon the motion (the "Motion")[2] filed by the foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors" or "Just Energy"), seeking provisional relief under the Bankruptcy Code to protect the Debtors and their property within the territorial jurisdiction of the United States pending recognition of the Debtors' voluntary arrangement proceedings commenced under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Superior Court of Ontario (the "Canadian Proceedings" and such court, the "Canadian Court"); the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. and §1334; and the relief requested in the Motion being a core proceeding pursuant to 28 U.S.C. § 157(b); and that this Court may enter a final order consistent with Article III of the United States Constitution; venue being proper

---

[1]  The identifying four digits of Debtor Just Energy Group Inc.'s local Canada tax identification number are 0469. Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/justenergy. The location of the Debtors' service address for purposes of these chapter 15 cases is: 100 King Street West, Suite 2360, Toronto, ON, M5X 1E1.

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the CCAA Order (as defined herein), as applicable.

before the Court pursuant to 28 U.S.C. § 1410; adequate and sufficient notice of the filing of the Motion having been given by the Foreign Representative; it appearing that the relief requested in the Motion is necessary and beneficial to the Debtors; and no objections or other responses having been filed that have not been overruled, withdrawn, or otherwise resolved; and after due deliberation and sufficient cause appearing therefor, it is hereby **FOUND** that:

A.      The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

B.      There is a substantial likelihood that the Foreign Representative will successfully demonstrate that the Canadian Proceedings constitute "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code.

C.      As evidenced by the CCAA Order, the Canadian Court has determined that the commencement or continuation of any action or proceeding in Canada against the Debtors or their assets should be enjoined pursuant to applicable Canadian law to permit the expeditious and economical administration of the Canadian Proceedings, and such relief will either (a) not cause an undue hardship to any creditors or other parties-in-interest or (b) any hardship to such creditors or parties is outweighed by the benefits of the relief requested.  This Court similarly determines that, consistent with the CCAA Order, the commencement or continuation of any action or proceeding in the United States against the Debtors or their assets should be enjoined pursuant to sections 105 and 1519(a) of the Bankruptcy Code to permit the expeditious and economical

administration of the Canadian Proceedings, and such relief will either (a) not cause an undue hardship to any creditors or other parties-in-interest or (b) any hardship to such creditors or parties is outweighed by the benefits of the relief requested.

D.       Unless a preliminary injunction is issued, and unless the Debtors are immediately authorized to comply with the CCAA Order, and unless all creditors, persons, parties in interest, contract parties, lenders and governmental units and agencies located within the territorial United States (collectively, the "U.S. Chapter 15 Parties") are bound by the terms of the CCAA Order pending the upcoming recognition hearing to be held by this Court, there is a material risk that the U.S. Chapter 15 Parties may take certain actions against the Debtors, including exercising certain remedies under existing debt obligations, existing executory contracts, or unexpired leases or under applicable law.  Such actions could (a) interfere with the jurisdictional mandate of this Court under chapter 15 of the Bankruptcy Code, (b) interfere with and cause harm to the Debtors' efforts to administer and implement the Canadian Proceedings, (c) interfere with the Debtors' operations, and (d) undermine the Debtors' efforts to achieve an equitable result for the benefit of all of the Debtors' stakeholders.  Accordingly, there is a material risk that the Debtors may suffer immediate and irreparable injury (with no adequate remedy at law), and it is therefore necessary that the Court grant the relief set forth in this order (the "Order").

E.       The Foreign Representative has demonstrated to the Canadian Court that the incurrence of indebtedness under the DIP Facility and the granting of liens and charge negotiated in connection with the DIP Facility is necessary to prevent irreparable harm to the Debtors because, without such financing, the Debtors will be unable to continue operations and fund their restructuring proceedings, which will significantly impair the value of their assets, and the Canadian Court has approved the DIP Facility as being appropriate and the amount that the Debtors

have been authorized to borrow is reasonably necessary for the continued operations of the Debtors in the ordinary course of business.

F.    The Foreign Representative has demonstrated to the Canadian Court that the terms of the DIP Facility are fair and reasonable and were entered into in good faith by the Debtors and the DIP Lenders and that the DIP Lenders would not have extended financing without the provisions of this Order and the Court's recognition of the protections set forth in the CCAA Order relating to the DIP Facility.

G.    The interest of the public (including the Debtors U.S. based customers) will best be served by this Court's entry of this Order.

H.    The Foreign Representative and the Debtors are entitled to the full protections and rights available pursuant to section 1519(a)(1),(2), and (3) of the Bankruptcy Code because such relief is urgently needed to avoid transfer or infringement of and to protect the assets of the Debtors, particularly including the Debtors' retail electricity contracts and customers located in the territorial United States, and the interests of their creditors until this Court rules on the petition.

**BASED ON THE FOREGOING FINDINGS OF FACT AND AFTER DUE DELIBERATION AND SUFFICIENT CAUSE APPEARING THEREFORE, IT IS HEREBY ORDERED THAT**:

1.    Pending entry of the Recognition Order and notwithstanding anything to the contrary contained in this Order, the Foreign Representative and the Debtors, as applicable, are authorized to comply with the terms, conditions, and provisions of the CCAA Order including, without limitation, the sections of the CCAA Order (a) authorizing the Debtors to obtain credit under the DIP Facility in the amount of up to USD $125 million and granting to the DIP Lenders the DIP Lenders' Charge to authorize the Debtors to enter into, perform and borrow under the DIP Facility, (b) staying the commencement or continuation of any actions against the Debtors and their assets, (c) imposing a stay with respect to claims or actions against the Debtors' directors and

4

officers or their assets in connection with the directors' or officers' positions at the Debtor, and (d) granting the Directors' Charge and Administration Charge. In addition, from entry of this Order until the conclusion of the hearing to consider recognition of the Canadian Proceedings, every U.S. Chapter 15 Party shall be bound by the CCAA Order, subject solely to further order of this Court or the Canadian Court upon prior written notice to the Debtors and the Foreign Representative.

2.      Beginning on the date of this Order and continuing until the conclusion of the recognition hearing to be held by this Court (unless otherwise extended pursuant to section 1519(b) of the Bankruptcy Code):

a.      the Foreign Representative is recognized as, and shall be the representative of, the Debtors with full authority to administer the Debtors' assets and affairs in the United States and may operate the Debtors' business and exercise the rights and powers of a trustee unless otherwise specified in the CCAA Order.

b.      Section 362 of the Bankruptcy Code shall apply with respect to the Debtors and the Debtors' property that is within the territorial jurisdiction of the United States. For the avoidance of doubt and without limiting the generality of the foregoing, this Order shall impose a stay within the territorial jurisdiction of the United States of:

i.      the commencement or continuation, including the issuance or employment of process of, any judicial, administrative or any other action or proceeding involving or against the Debtors or their assets or proceeds thereof, or to recover a claim or enforce any judicial, quasi-judicial, regulatory, administrative or other judgment, assessment, order, lien or arbitration award against the Debtors or their assets or proceeds thereof, or to transfer, assign, or exercise any control over the Debtors' assets located in the United States, particularly including the Debtors' retail electricity contracts and customers located in the territorial United States, except as authorized by the Debtors in writing and in their sole discretion;

ii.      except as permitted in the CCAA Order, the creation, perfection, seizure, attachment, enforcement, or execution of liens or judgments against the Debtors' property in the United States or from transferring, encumbering, or otherwise disposing of or interfering with the Debtors' assets or agreements in the United States without the express written consent of the Foreign Representative, after

5

notice and hearing in conformance with this Court's procedures and
rules;

iii. any act to collect, assess, or recover a claim against the Debtors that
arose before the commencement of the Debtors' chapter 15 case;
and

iv. the setoff of any debt owing to the Debtors that arose before the
commencement of the Debtors' chapter 15 case against any claim of
the Debtor.

In the event of any conflict between the scope of the stays and/or injunctions set forth in
the CCAA Order and those contained in this Order, the language of the CCAA Order shall prevail,
subject to further order of this Court.

c. section 365(e) of the Bankruptcy Code shall apply with respect to the
Debtors' executory contracts and unexpired leases such that,
notwithstanding any provision in any such contract or lease or under
applicable law, no executory contract or unexpired lease with any of the
Debtors may be terminated, cancelled, or modified (and any rights or
obligations in such leases or contracts cannot be terminated or modified)
solely because of a provision in any contract or lease of the kind described
in sections 365(e)(1)(A), (B), or (C) of the Bankruptcy Code, and all
contract and lease counterparties located within the United States shall be
prohibited from taking any steps to terminate, modify, or cancel any
contracts or leases with the Debtors arising from or relating in any way to
any so-called "ipso facto" or similar clauses; *provided* that this Order does
not impair or affect the rights of any person under sections 559 through 561
of the Bankruptcy Code, subject to the terms of the CCAA Order.

d. the Foreign Representative shall have the rights and protections to which
the Foreign Representative is entitled under chapter 15 of the Bankruptcy
Code, including, but not limited to, the protections limiting the jurisdiction
of United States Courts over the Foreign Representative in accordance with
section 1510 of the Bankruptcy Code and the granting of additional relief
in accordance with sections 1519(a) and 1521 of the Bankruptcy Code.

e. until the conclusion of the recognition hearing to be held by this Court, no
U.S. Chapter 15 Party may file an involuntary petition or similar relief
against one or all of the Debtors under chapter 7 or chapter 11 of the
Bankruptcy Code.

f. notwithstanding any provision in the Bankruptcy Rules to the contrary,
(i) this Order shall be effective immediately and enforceable upon entry,
(ii) the Foreign Representative and the DIP Lenders are not subject to any

stay in the implementation, enforcement, or realization of the relief granted in this Order, and (iii) the Foreign Representative is authorized and empowered, and may, in his discretion and without further delay, take any action and perform any act necessary to implement and effectuate the terms of this Order.

g.    effective upon entry of this Order, section 525 of the Bankruptcy Code shall be in full force and effect in these chapter 15 cases and with respect to each of the Debtors, and this Court shall retain exclusive jurisdiction to hear any purported violations thereof, which requests may be brought by way of an expedited emergency motion.

h.    any and all landlords or other parties with a lease of premises to the Debtors located within the United States are hereby prohibited from: taking any steps to cancel, terminate, or modify any lease for any reason, including non-payment of rent and/or due to any ipso facto clause described by section 365(e)(1) of the Bankruptcy Code; enforcing any "landlord lien", possessory lien or similar lien against any property of the Debtor; changing the locks or codes on any of the Debtors' premises; or commencing or continuing any eviction or similar proceedings.

3.    Pending entry of the Recognition Order, the Foreign Representative and the Debtors are entitled to the benefits of, and may comply with, the terms and conditions of the DIP Financing, including but not limited to, the payment of associated fees and expenses as they come due without further notice or order of this Court. The CCAA Order provides, "that the DIP Agent and the DIP Lenders shall be entitled to the benefit of and are hereby granted a charge (the "**DIP Lenders' Charge**") on the Property,[3] which DIP Lenders' Charge shall not secure an obligation that exists before this Order is made" and "that the filing, registration or perfection of . . . the DIP Lenders' Charge . . . shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect." *See* CCAA Order, ¶¶ 38, 44. To the extent authorized

---

[3]  "Property" means Just Energy's current and future assets, licenses, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof. *See* CCAA Order, ¶ 4.

under the CCAA Order, the Court recognizes, on a provisional basis, the DIP Lenders' Charge, as defined in the CCAA Order, granted in the CCAA Order which applies to all of the Debtors' assets located in the United States, subject to the priorities, terms, and conditions of the CCAA Order, to secure current and future amounts outstanding under the DIP Facility.

4.      To the extent provided in the CCAA Order, and based on the finding therein and to promote cooperation between jurisdictions in cross-border insolvencies, the Debtors are hereby authorized to execute and deliver such term sheets, credit agreements, mortgages, charges, hypothecs and security documents, guarantees, and other definitive documents as are contemplated by the DIP Facility (collectively, the "DIP Documents") or as may be reasonably required by the DIP Lenders pursuant to the terms thereof, and the Debtors are hereby authorized to pay and perform all of its indebtedness, interest, fees, liabilities, and obligations to the DIP Lenders under and pursuant to the DIP Facility without any need for further approval from this Court.

5.      This Order shall be sufficient and conclusive notice and evidence of the grant, validity, perfection, and priority of the liens granted to the DIP Lenders in the CCAA Order without the necessity of filing or recording this Order or any financing statement, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction; *provided* that the Debtors are authorized to execute, and the administrative agent under the DIP Facility may file or record, any financing statements, mortgages, other instruments or any other DIP Document to further evidence the liens authorized, granted, and perfected hereby and by the CCAA Order.

6.      The validity of the indebtedness, and the priority of the liens authorized by the CCAA Order and made enforceable in the United States by this Order shall not be affected by any reversal or modification of this Order, on appeal or the entry of an order denying recognition of

the Canadian Proceedings pursuant to the terms of the CCAA Order and sections 105, 1517, and 1519 of the Bankruptcy Code.

7.      No action, inaction, or acquiescence by the DIP Lenders, including, without limitation, funding the Debtors' ongoing operations under this Order, shall be deemed to be or shall be considered as evidence of any alleged consent by the DIP Lenders to a charge against the collateral pursuant to sections 506(c), 552(b), or 105(a) of the Bankruptcy Code.  The DIP Lenders shall not be subject in any way whatsoever to the equitable doctrine of "marshaling" or any similar doctrine with respect to the collateral.

8.      Effective on a provisional basis upon entry of this Order, to the extent precluded by or provided for under the CCAA Order, no person or entity shall be entitled, directly or indirectly, whether by operation of sections 506(c), 552(b), or 105 of the Bankruptcy Code or otherwise, to direct the exercise of remedies or seek (whether by order of this Court or otherwise) to marshal or otherwise control the disposition of any collateral or property after a breach under the DIP Facility, the DIP Documents, the CCAA Order, or this Order.

9.      In accordance with the CCAA Order, the Foreign Representative and the Debtors, as applicable, are authorized to pay or remit (a) any taxes (including, without limitation, sales, use, withholding, unemployment, and excise) the nonpayment of which by any Just Energy entity could result in a responsible person associated with a Just Energy entity being held personally liable for such nonpayment and (b) taxes related to income or operations incurred or collected by a Just Energy entity in the ordinary course of business.

10.      Pursuant to Bankruptcy Rule 7065, the security provisions of Rule 65(c) of the Federal Rules of Civil Procedure are waived.

11.     Notice of this Order will be provided to:  (a) the Office of the United States Trustee; (b) the United States Attorney's Office for the Southern District of Texas; (c) administrative agent to the prepetition credit agreement and counsel thereto; (d) the Provisional Relief Parties; (e) all persons or bodies authorized to administer the Canadian Proceedings; and (f) any other parties of which the Foreign Representative becomes aware that are required to receive notice pursuant to Bankruptcy Rule 2002(q); and (g) such other entities as this Court may direct (collectively, the "Notice Parties"), which satisfies the requirements of Bankruptcy Rule 2002(q).  In light of the nature of the relief requested, no other or further notice is required.

12.     Service in accordance with this Order shall be deemed good and sufficient service and adequate notice for all purposes.  The Foreign Representative, the Debtors, and their respective agents are authorized to serve or provide any notices required under the Local Rules.

13.     The banks and financial institutions with which the Debtors maintain bank accounts or on which checks are drawn or electronic payment requests made in payment of prepetition or postpetition obligations are authorized and directed to continue to service and administer the Debtors' bank accounts without interruption and in the ordinary course and to receive, process, honor and pay any and all such checks, drafts, wires and automatic clearing house transfers issued, whether before or after the Petition Date and drawn on the Debtors' bank accounts by respective holders and makers thereof and at the direction of the Foreign Representative or the Debtor, as the case may be.

14.     The Foreign Representative is authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

15.     This Court shall communicate directly with, or request information or assistance directly from, the Canadian Court or the Foreign Representative, subject to the rights of a party in interest to notice and participation.

16.     This Court shall retain jurisdiction with respect to the enforcement, amendment or modification of this Order, any requests for additional relief or any adversary proceeding or contested matter brought in and through the chapter 15 case, and any request by an entity for relief from the provisions of this Order, for cause shown, that is properly commenced and within the jurisdiction of this Court.

Signed: March 09, 2021

Marvin Isgur
United States Bankruptcy Judge

---

Additionally, the Court finds that any payments made to ERCOT are made subject to all of the Debtors' rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law.  Although the Court recognizes the authority to make payments to ERCOT as granted by the Canadian Order, this Court neither adds nor subtracts from any such authorization.

Finally, it is further ordered that the Court applies § 525 of the Bankruptcy Code to this recognition order.  Pending entry of an order by this Court to the contrary, the United States Bankruptcy Court for the Southern District of Texas reserves exclusive subject matter jurisdiction for any relief sought under § 525.  This provision is made to assure that this recognition order fully complies with US public policy.  This paragraph is entered with full respect and comity to the difficult work being done by the Court's Canadian counterpart, and with this Court's thanks.

---

**Exhibit A**

**PUCT Petition**



Control Number: 51812



Item Number: 51

Addendum StartPage: 0

**PROJECT NO. 51812**



| | | |
|---|---|---|
| **ISSUES RELATED TO THE STATE OF** | § | **PUBLIC UTILITY COMMISSION** |
| **DISASTER FOR THE FEBRUARY 2021** | § | |
| **WINTER WEATHER EVENT** | § | **OF TEXAS** |
| | § | |



## PETITION FOR EMERGENCY RELIEF

**TO THE HONORABLE PUBLIC UTILITY COMMISSION OF TEXAS:**

Just Energy Texas LP, Fulcrum Retail Energy, LLC and Hudson Energy Services LLC (collectively "Just Energy") request that the Public Utility Commission (the "Commission") order the Electric Reliability Council of Texas, Inc. ("ERCOT") to deviate from the deadlines and timing in its Protocols and Market Guides related to settlements, collateral obligations, and invoice payments and suspend the execution or issuance of invoices or settlements for intervals during the dates of February 14, 2021 through February 19, 2021 until issues related to the catastrophic winter event of February 2021 raised by Texas authorities from the executive and legislative branches (collectively, "State Authorities") are investigated, addressed, and resolved. Alternatively, Just Energy requests that the Commission grant a waiver of Section 9.6(2) of the ERCOT Protocols to allow Just Energy to delay payment of certain ERCOT Settlement Invoices while it fully exercises its rights under the ERCOT Protocols to dispute the invoiced payment amounts.

In support, Just Energy shows as follows:

## I.   BACKGROUND

Just Energy is the largest independent REP licensed by ERCOT. As the Commission is aware, beginning on or about February 13, 2021, the state of Texas experienced an unprecedented and catastrophic energy crisis when a powerful winter storm moved over and blanketed the entire state, resulting in temperatures well below 20°F in a state where many homes and businesses rely on electricity for heating. Price shocks in Texas were felt as early as February 12 when natural gas prices jumped from $3 to over $150/MMBtu in anticipation of short gas supply. Customer demand for power grew from February 13 and throughout the day on February 14, pushing Texas's power grid to a new winter peak demand record, topping 69 gigawatts between 6:00 p.m. and 7:00 p.m.—more than 3,200 megawatts higher than the previous winter peak set in January 2018. At the same time, demand for gas for heating grew.

1



In the early hours of February 15, ERCOT declared an Energy Emergency Alert Level 1, urging consumers to conserve power. Within an hour, ERCOT elevated to an Energy Emergency Alert Level 2, and only 13 minutes later, at 1:25 a.m., ERCOT elevated to an Energy Emergency Alert Level 3. With the grid stressed to within minutes of a catastrophic failure, ERCOT ordered transmission operators to implement deep cuts in load in the form of rotating outages to reduce the strain and avoid a complete collapse. While demand soared, supply plummeted as power plants tripped offline and demand threatened to exceed supply. Natural gas prices spiked in response to falling supply as lines froze up; as a result, the cost to produce electricity from gas-fueled power plants increased dramatically.

On February 15 (and amended on the 16th), the Commission directed ERCOT to adjust prices "to ensure that firm load that is being shed in [Energy Emergency Alert 3] is accounted for in ERCOT's scarcity pricing signals . . ." noting that, "[i]f customer load is being shed, scarcity is at its maximum, and the market price to serve that load should also be at its highest[.]"[1] Based on this order, ERCOT set prices at the System Wide Offer Cap ($9,000 per MWh). Although load stopped being shed as of 1:05 a.m. on the morning of February 18, 2021, ERCOT continued to set prices at the System Wide Offer Cap until 9:00 a.m. on February 19, 2021.

The February winter event caused the ERCOT wholesale market to incur charges of $55 billion over a seven-day period—an amount equal to what it ordinarily incurs over four years. In recognition of this fact, on February 21, 2021, the Commission issued an "Order Directing ERCOT to Take Action and Granting Exception to ERCOT Protocols" (the "February 21 Order") which explained:

> In an attempt to protect the overall integrity of the financial electric market in the ERCOT region, the Commission concludes it is necessary to authorize ERCOT to use its sole discretion in taking actions under the ERCOT Nodal Protocols to resolve financial obligations between a market participant and ERCOT. It is appropriate that ERCOT's discretion include, but not be limited to, ERCOT's ability to take the following actions:
>
> - Deviate from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments;
> - Utilize available funds, such as undistributed congestion revenue right auction revenues, to cover short-paying invoice recipients;

---

[1]      *Oversight of the Electric Reliability Council of Texas, Project No 51617,* Second Order Directing ERCOT to Take Action and Granting Exception to Commission Rules (Feb. 16, 2021).

2

- Relax credit requirements and releasing cash or other collateral to provide short-term market-participant liquidity;
- Deviate from protocol requirements regarding the maximum amount of default uplift invoices;
- Suspend breach notifications to certain market participants for failure to make payment or provide financial security; and
- Produce reconciliation settlements following market stabilization.

In Response to the Order, ERCOT issued this notice on February 22, 2021:

ERCOT is temporarily deviating from Protocol deadlines and timing related to settlements, collateral obligations, and Invoice payments while prices are under review. Invoices or settlements will not be executed until issues are finalized by State leaders considering solutions to the financial challenges caused by the winter event, which is anticipated to occur this week.

Then one day later and without explanation, ERCOT issued a second notice saying that "ERCOT has ended its temporary deviation from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments. Invoices and settlement will be executed in accordance with Protocol language."

This action by ERCOT does not provide opportunity to State Authorities to implement solutions necessary to preserve the Texas competitive electricity market. Many REPs including Just Energy, electric cooperatives, municipalities, and their customers will suffer severe and irreparable injury without emergency Commission action. The extreme costs of energy and ancillary services that will be passed on to REPs and potentially some of their customers for the dates of the winter weather event will likely drive many participants from the market, thereby dramatically decreasing consumer choice. This has the potential to devastate the competitive electricity market that has been a model since implementation and provided untold benefits to consumers.

Furthermore, ERCOT's processes do not provide any opportunity for market participants or policymakers to consider action to preserve the Texas competitive electricity market, nor does it provide sufficient opportunity for suppliers to adequately address their concerns about settlement invoices issued for February 14, 2021 through 19, 2021. The requirement to pay the invoices immediately while disputing the charges through a comparatively lengthy process is inadequate and payment would cause irreparable harm. During a meeting open to the public held on February 24, 2021 as well as legislative hearings on February 25, 2021, senior ERCOT executives provided

3

no assurances regarding these issues or any indication that they would temporarily suspend their invoice process.

## II. DISCUSSION

The Commission has broad powers, especially during an emergency, and the Commission continues to exercise this authority in issuing orders related to the February winter weather event. The Commission's February 21 Order noted that PURA §39.151(d) gives the Commission complete authority over ERCOT. The Commission also has the authority to grant exceptions to any requirement in its rules for good cause.[2] The Commission should exercise this authority in these extraordinary circumstances to take all necessary action to preserve the competitive electricity market while State Authorities determine the proper policy solutions to resolve the market issues for February 14 to February 19, 2021.

Just Energy requests the Commission to order ERCOT to deviate from the deadlines and timing in its Protocols and Market Guides related to settlements, collateral obligations, and invoice payments and suspend the execution or issuance of invoices or settlements for intervals during the dates of February 14, 2021 to February 19, 2021, until State Authorities consider and implement solutions to the immense financial challenges caused by the 2021 Texas winter event.

Granting the requested relief is within the jurisdiction of the Commission. PURA §39.151(d) gives the Commission complete authority over ERCOT, and the Commission has the authority to suspend its own rules for good cause.[3]

As this week's bankruptcy filing by Brazos River Electric Cooperative[4] demonstrates all too saliently, ERCOT's actions—requiring Market Participants such as Just Energy to pay full invoices in accordance with the rigid ERCOT settlement schedule, even while there are ongoing discussions regarding substantial resettlements and uncertainty regarding data, with billions of dollars in issue—has and will continue to drive Market Participants out of business. ERCOT's actions have essentially negated the benefit that the Commission sought to provide through the

---

[2]       PUC Subt. R. § 22.5(b).

[3]       PUC Subt. R. § 22.5(b).

[4]       *See* Voluntary Petition for Non-Individuals Filing for Bankruptcy, *In re Brazos Electric Power Cooperative, Inc.*, Case No. 21-30725 filed on March 1, 2021 in the United States Bankruptcy Court for the Southern District of Texas.

February 21, 2021 Order. Granting the requested relief will help ensure that no Market Participant is forced out of the market as a result of the current chaos just because ERCOT's calculations have not yet properly resettled, or because it is unable to raise the extraordinary amounts of capital required to meet these unprecedented invoices and collateral calls on mere days' notice.

Alternatively, Just Energy requests that the Commission grant a waiver of Section 9.6(2) of the ERCOT Nodal Protocols to allow Just Energy to delay payment of certain ERCOT Settlement Invoices while it fully exercises its rights under the ERCOT Nodal Protocols to dispute the invoiced payment amounts. Additionally, Just Energy requests that the Commission grant this waiver to require any invoiced amounts that Just Energy has already paid to be refunded. For settlement invoices Just Energy has received but that remain unpaid, settlement invoices not yet received by Just Energy, and potential resettlement invoices that Just Energy anticipates receiving, Just Energy requests this waiver in order to be excused from the requirement for immediate payment until all billing dispute rights are exhausted under the ERCOT protocols.

Just Energy has initiated and has a good faith basis for disputing the charges being invoiced. As an initial matter, Just Energy disputes the application of the $9,000 MWh System Wide Offer Cap to any time period after the ERCOT grid ceased shedding load at 1:05 a.m. on February 18, 2021, as applying the System Wide Offer Cap after that time contravenes the language of the Commission's February 15 and February 16 orders.[5] In addition, as the pleadings of other parties and the recent comments of the Independent Market Monitor[6] have made clear, there are significant concerns regarding how Ancillary Services charges were calculated and assessed during the winter weather event.

Further, Just Energy's invoices include Ancillary Services charges that Just Energy believes may have been either erroneously calculated or are an unreasonable application of ERCOT's Protocols. For example, for three settlement days during the week of February 14th, the charge for Reliability Deployment Ancillary Service Imbalance Revenue Neutrality, which usually ranges from $0-$1,000 per invoice, is approximately 185 times higher than the last 5 years of charges combined. Just Energy understands that this charge is a load-based allocation for

---

[5]     Just Energy supports the Emergency Request to Enforce Commission Order filed by the Texas Energy Association for Marketers in Project No. 51812 on February 19, 2021, and urges the Commission to grant the relief requested therein.

[6]     Comments of the Independent Market Monitor, Project No. 51812 (Mar. 1, 2021).

5

incremental revenue provided to online generation during a period of scarcity, which is then paid out based on online generation capacity net of generating volume and net of generation procured for ancillary service multiplied by real time Operating Reserve Demand Curve ("ORDC") adders. The ORDC adders for Operating Day February 18th and 19th, 2021, in particular, were artificially set and do not reflect available capacity on the system. As such, strict application of the ERCOT Protocols would mean that generators would receive a reliability revenue when there was no scarcity. Just Energy estimates that Market Participants were paying approximately $1.9 billion for this charge when there was no scarcity. Just Energy has been able to discern no reasonable basis for the exponential increase in this charge, and ERCOT has provided no data in support of this determination.

The requested waiver is limited in scope and addresses an immediate, concrete problem related to emergency circumstances. The waiver does not require that the Commission make a determination as to whether Just Energy should be relieved of its payment obligations. Just Energy intends to address these disputes with ERCOT, including its claims with respect to payment obligations, through the dispute resolution procedures set out in the ERCOT Nodal Protocols. Accordingly, if the Commission does not grant the relief requested above, Just Energy respectfully requests that the Commission waive the requirements of Section 9.6(2) such that its payment obligations may be delayed until the dispute with ERCOT is resolved. With respect to invoices already paid, Just Energy requests that the amounts paid be refunded by ERCOT.

## III.    REQUEST FOR RELIEF

PURA §39.151(d) gives the Commission complete authority over ERCOT. The Commission also may grant exceptions to any requirement in its rules for good cause.[7] Given the extraordinary circumstances facing the ERCOT market, the Commission should exercise its authority to take all necessary action to preserve the competitive electric market. Additionally, PUC Subt. R. § 25.501(a) provides that ERCOT determines market clearing prices of energy and other ancillary services in the ERCOT market unless otherwise directed by the Commission. PURA § 39.151(d-4) also provides that the Commission may "resolve disputes between an

---

[7]     PUC Subt. R. § 22.5(b).

affected person and an independent organization and adopt procedures for the efficient resolution of such disputes."

Therefore, based on the Commission's authority under Texas law, Just Energy requests that that the Commission immediately restore the deviation to ERCOT Protocols as was originally issued by ERCOT on February 22, 2021. In the alternative, Just Energy requests the Commission grant a temporary waiver of section 9.6(2) of ERCOT protocols to give Just Energy the additional opportunity to resolve its settlement dispute in accordance with ERCOT's dispute resolution protocol without inflicting undue financial harm upon Just Energy. Just Energy further requests that the Commission grant such other relief to which it is entitled.

<div style="margin-left:40%;">

Respectfully submitted,

Michael Carter
Chief Financial Officer
Just Energy
5251 Westheimer Road
Suite 1000
Houston, TX 77056
(214)724-8662
mcarter@justenergy.com

</div>

Dated: March 3, 2021

**<u>Exhibit B</u>**

**DIP Term Sheet**

*CCAA* **INTERIM DEBTOR-IN-POSSESSION FINANCING TERM SHEET**

**Dated as of March 9, 2021**

**WHEREAS**, Just Energy Group Inc. and Just Energy (U.S.) Corp., and the other parties listed on Schedule A hereto (collectively, the "**Applicants**") intend to make an application to the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**") pursuant to the Companies' Creditors Arrangement Act (Canada) (the "CCAA", and the proceedings of the Applicants thereunder, the "CCAA Proceedings") for an initial order (as may be amended and restated from time to time, the "**Initial Order**") granting, among other things, protection to the Loan Parties (as defined below).

**WHEREAS**, the Borrowers (as defined below) and the Guarantors (as defined below) intend to commence ancillary insolvency proceedings under chapter 15 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas (the **"U.S. Court"**) to recognize the CCAA Proceedings (the "**Chapter 15 Proceedings**").

**WHEREAS**, prior to the date hereof, financing was provided to the Borrowers pursuant to that certain Ninth Amended and Restated Credit Agreement, dated as of September 28, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Filing Date, the "**Original Senior Credit Agreement**"), by and among the Borrowers, the lenders from time to time party thereto (the "**Original Senior Lenders**"), National Bank of Canada, in its capacity as administrative agent for the Original Senior Lenders (in such capacity, the "**Original Senior Agent**").

**WHEREAS**, the Loan Parties (as defined below) have requested that the Lenders (as defined below) provide interim financing during the CCAA Proceedings and the Lenders have agreed to do so on the terms and subject to the conditions set out in this term sheet (which, together with the Schedules, is referred to as this "**Term Sheet**"), which upon execution by the Loan Parties shall become an enforceable agreement, subject to the satisfaction of the conditions precedent herein and the approval of the Canadian Court:

**NOW THEREFORE**, the mutual agreements contained in this Term Sheet, the Loan Parties hereby agree with the Lenders as follows:

| | | |
|---|---|---|
| 1. | **Borrowers:** | Just Energy Ontario L.P. and Just Energy Group Inc. (collectively the "**Canadian Borrower**") and Just Energy (U.S.) Corp. (the "**U.S. Borrower**", and together with the Canadian Borrower, collectively, the "**Borrowers**"). |
| 2. | **Guarantors:** | Each of the Persons listed on **Schedule A** hereto including any other Person that may become an Applicant in the *CCAA* Proceedings (collectively, the "**Guarantors**"). |
| 3. | **Lender:** | LVS III SPE XV LP, a Delaware limited partnership, TOCU XVII LLC, a Delaware limited liability company, HVS XVI LLC, a Delaware limited liability company, and OC II LVS XIV LP, a Delaware limited partnership, (collectively, and together with successors and permitted assigns, the "**Lender**" or the "**Lenders**"). |
| 4. | **Defined Terms:** | Capitalized words and phrases used in this Term Sheet have the meanings given thereto in **Schedule B**. Capitalized terms not defined in this Term Sheet shall have the meanings given to such terms in the Original Senior |

|   |   | Credit Agreement. Unless otherwise noted, all references to currency, "dollars" or "$" shall refer to U.S. dollars. |
|---|---|---|
| 5. | **DIP Agent** | Alter Domus (US) LLC as administrative agent and collateral agent for the Lenders (together with its successors and assigns, in such capacities, the "**DIP Agent**"). |
| 6. | **DIP Facility:** | A first lien super-priority debtor-in-possession delayed-draw term loan credit facility (the "**DIP Facility**") in favor of the Borrowers is created by the DIP Financing Order (as defined below), this Term Sheet and the Security Documents during the Term for the purposes set out in Section 13, under which the Lenders make available to the Borrowers, severally and not jointly, principal advances up to $125,000,000 (such amount being the "**Commitment**"). The maximum principal amount available to the Borrowers shall at no time exceed $125,000,000 (the "**Maximum Amount**"), which availability is subject to the continuing satisfaction of the Funding Conditions at the time of each drawing. During the Term, the Borrowers may not re-borrow amounts under the DIP Facility that are repaid. |
| 7. | **Term of DIP Facility:** | The DIP Facility shall become effective upon the satisfaction or waiver of the Initial Conditions and shall be available, subject to the satisfaction or waiver of the Funding Conditions, until the earlier of (such date being the "**Termination Date**" and the period between the DIP Facility becoming effective and the Termination Date, the "**Term**"): (a) December 31, 2021; (b) the *CCAA* Plan Implementation Date; (c) the expiry of the *CCAA* Stay; (d) the termination of the *CCAA* Proceedings; or (e) the acceleration of the DIP Facility in accordance with Section 26 herein upon the occurrence and during the continuation of an Event of Default (as defined below). The Borrowers may, at any time and from time to time prior to the Termination Date, prepay the Obligations in whole or in part without premium or penalty. Effective on the Termination Date, the DIP Facility and the Commitment shall terminate and the Obligations (including all accrued and unpaid interest) shall become immediately due and payable in cash in full without any further notice or actions by the Lender. |
| 8. | **Advances:** | So long as the Funding Conditions have been satisfied or waived, the Borrowers shall be permitted to obtain one or more advances (each an "**Advance**") under the DIP Facility, provided that:<br><br>(a) the initial Advance shall be for a minimum aggregate amount of $100,000,000;<br><br>(b) the final Advance shall be for a minimum aggregate amount equal to the lesser of (i) $25,000,000 and (ii) the Maximum Amount less the aggregate amount of the initial Advance;<br><br>(c) the aggregate of all Advances shall at no time exceed the Maximum Amount; and<br><br>(d) the Borrowers shall provide the DIP Agent with five (5) Business Days (or such shorter period as the Lenders may agree in their sole discretion) (by 11:00 am (Toronto time)) prior written notice requesting an Advance, |

|  | | substantially in the form of the advance request set out on **Schedule D** (an "**Advance Request**"), setting out the amount of the Advance being requested, the proposed date of the Advance and certifying that (i) no Event of Default then exists and is continuing or would result therefrom, (ii) that the use of proceeds of such Advance will comply with the Cash Flow Statements, (iii) that the representations and warranties of the Loan Parties are accurate in all material respects; provided, that any such representation that is qualified as to "materiality" or "Material Adverse Effect" shall be accurate in all respects, (iv) a flow of funds, and (v) the other matters provided for in the Advance Request. DIP Agent shall promptly notify each Lender of its respective pro rata share of such Advance. |
|  | (e) | Each Lender shall make its pro rata share of such Advance available to the DIP Agent at the account specified by the DIP Agent in writing, in same day funds, by not later than 1:00 p.m. Toronto time on the Business Day specified in the Advance Request and upon satisfaction of all Advance Conditions for any Advance and receipt by the DIP Agent of all requested funds, the DIP Agent shall make all funds so received available to the Borrower in like funds by wire transer of such funds in accordance with the Advance Request. |
|  | | Notwithstanding anything else contained in this "Advances" section, the maximum amount of the Advance which can be made by the Lenders prior to the Canadian Court hearing the Comeback Motion (as defined below) or such earlier date as may be ordered by the Canadian Court is $100,000,000. |
| 9. **Interest:** | | The Borrowers shall pay interest on the principal amounts outstanding under the DIP Facility during such period at a rate equal to 13.0% per annum, calculated and payable quarterly in cash in arrears on the last Business Day of each calendar quarter (commencing with the calendar quarter ending on June 30, 2021) by not later than 12:00 noon Toronto time to the account designated by the DIP Agent in writing to the Borrowers from time to time until the Obligations are repaid in full and the DIP Facility is terminated. All accrued interest shall be due and payable in cash on the Termination Date. |
|  | | Notwithstanding anything to the contrary set forth herein, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "**Maximum Lawful Rate**"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate. |
| 10. **Default Interest:** | | After the occurrence of any Event of Default, the applicable interest rate hereunder will automatically increase by an additional 2.0% per annum on all Obligations until indefeasibly paid in full in cash. Interest at this higher rate shall be payable on demand. |
| 11. **Fees**: | | The Lenders shall be entitled to a commitment fee (the "**Commitment Fee**") as consideration for making the DIP Facility available to the Borrowers in an amount equal to 1.0% of the Maximum Amount, which |

| | | Commitment Fee shall be fully earned and payable in cash on the Closing Date. |
|---|---|---|
| | | The Lenders shall be entitled to an origination fee (the "**Origination Fee**") as consideration for the origination of the DIP Facility in an amount equal to 1.0% of the Maximum Amount, which Origination Fee shall be fully earned and payable in cash on the Closing Date. |
| | | The DIP Agent shall be entitled to the fees set forth in the DIP Agent Fee Letter, which fees shall be fully earned and payable in cash in accordance with the terms and conditions of the DIP Agent Fee Letter. |
| 12. | **Costs and Expenses**: | The Borrowers will reimburse, without duplication, the DIP Agent and the Lenders, as applicable, for all reasonable and documented out-of-pocket expenses, including (x) the reasonable and documented fees and expenses of the DIP Agent, including reasonable and documented legal expenses of legal counsel of the DIP Agent in connection with the *CCAA* Proceedings, the *CCAA* Plan, the Chapter 15 Proceedings, the DIP Facility, this Term Sheet and the on-going monitoring, administration and enforcement of the DIP Facility, (y) reasonable and documented legal expenses of the legal counsel for the Lenders in connection with the *CCAA* Proceedings, the *CCAA* Plan, the Chapter 15 Proceedings, the DIP Facility, this Term Sheet and the on-going monitoring, administration and enforcement of the DIP Facility and (z) the reasonable and documented expenses of such other additional advisors as the Lenders shall determine are necessary (each, an "**Other Advisor**"); provided, that, in respect of legal fees for (i) DIP Agent, expense reimbursement shall be limtied ot the fees of one primary U.S. counsel (originally Holland & Knight LLP), and one local counsel in each reasonably necessary jurisdiction and (ii) the Lenders, expense reimbursement shall be limited to the fees of one primary Canadian counsel (originally Cassels Brock & Blackwell LLP), one primary U.S. counsel (originally Akin Gump Strauss Hauer & Feld LLP), and one local counsel in each reasonably necessary jurisdiction for all Lenders, taken as a whole and, in respect of Other Advisor fees for the Lenders, expense reimbursement shall be limited to the fees of one (1) such Other Advisor for all Lenders, taken as a whole. |
| 13. | **Purpose and Permitted Payments:** | The Borrowers shall use Advances under the DIP Facility solely for the following purposes, in each case in accordance with the *CCAA* Orders and the Cash Flow Statements, subject to the Permitted Variance: |
| | | (a) to pay the reasonable and documented legal fees and expenses of the Loan Parties during the *CCAA* Proceedings and Chapter 15 Proceedings and the reasonable and documented fees and expenses of any other advisors retained by the Loan Parties during the *CCAA* Proceedings and the Chapter 15 Proceedings; |
| | | (b) to pay the reasonable and documented fees and expenses of the Monitor and its legal counsel; |

|  | (c) | to pay the fees and expenses owing (x) to the DIP Agent, the Lenders and their respective legal counsel and (y) Other Advisors, in each case, under this Term Sheet and the other Loan Documents; |
|  | (d) | to fund the general corporate and working capital requirements of the Borrowers and Guarantors in a manner that is consistent with the Cash Flow Statements (subject to Permitted Variances) and this Term Sheet; provided that, on or prior to the entry into the Hungarian Security Agreement (as defined below), the Borrowers shall only be permitted to disburse the Advances to any Loan Party that is formed under the laws of Hungary (or a political subdivision thereof) (the "**Hungarian Subsidiaries**") to fund the intercompany arrangement with each Hungarian Subsidiary as disclosed to the Lenders prior to the Closing Date and the Borrowers shall not use any portion of the Advances to fund the general corporate and working capital requirements of any Subsidiary that is not formed under the laws of the United States, Canada or Hungary (or, in each case, a political subdivision thereof); |
|  | (e) | to pay pre-filing obligations to the extent any such payment is permitted by the Initial Order, is consistent with the Cash Flow Statements (subject to Permitted Variances) and is not contrary to this Term Sheet; and |
|  | (f) | to pay any other amount as approved by the Majority Lenders in their sole discretion. |
| 14. **Security:** | | The Obligations shall be secured by a super-priority charge against and attaching to the Property that secures the obligations arising under the Senior Credit Agreement, created by Order of the Canadian Court and the US Court in form and substance acceptable to the Lenders, in favor of the DIP Agent securing the Obligations (the "**DIP Facility Charge**").

The DIP Facility Charge shall rank first in priority as against the Property (other than the Hungarian Subsidiaries) to any other Lien now or hereafter against or attaching to the Property, (a) subject only to Permitted Priority Liens and (b) the DIP Facility Charge will be *pari passu* with the Priority Commodity/ISO Charge.

The Loan Parties shall furnish to the Lenders at the request in writing of the Majority Lenders, debentures and other security agreements granting Liens in favor of the Lenders as security for the Obligations, in form and substance reasonably acceptable to the Majority Lenders (all such security documents being collectively referred to as the "**Security Documents**"). It is contemplated that the Loan Parties formed under the laws of the United States (or a state thereof) shall enter into a general security agreement governed by the laws of the State of New York and the Loan Parties formed under the laws of Canada (or a province thereof) shall enter into a general security agreement governed by the laws of the Province of Ontario, in each case, as of the Closing Date. The Hungarian Subsidiaries shall enter into a general security agreement (or equivalent thereof) governed by the laws of Hungary (the "**Hungarian Security Agreement**") within sixty (60) days of the Closing Date (as defined |

| | | below) (or such other date as may be agreed to by the Majority Lenders in their sole discretion). |
|---|---|---|
| 15. | **Initial Conditions:** | The Commitment and the DIP Facility shall become effective upon the satisfaction or waiver by the Lenders of each of the following conditions precedent (collectively, the "**Initial Conditions**" and the date of such effectiveness, the "**Closing Date**"): |
| | | (a) the Loan Parties shall have fully executed and delivered this Term Sheet and all other Loan Documents (other than the Hungarian Security Agreement); |
| | | (b) The side letter agreements with BP Energy Company (or its applicable subsidiaries and affiliates) ("**BP**") and Royal Dutch Shell plc (or its applicable subsidiaries and affiliates) ("**Shell**") shall be in form and substance acceptable to the Lenders in their sole discretion (it being agreed and understood that the executed side letters delivered to advisors to the Lenders on or prior to the date hereof are acceptable to the Lenders); |
| | | (c) the DIP Agent shall have received the fully executed DIP Agent Fee Letter; |
| | | (d) each Canadian Issuing Lender (as defined in the Original Senior Credit Agreement), US Issuing Lender (as defined in the Original Senior Credit Agreement), and LC Lender (as defined in the Original Senior Credit Agreement) shall continue to be permitted to issue Letters of Credit in accordance with the terms of the Original Senior Credit Agreement (pursuant to the Initial Order, any other CCAA Order or otherwise, other than the satisfaction of any condition precedent to the issuance of Letters of Credit that, as a consequence of the CCAA Proceedings, the Chapter 15 Proceedings, or the entry into and performance of this Term Sheet, cannot be satisfied); |
| | | (e) the Lender and DIP Agent shall have had a reasonable opportunity to review advance copies of, and shall be reasonably satisfied with, all materials to be filed in respect of the CCAA Proceedings; |
| | | (f) the Canadian Court shall have issued the Initial Order on or before March 9, 2021, in the the form attached hereto as **Schedule E** to this Term Sheet; |
| | | (g) the Lender and DIP Agent shall be satisfied that (i) the Loan Parties are in compliance in all material respects with all Applicable Laws, in relation to their businesses other than as may be permitted under a CCAA Order or as to which any enforcement in respect of non-compliance is stayed by a CCAA Order, (ii) the entering into of this Term Sheet, the granting of the DIP Facility Charge, the consummation of the transactions contemplated hereby and the performance hereof shall not violate any Applicable Laws, (iii) each of the Applicants has obtained all corporate, governmental, regulatory and third party approvals as may be required in any relevant jurisdiction to enable and permit the entering into of this Term Sheet, the granting of the DIP Facility Charge, the consummation |

| | | |
|---|---|---|
| | | of the transactions contemplated hereby and the performance thereof and (iv) service has been effected on each holder of a Lien listed on the service list agreed between the Loan Parties and the Lender (or their respective counsel) as confirmed in the Initial Order; |
| | (h) | the U.S. Bankruptcy Court shall enter an order pursuant to §1519 of the U.S. Bankruptcy Code (the "**US Initial Order**"); |
| | (i) | the Lenders and DIP Agent shall be satisfied in their sole discretion with all motion and application materials to be filed by the Loan Parties in connection with the Initial Order and the US Initial Order; |
| | (j) | perfected liens in the Collateral (other than any Collateral owned by Hungarian Subsidiaries) with the priorities described herein pursuant to the Initial Order and US Initial Order, together with the execution and delivery of all guarantees from all Loan Parties (other than any Hungarian Subsidiaries) and personal property security documentation from all Loan Parties (other than any Hungarian Subsidiaries) and applicable PPSA and UCC perfection filings from the Loan Parties where practicable within one (1) Business Day of the Closing Date; |
| | (k) | delivery of the initial Cash Flow Statement in form and substance acceptable to the Lenders in their sole discretion (it being agreed and understood that the initial Cash Flow Statement delivered to counsel for the Lenders at 9:11 p.m. Houston time on March 8, 2021 is acceptable to the Lenders); |
| | (l) | the DIP Agent and the Lenders, as applicable, shall have received all fees and expenses required to be paid on the Closing Date, including the Commitment Fee, Origination Fee and the fees due the DIP Agent pursuant to the DIP Agent Fee Letttter, which fees shall be paid by the Borrowers by reducing the portion of the aggregate initial Advance payable to the Borrowers by the quantum of such fees; |
| | (m) | each Loan Party shall have executed and delivered to the DIP Agent and the Lenders an officer's certificate regarding standard corporate matters with copies of the organizational documents, authorizing resolutions and incumbency certificate as schedules, in form and substance satisfactory to the DIP Agent and the Lenders acting reasonably; and |
| | (n) | no Default or Event of Default shall have occurred. |
| 16. **Advance Conditions:** | | The Lender's obligation to fund any Advance to the Borrowers is subject to the satisfaction of each of the following conditions precedent (the "**Advance Conditions**" and together with the Initial Conditions, collectively, the "**Funding Conditions**"): |
| | (a) | the Initial Conditions shall have been satisfied or waived by the DIP Agent (at the direction of the Lenders in their sole discretion); |

(b) the aggregate of the outstanding Advances shall not exceed the Maximum Amount and the provision of the Advance shall not result in the Maximum Amount being exceeded;

(c) the DIP Agent shall have received a duly executed Advance Request within the time frame required by this Term Sheet;

(d) no Default or Event of Default shall have occurred or will occur as a result of an Advance;

(e) the representations and warranties of the Loan Parties in this Term Sheet shall be true and correct in all material respects;

(f) with respect to any advance to be made on or after March 9, 2021, all reasonable and documented expenses of the DIP Agent and the Lenders have been paid in full to the extent required under Section 12 (to the extent invoiced to the Borrower at least two (2) Business Days prior to drawing);

(g) neither the Initial Order nor any other *CCAA* Order shall be the subject of any leave for appeal, appeal or stay application, and neither the Initial Order nor any other *CCAA* Order shall have been appealed (including without limitation pursuant to a leave for appeal application), terminated, stayed, amended, vacated or otherwise revised in a manner that is in any way adverse to the Lenders except to the extent consented to by the Majority Lenders in their sole discretion, and each of such Initial Order and other CCAA Orders are and shall continue to be in full force and effect;

(h) there shall not have occurred a Material Adverse Effect since the Closing Date and no Material Adverse Effect shall result from the Advance;

(i) in connection with the initial Advance, the Canadian Court shall have issued a CCAA Order in form and substance satisfactory to the Lenders in their sole discretion granting a DIP Facility Charge securing an amount not less than the aggregate amount of the initial Advance (without giving effect to any reduction in the net amount of the initial Advance payable to the Borrowers in accordance with Section 15(l));

(j) since the commencement of the CCAA Proceedings, there shall not have occurred any payment, prepayment, redemption, purchase or exchange of any prepetition funded indebtedness or equity, or amendment or modification of any of the terms thereof, except as expressly permitted by the terms of the Initial Order or any other CCAA Order;

(k) with respect to any advance to be made after March 9, 2021, the Applicants' application materials in connection with its CCAA comeback motion for the Initial Order (the "**Comeback Motion**") shall be satisfactory to the Lenders;

(l) with respect to any advance to be made after March 9, 2021: on or before March 19, 2021, the Canadian Court shall have heard the Comeback

|   | | Motion and the Initial Order shall not have been amended, restated, supplemented or otherwise modified as a result of the Comeback Motion or otherwise in a manner adverse to the Lenders without the written consent of the Majority Lenders; provided that the Canadian Court shall have issued an order amending, restating, supplementing or otherwise modifying the Initial Order, in form and substance acceptable to the Lenders (such order, together with the Initial Order, the US Initial Order and the US Final Recognition Order, the "**DIP Financing Order**") as necessary to (i) approve service and/or substitute service on all holders of Liens likely to be affected by the DIP Facility Charge and on all other necessary or appropriate parties as agreed between the Loan Parties and the Lenders; (ii) approve the Maximum Amount of the DIP Facility on the terms of this Term Sheet; and (iii) provide that the DIP Facility Charge (1) shall have priority over all Liens of the CCAA Applicants, other than the Permitted Priority Liens and the Priority Commodity/ISO Charge (as defined in the Initial Order) and (2) shall be *pari passu* with the Priority Commodity/ISO Charge; |
|---|---|---|
|   | | (m) with respect to any advance to be made after March 9, 2021, on or before April 8, 2021, the U.S. Bankruptcy Court shall recognize the amended and restated Initial Order of the Canadian Court (as amended, extended or replaced from time to time, the "**US Final Recognition Order**"); |
|   | | (n) the DIP Financing Order shall not have been stayed, vacated or otherwise amended, restated or modified in a manner that impacts the rights and interests of the Lenders, without the written consent of the Lenders in their sole discretion; and |
|   | | (o) there shall be no Liens ranking in priority to the DIP Facility Charge over the Property, other than the Permitted Priority Liens. |
| 17. | **Waiver of Funding Conditions:** | The Funding Conditions are for the sole benefit of the DIP Agent and the Lenders and may be waived by the Majority Lenders in whole or in part with or without terms or conditions, in respect of all or any portion of an Advance, without affecting the right of the Lenders to assert such terms and conditions in whole or in part in respect of any other Advance. |
| 18. | **Cash Flow Statements and Variance Reporting:** | Attached as **Schedule C** is a copy of the consolidated statement setting out the weekly projected cash flow forecasts of cash disbursements of the Borrowers for a 13-week period from the date of this Term Sheet (the "**Initial Cash Flow Statements**"), which each Lender acknowledges is in form and substance satisfactory to such Lender.

Once every 4 weeks, the Borrowers shall deliver (i) a new consolidated statement setting out the weekly projected cash flow forecasts of cash disbursements of the Borrowers for a 13-week period from the date of delivery thereof, which new statement shall replace the immediately preceding statement of cash flow forecasts in its entirety upon the Majority Lenders' approval thereof, and (ii) a variance report setting out actual versus projected cash disbursements since the date of the Initial Order on an individual and aggregate basis (excluding disbursements related to (a) professional advisory |

fees and (b) ERCOT related settlements in connection with the "black swan" weather events that occurred in the State of Texas in February 2021 of the type that have been previously approved by the Majority Lenders in their sole discretion (collectively, the **"Excluded Disbursements"**)), with explanations for such variances (with the Initial Cash Flow Statements and each subsequent statements being the **"Cash Flow Statements"**), which subsequent Cash Flow Statements shall be delivered to the Lenders every Thursday following the last Business Day of every fourth week during the Term and so long as the Obligations remain outstanding and shall be in form and substance satisfactory to the Majority Lenders, acting reasonably.

The Majority Lenders shall have the right to approve any Cash Flow Statements (other than the Initial Cash Flow Statements) in their reasonable discretion; *provided*, that if the Majority Lenders have not approved or denied a proposed Cash Flow Statement within three (3) Business Days of the Borrowers providing such Cash Flow Statements to the Lender, then such Cash Flow Statements shall be deemed approved. If the Majority Lenders refuse to approve any Cash Flow Statement, the most recently approved Cash Flow Statement shall continue to be effective and any future variance reports shall reference such Cash Flow Statement until such time as the Majority Lenders approve a replacement Cash Flow Statement.

| | | |
|---|---|---|
| 19. | **Voluntary Prepayments:** | The Borrowers may prepay, upon advance writtten notice to the DIP Agent not later than 12:00 noon Toronto time one (1) Business Day prior to such voluntary prepayment date, any Obligations outstanding under the DIP Facility without premium or penalty at any time prior to the Termination Date; provided that any prepayment shall be in a minimum amount of $25,000,000 or in multiples of $1,000,000 in excess thereof.<br><br>Any payments made under the DIP Facility shall be applied *first* towards unpaid fees and expenses of the DIP Agent, *second* towards accrued and unpaid interest and fees, *third* to unpaid expenses of the Lenders (including the Lender's counsel and Other Advisor), and *fourth* towards principal of amounts outstanding. |
| 20. | **Mandatory Prepayments:** | Unless otherwise consented to in writing by the Majority Lenders, the Borrowers shall prepay, upon advance writtten notice to the DIP Agent not later than 12:00 noon Toronto time one (1) Business Day prior to such mandatory prepayment date, the Obligations in an amount equal to (i) 100% of the net cash proceeds, including insurance proceeds and condemnation and similar awards, of the sale, transfer, disposition, loss, destruction, damage, condemnation, seizure, taking, confiscation, requisition of any of the Loan Parties' Property outside the ordinary course of business, in each case, to the extent such net cash proceeds are in excess of $1,000,000 in respect of any individual event of series of related events) and (ii) 100% of the gross proceeds of the sale or issuance of any indebtedness (other than indebtedness permitted under this Term Sheet). |
| 21. | **Currency:** | If any payment is received by the DIP Agent in a currency other than dollars, or, if for the purposes of obtaining judgment in any court it is necessary to |

| | | convert a sum due in one currency (the "**Original Currency**") into another currency (the "**Other Currency**"), the Loan Parties agree that the rate of exchange used shall be the rate at which the DIP Agent is able to purchase the Original Currency with the Other Currency after any premium and costs of exchange on the Business Day preceding that on which such payment is to be made or final judgment is given. |
|---|---|---|
| 22. | **Representations and Warranties:** | See attached **Schedule G**. |
| 23. | **Affirmative Covenants:** | See attached **Schedule H**. |
| 24. | **Negative Covenants:** | See attached **Schedule I**. |
| 25. | **Events of Default:** | The occurrence of any one or more of the following events shall constitute an event of default (each an "**Event of Default**") under this Term Sheet:<br><br>(a) failure by a Loan Party to make any payment of the Obligations upon such payment becoming due under this Term Sheet (subject to a three (3) Business Day cure period in the case of interest, fees and any other amounts (other than principal amounts) due hereunder);<br><br>(b) failure by a Loan Party to (i) comply with the terms of any *CCAA* Order, (ii) deliver any Cash Flow Statement by the date set out therefor in Section 18 or, (iii) perform or comply with any of the other covenants set out herein;<br><br>(c) if the Loan Parties fail to complete any action or step required to be completed by the following *CCAA* Plan Milestone Dates (unless extended by the Majority Lenders):<br><br>    (i) the Comeback Motion shall have been heard by the Canadian Court and the amended and restated Initial Order shall have been granted by the Canadian Court in a form acceptable to the Lenders within ten (10) days of the of the commencement of the CCAA Proceedings (the "**Filing Date**")<br><br>    (ii) the U.S. Bankruptcy Court shall entered the US Final Recognition Order within 30 days of the Filing Date;<br><br>    (iii) the Hungarian Subsidiaries shall enter into the Hungarian Security Agreement within sixty (60) days of the Closing Date (or such other date as may be agreed to by the Majority Lenders in their sole discretion);<br><br>    (iv) delivery of a business plan reasonably acceptable to the Lenders within ninety (90) days of the Filing Date; |

(v)  (a) delivery to the Lenders of a term sheet ("**Recapitalization Term Sheet**") for a recapitalization transaction ("**Recapitalization Plan**") reasonably acceptable to the Lenders within 120 days of the Filing Date and (b) compliance with all milestones contained in the Recapitalization Term Sheet;

(vi)  if applicable, an order of the Canadian Court approving a meeting for a vote on the Recapitalization Plan (and approving all materials in connection therewith) (the "**CCAA Meetings Order**") shall have been entered within 160 days of the Filing Date;

(vii)  if applicable, the meeting materials in respect of the Recapitalization Plan shall have been mailed to all relevant stakeholders within 165 days of the Filing Date;

(viii)  if applicable, an order of the U.S. Court recognizing the CCAA Meetings Order shall have been entered within 180 days of the Filing Date;

(ix)  if applicable, a meeting for a vote on the Recapitalization Plan shall have been held within 190 days of the Filing Date;

(x)  if applicable, an order of the Canadian Court approving Recapitalization Plan (the "**CCAA Plan Approval Order**") shall have been entered within 200 days of the Filing Date; and

(xi)  if applicable, an order of the U.S. Court recognizing the CCAA Plan Approval Order shall have been entered within 215 days of the Filing Date.

(d)  any representation or warranty of the Loan Parties made in this Term Sheet or any other Loan Document is incorrect or misleading in any material respect as of the date made;

(e)  non-compliance under (i) any affirmative covenants, (other than the affirmative covenants in Section 23(6) and Section 23(29)(b)) subject to a grace period of (x) five (5) days with respect to the affirmative covenants in Section 23(2), 23(3), 23(12), 23(13), 23(14), 23(16), 23(17), 23(19), 23(20), 23(28) and 23(30)(h) through (n), or otherwise (y) three (3) days, in each case measured from the date of knowledge by any Loan Party or notice by the DIP Agent (at the direction of the Majority Lenders) to the Borrowers, (ii) the affirmative covenants in Section 23(6) and Section 23(29)(b), or (iii) any negative covenants;

(f)  termination of any material Hedging Agreement, Applicable Commodity Supply Agreement or other agreements with BP and Shell Energy Entities;

(g)  issuance of an order (i) dismissing the CCAA Proceedings or lifting the stay in the CCAA Proceedings to permit the enforcement of any security against any Loan Party or the Collateral, the appointment of a receiver, interim receiver or similar official, an assignment in bankruptcy, or the

making of a bankruptcy order or receiving order against or in respect of any Loan Party, in each case which order is not stayed pending appeal thereof, and other than in respect of a non-material asset not required for the operations of any Loan Party's business and which is subject to a Permitted Priority Lien; (ii) granting any other Lien in respect of the Collateral that is in priority to or pari passu with the DIP Facility Charge other than as expressly permitted pursuant to this Term Sheet; (iii) staying, reversing, vacating or otherwise modifying this Term Sheet or Loan Document, any CCAA Order without the prior written consent of the Lenders, (x) in its sole discretion in respect of any CCAA Order or amendment thereto relating to the DIP Facility or any other matter that affects the Lenders adversely in any material respect and (y) acting reasonably in respect of any other amendment; or (iv) by the Canadian Court or the U.S. Court which in any way adversely affects the rights or interests of the Lenders in any material respect and that is not acceptable to the Lenders in their sole discretion;

(h)     unless consented to by the Majority Lenders, the expiry without further extension of the *CCAA* Stay;

(i)     unless consented to by the Majority Lenders, the Canadian Court shall enter an order or orders allowing one or more creditors to execute upon or enforce Liens on any Property of the Loan Parties which has a fair market value in excess of $1,000,000 in the aggregate;

(j)     the DIP Facility Charge shall cease to be a valid, perfected and enforceable super-priority Lien that ranks in priority to all other Liens against the Property other than Permitted Priority Liens and the Priority Commodity/ISO Charge (which shall be *pari passu* with the DIP Facility Charge);

(k)     the making of any payments in respect of prepetition obligations other than as permitted by this Term Sheet or the Initial Order or any other CCAA Order;

(l)     the denial or repudiation by any Loan Party of the legality, validity, binding nature or enforceability of any Loan Document, the DIP Facility Charge or any Lien created by a Loan Document;

(m)    any employees subject to the KERP or any directors of the Loan Parties shall have been terminated or removed without the consent of the Lender;

(n)     unless the Lenders have consented thereto in writing, the filing by any of the Loan Parties of any motion or proceeding which (i) is not consistent with any provision of this Term Sheet, the Loan Documents, the Initial Order, or the DIP Financing Order, as applicable, (iii) could otherwise reasonably be expected to adversely affect the interests of the Lender, (iv) seeks an order which, if granted, could reasonably be expected to result in a Material Adverse Effect, (v) seeks to continue the CCAA Proceedings under the jurisdiction of a court other than the Court or (vi) seeks to initiate

|   |   |   |
|---|---|---|
|   |   | any restructuring proceedings other than the CCAA Proceedings or the Chapter 15 Proceedings in any court or jurisdiction; and |
|   |   | (o) the U.S. Bankruptcy Court refusing to recognize any order made under the CCAA which the Majority Lenders determine in their sole discretion is material. |
| 26. | **Remedies:** | Upon the occurrence and during the continuance of an Event of Default, subject to the DIP Financing Order, the Majority Lenders or the DIP Agent (acting at the direction of the Majority Lenders) may:

(a) immediately terminate the Commitment and the DIP Facility;

(b) declare the Obligations to be immediately due and payable;

(c) subject to the Canadian Court's order (which may only be sought on five days' notice to the Borrowers and the service list in the CCAA Proceeding), to exercise any and all of the rights and remedies of the Lenders or the DIP Agent against the Loan Parties or the Property under or pursuant to this Term Sheet, the other Loan Documents and the DIP Facility Charge, including without limitation for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against one or more of the Loan Parties and for the appointment of a trustee in bankruptcy of one or more of the Loan Parties (provided that all such remedies shall be directed by the Majority Lenders);

(d) set-off or consolidate any amounts then owing by the Lenders to a Loan Party against the Obligations; and

(e) subject to the Canadian Court's order (which may only be sought on five days' notice to the Borrowers and the service list in the CCAA Proceeding), exercise all such other rights and remedies under Applicable Law (provided, that, other than as provided in clause (b) above, all such rights and remedies shall be directed by the Majority Lenders).

The rights, powers and remedies under this Term Sheet, the other Loan Documents and the DIP Facility Charge are cumulative and are in addition to and not in substitution for any other rights, powers and remedies available at law or in equity or otherwise (provided that all such rights, powers and remedies shall be directed by the Majority Lenders, except as otherwise expressly set forth above). No single or partial exercise by the Lenders of any right, power or remedy precludes or otherwise affects the exercise of any other right, power or remedy to which the Lenders may be entitled. |
| 27. | **Indemnity and Release:** | The Loan Parties agree to indemnify and hold harmless the DIP Agent and each of the Lenders, solely in their capacity as Lenders under the DIP Facility, and the DIP Agent, solely in its capacity as DIP Agent under the DIP Facility, and each of their respective directors, officers, employees, advisors and agents (all such persons and entities being referred to hereafter as "**Indemnified Persons**") from and against any and all actions, suits, proceedings, claims, losses, damages and liabilities of any kind or nature whatsoever (excluding |

|    |    | indirect or consequential damages and claims for lost profits) which may be incurred by or asserted against any Indemnified Person, solely in their capacity as Lenders or DIP Agent under the DIP Facility, as applicable, as a result of or arising out of or in any way related to the CCAA Proceedings, the Chapter 15 Proceedings, the DIP Facility or any Loan Document and, upon demand, to pay and reimburse any Indemnified Person for any reasonable legal or other out-of-pocket expenses incurred in connection with investigating, defending or preparing to defend any such action, suit, proceeding or claim; provided, however, the Loan Party shall not be obligated to indemnify any Indemnified Person against any loss, claim, damage, expense or liability (x) to the extent it resulted from the gross negligence or willful misconduct of such Indemnified Person as finally determined by a court of competent jurisdiction, or (y) to the extent arising from any dispute solely among Indemnified Persons (except for any dispute between the DIP Agent, in its capacities as administrative agent and collateral agent, and any other Indmenified Person) other than any claims arising out of any act or omission on the part of the Loan Party.<br><br>No party hereto shall be responsible or liable to any other party hereto or any other person for consequential damages, loss of profits or punitive damages. |
|----|----|----|
| 28. | **Borrowers' and Lender's Approvals:** | Any consent, agreement, amendment, approval, waiver or instruction of the Borrowers, DIP Agent or Lenders to be delivered hereunder, may be delivered by any written instrument, including by way of electronic mail, by the Borrowers, DIP Agent or Lenders (or Majority Lenders, as the case may be) or their respective counsels on their behalf. |
| 29. | **Further Assurances:** | The Loan Parties shall, at their expense, from time to time do, execute and deliver, or will cause to be done, executed and delivered, all such further acts, documents and things as the DIP Agent (at the direction of the Majority Lenders) may reasonably request for the purpose of giving effect to this Term Sheet, any other Loan Document and the DIP Facility Charge. |
| 30. | **Interest Act Compliance:** | All interest and fees shall be computed on the basis of a year of 365 days, provided that whenever a rate of interest or fee hereunder is calculated on the basis of a year (the "deemed year") that contains fewer days than the actual number of days in the calendar year of calculation, such rate of interest or fee rate shall be expressed as a yearly rate by multiplying such rate of interest or fee by the actual number of days in the calendar year of calculation and dividing it by the number of days in the deemed year. |
| 31. | **Entire Agreement; Conflict:** | This Term Sheet and the other Loan Documents constitute the entire agreement between the parties pertaining to the subject matter thereof and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties, and there are no representations, warranties or other agreements between the parties in connection with the subject matter thereof except as specifically set out herein and therein. None of the Loan Parties have been induced to enter into this Term Sheet or any other Loan Document in reliance on, and there will be no liability assessed, either in tort or contract, with respect to, any warranty, representation, opinion, advice or assertion of fact, except to the extent it has been reduced to writing and included as a term in this Term Sheet or in any of the other Loan Document. To the extent that there is |

|  | | any inconsistency between this Term Sheet and any of the other Loan Documents once executed, this Term Sheet shall govern unless such Loan Document specifically states otherwise. |
|---|---|---|
| 32. | **Rules of Interpretation:** | (a) References in this Term Sheet to Sections and Schedules mean to sections of and schedules to this Term Sheet. |
|  |  | (b) No waiver or delay on the part of the DIP Agent or the Lenders in exercising any right or privilege under any Loan Document will operate as a waiver hereof or thereof unless made in writing by the DIP Agent and the Lenders and delivered in accordance with the terms of this Term Sheet, and then such waiver shall be effective only in the specific instance and for the specific purpose given. Unless otherwise stated in this Term Sheet, the granting of any waiver or delay on the part of the Lenders shall be in the Lender's sole and absolute discretion. |
|  |  | (c) No approval, consent or permission on the part of the DIP Agent or the Lenders in exercising any right or privilege under any Loan Document will operate as an approval, consent or permission hereof or thereof unless made in writing by the DIP Agent and the Lenders and delivered in accordance with the terms of this Term Sheet, and then such approval, consent or permission shall be effective only in the specific instance and for the specific purpose given. Unless otherwise stated in this Term Sheet, the granting of any approval, consent or permission by the Lenders shall be in the Lender's sole and absolute discretion. |
|  |  | (d) In this Term Sheet, words signifying the singular number include the plural and vice versa, and words signifying gender include all genders. Every use of the words "including" or "includes" in this Term Sheet is to be construed as meaning "including, without limitation" or "includes, without limitation", respectively. |
|  |  | (e) The division of this Term Sheet into Sections and the insertion of headings are for convenience of reference only and do not affect the construction or interpretation of this Term Sheet. |
|  |  | (f) Unless otherwise specified in this Term Sheet, a time period within which or following which any calculation or payment is to be made, or action is to be taken, will be calculated by excluding the day on which the period begins and including the day on which the period ends. If the last day of a time period is not a Business Day, the time period will end on the next Business Day. |
|  |  | (g) Wherever reference is made in this Term Sheet to a calculation to be made in accordance with IFRS, the reference is to the generally accepted accounting principles in Canada, applied on a consistent basis, and statements and interpretations (if applicable) issued by the Canadian Institute of Chartered Accountants or any successor body from time to time, including International Financial Reporting Standards. |

| | | |
|---|---|---|
| | (h) | Time is of the essence in all respects in this Term Sheet. |
| | (i) | Unless otherwise specified in this Term Sheet, any reference to any statute includes all regulations and subordinate legislation made under or in connection with that statute at any time, and is to be construed as a reference to that statute as amended, modified, restated, supplemented, extended, re-enacted, replaced or superseded at any time. |
| | (j) | This Term Sheet enures to the benefit of and is binding upon the parties and their respective successors and permitted assigns. |
| 33. **Amendments and Waivers:** | | Unless otherwise agreed, no amendment, discharge, modification, restatement, supplement, termination or waiver of this Term Sheet or any provision hereof is binding unless it is in writing and executed by the DIP Agent, Majority Lenders and the Borrowers. Notwithstanding the foregoing, the consent of all Lenders affected thereby shall be required for any amendment, discharge, modification, restatement, supplement, termination or waiver if such amendment, discharge, modification, restatement, supplement, termination or waiver: |
| | (a) | would increase the amount of the Commitments held by such Lender; |
| | (b) | reduce the fees payable or interest rates to such Lender; |
| | (c) | extend any date fixed for payment of principal or interest of such Lender; |
| | (d) | extend the scheduled repayment dates of the Advances, change the type or currency of the Advances available or the notice periods, or change the definition of Majority Lenders; |
| | (e) | discharge, terminate or waive any material part of the Liens, or amend any of the Liens in a manner that would have that effect, other than pursuant to the terms hereof; or |
| | (f) | amend this Section 33. |
| | | No amendment, discharge, modification, restatement, supplement, termination or waiver that affects the rights, duties and obligations of the DIP Agent shall be effective unless in writing and executed by the DIP Agent. |
| | | No waiver of, failure to exercise, or delay in exercising, any provision of this Term Sheet constitutes a waiver of any other provision (whether or not similar) nor does any waiver constitute a continuing waiver unless otherwise expressly provided. |
| 34. **Assignment:** | | The Lenders may assign or grant participation interests in all or part of their interest in the Loan Documents, the Obligations and the DIP Facility Charge in whole or in part to any Person, subject to (i) providing the Monitor with reasonable evidence that such assignee has the financial capacity to fulfill the obligations of the Lender hereunder, (ii) providing the DIP Agent with (x) a fully compiled and completed Assignment and Assumption form, together |

|  | | with, for any new Lender, a fully completed adminisrative questionnaire, all know your customer documentation requested by the DIP Agent, an IRS Form W-9 os such other applicable IRS Form, and (y) the $3,500 transfer fee, and (iii) the prior written consent of the Borrower such consent not to be unreasonably withheld or delayed, unless either (A) an Event of Default has occurred and is continuing or (B) the assignee is an affiliate of the Lender or a fund managed by the Lender. Neither this Term Sheet, any other Loan Document nor any right or obligation hereunder or thereunder may be assigned by the Borrowers or any other Loan Party. Notwithstanding the foregoing, no assignment or grant of participation interests by the Lenders shall include any right of the Lenders to provide its approval or consent hereunder. <br><br> Upon confirmation by the DIP Agent that (i), (ii) and (iii) above have been satisfied, the DIP Agent shall record such Assignment and Assumption in the register and at such time the assignee Lender shall, to the extent of the interst assigned by such Assignment and Assumption, have the rights and obligations of an Lender under this Term Sheet, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumpiton, be released from its obligations under this Term Sheet. |
| 35. | **Taxes:** | All payments by or on account of any obligation of any Loan Party under any Loan Documents, including any payments required to be made from and after the exercise of any remedies available to the Lenders upon an Event of Default, shall be made free and clear of, and without reduction for or on account of, any present or future taxes, levies, imposts, duties, charges, fees, deductions or withholdings of any kind or nature whatsoever or any interest or penalties payable with respect thereto now or in the future imposed, levied, collected, withheld or assessed by any country or any political subdivision of any country (collectively "**Taxes**"); provided, however, that if any Taxes (other than Excluded Taxes) are required by Applicable Law to be withheld ("**Withholding Taxes**") from any amount payable to the Lenders under the Loan Documents, the amount so payable to the Lenders shall be increased to the extent necessary so that after making all required deductions, including deductions applicable to amounts payable under this section, the Lenders will receive on such payment date an amount equal to the amount it would have received had no such deductions in respect of such Taxes been made. Each Loan Party shall timely pay to the relevant Governmental Authority any Withholding Taxes and the relevant Loan Party shall provide evidence satisfactory to the Lenders that the Taxes have been so withheld and remitted. Each Loan Party shall indemnify Lender for the full amount of any Taxes (other than Excluded Taxes) imposed on or with respect to any obligation of any Loan Party under any Loan Document or on account of any obligation of any Loan Party paid by Lender and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. |
| 36. | **Severability:** | Any provision in this Term Sheet which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions |

| | | hereof or affecting the validity or enforceability of such provision in any other jurisdiction. |
|---|---|---|
| 37. | **No Third Party Beneficiary:** | No person, other than the Loan Parties, the DIP Agent, the Lenders and the Indemnified Parties, is entitled to rely upon this Term Sheet or the other Loan Document and the parties expressly agree that this Term Sheet and the other Loan Documents do not confer rights upon any other party. |
| 38. | **Counterparts and Electronic Signatures:** | This Term Sheet may be executed in any number of counterparts and by email or other electronic transmission including "pdf email", each of which when executed and delivered shall be deemed to be an original, and all of which when taken together shall constitute one and the same instrument. |
| 39. | **Notices:** | Any notice, request or other communication hereunder to any of the parties shall be in writing and be well and sufficiently given if delivered personally or sent by mail or electronic mail to the such Person at its address set out on its signature page hereof. Any such notice, request or other communication hereunder shall be concurrently sent to the Monitor and its counsel.<br><br>Any such notice shall be deemed to be given and received when received, unless received after 5:00 p.m. Toronto Time or on a day other than a Business Day, in which case the notice shall be deemed to be received the next Business Day. |
| 40. | **Governing Law & Jurisdiction:** | This Term Sheet shall be governed by, and construed in accordance with, the laws of the Province of Ontario and the federal laws of Canada applicable therein, and the parties irrevocably attorn to the non-exclusive jurisdiction of the courts of the Province of Ontario. |
| 41. | **Agent as hypothecary representative (*Fondé de Pouvoir*):** | Without limiting the power of the DIP Agent hereunder or under any other Loan Document, each of the Lenders hereby acknowledges that for the purposes of holding any hypothec granted or to be granted by any Loan Party under any deed of hypothec ("**Deed of Hypothec**") pursuant to the laws of the Province of Quebec to secure payment of any obligation under this Term Sheet or any other Loan Document, the DIP Agent is hereby appointed to act as the hypothecary representative (*fondé de pouvoir*) pursuant to Article 2692 of the Civil Code of Quebec to act on behalf of each of the Lenders, and each Loan Party and each Lender hereby confirms and agrees to such appointment. Each Person which is or becomes Lender and each assignee of a Lender shall be deemed to have ratified the aforesaid appointment of the DIP Agent. The DIP Agent agrees to act in such capacity. The DIP Agent, in such capacity, shall (x) have the sole and exclusive right and authority to exercise, except as may be otherwise specifically restricted by the terms hereof, all rights and remedies given to the DIP Agent with respect to the collateral under a Deed of Hypothec, applicable law or otherwise, and (y) benefit from and be subject to all provisions hereof with respect to the DIP Agent, mutatis mutandis, including without limitation all such provisions with respect to the liability or responsibility to and indemnification by the Loan Parties and/or the Lenders. Without prejudice to the "Governing Law & Jurisdiction" section above, the |

| | | provisions of this Section 41 shall be also governed by the laws of the Province of Quebec. |
|---|---|---|
| 42. | **DIP Agent Provisions** | Each Loan Party and each Lender agrees to the terms set forth on **Schedule F** attached hereto. |

**[signature pages follow]**

**SCHEDULE A**

**GUARANTORS**

1. Just Energy Corp.

2. Just Energy Manitoba L.P.

3. Just Energy (B.C.) Limited Partnership

4. Just Energy Québec L.P.

5. Ontario Energy Commodities Inc.

6. Just Energy Trading L.P.

7. Just Energy Alberta L.P.

8. Universal Energy Corporation

9. Just Energy Finance Canada ULC

10. Hudson Energy Canada Corp.

11. Just Green L.P.

12. Just Energy Prairies L.P.

13. Just Management Corp.

14. Just Energy Illinois Corp.

15. Just Energy Indiana Corp.

16. Just Energy Massachusetts Corp.

17. Just Energy New York Corp.

18. Just Energy Texas I Corp.

19. Just Energy Texas LP

20. Just Energy, LLC

21. Just Energy Pennsylvania Corp.

22. Just Energy Michigan Corp.

23. Just Energy Solutions Inc.

24. Hudson Energy Services LLC

25. Hudson Energy Corp.

26. Interactive Energy Group LLC

27. Hudson Parent Holdings LLC

28. Drag Marketing LLC

29. Just Energy Advanced Solutions LLC

30. Just Energy Advanced Solutions Corp.

31. Fulcrum Retail Energy LLC

32. Fulcrum Retail Holdings LLC

33. Tara Energy, LLC

34. Just Energy Marketing Corp.

35. Just Energy Connecticut Corp.

36. Just Energy Limited

37. Just Solar Holdings Corp.¶

38. Just Energy Finance Holding Inc.

39. Just Energy (Finance) Hungary Zrt.

40. 11929747 Canada Inc.

41. 12175592 Canada Inc.

42. JE Services Holdco I Inc.

43. JE Services Holdco II Inc.

44. JEBPO Services LLP

45. 8704104 Canada Inc.

"

## SCHEDULE B

## DEFINED TERMS

"**Accounts**" means any accounts of any of the Borrowers or Guarantors.

"**Administration Charge**" has the meaning given to it in the Initial Order, which Administration Charge shall not be amended in an amount to exceed CAD$2,200,000 without the prior consent of the Majority Lenders.

"**Advance**" is defined in Section 8.

"**Advance Conditions**" is defined in Section 16.

"**Advance Request**" is defined in Section 8.

"**Applicable Laws**" means, in respect of any Person, property, transaction or event, all applicable laws, statutes, rules, by-laws and regulations and all applicable official directives, orders, judgments and decrees of any Governmental Authority having the force of law and binding on such Person, including, without limitation, Applicable Laws relating to health and safety, environment and labour.

"**Assignment and Assumption**" means an Assignment and Assumption in a form approved by the Administrative Agent.

"**Borrowers**" is defined in Section 1.

"**Business Day**" means any day other than a Saturday, Sunday or any other day in which banks in Calgary, Alberta, Toronto, Ontario or New York City, New York are not open for business.

"**Cash Flow Statements**" is defined in Section 18.¶

"**Canadian Court**" is defined in the Recitals and includes any appellate court in the CCAA Proceedings.

"**Canadian Order**" means an order of the Court.

"*CCAA*" is defined in the Recitals.

"*CCAA* **Order**" means any Order of the Court made in connection with the *CCAA* Proceedings and "*CCAA* **Orders**" means more than one *CCAA* Order.

"*CCAA* **Plan**" means a plan of compromise and arrangement proposed or filed with the Court in the CCAA Proceedings which is in form and substance acceptable to the Lenders.

"*CCAA* **Plan Implementation Date**" means the date on which the CCAA Plan is implemented or becomes effective.

"*CCAA* **Proceedings**" is defined in the Recitals.

"*CCAA* **Stay**" means the stay of proceedings provided for in the Initial Order and extended pursuant to *CCAA* Orders from time to time as acceptable to the Lenders.

"**Closing Date**" is defined in Section 15.

"

"**Commitment Fee**" is defined in Section 11.

"**Default**" means the occurrence of any of the events specified in Section 25, whether or not any requirement for notice or lapse of time or other condition precedent has been satisfied.¶

"**DIP Agent**" is defiend in Section 4.

"**DIP Agent Fee Letter**" means that certain Fee Letter dated as of the date hereof by and between Borrowes and Alter Domus (US) LLC.

"**DIP Facility Charge**" is defined in Section 14.¶

"**DIP Facility**" is defined in Section 6.

"**Directors' Charge**" has the meaning given to it in the Initial Order and shall not exceed CAD$30,000,000 without the prior written consent of the Majority Lenders.

"**Event of Default**" is defined in Section 25.

"**Excluded Disbursements**" is defined in Section 18.

"**Excluded Taxes**" means any of the following Taxes, (A) any Tax on the Overall Net Income of the Lender; (B) any withholding Tax imposed under FATCA or penalties and interest imposed pursuant to Part XVIII of the ITA; (C) any Tax under the ITA that would not have been imposed but for the Lenders (i) not dealing at arm's length for purposes of the ITA with the Borrowers (other than as a result of the Lender being a lender to the Borrowers or any of its affiliated entities under this DIP Facility or under any other lending arrangement), or (ii) being a "specified shareholder" (as defined in subsection 18(5) of the ITA) of the Borrowers or not dealing at arm's length for purposes of the ITA with any such specified shareholder; (D) Taxes that would not have been imposed but for the failure of the Lenders or DIP Agent to timely satisfy any certification, identification, information, documentation or other reporting requirements concerning the nationality, residence, identity or connection with the relevant taxing jurisdiction or otherwise establishing the right to the benefit of an exemption from, or reduction in the rate of, withholding or deduction, if such compliance is required by statute, treaty, regulation or published administrative practice of a relevant taxing jurisdiction as a precondition to exemption from, or reduction in the rate of deduction or withholding of, such Taxes, imposed by the relevant taxing jurisdiction; and (E) U.S. federal withholding Taxes imposed on amounts payable to or for the account of a Lender with respect to an applicable interest in a loan or commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the loan or commitment (other than pursuant to an assignment request by the Borrower) or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 35, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office.

"**FA Charge**" has the meaning given to it in the Initial Order, which FA Charge shall not be amended in an amount to exceed CAD$1,800,000 without the prior consent of the Majority Lenders.

"**Filing Date**" means the date of the commencement of the CCAA Proceedings.

"**Funding Conditions**" is defined in Section 16.

"**Governmental Authority**" means any federal, territorial, provincial, state, municipal, local or other government, governmental or public department, commission, board, bureau, agency or instrumentality,

"

including a political subdivision thereof, domestic or foreign and including any subdivision, agent, commission, board or authority, including a taxing authority, of any of the foregoing.

"**Guarantors**" is defined in Section 2.

"**Guarantees**" means the guarantees to be provided by the Guarantors in favor of the Lenders.

"**Indemnified Persons**" is defined in Section 27.

"**Initial Cash Flow Statements**" is defined in Section 18.

"**Initial Conditions**" is defined in Section 15.

"**Initial Order**" is defined in the Recitals.

"**Initial Reporting Date**" means March 11, 2021.

"**ITA**" means the *Income Tax Act* (Canada), as amended, including the regulations promulgated.

"**KERP**" means a key employee retention program approved by the Canadian Court in the CCAA Proceedings and in form and substance satisfactory to the Majority Lenders (it being agreed and understood that to the extent the key employee retention program approved by the Canadian Court in the CCAA Proceeding is consistent with the terms provided to the Lenders prior to the Closing Date, such key employee retention program shall be deemed to be in form and substance satisfactory to the Majority Lenders).

"**KERP Charge**" has the meaning given to it in the Initial Order, which KERP Charge shall not exceed CAD$6,827,340 without the consent of the Majority Lenders.

"**Lender**" is defined in Section 3.

"**Liens**" means all liens, mortgages, charges, encumbrances, hypothecs, security interests, trusts, deemed trusts (statutory or otherwise) and other encumbrances of every kind and nature whatsoever.

"**Loan Documents**" means this Term Sheet, the Security Documents, the Guarantees and all other instruments, agreements, certificates, and documents from time to time executed and delivered to the Lenders in connection with this Term Sheet.

"**Loan Parties**" collectively refers to the Borrowers and the Guarantors and "**Loan Party**" means any one of the Loan Parties.

"**Majority Lenders**" means Lenders holding at least 50.1% of the principal amount of Advances and unused commitments hereunder.

"**Material Adverse Effect**" means any event, circumstance, occurrence or change which would reasonably be expected to have a material adverse impact or effect on:

(a)  the ability of any Loan Party to perform any material obligation under this Term Sheet or any other Loan Document; or

(b)  the validity or enforceability of the DIP Facility Charge or any Liens created by the Security Documents, or upon the ranking of the DIP Facility Charge or of any such Liens, or upon any material

"

rights or remedies intended or purported to be granted to the Lenders under this Term Sheet, any other Loan Document or the DIP Facility Charge;

in each case, excluding the events, circumtances, occurrences and changes giving rise to, the actual filing of, or occuring on account of, the CCAA Proceeding or the Chapter 15 Proceeding.

"**Maximum Amount**" has the meaning given thereto in Section 6.

"**Monitor**" means FTI Consulting Canada Inc.in its capacity as the Court-appointed monitor in the *CCAA* Proceedings pursuant to the Initial Order and any successor monitor appointed in the *CCAA* Proceedings by the Court.

"**Obligations**" means the indebtedness, obligations, covenants or liabilities owing by the Borrowers and the other Loan Parties (and any one or more of them) to the Agent and the Lenders under the DIP Facility, this Term Sheet and any other Loan Document, including without limitation all principal, interest, fees, indemnities and expenses owing to the Agent and the Lenders.

"**Original Currency**" is defined in Section 21.

"**Origination Fee**" is defined in Section 11.

"**Other Currency**" is defined in Section 21.

"**Permitted Debt**" means indebtedness owing prior to the date of the Initial Order or otherwise permitted by the Original Senior Credit Agreement (other than clause (m) of the definition of Permitted Debt thereunder and any Future Intercompany Debt owed to a Loan Party by a Person that is not a Loan Party) (it being agreed and understood that any letters of credit issued on or after the Closing Date under the Original Senior Credit Agreement and shall constitute Permitted Debt hereunder).

"**Permitted Liens**" means (i) Permitted Priority Liens, (ii) the DIP Facility Charge, (iii) the Priority Commodity/ISO Charge, (iv) "Permitted Encumbrances" as such term is defined in the Original Senior Credit Agreement as in effect on the date hereof, (v) validly perfected Liens for amounts owing prior to the date of the Initial Order, (vi) without duplication, Liens for Taxes the nonpayment of which is excused, permitted, or required by the *CCAA* Proceedings or the Chapter 15 Proceedings, and (vii) inchoate statutory Liens arising after the Filing Date in respect of any accounts payable arising after the Filing Date in the ordinary course of business, subject to the obligation to pay all such amounts as and when due.

"**Permitted Priority Liens**" means the (i) the Administration Charge, (ii) the Directors' Charge, (iii) the KERP Charge, (iv) the FA Charge, (v) Liens in respect of claims that are individually and in the aggregate immaterial in the opinion of the Majority Lenders, solely to the extent such Liens are not registered under a personal property registry system, (vi) Liens related to amounts posted as cash collateral to the extent in compliance with Section 24(30) in respect of any ISO (as defined in the Intercreditor Agreement), ERCOT and PJM Interconnection and/or in connection with letters of credit, surety bonds or similar obligations, in either case, in an amount not to exceed $30,000,000, (vii) any amounts payable by the Loan Parties for wages, vacation pay, employee deductions, sales tax, excise tax, tax payable pursuant to Part IX of the *Excise Tax Act* (Canada) (net of input credits), income tax and workers compensation claims, in the case of this item, and (vii) solely to the extent such amounts are given priority by Applicable Law and only to the extent that the priority of such amounts have not been subordinated to the DIP Facility Charge pursuant to the Court Orders.

"**Permitted Variance**" is defined in Section 24(30).

"

"**Person**" means an individual, partnership, corporation, business trust, joint stock company, limited liability company, unlimited liability company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"**Property**" means all of the present and after-acquired real and personal property and undertaking of any of the Loan Parties or in which any of the Loan Parties have any interest of every nature and kind whatsoever, and wherever situate, including all proceeds thereof.

"**Related Parties**" means, with respect to any specified Person, such Person's affiliates, the board of directors or board of managers (or similar govenrning body) of such Person, members, officers, partners, members, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's affiliates.

"**Security Documents**" is defined in Section 14.

"**Tax on the Overall Net Income**" of the Lenders means any Tax imposed on or measured by net income (however denominated), franchise Taxes, Canadian federal or provincial capital Taxes, and branch profits Taxes (i) that is imposed as a result of the Lenders being organized under the laws of, or having its principal office located in, the applicable jurisdiction imposing such Tax (or any political subdivision thereof), or (ii) that is imposed as a result of a present or former connection between the Lenders and the jurisdiction imposing such Tax (other than connections arising solely from the Lenders having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Documents or sold or assigned an interest in the DIP Facility).

"**Taxes**" is defined in Section 35.

"**Term**" is defined in Section 7.

"**Term Sheet**" is defined in the Recitals.

"**Termination Date**" is defined in Section 7.¶

"**Priority Commodity/ISO Charge**" has the meaning given to it in the Initial Order.

"**U.S. Court**" is defined in the Recitals.¶

"**US Final Recognition Order**" is defined in Section 16.

"**US Initial Order**" is defined in Section 15.

"**Withholding Taxes**" is defined in Section 35.

"

**SCHEDULE C**

**INITIAL CASH FLOW STATEMENT**

[see attached]

DRAFT For Discussion Purposes Only - Subject to Change
Privileged and Confidential
Without Prejudice and Subject to FRE 408 and All State Law Equivalents

# Project Wellington - Short-term Liquidity Forecast

March 5, 2021



DRAFT For Discussion Purposes Only - Subject to Change
Privileged and Confidential
Without Prejudice and Subject to FRE 408 and All State Law Equivalents

# Project Wellington - Assumptions

## Key Assumptions

### General

1) Based on Just Energy's liquidity forecast dated March 05, 2021
2) The current forecast (the "Forecast") is subject to material change and continued review by JE's management team and advisors
3) The Forecast assumes a CCAA filing and corresponding U.S. Chapter 15 filing on March 9, 2021

### Receipts

1) The Forecast assumes no material impact to receipts collections as a result of the restructuring, except for receipts in April and May, which are partially impacted by delayed customer billing in Texas associated with the "February Freeze"
2) Other receipts include expected tax refunds

### Energy & Delivery Costs

1) Just Energy makes payments to ISOs, TDSPs, natural gas LDCs to ensure service to customers is not discontinued (e.g. avoid triggering a Provider of Last Resort ("POLR") event in ERCOT, which would permit ERCOT to divert Just Energy's customers to alternative suppliers)
2) The Company makes no payments to Commodity Suppliers relating to any pre-petition obligations
   a) BP and Shell agree not to terminate their supply and related contracts with the Company
   b) BP and Shell continue providing services post-petition and work towards a consensual long-term solution
   c) Other commodity suppliers are not paid on account of their pre-petition obligations
   d) In the event any other commodity suppliers (excl. BP and Shell) choose to terminate their contract(s), the Forecast does not account for any additional costs to shift the obligation to Shell and BP
3) All TDSP suppliers, Local Gas Distributors, weather hedge providers, and ICE are paid in the ordinary course to avoid operational disruption throughout the US and Canada
4) The Forecast assumes approximately US$32.5MM for incremental collateral requests on behalf of the Company's suppliers, TDSP providers, and surety and LC providers across the first several weeks of the case (in addition to requests for collateral already received by the Company)
5) The Forecast includes US$15MM to account for contraction of payment terms

### Payroll

1) Payroll includes the Company's wages and benefits

### Selling & Other Costs

1) The Company pays commission costs to third-party marketing firms integral to signing up new customers
2) Other SG&A costs include insurance premiums and internal marketing and administrative costs
   a) The Forecast includes C$1.5MM for a D&O insurance tail policy just prior to filing

### Professional Fees

1) Professional Fees include fees for the Company's counsel and investment banker, the Monitor, Monitor's Counsel, and DIP lenders' professionals
2) The Forecast assumes all professional fees paid in Canadian dollars incur a 13% sales tax

### Credit Facility

1) Credit facility payments include DIP borrowing and repayments
   a) The Forecast assumes an initial US$100MM draw against the DIP at the outset of the case, with a subsequent draw for the remainder of the facility to follow
2) For illustrative purposes, the DIP assumes (a) 13.0% interest rate; (b) 1% commitment and 1% origination fee on the full commitment, paid at closing; and (c) interest paid monthly

DRAFT For Discussion Purposes Only - Subject to Change
Privileged and Confidential
Without Prejudice and Subject to FRE 408 and All State Law Equivalents

# Project Wellington

CCAA 13-Week Cash Flow Forecast — Document 16-1 — Page 52 of 180
March 5, 2021

*(CAD$ in millions)*

| Weeks Ending (Sunday)[1] | | 3/14/21 | 3/21/21 | 3/28/21 | 4/4/21 | 4/11/21 | 4/18/21 | 4/25/21 | 5/2/21 | 5/9/21 | 5/16/21 | 5/23/21 | 5/30/21 | 6/6/21 | 13-Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Sales Receipts | [2] | $28.6 | $48.5 | $46.3 | $35.2 | $44.4 | $41.8 | $67.1 | $48.3 | $48.4 | $42.6 | $60.5 | $55.1 | $41.8 | $608.5 |
| Miscellaneous Receipts | [3] | - | - | - | 2.4 | - | - | - | 5.6 | - | - | - | - | - | 8.0 |
| Total Receipts | | $28.6 | $48.5 | $46.3 | $37.6 | $44.4 | $41.8 | $67.1 | $53.9 | $48.4 | $42.6 | $60.5 | $55.1 | $41.8 | $616.5 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Energy and Delivery Costs | [4] | ($172.1) | ($52.5) | ($59.7) | ($25.0) | ($13.2) | ($16.0) | ($79.8) | ($26.8) | ($13.6) | ($14.6) | ($103.2) | ($36.9) | ($10.8) | ($574.1) |
| Payroll | [5] | - | - | (2.5) | (3.2) | (2.5) | - | (2.5) | (2.5) | (2.5) | - | (2.5) | - | (6.5) | (22.3) |
| Taxes | [6] | (0.1) | (5.3) | (6.0) | (0.0) | (0.1) | - | (5.0) | (12.6) | - | (0.2) | (4.7) | (2.4) | (0.1) | (36.6) |
| Commissions | [7] | (2.2) | (4.0) | (4.5) | (0.6) | (2.5) | (0.7) | (4.8) | (0.7) | (1.4) | (0.4) | (4.5) | (0.7) | (0.6) | (27.8) |
| Selling and Other Costs | [8] | (6.3) | (3.4) | (4.2) | (6.4) | (5.0) | (3.5) | (3.3) | (5.4) | (6.6) | (2.9) | (3.5) | (2.9) | (5.4) | (58.7) |
| Total Operating Disbursements | | ($180.8) | ($65.2) | ($77.0) | ($35.2) | ($23.3) | ($20.2) | ($95.4) | ($45.4) | ($24.1) | ($18.0) | ($118.5) | ($42.9) | ($23.4) | ($719.5) |
| **OPERATING CASH FLOWS** | | ($152.2) | ($16.7) | $19.2 | $2.3 | $21.1 | $21.6 | ($28.4) | $8.4 | $24.3 | $24.6 | ($57.9) | $12.2 | $18.5 | ($103.0) |
| *Financing Disbursements* | | | | | | | | | | | | | | | |
| Credit Facility - Borrowings / (Repayments) | [9] | $126.0 | $- | $31.5 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $157.5 |
| *Restructuring Disbursements* | | | | | | | | | | | | | | | |
| Professional Fees | [10] | - | (1.4) | (2.6) | (1.3) | (1.6) | (1.1) | (1.1) | (0.8) | (1.1) | (0.8) | (0.9) | (0.9) | (0.9) | (14.4) |
| **NET CASH FLOWS** | | ($26.2) | ($18.1) | $48.2 | $1.1 | $19.5 | $20.5 | ($29.5) | $7.6 | $23.3 | $23.8 | ($58.9) | $11.3 | $17.6 | $40.1 |
| **CASH** | | | | | | | | | | | | | | | |
| Beginning Balance | | $77.3 | $51.2 | $33.0 | $81.2 | $82.3 | $101.8 | $122.2 | $92.8 | $100.4 | $123.7 | $147.4 | $88.6 | $99.9 | $77.3 |
| Net Cash Inflows / (Outflows) | | (26.2) | (18.1) | 48.2 | 1.1 | 19.5 | 20.5 | (29.5) | 7.6 | 23.3 | 23.8 | (58.9) | 11.3 | 17.6 | 40.1 |
| Other (FX) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| ENDING CASH | | $51.2 | $33.0 | $81.2 | $82.3 | $101.8 | $122.2 | $92.8 | $100.4 | $123.7 | $147.4 | $88.6 | $99.9 | $117.5 | $117.5 |
| **BORROWING SUMMARY** | | | | | | | | | | | | | | | |
| DIP Facility Credit Limit | | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 |
| DIP Draws | | 126.0 | - | 31.5 | - | - | - | - | - | - | - | - | - | - | 157.5 |
| DIP Principal Outstanding | | 126.0 | 126.0 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 | 157.5 |
| DIP Availability | | $31.5 | $31.5 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- |

1. The week shown as beginning 3/8/21 reflects 6-day stub week ending on 3/14/21 (the filing date).
2. Sales Receipts include collections from the Company's residential and commercial customers for the sale of energy, which primarily consists of electricity and natural gas, inclusive of sales tax. The sales forecast is based on historical sales patterns, seasonality, and management's current expectations.
3. Miscellaneous receipts reflect forecasted tax refunds and other receipts not sent from customers.
4. Energy & Delivery costs reflect the purchase energy from suppliers and the cost of delivery and transmission to the Company's customers.
5. Payroll disbursements reflect the current staffing levels and recent payroll amounts, inclusive of any payments associated with the Company's bonus programs.
6. Taxes reflect the remittance of sales taxes collected from customers and the Company's corporate income taxes.
7. Commissions include fees paid to customer acquisition contractors and suppliers.
8. Selling and Other Costs include selling, general, administrative and interest payments.
9. The Credit Facility Borrowings / (Repayments) assume USD$ 100 million of the DIP is drawn immediately, with a subsequent draw for the remainder of the facility within the first few weeks of the proceedings.
10. Professional Fees include fees for the Company's counsel and investment banker, the Monitor, the Monitor's Counsel, and the DIP lenders' professionals.

DRAFT for Discussion Purposes Only - Subject to Change
Privileged and Confidential
Without Prejudice and Subject to FRE 408 and All State Law Equivalents

# Project Wellington
CCAA 13-Day Cash Flow Forecast
March 5, 2021

*(CAD$ in millions)*

| Forecast Week | | 3/9/21 | 3/10/21 | 3/11/21 | 3/12/21 | 3/13/21 | 3/14/21 | 3/15/21 | 3/16/21 | 3/17/21 | 3/18/21 | 3/19/21 | 3/20/21 | 3/21/21 | 13-Day Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
| **RECEIPTS** | | | | | | | | | | | | | | | |
| Sales Receipts | [1] | $8.7 | $6.3 | $6.9 | $6.7 | $- | $- | $8.2 | $9.8 | $8.0 | $10.1 | $12.4 | $- | $- | $77.1 |
| Miscellaneous Receipts | [2] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Total Receipts* | | $8.7 | $6.3 | $6.9 | $6.7 | $- | $- | $8.2 | $9.8 | $8.0 | $10.1 | $12.4 | $- | $- | $77.1 |
| **DISBURSEMENTS** | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Energy and Delivery Costs | [3] | ($121.2) | ($45.8) | ($7.9) | $2.7 | $- | $- | ($1.8) | ($7.0) | ($22.6) | ($6.1) | ($15.0) | $- | $- | ($224.6) |
| Payroll | [4] | - | (0.1) | - | - | - | - | (5.3) | - | - | - | - | - | - | (5.4) |
| Taxes | [5] | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Commissions | [6] | - | (1.0) | - | (2.2) | - | - | - | (0.3) | (1.1) | - | (1.7) | - | - | (6.3) |
| Selling and Other Costs | [7] | (4.2) | - | - | (1.0) | - | - | - | (1.1) | (3.2) | - | - | - | - | (9.7) |
| *Total Operating Disbursements* | | ($125.4) | ($46.9) | ($7.9) | ($0.6) | $- | $- | ($7.1) | ($8.4) | ($26.9) | ($6.2) | ($16.7) | $- | $- | ($246.0) |
| **OPERATING CASH FLOWS** | | ($116.7) | ($40.6) | ($1.0) | $6.1 | $- | $- | $1.0 | $1.4 | ($18.8) | $3.9 | ($4.3) | $- | $- | ($168.9) |
| *Financing Disbursements* | | | | | | | | | | | | | | | |
| Credit Facility - Borrowings / (Repayments) | [8] | $126.0 | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $- | $126.0 |
| *Restructuring Disbursements* | | | | | | | | | | | | | | | |
| Professional Fees | [9] | - | - | - | - | - | - | (1.4) | - | - | - | - | - | - | (1.4) |
| **NET CASH FLOWS** | | $9.3 | ($40.6) | ($1.0) | $6.1 | $- | $- | ($0.4) | $1.4 | ($18.8) | $3.9 | ($4.3) | $- | $- | ($44.3) |
| **CASH** | | | | | | | | | | | | | | | |
| Beginning Balance | | $77.3 | $86.7 | $46.1 | $45.0 | $51.2 | $51.2 | $51.2 | $50.8 | $52.2 | $33.4 | $37.3 | $33.0 | $33.0 | $77.3 |
| Net Cash Inflows / (Outflows) | | 9.3 | (40.6) | (1.0) | 6.1 | - | - | (0.4) | 1.4 | (18.8) | 3.9 | (4.3) | - | - | (44.3) |
| Other (FX) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **ENDING CASH** | | $86.7 | $46.1 | $45.0 | $51.2 | $51.2 | $51.2 | $50.8 | $52.2 | $33.4 | $37.3 | $33.0 | $33.0 | $33.0 | $33.0 |
| **BORROWING SUMMARY** | | | | | | | | | | | | | | | |
| DIP Facility Credit Limit | | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 | $157.5 |
| DIP Draws | | 126.0 | - | - | - | - | - | - | - | - | - | - | - | - | $- |
| DIP Principal Outstanding | | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | 126.0 | - |
| DIP Availability | | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | 31.5 | $- |

1. Sales Receipts include collections from the Company's residential and commercial customers for the sale of energy, which primarily consists of electricity and natural gas, inclusive of sales tax. The sales forecast is based on historical sales patterns, seasonality, and management's current expectations.
2. Miscellaneous receipts reflect forecasted tax refunds and other receipts not sent from customers.
3. Energy & Delivery costs reflect the purchased energy from suppliers and the cost of delivery and transmission to the Company's customers.
4. Payroll disbursements reflect the current staffing levels and recent payroll amounts, inclusive of any payments associated with the Company's bonus or programs.
5. Taxes reflect the remittance of sales taxes collected from customers and the Company's corporate income taxes.
6. Commissions include fees paid to customer acquisition contractors and suppliers.
7. Selling and Other Costs include selling, general, administrative and interest payments.
8. The Credit Facility Borrowings / (Repayments) assume US$100 million of the DIP is drawn immediately, with a subsequent draw for the remainder of the facility within the first few weeks of the proceedings.
9. Professional Fees include fees for the Company's counsel and investment banker, the Monitor, the Monitor's Counsel, and the DIP lenders' professionals.

## SCHEDULE D

## FORM OF ADVANCE REQUEST

**TO:** Alter Domus (US) LLC**, as DIP Agent**

Reference is made to that certain CCAA Interim Debtor-In-Possession Financing Term Sheet, dated as of March 9, 2021, among Just Energy Ontario L.P., Just Energy Group Inc., and Just Energy (U.S.) Corp., as Borrowers, the Guarantors party thereto, LVS III SPE XV, a Delaware limited partnership, TOCU XVII LLC, a Delaware limited liability company, HVS XVI LLC, a Delaware limited liability company, and OC II LVS XIV LP, a Delaware limited partnership, as Lenders and Alter Domus (US) LLC, as DIP Agent, and the financial institutions party from time to time thereto as lenders (the "**Term Sheet**"). Capitalized terms used herein and not otherwise defined have the meanings given to them in the Term Sheet.

The Borrowers hereby give irrevocable notice pursuant to the terms of the Term Sheet for the proposed Advance as follows:

The date of the proposed Advance is: [●], 2021.

The aggregate amount of the proposed Advance is: $[●]

The location and number of the Borrowers' accounts to which proceeds of Advances are to be disbursed: [___]

The Borrowers hereby certify that:

(i)     all representations and warranties of the Loan Parties contained in the Term Sheet remain accurate in all material respects, provided, that any such representation that is qualified as to "materiality" or "Material Adverse Effect" is accurate in all respects, both before and after giving effect to the Advance referred to herein;

(ii)    all Funding Conditions have been satisfied;

(iii)   no Event of Default then exists and is continuing or would result from the Advance; and

(iv)   the proceeds of the Advance will be in compliance with Section 13 of the Term Sheet and will be consistent with the Cash Flow Statements.

Dated this [●] day of [●], 2021.

**JUST ENERGY ONTARIO L.P.**
**By its general partner, JUST ENERGY CORP**.

_____
Name:
Title:


**JUST ENERGY GROUP INC**.

_____
Name:

Title:

**JUST ENERGY (U.S.) CORP**.

_____
Name:
Title:

**SCHEDULE E**

**FORM OF INITIAL ORDER**

[see attached]

Court File No.

# ONTARIO
## SUPERIOR COURT OF JUSTICE
## COMMERCIAL LIST

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | TUESDAY, THE 9TH |
| | ) | |
| JUSTICE KOEHNEN | ) | DAY OF MARCH, 2021 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.**, JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC, HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS LLC, FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP. AND JUST ENERGY (FINANCE) HUNGARY ZRT. (each, an "**Applicant**", and collectively, the "**Applicants**")

## INITIAL ORDER

**THIS APPLICATION**, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), was heard this day by judicial videoconference via Zoom in Toronto, Ontario due to the COVID-19 pandemic.

**ON READING** the affidavit of Michael Carter sworn March 9, 2021 and the Exhibits thereto (the "**Carter Affidavit**"), the pre-filing report of the proposed monitor, FTI Consulting

2

Canada Inc. ("**FTI**"), dated March 9, 2021  (the "**Pre-Filing Report**"), and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicants and the partnerships listed in Schedule "A" hereto (the "**JE Partnerships**", and collectively with the Applicants, the "**Just Energy Entities**"), FTI, Alter Domus (US) LLC (the "**DIP Agent**"), as administrative agent for the lenders (the "**DIP Lenders**") under the DIP Term Sheet (as defined below) and ●, and on reading the consent of FTI to act as the monitor (the "**Monitor**"),

**SERVICE**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**DEFINED TERMS**

2.      **THIS COURT ORDERS** that capitalized terms that are used in this Order shall have the meanings ascribed to them in Schedule "B" hereto or the Carter Affidavit, as applicable, if they are not otherwise defined herein.

**APPLICATION**

3.      **THIS COURT ORDERS AND DECLARES** that the Applicants are companies to which the CCAA applies. Although not Applicants, the JE Partnerships shall enjoy the benefits of the protections and authorizations provided by this Order.

**POSSESSION OF PROPERTY AND OPERATIONS**

4.      **THIS COURT ORDERS** that the Just Energy Entities shall remain in possession and control of their respective current and future assets, licenses, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"). Subject to further Order of this Court, the Just Energy Entities shall continue to carry on business in a manner consistent with the preservation of their business (the "**Business**") and Property. The Just Energy Entities shall each be authorized and empowered to continue to retain and employ the employees, contractors, staffing agencies, consultants, agents, experts, accountants, counsel and

such other persons (collectively "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

5.     **THIS COURT ORDERS** that:

(a)    the Just Energy Entities shall be entitled to continue to utilize the central cash management system currently in place as described in the Carter Affidavit or, with the consent of the DIP Agent, replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System (a "**Cash Management Bank**") shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Just Energy Entities of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Just Energy Entities, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash Management System, an unaffected creditor under any  plan of compromise or arrangement with regard to Cash Management Obligations. All present and future indebtedness, liabilities and obligations of any and every kind, nature or description whatsoever to a Cash Management Bank under, in connection with, relating to or with respect to any and all agreements evidencing treasury facilities and cash management products (including, for greater certainty, all pre-authorized debit banking services, electronic funds transfer services and overdraft balances) provided by a Cash Management Bank to any Just Energy Entity, and any unpaid balance thereof, are collectively referred to herein as the "**Cash Management Obligations**";

(b)    during the Stay Period (as defined below), no Cash Management Bank shall, without leave of this Court: (i) exercise any sweep remedy under any applicable documentation (provided, for greater certainty, that the cash pooling and zero-balancing account services provided with respect to the JPMorgan accounts held by the U.S. Bank

Account Holders (as defined in the Carter Affidavit) may continue in the ordinary
course); or (ii) exercise or claim any right of set-off against any account included in the
Cash Management System;

(c)     any of the Cash Management Banks may rely on the representations of the applicable
Just Energy Entities with respect to whether any cheques or other payment order drawn
or issued by the applicable Just Energy Entity prior to the date of this Order should be
honoured pursuant to this or any other order of this Court, and such Cash Management
Bank shall not have any liability to any party for relying on such representations by the
applicable Just Energy Entities as provided for herein; and

(d)     (i) those certain existing deposit agreements between the Just Energy Entities and the
Cash Management Banks shall continue to govern the post-filing cash management
relationship between the Just Energy Entities and the Cash Management Banks, and
that all of the provisions of such agreements shall remain in full force and effect, (ii)
either any of the Just Energy Entities, with the consent of the Monitor, the DIP Agent
and the Cash Management Banks may, without further Order of this Court, implement
changes to the Cash Management System and procedures in the ordinary course of
business pursuant to the terms of those certain existing deposit agreements, including,
without limitation, the opening and closing of bank accounts, and (iii) all control
agreements in existence prior to the date of this Order shall apply.

6.      **THIS COURT ORDERS** that, except as specifically permitted herein, the Just Energy
Entities are hereby directed, until further Order of this Court: (a) to make no payments of principal,
interest thereon or otherwise on account of amounts owing by any of the Just Energy Entities to
any of their respective creditors as of this date; (b) to grant no security interests, trust, liens, charges
or encumbrances upon or in respect of any of the Property; and (c) to not grant credit or incur
liabilities except in the ordinary course of the Business; provided, however, that the Just Energy
Entities, until further order of this Court, are hereby permitted, subject to the terms of the Definitive
Documents: (i) to reimburse the reasonable documented fees and disbursements of legal counsel
and one financial advisor to the agent under the Credit Agreement, whether incurred before or after
the date of this Order; (ii) to pay all non-default interest and fees to the agent and the lenders under
the Credit Agreement in accordance with its terms; and (iii) to repay advances under the Credit

Agreement for the purpose of creating availability under the Revolving Facilities in order for the Just Energy Entities to request the issuance of Letters of Credit under the Revolving Facilities to continue to operate the Business in the ordinary course during these proceedings, subject to: (A) obtaining the consent of the Monitor with respect to the issuance of the Letters of Credit under the Revolving Facilities; and (B) receipt of written confirmation from the applicable lender(s) under the Credit Agreement that such lender(s) will issue a Letter of Credit of equal value within one (1) Business Day thereafter. Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed thereto in the Credit Agreement.

7.      **THIS COURT ORDERS** that, subject to the terms of the Definitive Documents (as hereinafter defined), the Just Energy Entities shall be entitled but not required to pay the following amounts whether incurred prior to, on or after the date of this Order:

(a)     all outstanding and future wages (including, without limitation, the Q3 bonus described in the Carter Affidavit and any other incentive compensation payable in the ordinary course of business), salaries, commissions, employee benefits, contributions in respect of retirement or other benefit arrangements, vacation pay and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b)     all outstanding and future amounts owing to or in respect of other workers providing services in connection with the Business and payable on or after the date of this Order, incurred in the ordinary course of business and consistent with existing arrangements;

(c)     the fees and disbursements of any Assistants retained or employed by the Just Energy Entities in respect of these proceedings at their standard rates and charges, which, in the case of the Financial Advisor (as defined below) shall be the amounts payable in accordance with the Financial Advisor Agreement (as defined below);

(d)     with the consent of the Monitor in consultation with the agent under the Credit Agreement (or its advisors), amounts owing for goods or services actually provided to any of the Just Energy Entities prior to the date of this Order by third parties, if, in the opinion of the Just Energy Entities, such third party is critical to the Business and ongoing operations of the Just Energy Entities;

(e)     any taxes (including, without limitation, sales, use, withholding, unemployment, and excise) not covered by paragraph 9 of this Order, and whereby the nonpayment of which by any Just Energy Entity could result in a responsible person associated with a Just Energy Entity being held personally liable for such nonpayment; and

(f)     taxes related to revenue, State income or operations incurred or collected by a Just Energy Entity in the ordinary course of business.

8.     **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein and subject to the terms of the Definitive Documents, the Just Energy Entities shall be entitled but not required to pay all reasonable expenses incurred by the Just Energy Entities in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)     all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers' insurance), maintenance and security services; and

(b)     payment for goods or services actually supplied to the Just Energy Entities following the date of this Order.

9.     **THIS COURT ORDERS** that the Just Energy Entities shall remit, in accordance with legal requirements, or pay:

(a)     any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)     all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Just Energy Entities in connection with the sale of goods and services by the Just Energy Entities, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or

collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Just Energy Entities.

**RESTRUCTURING**

10.     **THIS COURT ORDERS** that the Just Energy Entities shall, subject to such requirements as are imposed by the CCAA and subject to the terms of the Definitive Documents, have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their Business or operations; and

(b)     pursue all avenues of refinancing, restructuring, selling and reorganizing the Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing, restructuring, sale or reorganization,

all of the foregoing to permit the Just Energy Entities to proceed with an orderly restructuring of the Just Energy Entities and/or the Business (the "**Restructuring**").

**NO PROCEEDINGS AGAINST THE JUST ENERGY ENTITIES, THE BUSINESS OR THE PROPERTY**

11.     **THIS COURT ORDERS** that until and including March 19, 2021 or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process before any court, tribunal, agency or other legal or, subject to paragraph 12, regulatory body (each, a "**Proceeding**") shall be commenced or continued against or in respect of any of the Just Energy Entities or the Monitor or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, except with the prior written consent of the Just Energy Entities and

the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Just Energy Entities or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

12.     **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental unit, body or agency, foreign regulatory body or agency or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Just Energy Entities or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Just Energy Entities and the Monitor, or leave of this Court, provided that nothing in this Order shall: (i) empower the Just Energy Entities to carry on any business which the Just Energy Entities are not lawfully entitled to carry on, (ii) subject to paragraph 13, affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

13.     **THIS COURT ORDERS** that notwithstanding Section 11.1 of the CCAA, all rights and remedies of provincial energy regulators and provincial regulators of consumer sales that have authority with respect to energy sales against or in respect of the Just Energy Entities or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended during the Stay Period except with the written consent of the Just Energy Entities and the Monitor, or leave of this Court on notice to the Service List.

**NO INTERFERENCE WITH RIGHTS**

14.     **THIS COURT ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Just Energy Entities except with the written consent of the Just Energy Entities and the Monitor, leave of this Court or as permitted under any Commodity ISO/Supplier Support Agreement.

**CONTINUATION OF SERVICES**

15.     **THIS COURT ORDERS** that during the Stay Period, except as permitted under any Commodity ISO/Supplier Support Agreement, all Persons having oral or written agreements with any Just Energy Entity or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Just Energy Entities or the Business, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Just Energy Entities, and that the Just Energy Entities shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case, that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Just Energy Entities in accordance with normal payment practices of the Just Energy Entities or such other practices as may be agreed upon by the supplier or service provider and the applicable Just Energy Entity and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

16.     **THIS COURT ORDERS** that, subject to paragraph 20 but notwithstanding any other paragraphs of this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to any of the Just Energy Entities. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**COMMODITY SUPPLIERS**

17.     **THIS COURT ORDERS** that each Qualified Commodity/ISO Supplier shall be entitled to the benefit of and is hereby granted a charge (together, the "**Priority Commodity/ISO Charge**") on the Property in an amount equal to the value of the Priority Commodity/ISO Obligations. The value of the Priority Commodity/ISO Obligations shall be determined in accordance with the terms of the existing agreements or arrangements between the applicable Just

Energy Entity and the Qualified Commodity/ISO Supplier or, in the event of any dispute, by the Court. The Priority Commodity/ISO Charge shall have the priority set out in paragraphs 43-45 herein.

18.     **THIS COURT ORDERS** that the Commodity/ISO Supplier Support Agreements are hereby ratified, approved and deemed to be Qualified Support Agreements.

19.     **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to execute and deliver Qualified Support Agreements with any counterparty to a Commodity Agreement.

20.     **THIS COURT ORDERS** that upon the occurrence of an event of default under a Qualified Support Agreement, the applicable Qualified Commodity/ISO Supplier may exercise the rights and remedies available to it under its Qualified Support Agreement, or upon five (5) days' notice to the Just Energy Entities, the Monitor and the Service List, may apply to this Court to seek the Court's authorization to exercise any and all of its other rights and remedies against the Just Energy Entities or the Property under or pursuant to its Commodity Agreement or ISO Agreement and the Priority Commodity/ISO Charge, including without limitation, for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Just Energy Entities and for the appointment of a trustee in bankruptcy of the Just Energy Entities.

21.     **THIS COURT ORDERS** that the Monitor shall provide a report on the value of the Priority Commodity/ISO Obligations as of the last day of each calendar month by posting such report on the Monitor's Website (as defined below) within three (3) Business Days of such calendar month end.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

22.     **THIS COURT ORDERS** that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Just Energy Entities with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Just Energy Entities whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Just Energy Entities, if one is

filed, is sanctioned by this Court or is refused by the creditors of the Just Energy Entities or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

23.     **THIS COURT ORDERS** that each of the Just Energy Entities shall jointly and severally indemnify their respective directors and officers against obligations and liabilities that they may incur as directors or officers of the Just Energy Entities after the commencement of the within proceedings, except to the extent that, with respect to any officer or director, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

24.     **THIS COURT ORDERS** that the directors and officers of the Just Energy Entities shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of C$30,000,000, as security for the indemnity provided in paragraph 23 of this Order. The Directors' Charge shall have the priority set out in paragraphs 43-45 herein.

25.     **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (i) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (ii) the Just Energy Entities' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 23.

**APPOINTMENT OF MONITOR**

26.     **THIS COURT ORDERS** that FTI is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Just Energy Entities with the powers and obligations set out in the CCAA or set forth herein and that the Just Energy Entities and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Just Energy Entities pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

27.     **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Just Energy Entities' receipts and disbursements;

(b)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(c)     assist the Just Energy Entities, to the extent required by the Just Energy Entities, in their dissemination to the DIP Agent, the DIP Lenders and their counsel of financial and other information in accordance with the Definitive Documents;

(d)     advise the Just Energy Entities in their preparation of the Just Energy Entities' cash flow statements and reporting required by the DIP Agent and DIP Lenders, which information shall be reviewed with the Monitor and delivered to the DIP Agent and DIP Lenders and their counsel in accordance with the Definitive Documents;

(e)     have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Just Energy Entities, wherever located and to the extent that is necessary to adequately assess the Just Energy Entities' business and financial affairs or to perform its duties arising under this Order;

(f)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(g)     perform such other duties as are required by this Order or by this Court from time to time.

28.     **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

29.     **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

30.     **THIS COURT ORDERS** that the Monitor shall provide any creditor of the Just Energy Entities and the DIP Agent and the DIP Lenders with information provided by the Just Energy Entities in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Just Energy Entities is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may agree.

31.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

32.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor (including both U.S. and Canadian counsel for all purposes of this Order), and counsel to the Just Energy Entities (including both U.S. and Canadian counsel for all purposes of this Order) shall be paid their

reasonable fees and disbursements, in each case at their standard rates and charges, whether incurred prior to, on, or subsequent to the date of this Order, by the Just Energy Entities as part of the costs of these proceedings. The Just Energy Entities are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor, and the Just Energy Entities' counsel on a weekly basis.

33.     **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

**ADMINISTRATION CHARGE**

34.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor and counsel to the Just Energy Entities shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of C$2,200,000 as security for their professional fees and disbursements incurred at their standard rates and charges, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs 43-45 herein.

**DIP FINANCING**

35.     **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to obtain and borrow or guarantee, as applicable, pursuant a credit facility from the DIP Agent and the DIP Lenders in order to finance the Just Energy Entities' working capital requirements and other general corporate purposes, all in accordance with the Cash Flow Statements (as defined in the DIP Term Sheet, which term is defined below) and Definitive Documents, provided that borrowings under such credit facility shall not exceed US$125,000,000 unless permitted by further Order of this Court.

36.     **THIS COURT ORDERS** that such credit facility shall be on the terms and subject to the conditions set forth in the CCAA Interim Debtor-in-Possession Financing Term Sheet between the Just Energy Entities, the DIP Agent and the DIP Lenders dated as of March 9, 2021 and attached as Appendix "DD" to the Carter Affidavit (as may be amended or amended and restated from time to time, the "**DIP Term Sheet**").

37.     **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to execute and deliver such mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively with the DIP Term Sheet and the Cash Flow Statements, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the DIP Agent and the DIP Lenders pursuant to the terms thereof, and the Just Energy Entities are hereby authorized and directed to pay and perform all of the indebtedness, interest, fees, liabilities and obligations to the DIP Agent and the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order. Notwithstanding any other provision in this Order, all payments and other expenditures to be made by any of the Just Energy Entities to any Person (except the Monitor and its counsel) shall be in accordance with the terms of the Definitive Documents, including in respect of payments in satisfaction of Priority Commodity/ISO Obligations.

38.     **THIS COURT ORDERS** that the DIP Agent and the DIP Lenders shall be entitled to the benefit of and are hereby granted a charge (the "**DIP Lenders' Charge**") on the Property, which DIP Lenders' Charge shall not secure an obligation that exists before this Order is made.  The DIP Lenders' Charge shall have the priority set out in paragraphs  43-45 hereof.

39.     **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

(a)      the DIP Agent on behalf of the DIP Lenders may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;

(b)      upon the occurrence of an event of default under any of the Definitive Documents or the DIP Lenders' Charge, the DIP Agent or the DIP Lenders, as applicable, may immediately cease making advances or providing any credit to the Just Energy Entities and shall be permitted to set off and/or consolidate any amounts owing by the DIP Agent or the DIP Lenders to the Just Energy Entities against the obligations of the Just Energy Entities to the DIP Agent and the DIP Lenders under the Definitive Documents or the DIP Lenders' Charge, make demand, accelerate payment and give other notices with respect to the obligations of the Just Energy Entities to the DIP Agent or the DIP Lenders under the Definitive Documents or the DIP Lenders' Charge, or to apply to

this Court on five (5) days' notice to the Just Energy Entities, the Monitor and the Service List to seek the Court's authorization to exercise any and all of its other rights and remedies against the Just Energy Entities or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Just Energy Entities and for the appointment of a trustee in bankruptcy of the Just Energy Entities; and

(c)     the foregoing rights and remedies of the DIP Agent and the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Just Energy Entities or the Property.

40.     **THIS COURT ORDERS AND DECLARES** that the DIP Agent, the DIP Lenders and the Qualified Commodity/ISO Suppliers shall be treated as unaffected in any plan of arrangement or compromise filed by the Applicants or any of them under the CCAA, or any proposal filed by the Applicants or any of them under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents.

**APPROVAL OF FINANCIAL ADVISOR AGREEMENT**

41.     **THIS COURT ORDERS** that the agreement dated February 20, 2021 engaging BMO Nesbitt Burns Inc. (the "**Financial Advisor**") as financial advisor to the Just Energy Entities and attached as Confidential Appendix "FF" to the Carter Affidavit (the "**Financial Advisor Agreement**"), and the retention of the Financial Advisor under the terms thereof, is hereby ratified and approved and the Just Energy Entities are authorized and directed *nunc pro tunc* to make the payments contemplated thereunder in accordance with the terms and conditions of the Financial Advisor Agreement.

42.     **THIS COURT ORDERS** that the Financial Advisor shall be entitled to the benefit of and is hereby granted a charge (the "**FA Charge**") on the Property, which charge shall not exceed an aggregate amount of C$1,800,000 as security for the fees and disbursements and other amounts payable under the Financial Advisor Agreement, both before and after the making of this Order in respect of these proceedings. The FA Charge shall have the priority set out in paragraphs  43-45 herein.

## VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER

43. **THIS COURT ORDERS** that the priorities of the Administration Charge, the FA Charge, the Directors' Charge, the DIP Lenders' Charge and the Priority Commodity/ISO Charge, as among them, shall be as follows:

> First – Administration Charge and FA Charge (to the maximum amount of C$2,200,000 and C$1,800,000, respectively), on a *pari passu* basis;

> Second – Directors' Charge (to the maximum amount of C$30,000,000); and

> Third – DIP Lenders' Charge (to the maximum amount of the Obligations (as defined in the DIP Term Sheet) owing thereunder at the relevant time) and the Priority Commodity/ISO Charge, on a *pari passu* basis.

44. **THIS COURT ORDERS** that the filing, registration or perfection of the Administration Charge, the FA Charge, the Directors' Charge, the DIP Lenders' Charge or the Priority Commodity/ISO Charge (collectively, the "**Charges**") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

45. **THIS COURT ORDERS** that each of the Charges shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests, trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person (including those commodity suppliers listed in Schedule "A" hereto), other than any Person with a properly perfected purchase money security interest under the *Personal Property Security Act* (Ontario) or such other applicable legislation that has not been served with notice of this Order.

46. **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court on notice to parties in interest, the Just Energy Entities shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges unless the Just Energy Entities also obtain the prior written consent of the Monitor, the DIP Agent on behalf of the DIP Lenders and the beneficiaries of the Administration Charge, the

FA Charge, the Directors' Charge and the Priority Commodity/ISO Charge, or further Order of this Court.

47.     **THIS COURT ORDERS** that the Charges, the agreements and other documents governing or otherwise relating to the obligations secured by the Charges, and the Definitive Documents shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Agent or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan document, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds any of the Just Energy Entities and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by any Just Energy Entity of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Just Energy Entities entering into the DIP Term Sheet, the creation of the Charges or the execution, delivery or performance of any of the other Definitive Documents; and

(c)     the payments made by the Just Energy Entities pursuant to this Order or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

48.     **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Just Energy Entities' interest in such real property leases.

**SERVICE AND NOTICE**

49.     **THIS COURT ORDERS** that the Monitor shall (i) without delay, publish in The Globe and Mail (National Edition) and the Wall Street Journal a notice containing the information prescribed under the CCAA, (ii) within five days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, or cause to be sent, in the prescribed manner or by electronic message to the e-mail addresses as last shown on the records of the Just Energy Entities, a notice to every known creditor who has a claim against the Just Energy Entities of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder, provided that the Monitor shall not make the claims, names and addresses of the individuals who are creditors publicly available.

50.     **THIS COURT ORDERS** that the Monitor shall create, maintain and update as necessary a list of all Persons appearing in person or by counsel in this proceeding (the "**Service List**"). The Monitor shall post the Service List, as may be updated from time to time, on the Monitor's website as part of the public materials to be recorded thereon in relation to this proceeding. Notwithstanding the foregoing, the Monitor shall haven o liability in respect of the accuracy of or the timeliness of making any changes to the Service List.

51.     **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website at http://www.ontariocourts.ca//scj/practice/practice-directions/toronto/eservice-commercial/) shall be valid and effective service. Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission. This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL - http://cfcanada.fticonsulting.com/justenergy (the "**Monitor's Website**").

52.     **THIS COURT ORDERS** that the Just Energy Entities, the DIP Agent or the DIP Lenders and the Monitor and their respective counsel are at liberty to serve or distribute this Order, any

other materials and orders as may be reasonably required in these proceedings, including any notices, or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal deliver, facsimile or other electronic transmission to the Just Energy Entities' creditors or other interested parties and their advisors and that any such service, distribution or notice shall be deemed to be received: (a) if sent by courier, on the next business day following the date of forwarding thereof, (b) if delivered by personal delivery or facsimile or other electronic transmission, on the day so delivered, and (c) if sent by ordinary mail, on the third business day after mailing. For greater certainty, any such distribution or service shall be deemed to be in satisfaction of a legal or judicial obligation, and notice requirements within the meaning of clause 3(c) of the *Electronic Commerce Protection Regulations*, Reg. 81000-2-175 (SOR/DORS).

**FOREIGN PROCEEDINGS**

53. **THIS COURT ORDERS** that the Applicant, Just Energy Group Inc. ("**JEGI**") is hereby authorized and empowered, but not required, to act as the foreign representative (in such capacity, the "**Foreign Representative**") in respect of the within proceedings for the purpose of having these proceedings recognized and approved in a jurisdiction outside of Canada.

54. **THIS COURT ORDERS** that the Foreign Representative is hereby authorized to apply for foreign recognition and approval of these proceedings, as necessary, in any jurisdiction outside of Canada, including in the United States pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

**GENERAL**

55. **THIS COURT ORDERS** that any interested party that wishes to amend or vary this Order shall be entitled to appear or bring a motion before this Court on a date to be set by this Court upon the granting of this Order (the "**Comeback Date**"), and any such interested party shall give not less than two (2) business days' notice to the Service List and any other party or parties likely to be affected by the Order sought in advance of the Comeback Date; provided, however, that the Chargees, the DIP Agent and the DIP Lenders shall be entitled to rely on this Order as issued and entered and on the Charges and priorities set out in paragraphs 43-45 hereof, including with respect to any fees, expenses and disbursements incurred and in respect of advances made under the Definitive Documents or pursuant to the Qualified Support Agreement, as applicable, until the

date this Order may be amended, varied or stayed. For the avoidance of doubt, no payment in respect of any obligations secured by the Priority Commodity/ISO Charge shall be subject to the terms of any intercreditor agreement, including any "turnover" or "waterfall" provision(s) therein.

56.     **THIS COURT ORDERS** that, notwithstanding paragraph 55 of this Order, the Just Energy Entities or the Monitor may from time to time apply to this Court to amend, vary or supplement this Order or for advice and directions in the discharge of their powers and duties under this Order or in the interpretation or application of this Order.

57.     **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Just Energy Entities, the Business or the Property.

58.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body or agency having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Just Energy Entities, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies and agencies are hereby respectfully requested to make such orders and to provide such assistance to the Just Energy Entities and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to JEGI, in any foreign proceeding, or to assist the Just Energy Entities and the Monitor and their respective agents in carrying out the terms of this Order.

59.     **THIS COURT ORDERS** that each of the Just Energy Entities and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body or agency, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that JEGI is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

60.     **THIS COURT ORDERS** that Confidential Appendices "FF" and "GG" to the Carter Affidavit shall be and are hereby sealed, kept confidential and shall not form part of the public record pending further Order of this Court.

61.    **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order.

_____

## SCHEDULE "A"

### JE Partnerships

**Partnerships:**

- JUST ENERGY ONTARIO L.P.

- JUST ENERGY MANITOBA L.P.

- JUST ENERGY (B.C.) LIMITED PARTNERSHIP

- JUST ENERGY QUÉBEC L.P.

- JUST ENERGY TRADING L.P.

- JUST ENERGY ALBERTA L.P.

- JUST GREEN L.P.

- JUST ENERGY PRAIRIES L.P.

- JEBPO SERVICES LLP

- JUST ENERGY TEXAS LP

**Commodity Suppliers:**

- EXELON GENERATION COMPANY, LLC

- BRUCE POWER L.P.

- SOCIÉTÉ GÉNÉRALE

- EDF TRADING NORTH AMERICA, LLC

- NEXTERA ENERGY POWER MARKETING, LLC

- MACQUARIE BANK LIMITED

- MACQUARIE ENERGY CANADA LTD.

- MACQUARIE ENERGY LLC

- MORGAN STANLEY CAPITAL GROUP

## SCHEDULE "B"

## DEFINITIONS

"**Commodity Agreement**" means a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas, electricity or environmental derivative products.

"**ISO Agreement**" means an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

"**Priority Commodity/ISO Obligation**" amounts that are due and payable, at the applicable time, for: (i)(A) the physical supply of electricity or gas that has been delivered on or after March 9, 2021; (B) financial settlements on or after March 9, 2021; and (C) amounts owing under a confirmation or transaction that was executed on or after March 9, 2021 pursuant to a Commodity Agreement as a result of the termination thereof in accordance with the applicable Qualified Support Agreement; and (ii) for services actually delivered by a Qualified Commodity/ISO Supplier on or after March 9, 2021 pursuant to an ISO Agreement (but for greater certainty, excluding any amount owing for ISO services provided under the BP ISO Agreement on or before the date of this Order, whether or not yet due).

"**Qualified Commodity/ISO Supplier**" means any counterparty to a Commodity Agreement or ISO Agreement as of March 9, 2021 that has executed or executes a Qualfied Support Agreement with a Just Energy Entity and refrained from exercising termination rights under the Commodity Agreement as a result of the commencement of the Proceedings absent an event of default under such Qualfied Support Agreement.

"**Qualified Support Agreement**" means a support agreement between a Just Energy Entity and a counterparty to a Commodity Agreement, in form and substance satisfactory to the Just Energy Entities and the DIP Lenders, acting reasonably, which includes, among other things: (i) that such counterparty shall apply to the Court on five (5) days' notice to the Just Energy Entities, the Monitor and the Service List prior to exercising any termination rights under a Qualified Support Agreement; (ii) the obligation to supply physical and financial power and natural gas and other

related services pursuant to any confirmations or transactions executed pursuant to a Commodity Agreement; and (iii) an agreement to refrain from exercising termination rights as a result of the commencement of the Proceedings absent an event of default under such support agreement.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED

Court File No: CV-19-

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF JUST ENERGY GROUP INC., et al (collectively, the "**Applicants**")

---

*Ontario*
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

Proceeding commenced at Toronto

---

**INITIAL ORDER**

**OSLER, HOSKIN & HARCOURT, LLP**
P.O. Box 50, 1 First Canadian Place
Toronto, ON M5X 1B8

Marc Wasserman (LSO# 44066M)
Michael De Lellis (LSO# 48038U)
Jeremy Dacks (LSO# 41851R)

Tel: (416) 362-2111
Fax: (416) 862-6666

Lawyers for the Applicants

LEGAL_1:65800321 17

**SCHEDULE F**

**DIP AGENT PROVISIONS**

[see attached]

SCHEDULE F

**DIP Agent Provisions**

(i)  <u>Appointment of DIP Agent</u>.

(a)  Each of the Lenders hereby irrevocably appoints Alter Domus (US) LLC and its successors to serve as administrative agent and collateral agent under the Loan Documents, and authorizes the DIP Agent to execute, deliver and administer the Loan Documents and to take such actions and to exercise such powers as are delegated to the DIP Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto. In addition, to the extent required under the laws of any jurisdiction other than the United States of America, each of the Lenders hereby grants to the DIP Agent any required powers of attorney to execute any security agreement or other instrument or document that is executed and delivered to secure the Obligations governed by the laws of such jurisdiction on such Lender's behalf. Neither the Borrowers nor any other Loan Party shall have rights as a third-party beneficiary of any such provisions.

(b)  The Person serving as the DIP Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the DIP Agent, and such Person and its affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrowers or any other subsidiary or other affiliate thereof as if such Person were not the DIP Agent hereunder and without any duty to account therefor to the Lenders.

(ii)  <u>Nature of Duties; Delegation</u>.

(a)  The DIP Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (i) the DIP Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or an Event of Default has occurred and is continuing (and it is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the DIP Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any requirement of law, and that such term is used as a matter of market custom and is intended to create or reflect only an administrative relationship between contracting parties), (ii) the DIP Agent shall not have any duty to take any discretionary action or to exercise any discretionary power, except discretionary rights and powers expressly contemplated by the Loan Documents that the DIP Agent is required to exercise as directed in writing by the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the DIP Agent shall believe in good faith to be necessary, under the circumstances as provided in the DIP Loan Documents); <u>provided</u> that the DIP Agent shall not be required to take any action that, in its opinion, could expose the DIP Agent to liability or be contrary to any Loan Document or any requirement of law, and (iii) except as expressly set forth in the Loan Documents, the DIP Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrowers, any other subsidiary or any other affiliate of any of the foregoing that is communicated to or obtained by the Person serving as DIP Agent or any of its afiliates in any capacity. The DIP Agent shall not be liable to any Person for any action taken or not taken by it with

the consent or at the request of the Majority Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the DIP Agent shall believe in good faith to be necessary, under the circumstances as provided in the Loan Documents) or in the absence of its own gross negligence or willful misconduct (such absence to be presumed unless otherwise determined by a court of competent jurisdiction by a final and nonappealable judgment); provided, that, no action taken or not taken at the direction of the Majority Lenders shall be considered gross negligence or willful misconduct. The DIP Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof (conspicuously stating that it is a "notice of default" and providing sufficient detail of such Default) is given to the DIP Agent by a Borrower or a Lender, and the DIP Agent shall not be responsible for or have any duty to ascertain or inquire into (A) any statement, warranty or representation made in or in connection with any Loan Document, (B) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (C) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or the occurrence of any Default, (D) the sufficiency, validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, or (E) the satisfaction of any condition set forth in this Term Sheet or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the DIP Agent or satisfaction of any condition that expressly refers to the matters described therein being acceptable or satisfactory to the DIP Agent. The DIP Agent shall be entitled to rely, and shall not incur any liability for relying, upon any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof). The DIP Agent also shall be entitled to rely, and shall not incur any liability for relying, upon any statement made to it orally or by telephone and believed by it to be made by the proper Person (whether or not such Person in fact meets the requirements set forth in the Loan Documents for being the signatory, sender or authenticator thereof), and may act upon any such statement prior to receipt of written confirmation thereof. In determining compliance with any condition hereunder to the making of an Advance that by its terms must be fulfilled to the satisfaction of a Lender, the DIP Agent may presume that such condition is satisfactory to such Lender unless the DIP Agent shall have received written notice to the contrary from such Lender prior to the making of such Advance. The DIP Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

(b)    The DIP Agent may perform any of and all its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the DIP Agent. The DIP Agent and any such sub-agent may perform any of and all their duties and exercise their rights and powers through their respective Related Parties. The exculpatory provisions of this clause (ii) shall apply to any such sub-agent and to the Related Parties of the DIP Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as DIP Agent. The DIP Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the

DIP Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

(iii)   <u>Successor Agent</u>.

(a)   Subject to the terms of this clause (iii), the DIP Agent may resign at any time from its capacity as such. In connection with such resignation, the DIP Agent shall give notice of its intent to resign to the Lenders and the Borrowers. Upon receipt of any such notice of resignation, the Majority Lenders shall have the right, in consultation with the Borrowers, to appoint a successor. If no successor shall have been so appointed by the Majority Lenders and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its intent to resign, then the retiring DIP Agent may, on behalf of the Lenders, appoint a successor DIP Agent, which shall be (i) a bank with an office in New York, New York, or an affiliate of any such bank, (ii) a Lender or (iii) any other Person with the prior written consent of the Majority Lenders. Upon the acceptance of its appointment as DIP Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent, and the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents. The fees payable by the Borrowers to a successor DIP Agent shall be the same as those payable to its predecessor unless otherwise agreed by the Borrowers and such successor.

(b)   Notwithstanding the foregoing, in the event no successor DIP Agent shall have been so appointed and shall have accepted such appointment within 30 days after the retiring DIP Agent gives notice of its intent to resign, the retiring DIP Agent may give notice of the effectiveness of its resignation to the Lenders and the Borrowers, whereupon, on the date of effectiveness of such resignation stated in such notice, (i) the retiring DIP Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; <u>provided</u> that, solely for purposes of maintaining any security interest granted to the DIP Agent for the benefit of the Lenders, the retiring DIP Agent shall continue to be vested with such security interest as collateral agent for the benefit of the Lenders and, in the case of any Collateral in the possession of the DIP Agent, shall continue to hold such Collateral, in each case until such time as a successor DIP Agent is appointed and accepts such appointment in accordance with this paragraph (it being understood and agreed that the retiring DIP Agent shall have no duty or obligation to take any further action with respect to the Collateral, including any action required to maintain the perfection of any such security interest), and (ii) the Majority Lenders shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring DIP Agent; <u>provided</u> that (A) all payments required to be made hereunder or under any other Loan Document to the DIP Agent for the account of any Person other than the DIP Agent shall be made directly to such Person and (B) all notices and other communications required or contemplated to be given or made to the DIP Agent shall also directly be given or made to each DIP Lender.

(c)   Following the effectiveness of the DIP Agent's resignation from its capacity as such, the provisions of this <u>Schedule F</u>, as well as any exculpatory, reimbursement and indemnification provisions set forth in any other Loan Document, shall continue in effect for the benefit of such retiring DIP Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as DIP Agent and in respect of the matters referred to in the proviso under clause (i) in clause (iii)(b) above.

(iv)     Non-Reliance on DIP Agent; DIP Lender Consent.

      (a)     Each Lender acknowledges that it has, independently and without reliance upon the DIP Agent or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Term Sheet. Each Lender also acknowledges that it will, independently and without reliance upon the DIP Agent or any other Lender, or any of the Related Parties of any of the foregoing, and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Term Sheet, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

      (b)     Each Lender shall be deemed to have acknowledged receipt of, and consented to and approved, each  Loan Document and each other document required to be delivered to, or be approved by or satisfactory to, the DIP Agent or the Lenders on the Closing Date.

(v)     Collateral Matters.

      (a)     Except with respect to a Lender's right to file a proof of claim in an insolvency proceeding, no Lender (other than the DIP Agent in its capacity as such) shall have any right individually to realize upon any of the Collateral or to enforce any guarantee of the Obligations, it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the DIP Agent on behalf of the Lenders in accordance with the terms thereof. In the event of a foreclosure by the DIP Agent on any of the Collateral pursuant to a public or private sale or other disposition, the DIP Agent or any Lender may be the purchaser or licensor of any or all of such Collateral at any such sale or other disposition, and the DIP Agent, as agent for and representative of the Lenders (but not any Lender or Lenders in its or their respective individual capacities unless the Majority Lenders shall otherwise agree in writing) shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such public sale, to use and apply any of the Obligations as a credit on account of the purchase price for any collateral payable by the DIP Agent on behalf of the Lenders at such sale or other disposition.

      (b)     The DIP Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the DIP Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the DIP Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

(vi)     Lender Indemnification.  To the extent the DIP Agent (or any sub-agent) or any affiliate thereof (each a "**DIP Agent Indemnitee**") is not timely reimbursed and indemnified by the Loan Parties, each Lender shall indemnify, reimburse and hold harmless the DIP Agent Indemnitees, based on and to the extent of such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought), from and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses (including reasonable and documented or invoiced out-of-pocket fees and expenses of a primary counsel for the DIP Agent Indemnitees, taken as a whole (in addition to, in the event of an actual conflict of interest that arises, one additional counsel (plus one local counsel in each relevant material jurisdiction) for the conflicted Agent Indemnitees, taken as a whole)) or disbursements of whatsoever kind or nature which may be imposed on, asserted against or

incurred by the DIP Agent Indemnitees in connection with any action taken or omitted to be taken by the DIP Agent Indemnitees or under any Loan Document or in any way relating to or arising out of the Term Sheet or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from a DIP Agent Indemnitee's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision) (it being understood and agreed that no action nor any omission to act taken by the DIP Agent at the direction of the Majority Lenders shall constitute gross negligence or willful misconduct). For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the outstanding Advances and unused Commitments at such time (or if such indemnity payment is sought after the date on which the Obligations have been paid in full and the Commitments are terminated in accordance with such Lender's pro rata share immediately prior to the date on which the Obligations are paid in full and the Commitments are terminated).

(vii)   <u>No Third Party Beneficiaries</u>. The provisions of this <u>Schedule F</u> are solely for the benefit of the DIP Agent and the Lenders, and, except solely to the extent of the Borrower's rights to consent pursuant to and subject to the conditions set forth in this <u>Schedule F</u>, none of the Borrowers or any other Loan Party shall have any rights as a third party beneficiary of any such provisions. Each Lender, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the guarantees of the Obligations provided under the Loan Documents, to have agreed to the provisions of this <u>Schedule F</u>.

# SCHEDULE G

# REPRESENTATIONS AND WARRANTIES

## 22. Representations and Warranties

As of the Closing Date, each Borrower represents and warrants to the DIP Agent and each Lender and acknowledges and confirms that the DIP Agent and each Lender is relying upon such representations and warranties:

(1)        Existence and Qualification  Subject to any restrictions arising on account of any Loan Party's protected status under the CCAA Proceedings (and only so long as such status exists), each Loan Party (i) has been duly incorporated, formed, amalgamated, merged or continued, as the case may be, and is validly subsisting as a corporation, company, limited liability company, partnership or trust, under the laws of its jurisdiction of formation, amalgamation, merger or continuance, as the case may; and (ii) is duly qualified, in good standing and has all required Material Licences to carry on its business in each jurisdiction in which the nature of its business requires qualification to the extent necessary to carry on its business.

(2)        Power and Authority  Subject to the entry of, and the terms of, the *CCAA* Orders and to any restrictions arising solely on account of any Loan Party's protected status under the *CCAA* Proceedings (and only so long as such status exists), each Loan Party has the corporate, trust, company, limited liability company or partnership power and authority, as the case may be, (i) to enter into, and to exercise its rights and perform its obligations under, the Loan Documents to which it is a party and all other instruments and agreements delivered by it pursuant to any of the Loan Documents, and (ii) to own its Property and carry on its business as currently conducted and as currently proposed to be conducted by it.

(3)        Execution, Delivery, Performance and Enforceability of Documents  Subject to the entry of, and the terms of, the *CCAA* Orders and to any restrictions arising solely on account of any Loan Party's protected status under the *CCAA* Proceedings (and only so long as such status exists), the execution, delivery and performance of each of the Loan Documents to which each Loan Party is a party, and every other instrument or agreement delivered by an Loan Party pursuant to any Loan Document has been duly authorized by all corporate, trust, company or partnership actions required, and each of such documents has been duly executed and delivered.  Each Loan Document to which any Loan Party is a party, upon entry of the *CCAA* Orders, constitutes the legal, valid and binding obligations of such Loan Party, enforceable against such Loan Party in accordance with its terms (except, in any case, as such enforceability may be limited by applied bankruptcy, insolvency, reorganization or similar laws affecting creditors' rights generally and by principles of equity).

(4)        Loan Documents Comply with Applicable Laws, Organizational Documents and Contractual Obligations  Subject to the entry of the CCAA Orders, none of the execution or delivery of, the consummation of the transactions contemplated in, or compliance with the terms, conditions and provisions of any of, the Loan Documents conflicts with or will conflict with, or results or will result in any breach of, or constitutes a default under or contravention of, (a) any Loan Parties' Organizational Document, (b) any Material Contract or Material Licence, (c) any Requirement of Law other than immaterial breaches or (d) results or will result in the creation or imposition of any Lien upon any of its Property that is not a Permitted Lien.

(5)        Consent Respecting Loan Documents  Each Loan Party has, obtained, made or taken all consents, approvals, authorizations, declarations, registrations, filings, notices and other actions whatsoever required with Governmental Authorities, third parties or otherwise to enable it to execute and deliver each of the Loan Documents to which it is a party and to consummate the transactions contemplated in the Loan Documents, other than the approvals, clarifications or authorizations of the Governmental Authorities (including, without limitation, the Reserve Bank of India) required under the laws of India for the execution and delivery by JEBPO of the Guarantee and the Security Documents to which it is a party, and the performance by JEBPO of its obligations thereunder.

(6)    Taxes  Except for those Taxes the nonpayment of which is excused, permitted, or required by the *CCAA* Proceedings or chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**"), each Loan Party has timely paid, or made adequate provision for the payment of, all Taxes that are due and payable, or has accrued amounts in its financial statements for the payment of such Taxes, regardless of whether they are shown to be payable on a Tax Return, except for any such taxes, charges, fees or dues (i) which are not material in amount, (ii) which are not delinquent or if delinquent are being contested, in good faith, or (iii)  in respect of which non-payment would not individually or in the aggregate have, or be reasonably likely to cause, a Material Adverse Effect. There is no action, suit, proceeding, investigation or audit or claim now pending or, to its knowledge, threatened in writing by any Governmental Authority regarding any Taxes, nor has it or any other Loan Party agreed to waive or extend any statute of limitations with respect to the payment or collection of Taxes, in each case, which would individually or in the aggregate have, or be reasonably likely to cause, a Material Adverse Effect. Except for those Taxes, the nonpayment of which is excused, permitted or required by the *CCAA* Proceedings or the Bankruptcy Code, each Loan Party has duly and timely withheld or collected all material Taxes required to be withheld or collected by it (including in connection with amounts paid to employees, non-residents of Canada, independent contractors, creditors, shareholders or other third parties) and has duly and timely remitted such material Taxes to the appropriate Governmental Authority when required by Law to do so, except for (i) any such taxes which are not delinquent or if delinquent are being contested in good faith, or (ii) in respect of which the failure to withhold, collect or remit would not individually or in the aggregate have, or be reasonably likely to cause, a Material Adverse Effect. For all transactions between a Loan Party that is a resident of Canada for purposes of the Tax Act and any person not resident in Canada for purpose of the Tax Act and with whom such Loan Party was not dealing arm's length, the Loan Party has made or obtained records or documents that meet the requirements of paragraphs 247(4)(a) to (c) of the Tax Act. Any Loan Party that is a corporate partner of the Canadian Borrower is not controlled by a person or by a group of non-resident persons who do not deal at arm's length with each other.

(7)    Judgments, Etc.  At the date given, other than pursuant to the *CCAA* Proceedings, no Loan Party is subject to any judgment, order, writ, injunction, decree or award, or to any restriction, rule or regulation (other than customary or ordinary course restrictions, rules and regulations consistent or similar with those imposed on other Persons engaged in similar businesses) which has not been lifted or stayed.

(8)    Absence of Litigation  Other than the CCAA Proceedings, there are no actions, suits or proceedings pending or, to the best of its knowledge and belief, after due inquiry and all reasonable investigation, threatened against or involving any Loan Party, (i) which would reasonably be expected to have a Material Adverse Effect or (ii) that involve this Term Sheet or the other Loan Documents, in each case, which are not subject to the *CCAA* Stay.

(9)    Title to Assets  Each Loan Party has good title to its assets, free and clear of all Liens except Permitted Liens and defects in title which are not material in nature to the conduct of any Loan Party's business, and no Person has any agreement or right to acquire an interest in such assets other than in the ordinary course of its business.  The Pledged Securities constitute all of the equity interests held by each Loan Party in any other Loan Party.

(10)    Liens  Subject to entry of the *CCAA* Orders, the DIP Facility Charge and the Liens created in favor of the DIP Agent under the Security Documents create valid, binding and perfected Liens on all right, title and interest in all of the Property which is the subject matter of the Security Documents and those Liens have priority over all other present and future Liens except for Permitted Priority Liens.

(11)    Use of Real Property  All real property material to the business of the Loan Party owned or leased by each Loan Party may be used by such Loan Party pursuant to Applicable Law for the present use and operation of the material elements of the business conducted, or intended to be conducted, on such real property by such Loan Party.

(12)    Insurance  Each Loan Party maintains insurance which is in full force and effect that complies with all of the requirements of the Original Senior Credit Agreement as of September 28, 2020.

(13)    Labour Relations  No Loan Party is engaged in any material unfair labour practice or material employment discrimination practice, and there is no material unfair labour practice complaint or material complaint

of employment discrimination pending against an Loan Party, or to its knowledge threatened against an Loan Party, before any Governmental Authority. To the best of its knowledge, no material grievance or arbitration arising out of or under any collective bargaining agreement is pending against an Loan Party or, to the best of its knowledge, threatened against an Loan Party, no strike, labour dispute, slowdown or stoppage is pending against an Loan Party or, to the best of its knowledge, threatened against an Loan Party and no union representation proceeding is pending with respect to any of an Loan Party's employees.

(14) <u>Compliance with Laws</u> No Loan Party is in material violation of any material Applicable Law or material Applicable Order, subject to the provisions of Section 21(27), in the case of Requirements of Environmental Law.

(15) <u>No Event of Default or Pending Event of Default</u> Other than as a result of the *CCAA* Proceedings, neither any Event of Default nor any Pending Event of Default has occurred and is continuing.

(16) <u>Corporate Structure</u> The corporate structure of the Borrowers and their subsidiaries is as set out in Schedule 22(16) to this Term Sheet.

(17) <u>Rights to Acquire Shares of Loan Parties</u> No Person has an agreement or option or any other right or privilege (whether by law, pre-emptive or contractual) capable of becoming an agreement or option, including convertible securities, warrants or convertible obligations of any nature, for the purchase, subscription, allotment or issuance of any unissued shares in the capital of any Loan Party (other than Just Energy Group Inc., a Canada corporation ("**JustEnergy**")).

(18) <u>Loan Parties</u> Each Loan Party either carries on their Business in Canada, the United States, India or Hungary, or carries on no business other than being a holding entity.

(19) <u>Relevant Jurisdictions</u> Schedule 22(19) to this Term Sheet identifies, in respect of each Loan Party, the Relevant Jurisdictions as of the Closing Date including each Loan Party's jurisdiction of formation and organizational registration number (if any), its full address (including postal code or zip code), chief executive office, registered office and all places of business and, if the same is different, the address at which the books and records of such Loan Party are located and the address from which the invoices and accounts of such Loan Party are issued.

(20) <u>Computer Software</u> Each Loan Party owns or has licensed for use or otherwise has the right to use all of the material software necessary to conduct its businesses. All Computer Equipment owned or used by an Loan Party and necessary for the conduct of business has been properly maintained in all material respects or replaced and is in good working order for the purposes of on-going operation, subject to ordinary wear and tear for Computer Equipment of comparable age and Computer Equipment which has been damaged but is in the course of being repaired.

(21) <u>Intellectual Property</u> Each Loan Party has rights sufficient for it to use all the Intellectual Property reasonably necessary for the conduct of its business except to the extent failure to do so would not reasonably be expected to have a Material Adverse Effect; all patents, trade-marks or industrial designs which have been either registered or in respect of which a registration application has been filed by it are listed on Schedule 22(21) to this Term Sheet. To its knowledge, no Loan Party is infringing or misappropriating or is alleged to be infringing or misappropriating the intellectual property rights of any other Person where such infringement or misappropriation is reasonably expected to have a Material Adverse Effect.

(22) <u>Material Contracts and Material Licences</u>.

(a) Schedule 22(22) to this Term Sheet, accurately sets out all Material Contracts and Material Licences;

(b) upon request by the DIP Agent (acting at the direction of Majority Lenders), a true and complete certified copy of each Material Contract and Material Licence has been or, within 30 days of its

entry into effect, will be delivered to the DIP Agent and each Material Contract and Material Licence is in full force and effect; and

(c)     each Material Contract is binding upon the Loan Party party thereto and, to its knowledge, is a binding agreement of each other Person who is a party to the Material Contract.

(23)     <u>Financial Year End</u>  The financial year end of the Loan Parties is March 31.

(24)     <u>Financial Information</u>  All of the financial statements which have been furnished to the Lenders in connection with this Term Sheet are complete in all material respects and such financial statements fairly present the results of operations and financial position of the Borrowers and the Guarantors as of the dates referred to therein and have been prepared on a Modified Consolidated Basis, except that, in the case of quarterly financial statements, notes to the statements and audit adjustments required by GAAP are not included.  All other financial information (including, without limitation the Cash Flow Statements) provided to the Lenders as of the date prepared (a) were based on reasonable assumptions and expectations and represent reasonable good faith estimates and (b) were believed to be achievable.

(25)     <u>Liabilities</u>  No Loan Party has any liabilities, whether accrued, absolute, contingent or otherwise, of any kind or nature whatsoever, except (i) as disclosed in the financial statements most recently delivered under Section 22(30); (ii) as incurred after the date of such financial statements and are permitted to be incurred hereunder; (iii) as incurred in the ordinary course of business of an Loan Party; provided that, in respect this clause (iii), such liabilities: (x) are not material to the Business, (y) are not required in accordance with GAAP to be disclosed in such Loan Party's financial statements referred to in clause (i) above and (z) are not incurred in violation of this Term Sheet, and (iv) for liabilities consented to by the Lenders.

(26)     <u>No Material Adverse Effect</u>  Since the Closing Date and other than as a result of the *CCAA* Proceedings or the Chapter 15 Proceedings, or the events giving rise thereto, there has been no condition (financial or otherwise), event or change in its business, liabilities, operations, results of operations, assets or prospects which would reasonably be expected to have a Material Adverse Effect.

(27)     <u>Environmental</u>  (a) No Loan Party is subject to any civil or criminal proceeding relating to Requirements of Environmental Laws and is not aware of any investigation or threatened proceeding or investigation, (b) each Loan Party has all material permits, licenses, registrations and other authorizations required by the Requirements of Environmental Laws for the operation of its business and the properties which it owns, leases or otherwise occupies, (c) each Loan Party currently operates its business and its properties (whether owned, leased or otherwise occupied) in compliance in all material respects with all applicable material Requirements of Environmental Laws, (d) no Hazardous Substances are stored or disposed of by any Loan Party or otherwise used by an Loan Party in violation of any applicable Requirements of Environmental Laws (including, without limitation, there has been no Release of Hazardous Substances by any Loan Party at, on or under any property now or previously owned or leased by the Borrowers or any of their subsidiaries), (e) except as disclosed in the environmental reports identified on Schedule 22(27) to this Term Sheet, to the knowledge of the Borrowers (i) all underground storage tanks now or previously located on any real property owned or leased by it have been operated, maintained and decommissioned or closed, as applicable, in compliance with applicable Requirements of Environmental Law; and (ii) no real property or groundwater in, on or under any property now or previously owned or leased by any Loan Party is or has been during such Loan Party's ownership or occupation of such property contaminated by any Hazardous Substance except for any contamination that would not reasonably be expected to give rise to material liability under Requirements of Environmental Laws nor, to the best of its knowledge, is any such property named in any list of hazardous waste or contaminated sites maintained under the Requirements of Environmental Law.

(28)     <u>CERCLA</u>  No portion of any Loan Party's Property has been listed, designated or identified in the National Priorities List or the CERCLA Information System both as published by the United States Environmental Protection Agency, or any similar list of sites published by any federal, state or local authority proposed for requiring clean up or remedial or corrective action under any Requirements of Environmental Laws.

(29)  <u>Canadian Welfare and Pension Plans</u>  The Canadian Borrower has adopted all Canadian Welfare Plans and all Canadian Pension Plans in accordance with Applicable Laws and each such plan has been maintained and is in compliance in all material respects with its terms and such laws including, without limitation, all requirements relating to employee participation, funding, investment of funds, benefits and transactions with the Loan Parties and persons related to them.  As of the commencement of the CCAA Proceedings (the **"CCAA Filing Date"**) and at no time preceding the CCAA Filing Date has any Loan Party maintained, sponsored, administered, contributed to, or participated in a Specified Canadian Pension Plan.  With respect to Canadian Pension Plans:  (a) no steps have been taken to terminate any Canadian Pension Plan (wholly or in part) which could result in any Loan Party being required to make an additional contribution in excess of $2,500,000 to the Canadian Pension Plan; (b) no contribution failure in excess of $2,500,000 has occurred with respect to any Canadian Pension Plan sufficient to give rise to a lien or charge under any applicable pension benefits laws of any other jurisdiction; and (c) no condition exists and no event or transaction has occurred with respect to any Canadian Pension Plan which is reasonably likely to result in any Loan Party incurring any liability, fine or penalty in excess of $2,500,000.  No Loan Party has a contingent liability in excess of $2,500,000 with respect to any post-retirement benefit under a Canadian Welfare Plan.  With respect of each Canadian Pension Plan: (a) all contributions (including employee contributions made by authorized payroll deductions or other withholdings) required to be made to the appropriate funding agency in material compliance with all Applicable Laws and the terms of each Pension Plan have been made in accordance with all Applicable Laws and the terms of each Canadian Pension Plan; and (b) no event has occurred and no conditions exist with respect to any Canadian Pension Plan that has resulted or could reasonably be expected to result in any Canadian Pension Plan being the subject of a requirement to be wound up (wholly or in part) by any applicable regulatory authority, having its registration revoked or refused by any applicable regulatory authority or being required to pay any taxes or penalties under any applicable pension benefits or tax laws.

(30)  <u>ERISA Plans</u>  (a) Each ERISA Plan of any Loan Party carrying on business in the United States has been maintained and is in compliance in all material respects with Applicable Laws including, without limitation, all requirements relating to employee participation, investment of funds, benefits and transactions with the Loan Parties and persons related to them, (b) with respect to such ERISA Plans: (i) no condition exists and no event or transaction has occurred with respect to any such ERISA Plan that is reasonably likely to result in any Loan Party, to the best of its knowledge, incurring any liability, fine or penalty in excess of the US$ Equivalent Amount of Cdn.$2,500,000; and (ii) no Loan Party carrying on business in the United States has a contingent liability with respect to any post-retirement benefit under a US Welfare Plan in excess of the US$ Equivalent Amount of Cdn.$2,500,000, (c) all contributions (including employee contributions made by authorized payroll deductions or other withholdings) required to be made have been made in accordance with all Applicable Laws and the terms of each ERISA Plan, (d) each of the ERISA Plans that is intended to be "qualified" within the meaning of Section 401(a) of the Code (i) has received a favourable determination letter from the IRS, (ii) is or will be the subject of an application for a favourable determination letter, and no circumstances exist that has resulted or could reasonably be expected to result in the revocation or denial of any such determination letter, or (iii) is entitled to rely on an appropriately updated prototype plan document that has received a national office determination letter and has not applied for a favourable determination letter of its own and (e) no Loan Party carrying on business in the United States has any US Pension Plans and no multiemployer plans as defined in Section 4001(a)(3) of ERISA are maintained by any Loan Party or to their knowledge have been maintained by any member of any Loan Party's Controlled Group.

(31)  <u>Not an Investment Company</u>  No Loan Party is an "investment company" or a company "controlled" by an "investment company" within the meaning of the United States Investment Company Act of 1940 or a "holding company", or a "subsidiary company" of a "holding company", or an "affiliate" of a holding company, or of a "subsidiary company" of a "holding company", within the meaning of the United States Public Utility Holding Company Act of 2005.

(32)  <u>No Margin Stock</u>  No Loan Party is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock.  None of the proceeds of any Advance will be used to purchase or carry, or to reduce or retire or refinance any credit incurred to purchase or carry, any margin stock (within the meaning of Regulations U and X of the Board of Governors of the Federal Reserve System of the United States) or to extend credit to others for the purpose of purchasing or carrying any margin stock.

(33) <u>Full Disclosure</u>  All information provided or to be provided by or on behalf of any Loan Party to the DIP Agent and the Lenders in connection with the DIP Facility (other than future-looking information or information of a general economic or industry nature) was or will be at the time prepared, to its knowledge, true and correct in all material respects and none of the documentation furnished to the DIP Agent or any Lender by or on behalf of any Loan Party, to its knowledge, omitted or will omit as of such time, a material fact necessary to make the statements contained therein not misleading in any material way, and all expressions of expectation, intention, belief and opinion contained therein were honestly made on reasonable grounds after due and careful inquiry by it at the time made (and, to its knowledge any other Person who furnished such material on behalf of them).

(34) <u>CCAA Orders</u>  The applicable Initial Order is in full force and effect and is not subject to any leave to appeal application or appeal, and has not been vacated, reversed, modified, amended or stayed without the prior written consent of the Majority Lenders.  The Loan Parties are and remain in compliance with the CCAA Orders.¶

(35) <u>Non-Arm's Length Transactions</u>  All agreements, arrangements or transactions between any Loan Party, on the one hand, and any Associate of, Affiliate of or other Person not dealing at Arm's Length with such Loan Party, on the other hand (other than another Loan Party), in existence at the date hereof are set forth on Schedule 22(35) to this Term Sheet or are otherwise permitted pursuant to Section 23(19).

(36) <u>Budget</u> The Loan Parties have disclosed all material assumptions with respect to the Cash Flow Statements and affirm the reasonableness of the assumptions in the Cash Flow Statements in all material respects.

(37) <u>Debt</u>  No Loan Party has any Debt that is not permitted under this Term Sheet.

(38) [Reserved]

(39) <u>Schedules</u>  The information contained in each Schedule attached hereto is as of the Closing Date, or at the time a replacement thereof is provided to the DIP Agent and the Lenders pursuant hereto, will be true, correct and complete in all material respects.

(40) <u>Sanctions</u>.  It is not in violation of, in any material respect, any of the country or list based economic and trade sanctions administered and enforced by OFAC, or any Sanctions Laws.  As of the date of this Term Sheet, no Loan Party (i) is a Sanctioned Person or (ii) is a Person designated under Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 or other Sanctions Laws.  If a senior officer of any Loan Party receives any written notice that any Loan Party, any affiliate or any subsidiary of any Loan Party is named on the then current OFAC SDN List or is otherwise a Sanctioned Person (such occurrence, a "**Sanctions Event**"), such Loan Party shall promptly (i) give written notice to the DIP Agent of such Sanctions Event, and (ii) comply in all material respects with all applicable laws with respect to such Sanctions Event (regardless of whether the Sanctioned Person is located within the jurisdiction of the United States of America or Canada), and each Loan Party hereby authorizes and consents to the Lenders and the DIP Agent (acting at the direction of the Majority Lenders) taking any and all steps the Lenders or the DIP Agent (acting at the direction of the Majority Lenders) deem necessary, in their sole but reasonable discretion, to avoid violation of, in any material respect, all applicable laws with respect to any such Sanctions Event.

(41) <u>Anti-Corruption Laws</u>.  No part of the proceeds of the Advances shall be used, directly or, to the Borrowers' knowledge, indirectly: (a) to offer or give anything of value to any official or employee of any foreign government department or agency or instrumentality or government-owned entity, to any foreign political party or party official or political candidate, or to anyone else acting in an official capacity, in order to obtain, retain or direct business, or obtain any improper advantage, in material violation of any Anti-Corruption Law.

(42) <u>Anti-Terrorism Laws</u>.  To the extent applicable, each Loan Party is in compliance, in all material respects, with (i) the U.S. Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, (ii) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (United States), as amended (the

"**Patriot Act**"); and (iii) *Proceeds of Crime (Money Laundering) and Terrorist Financing Act* (Canada) (collectively with clauses (i) and (ii) above, the "**Anti-Terrorism Laws**").   The use of the proceeds of the Advances will not violate, in any material respect, the Trading with the Enemy Act, as amended, or any of the foreign assets control regulations of the United States Treasury Department (31 C.F.R. Subtitle B, Chapter V, as amended) or any enabling legislation or executive order relating thereto, in any material respect.

(43)   As of March 1, 2021, the outstanding obligations owed to the Lender Hedge Providers (as defined in the Intercreditor Agreement) by the Loan Parties in respect of Hedging Agreements (as defined in the Intercreditor Agreement) does not exceed $7,364,437 after giving effect to any mandatory consequences of the commencement of the CCAA Proceedings thereunder.

# SCHEDULE H

# AFFIRMATIVE COVENANTS

**23. Affirmative Covenants**

So long as this Term Sheet is in force and except as otherwise permitted by the prior written consent of the Majority Lenders, each Borrower will and will cause each other Loan Party to:

(1)     <u>Timely Payment</u>  Make due and timely payment of the Obligations required to be paid by it hereunder and under each other Loan Document.

(2)     <u>Conduct of Business, Maintenance of Existence, Compliance with Laws</u>  Subject to any necessary Order or authorization of the Court, (a) engage in business of the same general type as now conducted by it; (b) carry on and conduct its business and operations in a proper, efficient and businesslike manner, in accordance with good business practice; (c) except as otherwise permitted by Section 23(2), preserve, renew and keep in full force and effect its existence; (d) take all action necessary to maintain all material registrations, material licenses, material rights, material privileges and franchises necessary or desirable in the normal conduct of its business; and (e) comply in all material respects with all Requirements of Law, including without limitation, Requirements of Environmental Law.

(3)     <u>Further Assurances</u>  Subject to any necessary Order or authorization of the Court, provide the Lenders and the DIP Agent with such other documents, opinions, consents, acknowledgements and agreements as are reasonably necessary to implement this Term Sheet, the other Loan Documents and are required by the DIP Agent or the Lenders from time to time.

(4)     <u>Access to Information</u>  Promptly provide the DIP Agent and the Lenders with all information reasonably requested by the DIP Agent (at the direction of the Majority Lenders) from time to time concerning its financial condition and Property, and during normal business hours and from time to time upon reasonable notice, permit representatives of the DIP Agent and Lenders, if accompanied by a Lender, to inspect any of its Property, to examine and take extracts from its financial books, accounts and records including but not limited to accounts and records stored in computer data banks and computer software systems, and to discuss its financial affairs, its business or any part of its Property with its senior officers and (in the presence of such of its representatives as it may designate) its auditors.  If an Event of Default or a Pending Event of Default has occurred and is continuing, the Canadian Borrower will pay all reasonable expenses incurred by such representatives in order to visit a Borrower's premises or attend at its and each other Loan Party's principal office, as applicable, for such purposes. In addition, the Borrowers shall, and shall cause each other Loan Party to, promptly provide the DIP Agent with such information as the DIP Agent or any Lender may reasonably request in order to comply with the Beneficial Ownership Regulation and written notice of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in such Certification.

(5)     <u>Payment Obligations</u>  Except to the extent stayed pursuant to the CCAA Stay and the Chapter 15 Proceedings but in all cases subject to the Cash Flow Statements approved hereunder, pay or discharge, or cause to be paid or discharged (i) before the same become delinquent (A) all Taxes imposed upon it or upon its income or profits or in respect of its business or Property and file all tax returns in respect thereof (except for those Taxes, the nonpayment of which is excused, permitted or required by the *CCAA* Proceedings or the Bankruptcy Code) and (B) all required payments under any of its Debt and (ii) in a timely manner in accordance with prudent business practices (A) all lawful claims for labour, materials and supplies, and (B) all other material obligations the failure of which would reasonably be expected to result in an Event of Default; provided, however that it will not be required to pay or discharge or to cause to be paid or discharged any such amount referred to in clauses (i) and (ii) so long as the validity or amount thereof is being contested in good faith by appropriate proceedings and an adequate reserve in accordance with GAAP and satisfactory to the Majority Lenders, acting reasonably, has been established in its books and records, or, in the case of clause (i)(A), the nonpayment thereof would not individually or in the aggregate have, or be reasonably likely to cause, a Material Adverse Effect.

(6)     Use of DIP Facility   Use the proceeds of the DIP Facility as contemplated by Section 12 and in accordance with the restrictions set out herein and in the manner contemplated by the Cash Flow Statements.

(7)     Insurance   Maintain or cause to be maintained with reputable insurers, coverage against risk of loss or damage to its Property (including public liability and damage to property of third parties), business interruption insurance, fire and extended peril insurance and boiler and machinery insurance of such types as is customary for and would be maintained by a corporation with an established reputation engaged in the same or similar business in similar locations and provide to the DIP Agent, on an annual basis, if requested, evidence of such coverage. The DIP Agent will be indicated in all insurance policies, as applicable and to the extent practicable on commercially reasonable terms, as a loss payee and additional insured within five (5) Business Days (or such later date as approved by the Majority Lenders) of the Closing Date.

(8)     Notice of Event of Default or Pending Event of Default   Promptly notify the DIP Agent of any Event of Default or Pending Event of Default that would apply to it or to any Loan Party of which it becomes aware.

(9)     Notice of Material Adverse Effect   Promptly notify the DIP Agent of any condition (financial or otherwise), event or change in its or any other Loan Party's business, liabilities, operations, results of operations, assets or prospects which would reasonably be expected to have a Material Adverse Effect.

(10)     [Reserved]

(11)     Other Notices   Promptly, upon having knowledge, give notice to the DIP Agent of:

(a)     any violation of any Applicable Law, which does or could reasonably be expected to have a Material Adverse Effect;

(b)     any termination or expiration of or default under a Material Contract or Material Licence;

(c)     any damage to or destruction of any property, real or personal, of any Loan Party having a replacement cost in excess of $2,500,000;

(d)     the receipt of insurance proceeds by any Loan Party in excess of $2,500,000;

(e)     any change in the regulatory framework relating to the energy market which is materially adverse to the Business or could reasonably be expected to be materially adverse to the Business with the passage of time;

(f)     any Lien registered against any property or assets of any Loan Party, other than a Permitted Lien;

(g)     any entering into of a Material Contract or Material Licence, together with a true copy thereof;

(h)     any assignment of a Material Contract by the counterparty thereto; or

(i)     the delivery by ERCOT (as defined in the Intercreditor Agreement) of any settlement proposals in connection with the "black swan" weather events that occurred in the State of Texas in February 2021, together with a true copy thereof.

(12)     Computer Software   Own or license for use or otherwise maintain the right to use all of the material software necessary to conduct its businesses and in all material respects, properly maintain and keep in good working order for the purposes of on-going operation, all Computer Equipment owned or used by an Loan Party and necessary for the conduct of business, subject to ordinary wear and tear for Computer Equipment of comparable age and lost or damaged Computer Equipment replaced or repaired to the extent required to conduct its Business.

(13)    Intellectual Property  Maintain rights sufficient for it to use all the Intellectual Property reasonably necessary for the conduct of its business and not knowingly infringe or misappropriate in any material way the intellectual property rights of any other Person.

(14)    Environmental Compliance  Operate its business in compliance in all material respects with all applicable material Requirements of Environmental Laws and operate all Property owned, leased or otherwise occupied by it with a view to ensuring that no material obligation, including a clean-up or remedial obligation, will arise in respect of an Loan Party under any Requirements of Environmental Law; provided however, that if any such obligation arises, the applicable Loan Party will promptly satisfy or contest such obligation at its own cost and expense.  It will promptly notify the Lender, to the extent not disclosed as of the date hereof, upon (i) learning of the existence of Hazardous Substance located on, above or below the surface of any land which it owns, leases, operates, occupies or controls (except those being stored, used or otherwise handled in substantial compliance with applicable Requirements of Environmental Law), or contained in the soil or water constituting such land and (ii) the occurrence of any lawfully reportable release, spill, leak, emission, discharge, leaching, dumping or disposal of Hazardous Substances that has occurred on or from such land which, in either case, is likely to result in liability under Requirements of Environmental Law.

(15)    [Reserved]

(16)    Maintenance of Property  Subject to any necessary Order or authorization of the Court, keep all Property necessary in its business in good working order and condition, normal wear and tear excepted, save for lost or damaged Property replaced or repaired to the extent required to conduct its Business.

(17)    ERISA Matters

(a)    Maintain each ERISA Plan in compliance in all material respects with all applicable Requirements of Law;

(b)    refrain from adopting, participating in or becoming obligated with respect to any US Pension Plan or multiemployer plan as defined in Section 4001(a)(3) of ERISA without the prior written consent of the DIP Agent (at the direction of the Majority Lenders); and

(c)    promptly notify the DIP Agent on becoming aware of (i) the institution of any steps by any Person to terminate any US Pension Plan, (ii) the failure of any Loan Party to make a required contribution to any US Pension Plan if such failure is sufficient to give rise to an Lien under Section 303(k) of ERISA, (iii) the taking of any action with respect to a US Pension Plan which is reasonably likely to result in the requirement that any Loan Party furnish a bond or other security to the US Pension Benefit Guaranty Corporation under ERISA or such Pension Plan, or (iv) the occurrence of any event with respect to any ERISA Plan which is reasonably likely to result in any Loan Party incurring any liability, fine or penalty in excess of $5,000,000, and following notice to the DIP Agent thereof, provide copies of all documentation relating thereto if requested by the DIP Agent or any Lender.

(18)    Canadian Pension Plans

(a)    maintain each Canadian Pension Plan in compliance in all material respects with all applicable Requirements of Law;

(b)    refrain from adopting, participating in or becoming obligated with respect to any Specified Canadian Pension Plan; and

(c)    promptly notify the DIP Agent on becoming aware of (i) the institution of any steps by any Person to terminate any Canadian Pension Plan, (ii) the failure of any Loan Party to make a required contribution to any Canadian Pension Plan if such failure is sufficient to give rise to a deemed trust or lien under applicable pension benefits standards laws, or (iii) the occurrence of any event

with respect to any Canadian Pension Plan or Canadian Welfare Plan which is reasonably likely to result in any Loan Party incurring any liability, fine or penalty in excess of $5,000,000, and following notice to the DIP Agent thereof, provide copies of all documentation relating thereto if requested by the DIP Agent or any Lender.

(19)    Employee Benefit and Welfare Plans  Maintain all employee benefit and Canadian Welfare Plans relating to the Business in compliance in all material respects with all Applicable Laws and ensure that all premiums and payments relating to employee benefits and pensions are paid as due.

(20)    Additional Information  Promptly provide the DIP Agent, upon receipt thereof, with copies of all "management letters" or other material letters submitted by independent public accountants in connection with audited financial statements described in Section 22(30) raising issues associated with the audit of the Loan Parties.

(21)    Maintenance of Material Contracts and Material Licenses  Except as otherwise permitted under Section 23(17), maintain in good standing and perform all of its obligations under and comply with all Material Contracts and Material Licenses.

(22)    [Reserved]

(23)    ERCOT Related Settlements; Tier 1 Commodity/ISO Charge; Tier 2 Commodity Charge  On Thursday of each week, for the immediately preceding Friday, provide an estimate of (i) ERCOT related settlements in connection with the "black swan" weather events that occurred in the State of Texas in February 2021 and (ii) the amount of the Priority Commodity/ISO Charge.

(24)    LDC Agreements  Promptly provide to the DIP Agent copies of any notices received from LDCs in connection with any collections, services, agreements or any Transportation Agreements, requests to increase the billing service amount under any Collection Services Agreements, offsets or material matters under any LDC Agreement, in each case which would reasonably be expected to have a Material Adverse Effect.

(25)    [Reserved]

(26)    No Supplier Recourse  Other than in connection with the *CCAA* Proceedings, no supplier to any non-Guarantor subsidiary of JustEnergy has any recourse to any Loan Party.

(27)    [Reserved]

(28)    Keepwell  Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honour all of its obligations under the Guarantee in respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this Section for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this Section, or otherwise under the Guarantee, voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount).  The obligations of each Qualified ECP Guarantor under this Section and under the Guarantee shall remain in full force and effect until discharged in accordance with this Term Sheet and the Guarantee .  Each Qualified ECP Guarantor intends that this Section constitute, and this Section shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

(29)    CCAA Proceedings and Chapter 15 Proceeds

(a)    comply in all material respects with all *CCAA* Orders, the US Orders and with Applicable Law, except to the extent not required to do so pursuant to the Initial Order, any other *CCAA* Order or the US Orders;

(b)    provide the DIP Agent's counsel and Lenders' counsel with draft copies of all motion materials, applications for proposed CCAA Orders and US Orders, as applicable, or any other materials that any Loan Party intends to file in the CCAA Proceedings and Chapter 15 Proceedings, as applicable, in order to provide the Lender's counsel with a reasonable opportunity to review and comment on same at as soon as is reasonably practicable in advance of the service of such materials to the service list in respect of the CCAA Proceedings and the Chapter 15 Proceedings, as applicable, at least two (2) Business Days prior to any such filing or, where it is not practically possible to do so within such time, as soon as possible prior to the time at which such motion materials, applications for proposed CCAA Orders and US Orders, as applicable, or any other materials are served on the service list in respect of the CCAA Proceedings and Chapter 15 Proceedings, as applicable; provided that all such motion materials, applications for proposed CCAA Orders and US Orders, as applicable, or any other materials shall be in form and substance reasonably satisfactory to the DIP Agent, the Lenders and their respective counsel to the extent that motion materials, applications for proposed CCAA Orders and US Orders, as applicable, or any other materials affect or could reasonably be expected to affect the rights and interests of the DIP Agent and Lenders in any respect;

(c)    take all actions necessary or available to defend the CCAA Orders and US Orders, as applicable, from any appeal, reversal, modifications, amendment, stay or vacating to the extent that it would adversely affect the rights and interests of the DIP Agent and Lenders in any material respect;

(d)    keep the Lenders and the DIP Agent and their respective counsel apprised on a timely basis of all material developments with respect to the business and affairs of the Loan Parties, the *CCAA* Proceedings and the Chapter 15 Proceedings, including all matters relating to the CCAA Plan or any matter which could reasonably be expected to materially affect the rights and interests of the Lenders or the DIP Agent in any respect;

(e)    deliver to the DIP Agent, the Lenders and their respective counsel reporting and other information reasonably requested by them from time to time as set out in this Term Sheet including, without limitation, the Cash Flow Statements at the times set out herein; and

(f)    participate (through its counsel and/or other advisors) on a weekly update call once (1) per week with Lenders and Lenders' counsel, *provided*, that upon the reasonable prior written request of DIP Agent (at the direction of the Majority Lenders) (which request shall be made at least twenty-four (24) hours before such weekly update call), representatives from the management team of the Borrowers and the Loan Parties will join such weekly update call (it being agreed and understood that such calls with the management team shall be pursuant to a single call)).

(30)    Reporting Requirements  So long as this Term Sheet is in force and except as otherwise permitted by the prior written consent of the DIP Agent (at the discretion of the Majority Lenders), the Canadian Borrower will:

(a)    Annual Reports  As soon as available and in any event within 120 days after the end of each Fiscal Year, cause to be prepared and delivered to the DIP Agent the audited consolidated financial statements of JustEnergy, including, without limitation, a balance sheet, statement of equity, income statement and cash flow statement, certified by the chief financial officer of JustEnergy.

(b)    Quarterly Reports

    (i)    As soon as available and in any event within 60 days of the end of each of its first three Fiscal Quarters of each Fiscal Year, cause to be prepared and delivered to the DIP Agent as at the end of such Fiscal Quarter the unaudited interim consolidated financial statements of JustEnergy, including, in each case and without limitation, an income statement, balance sheet and cash flow statement, certified by the chief financial officer of JustEnergy.

    (ii)    As soon as available and in any event within 60 days of the end of each Fiscal Quarter (including the fourth Fiscal Quarter), cause to be prepared and delivered to the DIP Agent as at the end of such Fiscal Quarter the unaudited financial statements of the Borrowers prepared on a Modified Consolidated Basis, including, in each case and without limitation, an income statement, balance sheet and cash flow statement, certified by the chief financial officer of JustEnergy.

(c)    Compliance Certificate   Concurrently with the delivery of the financial statements referred to in Sections 22(30)(a) and (b) above, provide the DIP Agent with a Compliance Certificate.

(d)    [Reserved]

(e)    [Reserved]

(f)    [Reserved]

(g)    [Reserved]

(h)    Risk Management Policy   Promptly notify the DIP Agent of any material changes or modifications to the risk management and hedging policy of the Loan Parties from that in effect on the date hereof and promptly provide a copy of such change or modification.

(i)    [Reserved]

(j)    [Reserved]

(k)    [Reserved]

(l)    Other Information   Deliver to the DIP Agent such other information relating to the conduct of business or financial condition of the Loan Parties as the DIP Agent on behalf of the Lenders may reasonably request from time to time.

(m)    PPSA Lien Filings   Prepare and register PPSA financing statements in form satisfactory to the DIP Agent acting reasonably against each applicable Loan Party in favor of the DIP Agent as soon as practicable after the date of this Term Sheet and in any even within one (1) Business Day after the date of this Term Sheet.

(n)    UCC Lien Filings   Prepare and register Uniform Commercial Code financing statements in form satisfactory to the DIP Agent acting reasonably against each applicable Loan Party in favor of the DIP Agent as soon as practicable after the date of this Term Sheet and in any event within 3 Business Days after the date of this Term Sheet (or such later time as the Lenders may agree in their sole discretion).

# SCHEDULE I

# NEGATIVE COVENANTS

**24. Negative Covenants**

So long as this Term Sheet is in force and except as otherwise permitted by the prior written consent of the DIP Agent (at the direction of the Majority Lenders), each Borrower will not and will ensure that each other Loan Party will not:

(1)      Disposition of Property  Except as permitted by the CCAA Proceedings, transfer, lease or otherwise dispose of all or any part of their property, assets or undertaking outside of the ordinary course of business, except for the disposition of obsolete or worn out equipment or assets consistent with past practice.

(2)      Fundamental Changes  Except as permitted by the CCAA Proceedings, enter into any corporate transaction (or series of transactions), whether by way of arrangement, reorganization, consolidation, amalgamation, merger or otherwise, whereby all or substantially all of its undertaking and assets would become the property of any other Person or in the case of any amalgamation, the property of the continuing corporation resulting from the amalgamation, except that if at the time of and immediately after giving effect to the corporate transaction, if no Event of Default will have occurred and be continuing, it may amalgamate or merge (including by way of a wind-up that is not as a result of an insolvency) with or transfer all or substantially all of its assets to a Borrower or any wholly-owned subsidiary of a Borrower; provided that it provides the DIP Agent with prior notice of any such transaction and upon any amalgamation or merger (except by way of a wind-up), the resulting company or the entity to whom the assets have been transferred, as applicable, delivers to the DIP Agent the Security Documents and an assumption agreement pursuant to which the amalgamated or merged company or the entity to whom the assets have been transferred, as applicable, confirms its assumption of all of the obligations of the amalgamating or merging companies or the entity which transferred the assets, as applicable, under the Loan Documents and such other security, certificates and opinions as may be required by the DIP Agent and Lenders including, if applicable, a pledge of the amalgamated or merged company's shares.

(3)      No Debt  Except as permitted by the CCAA Proceedings, create, incur, assume or permit any indebtedness to remain outstanding, other than, in the case of all Loan Parties (other than any Loan Party that is not organized under the laws of the United States, Canada or, after the Hungarian Security Agreement has been delivered, Hungary (or, in each case, any political subdivision thereof)), Permitted Debt and, in the case of all Loan Parties, the Obligations.

(4)      No Repayment or Prepayment of Debt  Except as permitted by the CCAA Proceedings, directly or indirectly voluntarily prepay, defease or in substance defease, purchase, redeem, retire or otherwise acquire any indebtedness not permitted by the Term Sheet or the Canadian Court in each case in accordance with the CCAA Orders and the Cash Flow Statements, subject to the Permitted Variance.

(5)      No Financial Assistance  Give any Financial Assistance to any Person other than: (a) Existing Intercompany Debt; (b) Future Intercompany Debt; (c) Financial Assistance existing as of the Closing Date; (d) Financial Assistance to Restricted Subsidiaries (subject to an aggregate cap of $250,000 for Financial Assistance to non-Loan Parties); (e) loans and advances to employees made in accordance with Section 9.04(9) of the Original Senior Credit Agreement in an amount not to exceed $250,000 in the aggregate; and (f) any Financial Assistance provided for in the Cash Flow Statements most recently approved by the Majority Lenders at the time of giving such Financial Assistance; provided that, notwithstanding the foregoing exceptions, each Borrower will not and will ensure that each other Loan Party will not give any Financial Assistance to any Loan Party that is not organized under the laws of the United States, Canada or, after the Hungarian Security Agreement has been delivered, Hungary (or, in each case, any political subdivision thereof).

(6)     [Reserved]

(7)     No Distributions  Except as permitted by the CCAA Proceedings make or permit any Distributions (other than Distributions between Loan Parties); provided, for the avoidance of doubt, a Loan Party shall be permitted to make customary tax distributions within consolidated, combined, unitary, or similar tax groups of which they are a member to pay taxes attributable to such Loan Party's income.

(8)     Distribution Restrictions  Except as permitted by the CCAA Proceedings, enter into any other agreement that would limit its ability to effect any dividends or distributions between Loan Parties.

(9)     [Reserved]

(10)    No Liens  Except as permitted by the CCAA Proceedings, create, incur, assume or permit to exist any Lien upon any of its Property except, in the case of all Loan Parties (other than any Loan Party that is not organized under the laws of the United States, Canada or, after the Hungarian Security Agreement has been delivered, Hungary (or, in each case, any political subdivision thereof)), Permitted Liens.

(11)    No Acquisitions  Except as permitted by the CCAA Proceedings, make any acquisitions.

(12)    No Change to Year End  Make any change to its Fiscal Year; provided that the Borrowers may elect to change its Fiscal Year to end on December 31 by delivering 60 days prior written notice to the Lender.

(13)    No Qualified Support Agreements  Enter into any Qualified Support Agreement (as defined in the Initial Order) without the consent of the Majority Lenders, which consent is not to be unreasonably withheld.

(14)    No Consent to Lifting  Consent to a lifting of the stay in the CCAA Proceedings pursuant to paragraph [13] of the Initial Order without the consent of the Majority Lenders.

(15)    No Share Issuance  Issue any new capital other than as approved pursuant to the CCAA Proceedings.

(16)    Amendments to Organizational Documents  Except as permitted by the CCAA Proceedings, amend any of its Organizational Documents in a manner that would be prejudicial to the interests of any of the Lenders or the DIP Agent under the Loan Documents.

(17)    [Reserved]

(18)    Hostile Take-Over Bid  Make or complete a Hostile Take-Over Bid.

(19)    Non-Arm's Length Transactions  Effect any transactions with any Person (other than any Loan Party) not dealing at Arm's Length with the transacting Loan Party except for (i) those transactions identified in Schedule 22(35) to this Term Sheet; (ii) [reserved]; (iii) transactions permitted under Section 23(5); (iv) technical and administrative service agreements on commercially reasonable terms between any of the Canadian Borrower. and any of their subsidiaries and the provision of the services contemplated thereby; and (v) sales arrangements on commercially reasonable terms between an Loan Party and an non-Guarantor subsidiary of the Canadian Borrower with respect to the Business.

(20)    Sale and Leaseback  Except as permitted by the CCAA Proceedings, enter into any arrangement with any Person providing for the leasing by any Loan Party, as lessee, of property which has been or is to be sold or transferred by such Loan Party to such Person or to any other Person to whom funds have been or are to be advanced by such Person on the security of such property or the lease obligation of any Loan Party.

(21)    Hedging Contracts  Enter into or permit to be outstanding at any time any Hedge unless such Hedge satisfies the following conditions:

(a)     if such Hedge is an Interest Rate Hedge, it is designed to protect the Loan Parties against fluctuations in interest rates;

(b)     if such Hedge is a Currency Hedge, it is designed to protect the Loan Parties against fluctuations in currency exchange rates;

(c)     if such Hedge is an Equity Hedge, it is designed to protect the Loan Parties against fluctuations in share price;

(d)     if such Hedge is a Commodity Hedge, it is designed to protect the Loan Parties against fluctuations in commodity prices; and

(e)     such Hedge has been entered into by an Loan Party *bona fide* and in good faith in the ordinary course of its business for the purpose of carrying on the same and not for speculative purposes.

(22)     [Reserved]

(23)     [Reserved]

(24)     Anti-Money Laundering and Anti-Terrorism Finance Laws; Foreign Corrupt Practices Act; Sanctions Laws; Restricted Person  The Borrowers shall not, and shall not permit any Loan Party to, (a) engage in or conspire to engage in any transaction that violates, in any material respect, any Anti-Terrorism Law, any Anti-Corruption Law or any Sanctions Law, or (b) use any part of the proceeds of the Advances, directly or, to the Borrowers' knowledge, indirectly, for any conduct that would cause the representations and warranties in Sections 21(40), 21(41) or 21(42) to be untrue in any material respect as if made on the date any such conduct occurs.

(25)     CCAA Proceedings  No Loan Party shall apply for or support an application for any Order or any change, amendment or modification to any CCAA Order which has or would reasonably be expected to adversely affect the rights or interests of the Lender.

(26)     [Reserved]

(27)     [Reserved]

(28)     Key Employee Retention Programs  No Loan Party shall enter into an employee retention program other than a KERP.

(29)     Subsidiaries  Except as permitted by the CCAA Proceedings, ensure that any subsidiary formed or acquired after the Closing Date in accordance with the terms of this Term Sheet shall be deemed a Guarantor and the Borrowers shall deliver to the DIP Agent all items, documents and agreements with respect to such new Guarantor as reasonably requested by the Majority Lenders.

(30)     Permitted Variance  Without the consent of the Majority Lenders (which may be communicated by e-mail from the Majority Lenders or their selected representative(s)), as of 4:00 p.m. Central Time on the Initial Reporting Date and on each Thursday thereafter that is the four (4) week anniversary of the Initial Reporting Date (each such date, the "**Monthly Variance Testing Date**" and each such four (4) week period ending on the Saturday preceding each Monthly Variance Testing Date, the "**Monthly Variance Testing Period**"), permit (A) any variance of (x) the actual individual disbursements for such Monthly Variance Testing Period *in excess of* (y) projected individual disbursements to such Monthly Variance Testing Period set forth in the Cash Flow Statements most recently approved by the Majority Lenders (excluding, in each case of clauses (x) and (y), for purposes of this calculation, the Excluded Disbursements) to exceed 20% of such projected amounts, (B) any variance of (x) the actual aggregate disbursements for such Monthly Variance Testing Period *in excess of* (y) projected aggregate disbursements for such Monthly Variance Testing Period set forth in the Cash Flow Statements most recently approved by the Majority Lenders (excluding, in each case of clauses (x) and (y), for purposes of this calculation, the Excluded Disbursements) to exceed 15% of such projected amounts or (C) projected individual disbursements for such Monthly

Variance Testing Period set forth in the Cash Flow Statements most recently approved by the Majority Lenders with respect to ERCOT related settlements in connection with the "black swan" weather events that occurred in the State of Texas in February 2021 to exceed 25% of such projected amounts (the "**Permitted Variance**").

**SCHEDULE 22(16)**

**CORPORATE STRUCTURE**

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 1. | Just Energy Group Inc.* | Canada | unlimited number of Common Shares<br><br>50,000,000 Preferred Shares | 48,987,581 Common Shares | Publicly held |
| 2. | Just Energy Corp.* | Province of Ontario | unlimited number of Common Shares, Class A Preference Shares and Class B Preference Shares | (a) 300 Common Shares | (a) Just Energy Group Inc. |
| 3. | Just Energy Trading L.P. * | Province of Ontario | unlimited number of Class A Limited Partnership Units and unlimited number of Class B Limited Partnership Units | (a) 872,941 Class A Limited Partnership Units | (a) Just Energy Group Inc. |
| | | | | (b) 9 Class A Limited Partnership Units | (b) Just Energy Corp. |
| | | | | (c) 265,179 Class B Limited Partnership Units | (c) Just Energy Group Inc. |
| | | | | (d) 3,444 Class B Limited Partnership Units | (d) Just Energy Corp. |
| | | | | (e) 5,214 Class B Limited Partnership Units | (e) Universal Energy Corporation |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 4. | Just Energy (B.C.) Limited Partnership* | Province of British Columbia | unlimited number of Limited Partnership Units | (a) 1 Class A Limited Partnership Unit<br><br>(b) 2,499 Class A Limited Partnership Units<br><br>(c) 394 Class B Units | (a) Just Energy Corp.<br><br>(b) Just Energy Trading L.P.<br><br>(c) Just Energy Trading L.P. |
| 5. | Just Energy Ontario L.P.* | Province of Ontario | unlimited number of Class A Units and unlimited number of Class B Preferred Units | (a) 82,478 Class A Units<br><br>(b) 3,000 Class A Units<br><br>(c) 379,671 Class B Preferred Units | (a) Just Energy Trading L.P.<br><br>(b) Just Energy Corp.<br><br>(c) Just Energy Trading L.P. |
| 6. | Just Green L.P.* | Province of Alberta | unlimited number of Limited Partnership Units | (a) 1 Limited Partnership Unit<br><br>(b) 864,449 Limited Partnership Units | (a) Just Energy Corp.<br><br>(b) Just Energy Trading L.P. |
| 7. | Just Energy Québec L.P.* | Province of Quebec | unlimited number of Limited Partnership Units | (a) 1 Limited Partnership Unit<br><br>(b) 2,499 Limited Partnership Units | (a) Just Energy Corp.<br><br>(b) Just Energy Trading L.P. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 8. | Just Energy Manitoba L.P.* | Province of Manitoba | unlimited number of Class A Units and unlimited number of Class B Preferred Units | (a) 918 Class A Units | (a) Just Energy Trading L.P. |
| | | | | (b) 82 Class A Limited Partnership Units | (b) Just Energy Corp. |
| | | | | (c) 760 Class B Preferred Units | (c) Just Energy Trading L.P. |
| 9. | Ontario Energy Commodities Inc.* | Province of Ontario | unlimited number of Common Shares | (a) 65,183,851 Common Shares | (a) Just Energy Ontario L.P. |
| | | | | (b) 200,781 Common Shares | (b) Universal Energy Corporation |
| | | | | (c) 9,782,244 Common Shares | (c) Just Energy Group Inc. |
| | | | | (d) 1,200 Preferred Shares | (d) Just Energy Group Inc. |
| 10. | Hudson Energy Canada Corp.* | Canada | unlimited number of Common Shares | 100 Common Shares | Just Energy Group Inc. |
| | | | | 14,000 common shares | Just Energy Alberta L.P. |
| | | | | 3,166,000 common shares | Just Energy Ontario L.P. |
| 11. | Just Energy (U.S.) Corp.* | State of Delaware | 5,000 Common Shares | (a) 2,897 Common Shares | (a) Ontario Energy Commodities Inc. |
| | | | | (b) 328 Common Shares | (b) Just Energy Group Inc. |
| | | | | (c) 53 Common Shares | (c) Just Energy Finance Canada ULC |

| | **Name of Obligor – Restricted Subsidiary\*, Unrestricted Subsidiary\*\*** | **Jurisdiction** | **Authorized Capital** | **Issued Capital** | **Owner of Securities** |
|---|---|---|---|---|---|
| 12. | Just Energy Marketing Corp.\* | State of Delaware | 100 Common Shares | 100 Common Shares | Just Energy (U.S.) Corp. |
| 13. | Just Energy Illinois Corp.\* | State of Delaware | 5,000 Common Shares | 2,600 Common Shares | Just Energy (U.S.) Corp. |
| 14. | Just Energy Indiana Corp.\* | State of Delaware | 100 Common Shares | 100 Common Shares | Just Energy (U.S.) Corp. |
| 15. | Just Energy New York Corp.\* | State of Delaware | 5,000 Common Shares | 900 Common Shares | Just Energy (U.S.) Corp. |
| 16. | Just Energy Michigan Corp.\* | State of Delaware | 100 Common Shares | 100 Common Shares | Just Energy (U.S.) Corp. |
| 17. | Momentis U.S. Corp.\*\* | State of Delaware | 100 Common Shares | 100 Common Shares | Just Energy (U.S.) Corp. |
| 18. | Just Energy Texas I Corp.\* | State of Delaware | 1,000 Common Shares | 1,000 Common Shares | Just Energy (U.S.) Corp. |
| 19. | Just Energy Texas LP\* | State of Texas | unlimited number of Class A1 Limited Partnership Units, unlimited number of Class A2 Limited Partnership Units and unlimited number of General Partnership Units | (a) 23,560 Class A1 Limited Partnership Units<br><br>(b) 917 Class A2 Limited Partnership Units<br><br>(c) 24.1 General Partnership Units | (a) Just Energy Texas I Corp.<br><br>(b) Just Energy Texas I Corp.<br><br>(c) Just Energy, LLC |
| 20. | Just Energy, LLC\* | State of Texas | 10,000 Membership Units | (a) 2,356 Membership Units | (a) Just Energy Texas I Corp. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 21. | Just Energy Massachusetts Corp.* | State of Delaware | 1,000 Common Shares | 1,000 Common Shares | Just Energy (U.S.) Corp. |
| 22. | Just Energy Connecticut Corp.* [pending dissolution] | State of Delaware | 1,000 Common Shares | 1,000 Common Shares | Just Energy (U.S.) Corp. |
| 23. | Just Energy Alberta L.P.* | Province of Alberta | unlimited number of Limited Partnership Units | (a) 1 Class A Limited Partnership Unit (b) 99 Class A Limited Partnership Units (c) 1 Class B Limited Partnership Unit (d) 131 Class A Limited Partnership Units | (a) Just Energy Corp. (b) Just Energy Trading L.P. (c) Just Green L.P. (d) Just Green L.P. |
| 24. | Just Energy Pennsylvania Corp.* | State of Delaware | 1,000 Common Shares | 100 Common Shares | Just Energy (U.S.) Corp. |
| 25. | Just Energy Finance Canada ULC* | Province of Nova Scotia | unlimited number of common shares | (a) 18,752 Common Shares | (a) Ontario Energy Commodities Inc. |
| 26. | Just Energy Limited* | State of Delaware | 100 Common Shares | 100 Common Shares | Just Energy (U.S.) Corp. |
| 27. | Just Energy Advanced Solutions LLC* | State of Delaware | unlimited Common Units | 100 Common Units | Just Energy New York Corp. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 28. | Just Management Corp.* | Canada | Unlimited number of Common Shares | 100 Common Shares | Just Energy Group Inc. |
| | | | | 7,341,420 Class A preferred shares | Just Energy Ontario L.P. |
| | | | | 1,703,540 Class B preferred shares | Just Energy Ontario L.P. |
| 29. | Just Holdings L.P.** | Province of Manitoba | unlimited number of Class A Limited Partnership Units and unlimited number of Class B Limited Partnership Units | (a) 1 Class A Limited Partnership Units | (a) Just Management Corp. |
| | | | | (b) 1,000 Class A Limited Partnership Units | (b) Just Energy Group Inc. |
| 30. | Just Ventures LLC** | State of Delaware | Unlimited number of Membership Interest Units | 100 Membership Interest Units | Just Energy Marketing Corp. |
| 31. | Just Ventures GP Corp.** | Canada | Unlimited number of common shares | 100 common shares | Just Energy Corp. |
| 32. | Just Ventures L.P.** | Province of Ontario | Unlimited number of Class A Limited Partnership Units | (a) 998 Class A Limited Partnership Units | (a) Just Energy Ontario L.P. |
| | | | | (b) 2 Class A Limited Partnership Units | (b) Just Ventures GP Corp. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 33. | Just Energy Prairies L.P.* | Province of Manitoba | unlimited number of Class A Limited Partnership Units and unlimited number of Class B Limited Partnership Units | (a) 1 Class A Limited Partnership Units<br><br>(b) 999 Class A Limited Partnership Units | (a) Just Energy Corp.<br><br>(b) Just Energy Trading L.P. |
| 34. | Universal Energy Corporation* | Province of Ontario | Unlimited Common shares<br><br>Unlimited Class A Shares<br><br>Unlimited Class B Shares<br><br>Unlimited Class C Shares | (a) 100,100 Common Shares<br><br>(b) 25, 000,000 Class C Shares | (a) Just Energy Group Inc.<br><br>(b) Just Energy Group Inc. |
| 35. | American Home Energy Services Corp.** | State of Delaware | 1,000 common voting shares | 100 common voting shares | Just Energy (U.S.) Corp. |
| 36. | 8704104 Canada Inc. * | Canada | Unlimited Common Shares<br><br>Unlimited Class A Special Shares | (a) 100 Common Shares<br><br>(b) 9,500,000 Class A Special Shares | (a) Just Energy Group Inc.<br><br>(b) Just Energy Group Inc. |
| 37. | Just Energy Solutions Inc.* (formerly known as Commerce Energy, Inc.) | State of California | 50,000,000 Common stock<br><br>10,000,000 Preferred Stock | 30,553,540 Common Stock | Just Energy (U.S.) Corp. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| | | | 1,000,000 Series A Convertible Preferred Stock | | |
| 38. | Hudson Energy Corp.* | State of Delaware | 1,500 Common Shares | 1,001 Common Shares | Just Energy (U.S.) Corp. |
| 39. | Hudson Parent Holdings LLC* [pending dissolution] | State of Delaware | Unlimited Preferred Units Unlimited Common Units | (a) 89,328 Preferred Units (b) 7,251,158 Common Units | (a) Hudson Energy Corp. (b) Hudson Energy Corp. |
| 40. | Interactive Energy Group LLC* (formerly known as HE Holdings, LLC) | State of Delaware | Unlimited Common Units | 100 Common Units | Hudson Parent Holdings LLC |
| 41. | Drag Marketing LLC* [pending dissolution] | State of Delaware | Unlimited Common Units | 1,000 Common Units | Hudson Parent Holdings LLC |
| 42. | Hudson Energy Services LLC* | State of New Jersey | Unlimited Common Units | 1,000 Class A Membership Interests | Interactive Energy Group LLC |
| 43. | Hudson Energy Holdings UK Limited** | England and Wales | Unlimited number of ordinary shares | 1,250,751 ordinary shares | Just Energy Group Inc. |
| 44. | Just Energy (U.K.) Limited** | England and Wales | Unlimited number of ordinary shares | 100 ordinary shares | Just Energy Group Inc. |
| 45. | Fulcrum Retail Holdings LLC* | State of Texas | Unlimited Membership Units | 10,000,000 units | Just Energy (U.S.) Corp. |
| 46. | Fulcrum Retail Energy LLC* | State of Texas | Unlimited Membership Units | 100 units | Fulcrum Retail Holdings LLC |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 47. | Tara Energy, LLC* | State of Texas | Unlimited Membership Units | 100 units | Fulcrum Retail Holdings LLC |
| 48. | Just Energy Foundation Canada ** | Canada (Not for Profit) | N/A | N/A | N/A |
| 49. | Just Energy Foundation USA, Inc. ** | State of Georgia (Not for Profit) | N/A | N/A | N/A |
| 50. | Just Solar Holdings Corp.* | State of Delaware | 1,000 Common Stock | 100 Common Stock | Just Energy (U.S.) Corp. |
| 51. | Just Energy (Ireland) Limited** | Ireland | Unlimited Ordinary Shares | 1 Ordinary Share | Hudson Energy Holdings UK Limited |
| 52. | Just Energy Germany GmbH** | Germany | Unlimited Ordinary Shares | 25,000 Ordinary Shares | Just Energy (U.K.) Limited |
| 53. | JE Services Holdco I Inc.* | Canada | Unlimited number of Common Shares | 100 Common Shares | 8704104 Canada Inc. |
| 54. | JE Services Holdco II Inc.* | Canada | Unlimited number of Common Shares | 100 Common Shares | 8704104 Canada Inc. |
| 55. | JEBPO Services LLP* | India | N/A | (a) 99%<br><br>(b) 1% | JE Services Holdco I Inc.<br><br>JE Services Holdco II Inc. |
| 56. | Just Energy Advanced Solutions Corp.* | Ontario | Unlimited number of Common Shares | 100 Common Shares | Just Energy Corp. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 57. | JEAS Holdings L.P.** | Province of Ontario | unlimited number of Class A Units and unlimited number of Class B Units | (a) 1 Class A Units<br><br>(b) 99 Class A Units | (a) Just Energy Corp.<br><br>(b) Just Energy Advanced Solutions Corp. |
| 58. | Just Energy Finance Holding Inc.* | Province of Ontario | unlimited number of common shares | 235,000,001 common shares | Just Energy Group Inc. |
| 59. | Just Energy (Finance) Hungary Zrt.* | Hungary | N/A | 1 ordinary share | Just Energy Finance Holding Inc. |
| 60. | Filter Group Inc.** | Canada | unlimited number of Class A common shares, unlimited number of Class B common shares, unlimited number of common shares, unlimited number of Class A preferred shares, and unlimited number of Class B preferred shares | (a) 128,245 Class A common shares<br>(b) 128,245 Class B common shares | 8704104 Canada Inc. |
| 61. | Filter Group USA Inc.** | Delaware | 1,500 common shares | 100 common shares | Filter Group Inc. |

| | Name of Obligor – Restricted Subsidiary*, Unrestricted Subsidiary** | Jurisdiction | Authorized Capital | Issued Capital | Owner of Securities |
|---|---|---|---|---|---|
| 62. | 11929747 Canada Inc.* | Canada | Unlimited number of common shares<br><br>Unlimited number of Series A Preference Shares | (a) 100 common shares<br><br>(b) 210,000,000 Series A Preference Shares | Just Energy Group Inc.<br><br>Hudson Energy Canada Corp. |
| 63. | 12175592 Canada Inc.* | Canada | Unlimited number of common shares | 10 common shares | Just Energy Group Inc. |
| 64. | Just Energy Deutschland GmbH** | Germany | Unlimited number of common shares | (a) 23,750 common shares<br><br>(b) 1,250 common shares | (a) Just Energy Germany GmbH<br><br>(b) Dieter Helmut Scott |
| 65. | Just Energy Services Limited** | Barbados | Unlimited number of common shares | 100 common shares | Ontario Energy Commodities Inc. |

**SCHEDULE 22(19)**

**RELEVANT JURISDICTIONS**

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Group Inc. | Canada | 750207-9 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy Ontario L.P. | Ontario | LP11837473 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Corp. | Ontario | 1733628 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy Trading L.P. | Ontario | 140854530 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Quebec L.P. | Quebec | N/A | Québec | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy (B.C.) Limited Partnership | British Columbia | N/A | British Columbia | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Ontario Energy Commodities Inc. | Ontario | 1512568 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy (U.S.) Corp. | Delaware | 3437441 | Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy Manitoba L.P. | Manitoba | N/A | Manitoba | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Illinois Corp. | Delaware | 3698192 | Illinois | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy Indiana Corp. | Delaware | 3698189 | Indiana | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy New York Corp. | Delaware | 3832304 | New York | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy Texas I Corp. | Delaware | 4101099 | Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Texas LP | Texas | 0800661333 | Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 |
| Just Energy, LLC | Texas | 0800074936 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 |
| Just Energy Massachusetts Corp. | Delaware | 4412363 | Massachusetts | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 |
| Just Energy Alberta L.P. | Alberta | N/A | Alberta | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Pennsylvania Corp. | Delaware | 4659209 | Pennsylvania | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy Connecticut Corp. | Delaware | 4492197 | Connecticut | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy Limited | Delaware | 4675061 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Just Energy Marketing Corp. | Delaware | 3745362 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Universal Energy Corporation | Ontario | 1640183 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy Solutions Inc. (formerly known as Commerce Energy, Inc.) | California | C1909805 | California, Maryland, Michigan, New Jersey, Ohio, Pennsylvania New York and Nevada | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Finance Canada ULC | Nova Scotia | 3241239 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy Michigan Corp. | Delaware | 3720535 | Michigan | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Hudson Energy Corp. | Delaware | 4113503 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Hudson Parent Holdings LLC | Delaware | 4135199 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Interactive Energy Group LLC (formerly known as HE Holdings, LLC) | Delaware | 4667879 | New York, Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Hudson Energy Services LLC | New Jersey | 0400015448 | New York, Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Drag Marketing LLC | Delaware | 4136040 | Florida | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Hudson Energy Canada Corp. | Canada | 756028-1 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Advanced Solutions LLC | Delaware | 4887030 | None | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 770564 |
| Fulcrum Retail Holdings LLC | Texas | 0801141765 | Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Fulcrum Retail Energy LLC | Texas | 0800173077 | Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |
| Tara Energy, LLC | Texas | 0801157492 | Texas | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000 Houston, Texas 77056 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|--------|--------------|-----------------------------------|------------------------------|----------------------------------------|------------------------|-------------------|-------------------|
| Just Green L.P. | Alberta | LP11326733 | Alberta | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy Prairies L.P. | Manitoba | 6457364 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Management Corp. | Canada | 798857-5 | Ontario | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 |
| Just Solar Holdings Corp. | Delaware | 5666263 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 | 5251 Westheimer Road, Ste. 1000, Houston, Texas 77056 |
| Just Energy Advanced Solutions Corp. | Ontario | 2518801 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355, Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| Just Energy Finance Holding Inc. | Ontario | 2639395 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| Just Energy (Finance) Hungary Zrt. | Hungary | 01-10-049893 | H-1062 Budapest, Váci út 1-3. "A" tower, 6th floor | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | H-1062 Budapest, Váci út 1-3. "A" tower, 6th floor | H-1062 Budapest, Váci út 1-3. "A" tower, 6th floor | H-1062 Budapest, Váci út 1-3. "A" tower, 6th floor<br><br>First Canadian Place, 100 King Street West Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| 11929747 Canada Inc. | Canada | 1192974-7 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| 12175592 Canada Inc. | Canada | 1217559-2 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| JE Services Holdco I Inc. | Canada | 994141-0 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| JE Services Holdco II Inc. | Canada | 994143-6 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

| Entity | Jurisdiction | Organizational Registration Number | Location of Tangible Property | Address from which invoices are issued | Chief Executive Office | Registered Office | Books and Records |
|---|---|---|---|---|---|---|---|
| JEBPO Services LLP | India | AAI-4133 | Ground Floor, Block 2B (Hibiscus) Tower 3 Embassy Tech Village (SEZ), Outer Ring Road Bengaluru Bangalore KA 560103 IN | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | Ground Floor, Block 2B (Hibiscus) Tower 3 Embassy Tech Village (SEZ), Outer Ring Road Bengaluru Bangalore KA 560103 IN | Ground Floor, Block 2B (Hibiscus) Tower 3 Embassy Tech Village (SEZ), Outer Ring Road Bengaluru Bangalore KA 560103 IN | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |
| 8704104 Canada Inc. | Canada | 8704104 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | 80 Courtneypark Drive West, Mississauga, ON L5W 0B3 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 | First Canadian Place, 100 King Street West, Suite 2630, P.O. Box 355 Toronto, Ontario Canada M5X 1E1 |

**SCHEDULE 22(21)**

**INTELLECTUAL PROPERTY**

*Trademarks*

| TRADEMARK | ENTITY | COUNTRY | APPLICATION / REGISTRATION NUMBER |
|---|---|---|---|
| ONTARIO ENERGY SAVINGS CORP. & FLAG Design | Just Energy Group Inc. | Canada | TMA619698 |
| THE ENERGY SAVINGS GROUP & Design | Just Energy Group Inc. | Canada | TMA688634 |
| JUST ENERGY & DESIGN | Just Energy Group Inc. | Canada | TMA768038 |
| JUST ENERGY | Just Energy Group Inc. | Canada | TMA775273 |
| JUST ENERGY | Just Energy Group Inc. | Canada | TMA774244 |
| JUST ENERGY GROUP | Just Energy Group Inc. | Canada | TMA821985 |
| JUSTGREEN | Just Energy Group Inc. | Canada | TMA800468 |
| JUSTCLEAN | Just Energy Group Inc. | Canada | TMA800467 |
| JUSTREWARDS | Just Energy Group Inc. | Canada | TMA840225 |
| COMMERCE ENERGY | Just Energy Group Inc. | Canada | TMA834723 |
| GIVING YOU THE POWER TO SAVE | Universal Energy Corporation | Canada | TMA731578 |
| UNIVERSAL ENERGY | Universal Energy Corporation | Canada | TMA673419 |
| PRICE PROTECTION PLUS | Universal Energy Corporation | Canada | TMA709610 |
| FIGHT BACK AGAINST HIGH ENERGY PRICES | Universal Energy Corporation | Canada | TMA709609 |
| UNIVERSAL POWER | Universal Energy Corporation | Canada | TMA725654 |
| HUDSON ENERGY | Hudson Energy Canada Corp. | Canada | TMA826363 |
| PREDICT-A-BILL | Just Energy Group Inc. | Canada | TMA840682 |

| TRADEMARK | ENTITY | COUNTRY | APPLICATION / REGISTRATION NUMBER |
|---|---|---|---|
| TARA ENERGY | Just Energy Group Inc. | Canada | TMA887538 |
| ENERGY MADE EASY | Just Energy Group Inc. | Canada | TMA905281 |
| CLIMATE SAVER | Just Energy Group Inc. | Canada | TMA840226 |
| TERRAPASS DESIGN | Just Energy Advanced Solution LLC | Canada | TMA1041029 |
| TERRAPASS | Just Energy Advanced Solution LLC | Canada | TMA755982 |
| JUST ENERGY | Just Energy Group Inc. | USA | 3848587 |
| JUST ENERGY | Just Energy Group Inc. | USA | 3666093 |
| JUST ENERGY GROUP | Just Energy Group Inc. | USA | 4187070 |
| FLOWER DESIGN | Just Energy Group Inc. | USA | 3861733 |
| TARA ENERGY | Just Energy Group Inc. | USA | 88787615 |
| JUSTGREEN | Just Energy Group Inc. | USA | 3905420 |
| TERRAPASS DESIGN | Just Energy Advanced Solution LLC | USA | 5323333 |
| TERRAPASS | Just Energy Advanced Solution LLC | USA | 5323332 |
| HUDSON ENERGY | Hudson Energy Services LLC | USA | 3950313 |
| TARA ENERGY | Tara Energy, LLC | USA | 3001649 |
| SMART PREPAID ELECTRIC | Tara Energy, LLC | USA | 4022479 |

*Patents*

| PATENT | ENTITY | COUNTRY | APPLICATION NUMBER |
|---|---|---|---|
| Automatically refreshing tailored pricing for retail energy market | Hudson Energy Services LLC | USA | 11/856005 |

| PATENT | ENTITY | COUNTRY | APPLICATION NUMBER |
|---|---|---|---|
| Determining tailored pricing for retail energy market | Hudson Energy Services LLC | USA | 11/856001 |
| Tailored pricing for retail energy market | Hudson Energy Services LLC | PCT | PCT/US2008/074923 |
| Water filtration apparatus with improved filter cartridge housing and distributor | Filter Group Inc. | Canada | 2999315 |
| Water filtration apparatus with top-loading filter cartridge housing | Filter Group Inc. | USA | 15/911001 |

## SCHEDULE 22(22)

## MATERIAL CONTRACTS AND LICENCES

**MATERIAL CONTRACTS**

1.  Assignment, Assumption, Consent and Release Agreement dated as of August 1, 2005 between the Canadian Borrower and Shell Energy North America (Canada) Inc. (formerly, Coral Energy Canada Inc.) ("**Shell Energy**") (the "**JEOLP Assignment Agreement**").

2.  Security Agreement dated as of October 29, 2004 between JEC and Shell Energy as assigned by JEC to the Canadian Borrower pursuant to the JEOLP Assignment Agreement and as assigned by Shell Energy to Canadian Imperial Bank of Commerce as Collateral Agent pursuant to the assignment and assumption agreement dated as of November 1, 2004.

3.  Master Swap Agreement dated January 15, 2003 between JEC and Shell Energy, as assigned by JEC to the Canadian Borrower pursuant to the JEOLP Assignment Agreement and all confirmations and transactions thereunder.

4.  Energy Management Agreement dated October 15, 1998 between JEC and Shell Energy, as amended by amending agreements dated as of September 26, 2001, January 15, 2003 and April 1, 2004, as assigned by JEC to the Canadian Borrower pursuant to the JEOLP Assignment Agreement.

5.  Base Contract for Sale and Purchase of Natural Gas dated April 1, 2004 between Shell Energy North America (US), L.P. (formerly Coral Energy Resources L.P.) ("**Shell US**") and Just Energy Illinois Corp., as amended by amending agreement dated October 31, 2005.

6.  Base Contract for Sale and Purchase of Natural Gas dated as of October 31, 2005 between Shell Energy, as seller and the Canadian Borrower, as buyer (amending and restating that certain natural gas sale agreement dated as of October 15, 1998 between Shell Energy, as seller and JEC, as buyer, as amended by amending agreements dated as of September 26, 2001, January 15, 2003 and October 29, 2004 and as assigned by JEC to the Canadian Borrower pursuant to the JEOLP Assignment Agreement).

7.  Base Contract for the Sale and Purchase of Natural Gas dated as of October 31, 2005 between Shell US and Just Energy New York Corp.

8.  Master Swap Agreement dated April 1, 2004 between Shell US and Just Energy Illinois Corp., as amended October 31, 2005 and all confirmations and transactions thereunder.

9.  Third Amended and Restated Scheduling Coordinator Agreement dated December 1, 2014 among Just Energy New York Corp., Just Energy (U.S). Corp., Commerce Energy, Inc. and Shell US.

10. Master Power Purchase and Sale Agreement dated September 14, 2005, as amended and restated October 31, 2005, between Just Energy New York Corp. and Shell US and all confirmations and transactions thereunder.

11. Master Swap Agreement dated October 31, 2005 between Shell US and Just Energy New York Corp. as assigned by Shell Energy US to Shell Trading via Novation and Amendment Agreement dated October 16, 2013 and all confirmations and transactions thereunder.

12. Base Contract for the Sale and Purchase of Natural Gas dated as of February 23, 2007 between Shell Energy and Just Energy New York Corp. and all confirmations and transactions thereunder.

13. NAESB Base Contract for Sale and Purchase of Natural Gas dated October 31, 2005 between the Canadian Borrower and BP Canada Energy Company (amending and restating the NAESB Base contract for Sale and Purchase of Natural Gas dated September 1, 2004 between JEC and BP Canada Energy Company, as assigned by JEC to the Canadian Borrower pursuant to the JEOLP Assignment Agreement and by the agreement dated October 31, 2005 between BP Canada Energy Company and the Canadian Borrower and as assigned to BP Canada Energy Group ULC pursuant to assignment and novation agreement dated March 30, 2012), and all confirmations and transactions thereunder.

14. NAESB Base Contract for Sale and Purchase of Natural Gas dated October 31, 2005 between Just Energy Illinois Corp. and BP Canada Energy Marketing Corp. (amending and restating the NAESB Base Contract for Sale and Purchase of natural Gas dated October 21, 2005 between Just Energy Illinois Corp. and BP Canada Energy Company), and all confirmations and transactions thereunder.

15. ISDA Master Agreement dated as of January 1, 2007 between Just Energy Illinois Corp. and BP Corporation of North America Inc., as assigned to BP Energy Company pursuant to an assignment and amendment agreement dated October 15, 2012, and all confirmations and transactions thereunder.

16. NAESB Base Contract for Sale and Purchase of Natural Gas dated July 1, 2007 between Just Energy New York Corp. and BP Canada Energy Company, and all confirmations and transactions thereunder.

17. ISDA Master Agreement dated as of November 30, 2006 between the Canadian Borrower and Constellation Energy Commodities Group, Inc. and all confirmations and transactions thereunder.

18. ISDA Master Agreement dated as of July 16, 2007 between Just Energy New York Corp. and Constellation Energy Commodities Group, Inc. and all confirmations and transactions thereunder.

19. ISDA Master Agreement dated as of October 12, 2007 between Just Energy Texas I Corp. and Constellation Energy Commodities Group, Inc. and all confirmations and transactions thereunder.

20. Amended and Restated ISDA Master Agreement dated as of March 9, 2007 between the Canadian Borrower and Bruce Power L.P., as amended by letter agreement dated April 5, 2007, and all confirmations and transactions thereunder.

21. Amended and Restated Master Power Purchase and Sale Agreement made as of February 1, 2005 between Just Energy Texas L.P. and Shell US and all confirmations and transactions thereunder.

22. The Intercreditor Agreement.

23. Trust Indenture between Just Energy Income Fund and Computershare Trust Company of Canada, providing for the issue of unsecured subordinated debentures dated May 5, 2010, as supplemented by a First Supplemental Trust Indenture dated as of January 1, 2011 between Just Energy Group Inc. and Computershare Trust Company of Canada ("**Computershare**") and a Second Supplemental Trust Indenture dated as of September 22, 2011 between Just Energy Group Inc. and Computershare;

24. Western Systems Power Pool Agreement amongst all Pool Parties effective February 1, 2004.

25. Base Contract for Sale and Purchase of Natural Gas dated January 13, 2005 between Shell US and Commerce Energy, Inc., as amended by a First Amendment dated as of July 1, 2009 between Shell US and Commerce Energy, Inc.

26. Master Power Purchase and Sale Agreement dated October 1, 2004 between Commerce Energy, Inc. and Shell US, as amended by amending agreements dated February 10, 2009 and July 1, 2009 (as each may be amended, restated, modified or supplemented from time to time).

27. ISDA Master Agreement dated as of May 7, 2010 between BP Corporation North America Inc. (as assigned to BP Energy Company pursuant to an assignment and amendment agreement dated October 15, 2012) and Hudson Energy Services LLC.

28. Base Contract for Sale and Purchase of Natural Gas dated as of May 7, 2010 between BP Energy Company and Hudson Energy Services LLC.

29. Master Power Purchase and Sale Agreement dated as of May 7, 2010 between BP Energy Company and Hudson Energy Services LLC.

30. Master Netting Agreement dated as of May 7, 2010 between BP Energy Company, BP Corporation North America Inc. (as assigned to BP Energy Company pursuant to an assignment and amendment agreement dated October 15, 2012) and Hudson Energy Services LLC.

31. ISO Services Agreement dated as of May 7, 2010 between BP Energy Company and Hudson Energy Services LLC, as amended.

32.     ISDA Master Agreement dated as of June 10, 2010 between Just Energy (U.S). Corp. and EDF Trading North America, LLC.

33.     ISDA 2002 Master Agreement dated as of June 21, 2010 between Just Energy Trading L.P. and National Bank of Canada.

34.     Amended and Restated Master Power Purchase and Sale Agreement made as of October 3, 2011 between Fulcrum Retail Holdings LLC and Shell Energy North America (US), L.P.

35.     ISDA Master Agreement dated as of June 13, 2012 between Just Energy Trading L.P. and BP Energy Company, and all confirmations and transactions thereunder.

36.     Trust Deed dated January 29, 2014, among Just Energy Group Inc., U.S. Bank Trustees Limited, and Elavon Financial Services Limited.

37.     Master Power Purchase and Sale Agreement (Alberta) dated as of October 1, 2013 between Shell Energy and Just Energy Alberta L.P.

38.     ISDA Master Agreement dated as of June 10, 2010, between Nextera Energy Power Marketing, LLC and Just Energy (U.S). Corp., as amended by amending agreements dated as of June 10, 2010, December 2014, July 29, 2015, and April 18, 2018 (as each may be amended, restated, modified or supplemented from time to time).

39.     ISDA Master Agreement dated as of November 20, 2015, between Macquarie Energy LLC and Just Energy (U.S). Corp., as amended by amending agreements dated as of November 2, 2016 and April 18, 2018 (as each may be amended, restated, modified or supplemented from time to time).

40.     NAESB Base Contract for Sale and Purchase of Natural Gas dated April 14, 2016 between Just Energy Ontario L.P. and Macquarie Energy Canada Ltd., and all confirmations and transactions thereunder.

41.     Trust Indenture dated as of October 5, 2016 between Just Energy Group Inc. and Computershare Trust Company of Canada providing for the issue of unsecured subordinated debentures as amended or supplemented from time to time.

42.     Trust Indenture dated as of February 22, 2018 between Just Energy Group Inc. and Computershare Trust Company of Canada providing for the issue of unsecured subordinated debentures as amended or supplemented from time to time.

43.     First Amended and Restated Loan Agreement, dated September 28, 2020 between, amongst others, Just Energy Group Inc., Computershare Trust Company of Canada, and Sagard Credit Partners, LP, as amended.

44.     Trust Indenture dated as of September 28, 2020 between Just Energy Group Inc. and Computershare Trust Company of Canada providing for the issue of an unsecured subordinated note as amended or supplemented from time to time.

45. ISDA Master Agreement dated as of November 6, 2020 between Shell Energy North America (Canada) Inc. and the Canadian Debtor and the schedule thereto.

46. ISDA Master Agreement dated as of January 15, 2021 between Shell Energy North America (Canada) Inc. and Just Energy New York Corp. and the schedule thereto.

47. Base Contract for the Purchase and Sale of Natural Gas, dated October 3, 2005, between Shell Energy and Just Green L.P.

**MATERIAL LICENCES**

1. The Canadian Borrower holds a natural gas license (#GM-2020-0121) and an electricity license (#ER-2020-0120), both of which were issued by the Ontario Energy Board on July 9, 2020.

2. Just Energy Illinois Corp. holds a Certificate of Service Authority as an Alternative Gas Supplier pursuant to Order No. 03-0720 dated December 17, 2003 issued by the Illinois Commerce Commission.

3. Just Energy New York Corp. is authorized to sell gas and electricity contracts in New York State. Physical licenses are not issued.

4. Just Energy Solutions Inc. is authorized to sell gas and electricity contracts in New York State. Physical licenses are not issued.

5. Just Energy (U.S.). Corp. holds an electricity license (#FERC - ER10-379) issued by the State of New York Federal Energy Regulatory Commission.

6. Just Energy Texas L.P. is qualified to participate in the Electric Reliability Council of Texas electric market and is certified by the Public Utility Commission of Texas as a Retail Electric Provider in the State of Texas pursuant to Certificate No. 10052. Physical licenses and certificates are not issued.

7. Just Energy Massachusetts Corp. is licensed as a Competitive Supplier of electricity by the Commonwealth of Massachusetts Department of Public Utilities under license no. CS-069 dated August 15, 2011.

8. Just Energy Alberta L.P. is licensed to operate as an Electricity Marketing Business by the Government of Alberta under license number 325638 dated December 1, 2020.

9. Just Energy Alberta L.P. is licensed to operate as a Natural Gas Marketing Business by the Government of Alberta under license number 325637 dated December 1, 2020.

10. Just Energy Alberta L.P. is licensed to operate as a Direct Seller by the Government of Alberta under license number 345191 dated February 1, 2021.

11. Just Energy Pennsylvania Corp. is licensed to operate as an Electric Generation Supplier by the Pennsylvania Public Utility Commission under license number A-2009-2097544 dated June 21, 2012.

12. Just Energy Pennsylvania Corp. is licensed to operate as a Natural Gas Supplier by the Pennsylvania Public Utility Commission under license number A-2009-2098011 dated December 28, 2009.

13. Just Energy Michigan Corp. is licensed to operate as a Michigan Alternative Gas Supplier by the State of Michigan Public Service Commission pursuant to Case No. U-15980.

14. Just Energy Solutions Inc. is licensed to operate as an alternative retail electric supplier by the Illinois Commerce Commission of the State of Illinois who granted an Application for Certificate of Service Authority under Section 16-115 of the Public Utilities Act, Order No. 06-0723.

15. Just Energy Solutions Inc. is licensed to operate as an alternative gas supplier by the Illinois Commerce Commission of the State of Illinois who granted an Application for Certificate of Service Authority under Section 19-110 of the Public Utilities Act, Order No. 07-0501.

16. Just Energy Solutions Inc. was granted a licence for Electric Generation Supplier by the Pennsylvania Public Utility Commission, Licence Number A-110117 dated September 15, 1999.

17. Just Energy Solutions Inc. was granted a licence for Natural Gas Supplier by the Pennsylvania Public Utility Commission, Licence Number A-125138 dated May 19, 2005.

18. Just Energy Solutions Inc. was granted a licence by the State of New Jersey Board of Public Utilities Licence to conduct business in the State of New Jersey as an Electric Power Supplier, Licence Number ESL-0046.

19. Just Energy Solutions Inc. was granted a Competitive Retail Natural Gas Marketer's Certificate by the State of Ohio, Certificate number 02-023G (9).

20. Just Energy Solutions Inc. was granted a Competitive Retail Electric Service Provider Certificate by the State of Ohio, Certificate No. 01-1123-EL-CRS.

21. Just Energy Solutions Inc. was granted a licence as an alternative electric supplier pursuant to a decision of the Michigan Public Service Commission, Case No. U-13203.

22. Just Energy Solutions Inc. was granted a Certificate by the Public Utilities Commission of the State of California to operate as an electric service provider, ESP No. 1092.

23. Just Energy Solutions Inc. holds an Electricity license (#FERC - ER97-4253) issued by the Federal Energy Regulatory Commission for New York.

24. Just Energy New York Corp. holds an Electricity license (#FERC – ER13-1081-000) issued by the Federal Energy Regulatory Commission for New York.

25.    Just Energy Illinois Corp. holds an Electricity license (#FERC – ER13-1104-000) issued by the Federal Energy Regulatory Commission for New York.

26.    Just Energy Pennsylvania Corp. holds an Electricity license (#FERC – ER17-2428-000) issued by the Federal Energy Regulatory Commission for New York.

27.    Just Energy Texas L.P. holds an Electricity license (#FERC – ER17-2429-000) issued by the Federal Energy Regulatory Commission for New York.

28.    Hudson Energy Services, LLC. holds an Electricity license (#FERC – ER17-2427-000) issued by the Federal Energy Regulatory Commission for New York.

29.    Hudson Energy Services LLC holds Retail Electric Provider Certification No. 30061 from the Public Utility Commission of Texas, dated September 14, 2004.

30.    Hudson Energy Services LLC holds a Certificate of Service Authority as an Alternative Retail Electric Supplier pursuant to Order No. 07-0455, dated September 26, 2007, issued by the Illinois Commerce Commission.

31.    Hudson Energy Services LLC, by letter dated December 16, 2002 from the New York Department of Public Service, was approved for retail electric sales.

32.    Hudson Energy Services LLC, by letter dated September 25, 2002, from the State of New York Department of Public Service, was approved to sell retail natural gas to residential and non-residential consumers.

33.    Hudson Energy Services LLC holds Electric Power Supplier License No. ESL-0083 dated October 25, 2019, from the New Jersey Board of Public Utilities.

34.    Hudson Energy Services LLC holds Gas Power License No. GSL-0069 dated October 25, 2019, from the New Jersey Board of Public Utilities.

35.    Hudson Energy Services LLC holds a Gas license (Certificate # 12-271G (4)) dated October 17, 2018, issued by the Public Utilities Commission of Ohio.

36.    Hudson Energy Services LLC holds an Electric license (Certificate # 12-538 E (4)) dated July 27, 2016, issued by the Public Utilities Commission of Ohio.

37.    Hudson Energy Services LLC by letter dated September 24, 2012 from the Massachusetts Department of Public Utilities, was approved as a Competitive Supplier, License No. CS-061.

38.    Hudson Energy Services LLC by letter dated September 4, 2014 from the Massachusetts Department of Public Utilities, was approved as a Gas Supplier, License No. GS-034.

39.    Just Energy Solutions Inc. holds a Gas license (#GSL-0116) issued on July 25, 2018, by the New Jersey Board of Public Utilities.

40.    Hudson Energy Canada Corp. holds an Electricity Retailer Licence issued by the Province of Ontario, Licence Number ER-2020-0117, issued June 11, 2020.

41.    Hudson Energy Canada Corp. holds a Gas Marketer Licence issued by the Province of Ontario, Licence Number GM-2020-0118, issued June 11, 2020.

42.    Hudson Energy Canada Corp. holds an Electricity Marketing Business Licence issued by the Government of Alberta, Licence Number 331458, issued September 1, 2020.

43.    Hudson Energy Canada Corp. holds a Natural Gas Marketing Business Licence issued by the Government of Alberta Licence, Number 331459, issued September 1, 2020.

44.    Hudson Energy Services LLC holds a License for Electric Generation Supplier, issued by the Pennsylvania Public Utility Commission, Certification No. A-2010-2192137 dated February 11, 2011.

45.    Hudson Energy Services LLC holds a License for Natural Gas Supplier, issued by the Pennsylvania Public Utility Commission, Certification No. A-2018-3002121 dated November 8, 2018.

46.    Hudson Energy Services LLC holds a Natural Gas license (#12-04), issued by the State of Connecticut, Department of Public Utility Control on October 1, 2015.

47.    Fulcrum Retail Energy LLC is qualified to participate in the Electric Reliability Council of Texas electric market and is certified by the Public Utility Commission of Texas as a Retail Electric Provider in the State of Texas pursuant to Certificate No. 10081 dated January 30, 2004.

48.    Tara Energy, LLC is qualified to participate in the Electric Reliability Council of Texas electric market and is certified by the Public Utility Commission of Texas as a Retail Electric Provider in the State of Texas pursuant to Certificate No. 10051.

49.    Just Energy (B.C.) Limited Partnership is licensed by the Province of British Columbia to operate as a Gas Marketer, Commission Order and Licence No. A-8-20, effective November 1, 2020.

50.    Just Energy Solutions Inc. was granted a Certificate by the Public Utilities Commission of the State of California to operate as a Core Transport Agent, as mandated by Senate Bill (SB) 656 and pursuant to Commission Decision (D.) 14-08-043, dated August 28, 2014, Certificate No. CTA0010 dated February 25, 2015.

51.    Just Energy Solutions Inc. was granted a Certificate by the State of Delaware Public Service Commission to operate as an Electric Supplier pursuant to PSC Docket No. 07-275, Order No. 7330 issued December 18, 2007.

52.    Just Energy Solutions Inc. was granted approval by the Georgia Public Service Commission to provide firm retail natural gas services pursuant to Certificate of Authority No. GM-030, Docket No. 20504 issued March 15, 2011.

53. Just Energy Manitoba L.P. is licensed by the Manitoba Public Utilities Board to participate as a Gas Marketer, Licence No. 659 dated October 30, 2020.

54. Just Energy Solutions Inc. is licensed by the State of Maryland Public Service Commission to operate as an electricity supplier, License Reference No.: IR-639, dated July 7, 2004.

55. Just Energy Solutions Inc. is licensed by the State of Maryland Public Service Commission to operate as a natural gas supplier, License Reference No.: IR-737, issued June 15, 2005.

56. Hudson Energy Services LLC is licensed by the State of Maryland Public Service Commission to supply electricity or electric generation services in Maryland, License Reference No.: IR-1114 dated October 10, 2007.

57. Hudson Energy Services LLC is licensed by the State of Maryland, Public Service Commission to supply natural gas services in Maryland, License Reference No.: IR-1120 dated October 24, 2007.

58. Just Energy New York Corp. holds an Electricity Wholesaler Licence, No. EW-2019-0108, issued by the Ontario Energy Board on May 30, 2019.

59. Just Energy Solutions Inc. holds an Electricity Wholesaler Licence, No. EW-2016-0149, issued by the Ontario Energy Board on June 2, 2016.

60. Just Energy Prairies L.P. holds a Direct Seller Licence issued on April 29, 2020, by the Province of Saskatchewan to sell natural gas, Licence No. 328505.

61. Interactive Energy Group LLC holds an electricity license, No. 17-0390, issued by the State of Illinois on November 1, 2017.

62. Interactive Energy Group LLC holds an electricity broker license, No. 2017-00298, issued by the State of Maine on December 8, 2017.

63. Interactive Energy Group LLC holds an electricity broker license, IR-3982, issued by the State of Maryland on September 26, 2018.

64. Interactive Energy Group LLC holds a natural gas broker license, IR-3980, issued by the State of Maryland on September 26, 2018.

65. Interactive Energy Group LLC holds an Electricity Broker License, EB-433, issued by the State of Massachusetts on February 11, 2020.

66. Interactive Energy Group LLC holds a Natural Gas Broker license, RA-200, issued by the State of Massachusetts on April 1, 2019.

67. Just Energy Solutions Inc. holds a gas license, G-13 Sub 1, issued by the state of Nevada on November 30, 2006.

68. Interactive Energy Group LLC holds an Energy Agent license, EA-0484, issued by the State of New Jersey on June 10, 2020.

69. Interactive Energy Group LLC holds a natural gas broker license, 17-624G(2), issued by the State of Ohio on October 19, 2019.

70. Interactive Energy Group LLC holds a power broker license, 17-1266E(2), issued by the State of Ohio on October 19, 2019.

71. Interactive Energy Group LLC is licensed to operate as a Natural Gas Broker by the Pennsylvania Public Utility Commission under license number A-2017-2634175 dated March 1, 2018.

72. Interactive Energy Group LLC is licensed to operate as an Electricity Broker by the Pennsylvania Public Utility Commission under license number A-2017-2635016 dated March 1, 2018.

73. Interactive Energy Group LLC is licensed to operate as a broker by the Public Utility Commission of Texas under license number BR190398.

74. Just Energy Just Energy Solutions Inc. is licensed by the State of Virginia to operate as a competitive service provider of natural gas, License No.: G-30, dated April 21, 2011.

75. Just Energy Just Energy Solutions Inc. is licensed by the State of Virginia to operate as a competitive service provider of electric services, License No.: G-26, dated April 21, 2011.

76. Just Energy Texas L.P. is qualified to participate in the Electric Reliability Council of Texas electric market and is certified by the Public Utility Commission of Texas as a Retail Electric Provider in the State of Texas pursuant to Certificate No. 10052.

77. Universal Energy Corporation holds a natural gas license (#GM-2016-0261) issued by the Ontario Energy Board on November 24, 2016.

78. Universal Energy Corporation holds an electricity license (#ER-2016-0332) issued by the Ontario Energy Board on December 29, 2016.

79. Hudson Energy Services, LLC has been granted a blanket authorization to import and export natural gas from and to Canada by the United States Department of Energy pursuant to DOE/FE Order No. 4399 date June 11, 2019.

80. Just Energy Ontario L.P. has been granted a blanket authorization to import and export natural gas from and to Canada by the United States Department of Energy pursuant to DOE/FE Order No. 4417 dated July 26, 2019.

81. Just Energy New York Corp. has been granted a blanket authorization to import and export natural gas from and to Canada by the United States Department of Energy pursuant to DOE/FE Order No. 4431 dated September 3, 2019.

## SCHEDULE 22(27)

### ENVIRONMENTAL REPORTS

Nil.

## SCHEDULE 22(35)

## NON ARM'S LENGTH TRANSACTIONS

Nil.

**Exhibit C**

**Shell Support Agreement**

# SUPPORT AGREEMENT

This SUPPORT AGREEMENT (this "**Agreement**") is entered into as of March 9, 2021, by and among Just Energy Ontario L.P., a limited partnership existing under the laws of the Province of Ontario (the "**Canadian Applicant**") and Just Energy (U.S.) Corp., a corporation incorporated under the laws of the State of Delaware (the "**U.S. Applicant**") and each of their affiliates listed on <u>Annex I</u> (collectively, with the Canadian Applicant and U.S. Applicant, the "**JE Customer Parties**"), Shell Energy North America (Canada) Inc., a Canadian corporation ("**Shell Canada**"), Shell Energy North America (US), L.P., a Delaware limited partnership ("**Shell US**" and together with Shell Canada and Shell US, "the **Shell Parties**" and together with the JE Customer Parties, the "**Parties**").

## RECITALS

**WHEREAS**, the Canadian Applicant and the U.S. Applicant, and certain of their affiliates (collectively, the "**Canadian Applicants**"), intend to make an application to the Ontario Superior Court of Justice (Commercial List) (the "**Bankruptcy Court**"), for an initial order (as may be amended and restated from time to time, the "**Initial Order**") granting protection to the Shell Parties, the DIP Lenders (as defined below) and the BP Parties (as defined below) under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**", and the proceedings of the Shell Parties, the DIP Lenders and the BP Parties thereunder, the "**CCAA Proceedings**").

**WHEREAS**, the Canadian Applicant and U.S. Applicant, and certain of their affiliates (the "**US Applicants**", and collectively with the Canadian Applicants, the "**Applicants**"), intend to commence ancillary insolvency proceedings under chapter 15 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas to recognize the CCAA Proceedings (the "**Chapter 15 Proceeding**" and, together with the CCAA Proceedings, the "**Bankruptcy Event**").

**WHEREAS**, the Shell Parties and the JE Customer Parties have entered into those certain agreements listed on <u>Annex II</u> hereto (collectively, the "**Existing Agreements**").

**WHEREAS**, in order induce the Shell Parties to refrain from exercising any Termination Rights (as defined herein), and to induce the Shell Parties continue transacting with the JE Customer Parties under the Existing Agreements during the Bankruptcy Event, the Shell Parties require that the Initial Order provide Super Priority Status to the Shell Post-Petition Claims.

**NOW, THEREFORE**, in consideration of the foregoing, the terms, covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

SECTION 1. **Definitions.** "**A&R ICA**" means that certain Sixth Amended and Restated Intercreditor Agreement, dated as of September 1, 2015, by and among Canadian Imperial Bank of Commerce, as collateral agent and agent for itself as agent and the lenders, the Shell Parties, BP Canada Energy Group ULC, BP Canada Energy Marketing Corp., BP Energy Company, Exelon Generation Company, LLC, Bruce Power L.P., Societe Generale, EDF Trading North America, LLC, National Bank of Canada, Nextera Energy Power Marketing, LLC, Macquarie Bank Limited, Macquarie Energy Canada Ltd., Macquarie Energy LLC and each other person identified as a commodity supplier from time to time party thereto and Just Energy Ontario L.P. and Just Energy (U.S.) Corp., as borrowers, as amended from time to time.

"**Bankruptcy Court**" is defined in the Recitals.

"**Bankruptcy Event**" is defined in the Recitals.

"**BP Parties**" means BP Canada Energy Company, BP Canada Energy Marketing Corp., BP Energy Company, BP Corporation North America Inc. and BP Canada Energy Group ULC.

"**Canadian Applicant**" is defined in the Preamble.

"**CCAA**" is defined in the Recitals.

"**CCAA Proceeding**" is defined in the Recitals.

"**Chapter 15 Proceeding**" is defined in the Recitals.

"**Collateral Agent Succession Agreement**" means that certain Collateral Agent Succession Agreement, dated as of March 1, 2019, by and among Canadian Imperial Bank of Commerce, as resigning collateral agent, National Bank of Canada, as successor collateral agent, Canadian Applicant and U.S. Applicant, as borrowers.

"**Applicants**" is defined in the Preamble.

"**Definitive Documents**" has the meaning set forth in the Initial Order or the Final Order, as the case may be.

"**DIP Agent**" means the agent under the DIP Facility.

"**DIP Facility**" means that certain credit facility described in that certain CCAA Interim Debtor-In-Possession Financing Term Sheet, dated as of the date hereof.

"**DIP Lenders**" means the lenders under the DIP Facility.

"**Existing Agreements**" is defined in the Recitals.

"**Event of Default**" has the meaning set forth in Section 7.

"**Final Order**" means a final order entered or approved by the Bankruptcy Court authorizing this Agreement and the terms herein in substantially the form of the Initial Order, with only such modifications in form and substance that are satisfactory to the Shell Parties in their sole

discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of the Shell Parties, in their sole discretion).

"**ICA**" means the A&R ICA, First Amendment to ICA and Collateral Agent Succession Agreement.

"**Initial Order**" is defined in the Recitals.

"**First Amendment to ICA**" means that certain First Amending Agreement and Adhesion Agreement to Intercreditor Agreement, dated as of May 17, 2018, by and among Canadian Imperial Bank of Commerce, as collateral agent and agent for itself and the lenders, the Shell Parties, BP Canada Energy Group ULC, BP Canada Energy Marketing Corp., BP Energy Company, Exelon Generation Company, LLC, Nextera Energy Power Marketing, LLC, Macquarie Bank Limited, Macquarie Energy Canada Ltd. and Macquarie Energy LLC, as commodity suppliers, Morgan Stanley Capital Group Inc., as new commodity supplier and Just Energy Ontario L.P. and Just Energy (U.S.) Corp., as borrowers.

"**Parties**" is defined in the Preamble.

"**Performance Assurance**" is defined in Section SECTION 3.

"**Petition Date**" is defined in the Recitals.

"**Review Period**" is defined in Section 5(a).

"**Shell Canada**" is defined in the Preamble.

"**Shell Parties**" is defined in the Preamble.

"**Shell Post-Petition Claims**" means those certain claims in respect of Priority Commodity/ISO Obligations (as defined in the Initial Order or the Final Order, as the case may be).

"**Shell Pre-Petition Claims**" means all obligations owing to the Shell Parties as of the Petition Date which constitute "Senior Obligations" as defined in the ICA.

"**Shell US**" is defined in the Preamble.

"**Super Priority Status**" means the status assigned to the Priority Commodity/ISO Charge (pursuant to and as defined in the Initial Order or the Final Order, as the case may be).

"**Termination Rights**" means any right to terminate or disclaim the Existing Agreements, or any trades or transactions thereunder, as a result of the Bankruptcy Event.

"**US Applicant**" is defined in the Preamble.

SECTION 2.  **Agreement not to Exercise Termination Rights.  The Parties acknowledge and agree that the Existing Agreements constitute eligible financial contracts under the CCAA.** The Shell Parties agree to refrain from exercising any Termination Rights so long as no Event of

Default (as defined herein) has occurred**.** The JE Customer Parties agree to refrain from exercising any Termination Rights.

SECTION 3. **No Performance Assurance**. So long as the JE Customer Parties comply with the terms of this Agreement and any Order in the CCAA Proceeding, including with respect to timely payment for deliveries made following the Initial Order, the Shell Parties will not impose more restrictive conditions (including, without limitation, any request for additional collateral, credit support or other type of performance assurance, or any replacement guarantees (collectively, the "**Performance Assurance**")), beyond what the JE Customer Parties (or their affiliates) have provided or posted pursuant to the Existing Agreements as of the date hereof. For the avoidance of doubt, the Shell Parties have the right, but no obligation, to accept further confirmations under the Existing Agreements. For the avoidance of doubt, nothing in this Agreement, the Initial Order or the Final Order shall limit any rights of any Shell Party relating to set-off, recoupment or netting available to it under applicable law, in equity or by agreement with respect to confirmations and transactions occurring on or after March 9, 2021.

SECTION 4. **[Reserved]**.

SECTION 5. **JE Customer Parties' Obligations**.

      (a)     <u>Shell Parties' Fees and Expenses</u>. The JE Customer Parties agree to pay the reasonable and documented fees and expenses of the Shell Parties' legal counsel, whether arising before**,** on or after the Petition Date, within ten (10) days (the "**Review Period**") after the JE Customer Parties' receipt of invoices for such fees and expenses; provided that the JE Customer Parties may raise good faith disputes regarding any such invoice by written notice to the Shell Parties before the end of the Review Period, but the Shell Customer Parties shall pay any undisputed portion of such invoice by the end of the Review Period.

      (b)     <u>Reporting</u>. The JE Customer Parties will provide copies of all documentation provided to the DIP Agent and DIP Lenders under the Definitive Documents, including copies of the Applicants' cash flow statements and all other financial statements, reports and notices, on or prior to the dates such information is required to be provided to the DIP Agent and DIP Lenders and their counsel in accordance with the Definitive Documents.

SECTION 6. **Conditions Precedent**. The obligations of the Shell Parties hereunder shall not become effective until the date on which each of the following conditions are satisfied (or waived in writing by the Shell Parties in their sole discretion):

      (a)     The Bankruptcy Court shall have entered the Initial Order providing Super Priority Status to the Shell Post-Petition Claims, and the Initial Order shall be in form and substance satisfactory to Shell Parties and shall be in full force and effect, and Applicants shall be in compliance in all respects with the Initial Order. Any such charge shall continue to the benefit of the Shell Parties in the event of an Applicants' Event of Default under Section 7 herein.

      (b)     All orders entered by the Bankruptcy Court in the Bankruptcy Event pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the Shell Parties.

(c)     The JE Customer Parties shall have executed and delivered to the Shell Parties such other documents in connection with the matters contemplated herein as the Shell Parties may have reasonably requested.

SECTION 7.    **Events of Default.**    Subject to the Bankruptcy Court's order, which may only be sought on five days' notice to Just Energy and the service list in the CCAA Proceedings, the Shell Parties may exercise their Termination Rights upon the occurrence of any of the events set forth below (each, an "**Event of Default**") by providing three days' written notice to the JE Customer Parties; provided that after the three day cure period, the Shell Parties have the right to suspend any deliveries by the Shell Parties under the Existing Agreements unless the JE Customer Parties prepay for such deliveries (for the avoidance of doubt, such prepayments may be made on a daily basis); provided further that notwithstanding the foregoing, the Shell Parties may immediately suspend deliveries under the Existing Agreement if an Event of Default occurs under clause (a) below, without the need of notice or Bankruptcy Court order:

(a)     Any JE Customer Party shall default in the payment when due of any amount owing to the Shell Parties under the Existing Agreements and arising after the Petition Date.

(b)     [Reserved].

(c)     An Event of Default (as defined in the DIP Facility) shall occur and be continuing under the DIP Facility and either (i) such Event of Default has not been waived by the requisite lenders thereunder or (ii) such Event of Default would have a material adverse effect on the financial condition of the JE Customer Parties or the viability of the Bankruptcy Event, and such Event of Default has not been waived by the Shell Parties.

(d)     The violation of any term or condition in the Initial Order or Final Order by the Applicants, or the Initial Order or Final Order, as applicable, shall fail to be in full force and effect.

(e)     The Bankruptcy Court shall enter an order or orders allowing any one or more creditors to execute upon or enforce liens on any assets of the Applicants which have a fair market value in excess of $1,000,000 in the aggregate.

(f)     The filing of a Plan of Compromise or Arrangement that does not propose to repay all Shell Post-Petition Claims in full, in cash immediately upon its effectiveness.

(g)     The CCAA Proceeding or the Chapter 15 Proceeding is dismissed or converted to a liquidation proceeding including a receivership, bankruptcy, United States Chapter 7 proceeding or otherwise ("**Liquidating Proceeding**") or the Applicants shall file a motion or other pleading seeking the dismissal of the CCAA Proceeding or the Chapter 15 Proceeding or conversion to a Liquidating Proceeding.

(h)     The liens securing the Shell Pre-Petition Claims for any reason cease to be valid and perfected liens on the collateral purported to be covered thereby, subject only to (i) encumbrances expressly permitted by the ICA and (ii) encumbrances created by the Initial Order or the Final Order, or any action shall be taken by the Applicants to discontinue or to assert the invalidity or unenforceability of any lien securing the Shell Pre-Petition Claims, or the validity or enforceability of the ICA.

      (i)     The JE Customer Parties shall fail to pay any undisputed amount owed hereunder or shall fail to perform in any material respect any other obligations under this Agreement.

SECTION 8.  **Release**.  The JE Customer Parties hereby unconditionally and irrevocably release the Shell Parties and their respective successors, assigns, officers, directors, employees, attorneys and agents from any liability for actions or omissions arising or occurring prior to the Petition Date, whether known or unknown, whether in connection with the Existing Agreements or otherwise (it being agreed and understood that this release shall not extend to any liabilities arising under this Agreement or other actions or omissions on or after the Petition Date whether in connection with the Existing Agreements or otherwise).

SECTION 9.  **Termination of Extended Payment Terms**.  The letter agreement entitled "Regarding Payment Obligations between Shell Entities and Just Energy Entities" dated December 17, 2018 among Shell US, Shell Canada, Just Energy Alberta L.P., Just Energy New York Corp. and Just Energy Texas L.P., Just Energy Solutions Inc. is hereby terminated, and for avoidance of doubt (i) the extended payment terms set forth therein shall not apply to amounts owing to the Shell Parties arising after the Petition Date (including amounts arising after the Petition Date with respect to trades entered into prior to the Petition Date) and (ii) the $0.15/MWh fee shall not apply to transactions entered into after the Petition Date.

SECTION 10. **Governing Law; Submission to Jurisdiction and Venue.**  **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN. THE PARTIES SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT, WHICH SHALL HEAR MATTERS REGARDING THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT.**

SECTION 11. **Construction.**  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties. Neither the provisions of this Agreement nor any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or its counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction. Each of the Parties hereto represents and declares that such Party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such Party knows the contents thereof and signs the same freely and voluntarily. The Parties acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection herewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect. If any matter is left to the decision, right, requirement, request, determination, judgment, opinion, approval, consent, waiver, satisfaction, acceptance, agreement, option, or discretion of the Shell Parties or their employees, counsel, or agents in the ICA, such action shall be deemed to be exercisable by the Shell Parties in their sole and absolute discretion and according to standards established in its sole and absolute discretion. Without limiting the generality of the foregoing, "option" and "discretion" shall be implied by the use of the words "if" and "may".

SECTION 12. **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which shall be deemed to be an original and such counterparts taken together shall constitute

one agreement, and any of the Parties may execute this Agreement by signing any such counterpart.  Delivery of an executed signature page to this Agreement by facsimile, e-mail or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 13. **Severability.**  Each provision of this Agreement is intended to be severable and if any provision is illegal, invalid or unenforceable, such illegality, unenforceability or invalidity shall not affect the validity of this Agreement or the remaining provisions.

SECTION 14. **Further Assurances.**  The Parties agree to execute and deliver such further and other documents and perform and cause to be performed such further and other acts and things as may be necessary or desirable in order to give full effect to this Agreement and every part thereof, including all acts, deeds and agreements as may be necessary or desirable for the purpose of registering or filing notice of the terms of this Agreement.

SECTION 15.  **Section Headings.**  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

SECTION 16.  **Notices.**  All notices, requests, and demands to or upon the Parties shall be given in accordance with the ICA, with additional copies to counsel for the Parties as required by the Bankruptcy Court.

SECTION 17.  **Assignments; No Third Party Beneficiaries.**  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; provided that the Applicants shall not be entitled to assign any of their rights or remedies set forth in this Agreement without the prior written consent of the Shell Parties in their sole discretion.  No person other than the Parties hereto shall have any rights hereunder or shall be entitled to rely on this Agreement and all third-party beneficiary rights are hereby expressly disclaimed.

*[Signature pages follow]*

IN WITNESS WHEREOF, this Support Agreement has been executed by the Parties as of the date first written above.

**JUST ENERGY ONTARIO L.P.,** by its general partner, **JUST ENERGY CORP.**

By:_____

Name: Michael Carter
Title:   Chief Financial Officer

By:_____

Name: Jonah Davids
Title:   Executive Vice President, General Counsel and Corporate Secretary

**JUST ENERGY (U.S.) CORP.**

By:_____

Name: Michael Carter
Title:   Chief Financial Officer

By:_____

Name: Jonah Davids
Title:   Executive Vice President, General Counsel and Corporate Secretary

**JUST ENERGY NEW YORK CORP.**

By:_____

Name: Michael Carter
Title:   Chief Financial Officer

By:_____

Name: Jonah Davids
Title:   Executive Vice President, General Counsel and Corporate Secretary

**JUST ENERGY ALBERTA L.P.,** by its general
partner**, JUST ENERGY CORP.**

By:_____

Name:  Michael Carter

Title:   Chief Financial Officer

By:_____

Name: Jonah Davids

Title:   Executive Vice President, General Counsel
and Corporate Secretary


**FULCRUM RETAIL HOLDINGS LLC**

By:_____

Name: Michael Carter

Title:   Chief Financial Officer

By:_____

Name: Jonah Davids

Title:   Executive Vice President, General Counsel
and Corporate Secretary

**JUST ENERGY TEXAS LP,** by its general
partner**, JUST ENERGY, LLC,** by its sole member
and sole manager**, JUST ENERGY TEXAS I
CORP.**

By:_____

Name:  Michael Carter

Title:   Chief Financial Officer

By:_____

Name: Jonah Davids

Title:   Executive Vice President, General Counsel
and Corporate Secretary

**SHELL PARTIES**

**SHELL ENERGY NORTH AMERICA (CANADA) INC.**

By: *Greg chownyk*

Name: Greg Chownyk

Title: Vice President

**SHELL ENERGY NORTH AMERICA (US), L.P.**

By: _____

Name: _____

Title: _____

**SHELL PARTIES**

**SHELL ENERGY NORTH AMERICA (CANADA) INC.**

By: _____
Name: _____
Title: _____

**SHELL ENERGY NORTH AMERICA (US), L.P.**

By: _____
Name: ____Christopher Riley____
Title: ____Vice President____

## ANNEX I

**Affiliate Parties**

Fulcrum Retail Holdings LLC

Just Energy Alberta L.P.

Just Energy Corp.

Just Energy Illinois Corp.

Just Energy New York Corp.

Just Energy Solutions Inc.

Just Energy Texas LP

Just Green L.P.

## ANNEX II
## EXISTING AGREEMENTS

1. Assignment, Assumption, Consent and Release Agreement dated as of August 1, 2005 between the Canadian Applicant and Shell Canada (formerly, Coral Energy Canada Inc.) (the "**JEOLP Assignment Agreement**").

2. Intentionally Omitted[1].

3. Intentionally Omitted[2].

4. Intentionally Omitted[3].

5. Base Contract for Sale and Purchase of Natural Gas dated April 1, 2004 between Shell US (formerly Coral Energy Resources L.P.) and Just Energy Illinois Corp., as amended by amending agreement dated October 31, 2005, and all confirmations and transactions thereunder.

6. Master Power Purchase and Sale Agreement dated October 1, 2004 between Commerce Energy, Inc. (now known as, Just Energy Solutions Inc.) and Shell US, as amended by amending agreements dated February 10, 2009 and July 1, 2009 (as each may be amended, restated, modified or supplemented from time to time).

7. Amended and Restated Master Power Purchase and Sale Agreement made as of February 1, 2005 between Just Energy Texas L.L.C. (now known as Just Energy Texas LP) and Shell US, and all confirmations and transactions thereunder.

8. Base Contract for Sale and Purchase of Natural Gas dated January 13, 2005 between Shell US and Commonwealth Energy Corporation (now known as Just Energy Solutions Inc.), as amended by a first amendment dated as of July 1, 2009, and all confirmations and transactions thereunder.

9. Master Power Purchase and Sale Agreement dated September 14, 2005, as amended and restated October 31, 2005, between Just Energy New York Corp. and Shell US, and all confirmations and transactions thereunder.

10. Base Contract for Sale and Purchase of Natural Gas dated as of October 31, 2005 between Shell Canada, as seller and the Canadian Applicant (formerly known as Ontario Energy Savings L.P.), as buyer (amending and restating that certain natural gas sale agreement dated as of October 15, 1998 between Shell Energy, as seller and Just Energy Corp., as buyer, as amended by amending agreements dated as of September 26, 2001, January 15, 2003 and October 29, 2004 and as assigned by Just Energy Corp. to the Canadian Applicant

---

[1] Note – this agreement is inactive

[2] Note – this agreement is inactive

[3] Note – this agreement is inactive

pursuant to the JEOLP Assignment Agreement), and all confirmations and transactions thereunder.

11. Base Contract for the Sale and Purchase of Natural Gas, dated as of October 31, 2005 between Shell US and New York Energy Savings Corp. (now known as Just Energy New York Corp., and all confirmations and transactions thereunder.

12. Intentionally Omitted.

13. Intentionally Omitted.[4]

14. Base Contract for the Sale and Purchase of Natural Gas dated as of February 23, 2007 between Shell Canada and New York Energy Savings Corp. (now known as Just Energy New York Corp., and all confirmations and transactions thereunder.

15. Amended and Restated Master Power Purchase and Sale Agreement made as of October 3, 2011 between Fulcrum Retail Holdings LLC and Shell US.

16. Master Power Purchase and Sale Agreement (Alberta) dated as of October 1, 2013 between Shell Canada and Just Energy Alberta L.P.

17. Third Amended and Restated Scheduling Coordinator Agreement dated December 1, 2014 among Just Energy New York Corp., Just Energy (U.S.) Corp., Commerce Energy, Inc. (now known as, Just Energy Solutions Inc.) and Shell US.

18. ISDA Master Agreement dated as of November 6, 2020 between Shell Canada and the Canadian Applicant and the schedule thereto.

19. ISDA Master Agreement dated as of January 15, 2021 between Shell US and Just Energy New York Corp. and the schedule thereto.

20. Base Contract for Sale and Purchase of Natural Gas dated as of October 31, 2005 between Shell Canada and Just Energy Alberta L.P., and all confirmations and transactions thereunder.

---

[4] Note – this agreement is inactive

**Exhibit D**

**BP Support Agreement**

# SUPPORT AGREEMENT

This SUPPORT AGREEMENT (this "**Agreement**") is entered into as of March 9, 2021, by and among Just Energy Ontario L.P., a limited partnership existing under the laws of the Province of Ontario (the "**Canadian Applicant**") and Just Energy (U.S.) Corp., a corporation incorporated under the laws of the State of Delaware (the "**U.S. Applicant**") and each of their affiliates listed on Annex I (collectively, with the Canadian Applicant and U.S. Applicant, the "**JE Customer Parties**"), and BP Canada Energy Marketing Corp., a Delaware corporation ("**BP Marketing**"), BP Energy Company, a Delaware corporation ("**BP Energy**"), BP Corporation North America Inc., an Indiana corporation ("**BP North America**"), BP Canada Energy Group ULC, a corporation incorporated pursuant to the laws of Nova Scotia, Canada ("**BP ULC**" and together with BP Marketing, BP Energy and BP North America, "**BP**" or the "**BP Parties**" and together with the JE Customer Parties, the "**Parties**").

## RECITALS

**WHEREAS**, the Canadian Applicant and the U.S. Applicant, and certain of their affiliates (collectively, the "**Canadian Applicants**"), intend to make an application to the Ontario Superior Court of Justice (Commercial List) (the "**Bankruptcy Court**"), for an initial order (as may be amended and restated from time to time, the "**Initial Order**") granting protection to, among others, the DIP Lenders (as defined below) and the BP Parties under the *Companies' Creditors Arrangement Act* (Canada) (the "**CCAA**", and the proceedings thereunder, the "**CCAA Proceedings**").

**WHEREAS**, the Canadian Applicant and U.S. Applicant, and certain of their affiliates (the "**US Applicants**", and collectively with the Canadian Applicants, the "**Applicants**"), intend to commence ancillary insolvency proceedings under chapter 15 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas to recognize the CCAA Proceedings (the "**Chapter 15 Proceeding**" and, together with the CCAA Proceedings, the "**Bankruptcy Event**").

**WHEREAS**, the BP Parties and the JE Customer Parties have entered into those certain agreements listed on Annex II hereto (collectively, the "**Existing Agreements**").

**WHEREAS**, in order induce the BP Parties to refrain from exercising any Termination Rights (as defined herein), and to induce the BP Parties to continue transacting with the JE Customer Parties under the Existing Agreements during the Bankruptcy Event, the BP Parties require that the Initial Order provide Super Priority Status to the BP Post-Petition Claims.

**NOW, THEREFORE**, in consideration of the foregoing, the terms, covenants and conditions contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

SECTION 1. **Definitions.**

"**A&R ICA**" means that certain Sixth Amended and Restated Intercreditor Agreement, dated as of September 1, 2015, by and among Canadian Imperial Bank of Commerce, as collateral agent and agent for itself as agent and the lenders, Shell Energy North America (Canada) Inc., Shell Energy North America (US), L.P., Shell Trading Risk Management, LLC, BP, Exelon

Generation Company, LLC, Bruce Power L.P., Societe Generale, EDF Trading North America, LLC, National Bank of Canada, Nextera Energy Power Marketing, LLC, Macquarie Bank Limited, Macquarie Energy Canada Ltd., Macquarie Energy LLC and and each other person identified as a commodity supplier from time to time party thereto and Just Energy Ontario L.P. and Just Energy (U.S.) Corp., as borrowers, as amended from time to time.

"**Applicants**" is defined in the Preamble.

"**Bankruptcy Court**" is defined in the Recitals.

"**Bankruptcy Event**" is defined in the Recitals.

"**BP**" is defined in the Preamble.

"**BP Energy**" is defined in the Preamble.

"**BP Marketing**" is defined in the Preamble.

"**BP North America**" is defined in the Preamble.

"**BP**" is defined in the Preamble.

"**BP Post-Petition Claims**" means those certain claims in respect of Priority Commodity/ISO Obligations (as defined in the Initial Order or the Final Order, as the case may be).

"**BP Pre-Petition Claims**" means all obligations owing to the BP Parties as of the Petition Date which constitute "Senior Obligations" as defined in the ICA.

"**BP ULC**" is defined in the Preamble.

"**Canadian Applicant**" is defined in the Preamble.

"**CCAA**" is defined in the Recitals.

"**CCAA Proceeding**" is defined in the Recitals.

"**Chapter 15 Proceeding**" is defined in the Recitals.

"**Collateral Agent Succession Agreement**" means that certain Collateral Agent Succession Agreement, dated as of March 1, 2019, by and among Canadian Imperial Bank of Commerce, as resigning collateral agent, National Bank of Canada, as successor collateral agent, Canadian Applicant and U.S. Applicant, as borrowers.

"**Definitive Documents**" has the meaning set forth in the Initial Order or the Final Order, as the case may be.

"**DIP Agent**" means the agent under the DIP Facility.

"**DIP Facility**" means that certain credit facility described in that certain CCAA Interim Debtor-In-Possession Financing Term Sheet, dated as of the date hereof.

"**DIP Lenders**" means the lenders under the DIP Facility.

"**Existing Agreements**" is defined in the Recitals.

"**Event of Default**" has the meaning set forth in Section 7.

"**Final Order**" means a final order entered or approved by the Bankruptcy Court authorizing this Agreement and the terms herein in substantially the form of the Initial Order, with only such modifications in form and substance that are satisfactory to the BP Parties in their sole discretion (as the same may be amended, supplemented, or modified from time to time after entry thereof with the written consent of the BP Parties, in their sole discretion).

"**ICA**" means the A&R ICA, First Amendment to ICA and Collateral Agent Succession Agreement.

"**Initial Order**" is defined in the Recitals.

"**ISO Services**" is defined in Section 2(a) of the ISO Services Agreement.

"**ISO Services Agreement**" means that certain ISO Services Agreement, dated as of May 7, 2010, by and between BP Energy and Hudson Energy Services, LLC, as amended by Amendment #1 to ISO Services Agreement dated August 23, 2010, as further amended by the Second Amendment to ISO Services Agreement dated as of December 20, 2011, as further amended by the Third Amendment to ISO Services Agreement dated May 20, 2013, as further amended by the Fourth Amendment to ISO Services Agreement dated October 30, 2017, as further amended by the Fifth Amendment to ISO Services Agreement dated July 11, 2018, and as further amended, restated, supplemented and otherwise modified.

"**First Amendment to ICA**" means that certain First Amending Agreement and Adhesion Agreement to Intercreditor Agreement, dated as of May 17, 2018, by and among Canadian Imperial Bank of Commerce, as collateral agent and agent for itself and the lenders, Shell Energy North America (Canada) Inc., Shell Energy North America (US), L.P., Shell Trading Risk Management, LLC, BP, Exelon Generation Company, LLC, Nextera Energy Power Marketing, LLC, Macquarie Bank Limited, Macquarie Energy Canada Ltd. and Macquarie Energy LLC, as commodity suppliers, Morgan Stanley Capital Group Inc., as new commodity supplier and Just Energy Ontario L.P. and Just Energy (U.S.) Corp., as borrowers.

"**Parties**" is defined in the Preamble.

"**Performance Assurance**" is defined in Section 3.

"**Petition Date**" is defined in the Recitals

"**Review Period**" is defined in Section 5(a).

"**Super Priority Status**" means the status assigned to the Priority Commodity/ISO Charge (pursuant to and as defined in the Initial Order or the Final Order, as the case may be).

"**Termination Rights**" means any right to terminate or disclaim the Existing Agreements, or any trades or transactions thereunder, as a result of the Bankruptcy Event.

"**US Applicant**" is defined in the Preamble.

SECTION 2.   **Agreement not to Exercise Termination Rights.  The Parties acknowledge and agree that the Existing Agreements constitute eligible financial contracts under the CCAA; provided, however, the Parties reserve all rights as to whether the ISO Services Agreements constitute eligible financial contracts under the CCAA.** The BP Parties agree to refrain from exercising any Termination Rights so long as no Event of Default (as defined herein) has occurred**.** The JE Customer Parties agree to refrain from exercising any Termination Rights.

SECTION 3.   **Continued Supply**.  So long as no Event of Default has occurred and the JE Customer Parties comply with the terms of this Agreement and any Order in the CCAA Proceeding, including with respect to timely payment for deliveries made following the Initial Order as required under the Existing Agreements, the BP Parties (i) will continue to supply physical and financial power and natural gas, provide the ISO Services (as defined in the ISO Services Agreement (as defined below)) and provide other related services to the JE Customer Parties during the Bankruptcy Event pursuant to the terms of the Existing Agreements as modified by the Initial Order or the Final Order, as the case may be, and this Agreement; and (ii) will not impose more restrictive conditions (including, without limitation, any request for additional collateral, credit support or other type of performance assurance, or any replacement guarantees (collectively, the "**Performance Assurance**")), beyond what the JE Customer Parties (or their affiliates) have provided or posted pursuant to the Existing Agreements as of the date hereof or as provided in the Initial Order or the Final Order, as the case may be.  The BP Parties have the right, but no obligation, to accept further confirmations under the applicable Existing Agreements.  For the avoidance of doubt: (i) nothing in this Agreement, the Initial Order or the Final Order shall limit any rights of any BP Party relating to set-off, recoupment or netting available to it under applicable law, in equity or by agreement with respect to confirmations and transactions occurring on or after March 9, 2021 and (ii) as contemplated by Section 2(a)(iii) and Section 19 of the ISO Services Agreement, any power scheduled by BP under the ISO Services Agreement shall be sold by the BP Parties under a separate sale agreement between one or more of the BP Parties and one or more of the JE Customer Parties.

SECTION 4.   **[Reserved]**.

SECTION 5.   **JE Customer Parties' Obligations.**

(a)      BP Parties' Fees and Expenses.   The JE Customer Parties agree to pay the reasonable and documented fees and expenses of the BP Parties' legal counsel, whether arising before**, on** or after the Petition Date, within ten (10) days (the "**Review Period**") after the JE Customer Parties' receipt of invoices for such fees and expenses; provided that the JE Customer Parties may raise good faith disputes regarding any such invoice by written notice to the BP Parties before the end of the Review Period, but the JE Customer Parties shall pay any undisputed portion of such invoice by the end of the Review Period.

(b)    <u>Hedging</u>.

  (i) The JE Customer Parties shall not voluntarily terminate or liquidate any ERCOT Physical Hedge except in the case of a bona fide event of default or termination event thereunder arising after the Petition Date (it being agreed and understood that the occurrence of the Bankruptcy Event shall not be deemed an event of default or termination event thereunder), giving the JE Customer Parties the right to terminate such ERCOT Physical Hedge.  An "**ERCOT Physical Hedge**" any existing or newly-entered bilateral agreement (including any option) for the purchase of Energy (as defined in the ISO Services Agreement) by any JE Customer Party for delivery in ERCOT.

  (ii) For each day, the JE Customer Parties shall cause a quantity of Energy not less than the Daily Minimum Energy Quantity to be scheduled from the ERCOT Physical Hedges into the Qualified Scheduling Entity sub-account maintained by the BP Parties for purposes of scheduling load under the ISO Services Agreement.  The "**Daily Minimum Energy Quantity**" means a quantity of Energy equal to the lesser of (A) the Just Energy Parties' forecasted load to be scheduled under the ISO Services Agreement, and (B) the aggregate quantity of Energy available to be delivered that that day under the ERCOT Physical Hedges.

  (iii) The JE Customer Parties will comply with all existing risk policies of the JE Customer Parties in a manner that is consistent with past practices, including with respect to hedging and procuring physical supply for its forecasted load and expected price risk.

(c)    <u>Reporting</u>.  The JE Customer Parties will provide copies of all documentation provided to the DIP Agent and DIP Lenders under the Definitive Documents, including copies of the Applicants' cash flow statements and all other financial statements, reports and notices, on or prior to the dates such information is required to be provided to the DIP Agent and DIP Lenders and their counsel in accordance with the Definitive Documents.

SECTION 6.  **Conditions Precedent**. The obligations of the BP Parties hereunder shall not become effective until the date on which each of the following conditions are satisfied (or waived in writing by the BP Parties in their sole discretion):

(a)    The Bankruptcy Court shall have entered the Initial Order providing Super Priority Status to the BP Post-Petition Claims and the Initial Order shall be in form and substance satisfactory to the BP Parties and shall be in full force and effect, and Applicants shall be in compliance in all respects with the Initial Order.  Any such charge shall continue to the benefit of the BP Parties in the event of any Applicants' Event of Default under Section 7 herein.

(b)    All orders entered by the Bankruptcy Court in the Bankruptcy Event pertaining to cash management and adequate protection, shall, and all other motions and documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith shall be in form and substance satisfactory to the BP Parties.

(c)    The JE Customer Parties shall have executed and delivered to the BP Parties such other documents in connection with the matters contemplated herein as the BP Parties may have

reasonably requested.

(d)     The JE Customer Parties shall have delivered to the BP Parties fully executed copies of all Qualified Support Agreements (as defined in the Initial Order).

SECTION 7.   **Events of Default.**   The BP Parties may exercise their Termination Rights or suspend performance under any of the Existing Agreements upon the occurrence of any of the events set forth below (each, an "**Event of Default**") by providing three days' written notice to the JE Customer Parties; provided that after the three day cure period, the BP Parties have the right to exercise Termination Rights or suspend performance unless the JE Customer Parties prepay for the BP services (for the avoidance of doubt, such prepayments may be made on a daily basis); provided further that the BP Parties may immediately exercise Termination Rights or suspend performance under the Existing Agreement only if an Event of Default occurs under clause (a) below, without the need of notice or Bankruptcy Court order:

(a)     Any JE Customer Party shall default in the payment when due of any amount owing to the BP Parties under the Existing Agreements and arising after the Petition Date.

(b)     An event of default, termination event or similar event (other than those arising solely by reason of the filing of the CCAA Proceeding or the Chapter 15 Proceeding) occurs with respect to any JE Customer Party under the Existing Agreements after the Petition Date and after giving effect to any cure period thereunder.

(c)     An Event of Default (as defined in the DIP Facility) shall occur and be continuing under the DIP Facility to the extent (and only for so long as) such Event of Default has not been waived by the requisite lenders thereunder and, to the extent such Event of Default would have a material adverse effect on the financial condition of the JE Customer Parties or the viability of the Bankruptcy Event, the BP Parties.

(d)     The violation of any term or condition in the Initial Order or Final Order by the Applicants, or the Initial Order or Final Order, as applicable, shall fail to be in full force and effect or the Initial Order or Final Order, as applicable, shall be amended or otherwise modified in a way that is adverse to any BP Party without prior written consent of the BP Parties.

(e)     The Bankruptcy Court shall enter an order or orders allowing any one or more creditors to execute upon or enforce liens on any assets of the Applicants which have a fair market value in excess of $1,000,000 in the aggregate.

(f)     The filing of a Plan of Compromise or Arrangement that does not propose to repay all BP Post-Petition Claims in full, in cash immediately upon its effectiveness.

(g)     The CCAA Proceeding or the Chapter 15 Proceeding is dismissed or converted to a liquidation proceeding including a receivership, bankruptcy, United States Chapter 7 proceeding or otherwise ("**Liquidating Proceeding**") or the Applicants shall file a motion or other pleading seeking the dismissal of the CCAA Proceeding or the Chapter 15 Proceeding or conversion to a Liquidating Proceeding.

(h)     The liens securing the BP Pre-Petition Claims for any reason cease to be valid and perfected liens on the collateral purported to be covered thereby, subject only to (i) encumbrances expressly permitted by the ICA and (ii) encumbrances created by the Initial Order or the Final Order, or any action shall be taken by the Applicants to discontinue or to assert the invalidity or unenforceability of any lien securing the BP Pre-Petition Claims, or the validity or enforceability of the ICA.

(i)     The JE Customer Parties shall fail to pay any undisputed amount owed hereunder or shall fail to perform in any material respect any other obligations under this Agreement.

Subject to the Bankruptcy Court's order, which may only be sought on five days' notice to Just Energy and the service list in the CCAA Proceedings, the BP Parties may exercise their rights and remedies in respect of the Priority Commodity/ISO Charge.

SECTION 8.   **Release**.  The JE Customer Parties hereby unconditionally and irrevocably release the BP Parties and their respective successors, assigns, officers, directors, employees, attorneys and agents from any liability for actions or omissions arising or occurring prior to the Petition Date, whether known or unknown, whether in connection with the Existing Agreements or otherwise (it being agreed and understood that this release shall not extend to any liabilities arising under this Agreement or other actions or omissions on or after the Petition Date whether in connection with the Existing Agreements or otherwise).

SECTION 9.   **Governing Law; Submission to Jurisdiction and Venue.   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE PROVINCE OF ONTARIO AND THE FEDERAL LAWS OF CANADA APPLICABLE THEREIN. THE PARTIES SUBMIT TO THE JURISDICTION OF THE BANKRUPTCY COURT, WHICH SHALL HEAR MATTERS REGARDING THE INTERPRETATION OR ENFORCEMENT OF THIS AGREEMENT.**

SECTION 10. **Construction.**  This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the Parties.  Neither the provisions of this Agreement nor any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any Party on the ground that such Party or its counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.  Each of the Parties hereto represents and declares that such Party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such Party knows the contents thereof and signs the same freely and voluntarily.  The Parties acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection herewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect.  If any matter is left to the decision, right, requirement, request, determination, judgment, opinion, approval, consent, waiver, satisfaction, acceptance, agreement, option, or discretion of the BP Parties or their employees, counsel, or agents in the ICA, such action shall be deemed to be exercisable by the BP Parties in their sole and absolute discretion and according to standards established in its sole and absolute discretion.  Without limiting the generality of the foregoing, "option" and "discretion" shall be implied by the use of the words "if" and "may".

SECTION 11. **Counterparts**.  This Agreement may be executed in any number of counterparts, all of which shall be deemed to be an original and such counterparts taken together shall constitute one agreement, and any of the Parties may execute this Agreement by signing any such counterpart.  Delivery of an executed signature page to this Agreement by facsimile, e-mail or other electronic transmission shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 12. **Severability.**  Each provision of this Agreement is intended to be severable and if any provision is illegal, invalid or unenforceable, such illegality, unenforceability or invalidity shall not affect the validity of this Agreement or the remaining provisions.

SECTION 13. **Further Assurances.**  The Parties agree to execute and deliver such further and other documents and perform and cause to be performed such further and other acts and things as may be necessary or desirable in order to give full effect to this Agreement and every part thereof, including all acts, deeds and agreements as may be necessary or desirable for the purpose of registering or filing notice of the terms of this Agreement.

SECTION 14.  **Section Headings.**  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

SECTION 15.  **Notices.**  All notices, requests, and demands to or upon the Parties shall be given in accordance with the ICA, with additional copies to counsel for the Parties as required by the Bankruptcy Court.

SECTION 16.  **Assignments; No Third Party Beneficiaries.**  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; provided that the Applicants shall not be entitled to assign any of their rights or remedies set forth in this Agreement without the prior written consent of the BP Parties in their sole discretion.  No person other than the Parties hereto shall have any rights hereunder or shall be entitled to rely on this Agreement and all third-party beneficiary rights are hereby expressly disclaimed.

*[Signature pages follow]*

IN WITNESS WHEREOF, this Support Agreement has been executed by the Parties as of the date first written above.

**JF RT ENER. K ONTARIO WT.,** by its general partner, **JF RT ENER. K NORT.**

By: _____
Name: Michael Carter
Title:  Chief Financial Officer

By: _____
Name: Jonah Davids
Title:  Executive Vice President, General Counsel and Corporate Secretary

**JF RT ENER. K (F.R) NORT.**

By: _____
Name: Michael Carter
Title:  Chief Financial Officer

By: _____
Name: Jonah Davids
Title:  Executive Vice President, General Counsel and Corporate Secretary

**JF RT ENER. K NEW KORK NORT.**

By: _____
Name: Michael Carter
Title:  Chief Financial Officer

By: _____
Name: Jonah Davids
Title:  Executive Vice President, General Counsel and Corporate Secretary

**JFRT ENER. K BWWNOEBRNORT.**

By: _____
Name: Michael Carter
Title:   Chief Financial Officer

By: _____
Name: Jonah Davids
Title:   Executive Vice President, General Counsel
and Corporate Secretary

**JFRT ENER. K NORT.**

By: _____
Name: Michael Carter
Title:   Chief Financial Officer

By: _____
Name: Jonah Davids
Title:   Executive Vice President, General Counsel
and Corporate Secretary

**HF GRON ENER. K RERYENER, WWN**

By: _____
Name: Michael Carter
Title:   Chief Financial Officer

By: _____
Name: Jonah Davids
Title:   Executive Vice President, General Counsel
and Corporate Secretary

**BP**

**BP CANADA ENERGY MARKETING CORP.**

By:
Name:  Orlando Alvarez
Title:  President

**BP ENERGY COMPANY**

By:
Name:  Orlando Alvarez
Title:  Chairman and President

**BP CORPORATION NORTH AMERICA INC.**

By:
Name:
Title:

**BP CANADA ENERGY GROUP ULC**

By:
Name:  Chris Reid
Title:  Vice President

**BP**

**BP CANADA ENERGY MARKETING CORP.**

By:_____
Name:_____
Title:_____

**BP ENERGY COMPANY**

By:_____
Name:_____
Title:_____

**BP CORPORATION NORTH AMERICA INC.**

By: Susan Baur
Name: SUSAN BAUR
Title: VICE PRESIDENT

**BP CANADA ENERGY GROUP ULC**

By:_____
Name:_____
Title:_____

## ANNEX I

## Affiliate Parties

Hudson Energy Services, LLC

Just Energy Corp.

Just Energy Illinois Corp.

Just Energy New York Corp.

Just Energy Trading L.P.

## ANNEX II
## EXISTING AGREEMENTS

1.    Base Contract for Sale and Purchase of Natural Gas dated October 31, 2005 between the Canadian Applicant and BP Canada Energy Company (amending and restating the Base Contract for Sale and Purchase of Natural Gas dated September 1, 2004 between Just Energy Corp. and BP Canada Energy Company, as assigned by Just Energy Corp. to the Canadian Applicant pursuant to the agreement dated October 31, 2005 between BP Canada Energy Company and the Canadian Applicant and as assigned to BP Canada Energy Group ULC pursuant to assignment and novation agreement dated March 30, 2012), and all confirmations and transactions thereunder, as amended, restated, supplemented or otherwise modified from time to time.

2.    Base Contract for Sale and Purchase of Natural Gas dated October 31, 2005 between Just Energy Illinois Corp. and BP Canada Energy Marketing Corp. (amending and restating the NAESB Base Contract for Sale and Purchase of natural Gas dated October 21, 2005 between Just Energy Illinois Corp. and BP Canada Energy Company), and all confirmations and transactions thereunder, as amended, restated, supplemented or otherwise modified from time to time.

3.    1992 ISDA Master Agreement dated as of January 1, 2007 between Just Energy Illinois Corp. (formerly Illinois Energy Savings Corp.) and BP Corporation North America Inc., as assigned to BP Energy Company pursuant to an assignment and amendment agreement dated October 15, 2012, and all confirmations and transactions thereunder and all schedules, appendices, annexes and exhibits thereto, as amended, restated, supplemented or otherwise modified from time to time.

4.    Base Contract for Sale and Purchase of Natural Gas dated July 1, 2007 between Just Energy New York Corp. and BP Canada Energy Company, and all confirmations and transactions thereunder, as amended, restated, supplemented or otherwise modified from time to time.

5.    ISDA Master Agreement dated as of May 7, 2010 between BP Corporation North America Inc. (as assigned to BP Energy Company pursuant to an assignment and amendment agreement dated October 15, 2012) and Hudson Energy Services, LLC, and all confirmations and transactions thereunder and all schedules, appendices, annexes and exhibits thereto, as amended, restated, supplemented or otherwise modified from time to time.

6.    Base Contract for Sale and Purchase of Natural Gas dated as of May 7, 2010 between BP Energy Company and Hudson Energy Services, LLC, and all confirmations and transactions thereunder, as amended, restated, supplemented or otherwise modified from time to time.

7.    Master Power Purchase and Sale Agreement dated as of May 7, 2010 between BP Energy Company and Hudson Energy Services, LLC, and all confirmations and transactions thereunder and all schedules, appendices, annexes and exhibits thereto, as amended, restated, supplemented or otherwise modified from time to time.

LEGAL_1:66239385.4

8.  Master Netting, Setoff, Security, and Collateral Agreement dated as of May 1, 2010 between BP Energy Company, BP Corporation North America Inc. (as assigned to BP Energy Company pursuant to an assignment and amendment agreement dated October 15, 2012) and Hudson Energy Services, LLC, as amended, restated, supplemented or otherwise modified from time to time.

9.  ISO Services Agreement dated as of May 7, 2010 between BP Energy Company and Hudson Energy Services, LLC, as amended by Amendment #1 to ISO Services Agreement dated August 23, 2010, as further amended by the Second Amendment to ISO Services Agreement dated as of December 20, 2011, as further amended by the Third Amendment to ISO Services Agreement dated May 20, 2013, as further amended by the Fourth Amendment to ISO Services Agreement dated October 30, 2017, as further amended by the Fifth Amendment to ISO Services Agreement dated July 11, 2018 and as further amended, restated, supplemented or otherwise modified from time to time.

10. 1992 ISDA Master Agreement dated as of June 13, 2012 between Just Energy Trading L.P. and BP Energy Company, and all confirmations and transactions thereunder and all schedules, appendices, annexes and exhibits thereto, as amended, restated, supplemented or otherwise modified from time to time.

11. Assignment and Amendment dated October 15, 2012 among Just Energy Illinois Corp., BP Corporation North America Inc., and BP Energy Company.

12. Assignment and Novation Agreement dated as of March 30, 2012 among BP Canada Energy Company, BP Canada Energy Group ULC, Just Energy Ontario L.P., and Just Energy New York Corp.

13. Base Contract for Sale and Purchase of Natural Gas dated as of December 14, 2007 between BP Canada Energy Marketing Corp. and Just Energy New York Corp., and all confirmations and transactions thereunder, as amended, restated, supplemented or otherwise modified from time to time.

14. Adhesion Agreement dated as of June 14, 2010 among Canadian Imperial Bank of Commerce, National Bank of Canada, Just Energy Ontario L.P., Just Energy (U.S.) Corp., BP Canada Energy Company, BP Canada Energy Marketing Corp., BP Corporation North America Inc. and BP Energy Company.

15. Adhesion Agreement dated as of June 21, 2010 among Canadian Imperial Bank of Commerce, National Bank of Canada, Just Energy Ontario L.P., Just Energy (U.S.) Corp., BP Canada Energy Company, BP Canada Energy Marketing Corp., BP Corporation North America Inc. and BP Energy Company.

16. Adhesion Agreement dated as of April 25, 2012 among Canadian Imperial Bank of Commerce, Just Energy Ontario L.P., Just Energy (U.S.) Corp., BP Canada Energy Group ULC, and BP Canada Energy Company.

17. Base Contract for Sale and Purchase of Natural Gas dated as of June 16, 2010 between BP Canada Energy Marketing Corp. and Hudson Energy Services, LLC, and all confirmations

and transactions thereunder, as amended, restated, supplemented or otherwise modified from time to time.