**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| JUST ENERGY GROUP INC., *et al* | ) Case No. 21-30823 (MI) |
| | ) |
| Debtors in a Foreign Proceeding,[1] | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING OF (I) FACTUM OF THE
APPLICANTS (COMEBACK HEARING), (II) AMENDED AND RESTATED
INITIAL ORDER, AND (III) ENDORSEMENT IN THE CCAA PROCEEDINGS**

     **PLEASE TAKE NOTICE** that, on March 9, 2021, Just Energy Group, Inc. in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors" or "Just Energy"), which are the subject of proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice, Commercial List (the "CCAA Proceedings" and such court, the "Canadian Court"), initiated the above-referenced chapter 15 case by and through its undersigned counsel.

     **PLEASE TAKE FURTHER NOTICE** that, on March 9, 2021, the Canadian Court entered the *Initial Order* (the "Initial Order") in the CCAA Proceeding providing certain relief, including, *inter alia*, a stay of proceedings against Just Energy until and including March 19, 2021.

---

[1] The identifying four digits of Debtor Just Energy Group Inc.'s local Canada tax identification number are 0469. Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/justenergy. The location of the Debtors' service address for purposes of these chapter 15 cases is: 100 King Street West, Suite 2360, Toronto, ON, M5X 1E1.

PLEASE TAKE FURTHER NOTICE that, on March 18, 2021, Just Energy filed the *Factum of the Applicants (Comeback Hearing)* (the "Factum") in support of its *Motion Record of the Applicants (Motion for Amended and Restated Initial Order)* to be heard on March 19, 2021 in the CCAA Proceedings (the "Comeback Hearing").  A copy of the Factum is attached hereto as **Exhibit A**.

PLEASE TAKE FURTHER NOTICE that, on March 19, 2021, the Canadian Court held the Comeback Hearing and consequently entered the *Amended and Restated Initial Order (Amending the Initial Order Dated March 9, 2021)* (the "Amended Initial Order") and a corresponding email endorsement (the "Endorsement") of the Amended Initial Order in the CCAA Proceeding providing certain relief, including, *inter alia*, a stay of proceedings against Just Energy until and including June 4, 2021.  A copy of the Amended Initial Order and Endorsement is attached hereto as **Exhibit B** and **Exhibit C**, respectively.

PLEASE TAKE FURTHER NOTICE that copies of all pleadings filed by the Foreign Representative may be obtained free of charge by visiting www.omniagentsolutions.com/justenergy, by visiting the Court's website at http://www.txs.uscourts.gov (a PACER login and password are required to retrieve a document), or upon written request to the Foreign Representative's United States counsel addressed to: (i) Kirkland & Ellis LLP, Attn.:  Brian Schartz, Neil E. Herman, and Allyson B. Smith, 601 Lexington Avenue, New York, New York 10022; and (ii) Jackson Walker LLP, 1401 McKinney Street, #1900, Houston, Texas 77010, Attn: Matthew D. Cavenaugh and Genevieve M. Graham.

Houston, Texas
March 19, 2021


Respectfully Submitted,

_/s/ Matthew D. Cavenaugh_

**JACKSON WALKER LLP**
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:      (713) 752-4200
Facsimile:       (713) 752-4221
Email:            mcavenaugh@jw.com
                    ggraham@jw.com

_Co-Counsel to the Debtors and Debtors_
_in Possession_

**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:      (713) 836-3600
Facsimile:       (713) 836-3601
Email:            brian.schartz@kirkland.com

-and-

Neil E. Herman (admitted _pro hac vice_)
Allyson B. Smith (admitted _pro hac vice_)
601 Lexington Avenue
New York, New York 10022
Telephone:      (212) 446-4800
Facsimile:       (212) 446-4900
Email:            neil.herman@kirkland.com
                    allyson.smith@kirkland.com

_Co-Counsel to the Debtors and Debtors in Possession_

## Exhibit A

**Factum**

Court File No. CV-21-00658423-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF JUST ENERGY GROUP INC., JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC, HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS LLC, FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP. AND JUST ENERGY (FINANCE) HUNGARY ZRT.

APPLICANTS

# FACTUM OF THE APPLICANTS
## (Comeback Hearing)

March 18, 2021

**OSLER, HOSKIN & HARCOURT LLP**
100 King Street West, Suite 6200
Toronto ON  M5X 1B8

**Marc Wasserman** (LSO# 44066M)
Tel:      416.862.4908
Email: mwasserman@osler.com

**Michael De Lellis** (LSO# 48038U)
Tel:      416.862. 5997
Email: mdelellis@osler.com

**Jeremy Dacks** (LSO# 41851R)
Tel:      416.862.4923
Email: jdacks@osler.com

Lawyers for the Applicants

**TO:  THE SERVICE LIST**

## TABLE OF CONTENTS

**Page**

PART I  - NATURE OF THIS APPLICATION .......................................................... 1

PART II  - FACTS ......................................................................................... 3

    A.    The KERP.......................................................................................... 3
    B.    Employee bonuses ........................................................................... 4

PART III  - ISSUES AND THE LAW ................................................................... 9

    A.    The Stay extension should be granted ............................................. 9
    B.    The KERP should be approved...................................................... 10
    C.    Payment of the Q3 Bonuses should be approved ................................. 13

PART IV  - NATURE OF THE ORDER SOUGHT ................................................. 20

## PART I - NATURE OF THIS APPLICATION

1.      The Applicants obtained relief under the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36 (the "**CCAA**") by an initial order dated March 9, 2021 (the "**Initial Order**"). The relief requested by the Applicants was supported by the Affidavit of Michael Carter[1]. The Initial Order, among other things, appointed the Monitor and granted a stay of proceedings in favour of the Applicants until and including March 19, 2021 (the "**Initial Stay Period**").

2.      The Applicants now seek an order (the "**ARIO**") extending the stay of proceedings (the "**Stay**") up to and including June 4, 2021 (the "**Stay Period**") under section 11.02(1) of the CCAA, together with certain related relief. Since this Court issued the Initial Order, the Just Energy Group, in close consultation and with the assistance of the Monitor, has been working in good faith and with due diligence to stabilize its business and engage with its key stakeholders.[2]

3.      Much of the relief granted in the Initial Order was fully supported in the Factum of the Applicants filed on March 9, 2021.  Those submissions are not repeated below. This factum focuses on two employee-related measures: (a) the approval of a key employment incentive and retention plan (the "**KERP**"); and (b) payment of the employee bonuses to current employees in respect of the third quarter of fiscal 2021 (the "**Q3 Bonuses**").  Both of these measures, which are interrelated, are crucial to the ability of the Applicants to retain their key employees throughout the course of the restructuring and to motivate them to engage in the significant efforts that will be required of them. The Monitor supports both measures.

---

[1]     Affidavit of Michael Carter, sworn March 9, 2021 [Initial Order Affidavit].

[2]     Details of the steps taken in the Initial Stay Period are outlined in the Affidavit of Michael Carter, sworn March 16, 2021 [Second Carter Affidavit].

- 2 -

4.     The Applicants submit that the KERP is reasonable and appropriate in both its scope and its quantum. KERPs are routinely granted in restructurings of this nature, given the unique challenges facing a debtor company's employees in such circumstances and the corresponding flight risks.  The proposed KERP has been designed in consultation with the Monitor based on an evaluation of the employees that are necessary to the business and the restructuring and on the assumption that the Q3 Bonuses will be paid. The KERP Charge and its priority relative to other court-ordered charges has been disclosed to other stakeholders with security interests in the Applicants' property and no objections have been raised.

5.     The Q3 Bonuses are an integral part of the compensation package offered to employees. They were approved by the Board of Directors of the Applicants in February 2021, on the recommendation of the Compensation Committee, *before* the Texas weather event and this CCAA filing. They have been earned by the over 400 current employees and 8 executives  who are entitled to participate in the Fiscal 2021 Bonus Plan. The Q3 Bonuses relate to services performed by employees from October 1, 2020 to December 31, 2020, a time period in which the Applicants exceeded the Q3 Base EBITDA target for bonus payment by approximately $15 million, due at least in part to the efforts of the recipients who have worked hard to assist the Applicants over the past several years in addressing their then existing financial and other business challenges.

6.     The Q3 Bonuses are an integral part of the compensation of the Applicants' employees and are legally characterized as wages under employment standards legislation. It is customary – and essential – to pay all earned and outstanding compensation, including wages, bonuses and other incentive compensation, to employees who will be expected to remain engaged and committed during the restructuring period. Failure to pay the Q3 Bonuses to those who have earned them will have a potentially devastating impact on employee morale. Indeed, the Fiscal 2021 Bonus Plan

- 3 -

was specifically created to motivate employee performance and mitigate against employee departures as the Just Energy Group emerged from its recapitalization process in Fiscal 2020.

7.     Failure to pay the Q3 Bonuses could also hurt cohesion in the Applicants' workforce more generally, given that other performance-based incentive remuneration, such as commissions for sales staff (who are not Eligible Employees), will continue during a CCAA filing. At this juncture, the Applicants simply cannot afford to lose hundreds of employees and key executives whose skills and talents will be necessary to maintain going-concern operations while the Applicants seek to restructure.

## PART II  - FACTS

8.     The facts regarding this Application are fully set out in the Second Carter Affidavit and the affidavit of Margaret Munnelly.[3]

### A.     THE KERP

9.     The Initial Order Affidavit described the KERP developed by the Applicants.[4] Following the Filing Date, in consultation with the Monitor and in response to certain concerns expressed by this Court, the Applicants have made certain revisions to the KERP.[5]

10.     Briefly:

---

[3]     Affidavit of Margaret Munnelly, sworn March 16, 2021 [Munnelly Affidavit]. Capitalized terms not otherwise defined have the same meaning as in the Initial Order Affidavit. All references to monetary amounts in this affidavit are in Canadian dollars unless otherwise noted.

[4]     Initial Order Affidavit at paras. 150 to 153.  See also **Confidential Exhibit "GG"** attached to the Initial Order Affidavit.

[5]     Second Carter Affidavit at para. 33.

- 4 -

(a)     The KERP will be provided to a total of 42 employees, for a total amount of $6.9 million.[6]

(b)     Payments range from 35 percent to 102 percent of the base salary of relevant employees.[7]

(c)     The KERP designed for the 8 executives has been revised to provide that the final payment is incentive based (i.e. based solely on completion of a Successful Restructuring, as defined in the KERP), as opposed to time based, and cannot be paid prior to September 30, 2021 even if a Successful Restructuring occurs before such date.[8]

11.     For non-executive KERP recipients, the KERP payments continue to be based on certain time-based milestones.[9]

**B.     EMPLOYEE BONUSES**

**(a)     *Fiscal 2021 Bonus Plan***

12.     In light of the financial and operational challenges facing the Just Energy Group in Fiscal 2020 and the resulting impact on bonus entitlement and employee morale,[10] and in consultation with an executive compensation consulting firm, the Just Energy Group developed a new Quarterly Short-Term Incentive Bonus Plan for Eligible Employees and Eligible Executives for Fiscal 2021

---

[6]     Second Carter Affidavit, para. 34.

[7]     Second Carter Affidavit, para. 35.

[8]     Second Carter Affidavit, para. 36.

[9]     Second Carter Affidavit, para. 39.

[10]    This history is described in greater detail in the Munnelly Affidavit at paras. 3 to 7.

(the "**Fiscal 2021 Bonus Plan**").[11] The quarterly base EBITDA targets and quarterly payments were designed to motivate employee and executive behavior to drive performance, bolster employee morale and mitigate retention risk.[12]

13.     The Fiscal 2021 Bonus Plan was announced to employees of the Just Energy Group at a townhall meeting held on July 17, 2020. The meeting was recorded and posted to the Just Energy Group's internal company intranet. In addition, business leaders were asked to tell their teams about the Fiscal 2021 Bonus Plan, including the quarterly base EBITDA targets.[13]

>        **(b)     Bonuses for Eligible Employees**

14.     One component of the quarterly bonus plan applies to Eligible Employees, meaning regular full-time employees in North America who do not qualify for any other quarterly variable bonus or commission plan. This group comprises approximately 416 employees, out of the 424 total employees eligible for a Q3 Bonus. This is less than half of the total number of employees in the Just Energy Group. Eligible Employees will receive approximately 86% of the total Q3 Bonus amounts to be paid.[14]

15.     "Eligible Employees" include rank and file employees outside of sales,[15] such as legal, operations, HR, IT, finance, etc., and excludes executives.[16]

---

[11]   The terms "Eligible Employees" and "Eligible Executives" have the same meaning as in the Munnelly Affidavit at paras. 12 and 16.

[12]   Munnelly Affidavit at para. 8.

[13]   Munnelly Affidavit at para. 10.

[14]   Munnelly Affidavit at paras. 12-13. The remaining 14% of the bonus amounts will be paid to executives.

[15]   Sales personnel receive incentive-based compensation through commissions: Munnelly Affidavit at para. 32.

[16]   Munnelly Affidavit at para. 12.

16.     Bonus payments for Eligible Employees are contingent on achieving certain minimum corporate performance targets, with the specific bonus payment to individuals varying based on their contractual terms as well as their individual performance rating in the relevant period. The Board approved the following Base EBITDA targets for each quarter: Q1: $32 million; Q2: $27 million; Q3: 42 million; and Q4: $49 million. The Base EBITDA targets reflect the seasonal nature of the business, with the majority of the Just Energy Group's gas customers using high volumes of gas during Q3 and Q4 (October to March).[17]

17.     Following the close of each fiscal quarter, the Board meets to determine if the Base EBITDA targets has been met for that quarter and makes a determination with respect to approval of bonus payments for that quarter.[18]

         **(c)**     ***Bonuses for Eligible Executives***

18.     Quarterly bonuses are also available to Eligible Executives (which does not include Just Energy's CEO) (the "**Eligible Executives**"). There are eight (8) Eligible Executives covered by the Fiscal 2021 Bonus Plan, which has an incentive-based component.[19]

19.     For the first three quarters of the fiscal year, Eligible Executives are eligible to receive a partial quarterly bonus payment of up to 12.5% of their total bonus, with another 12.5% per quarter being deferred until year end and being conditional upon achievement of the annual target. After the close of the fourth quarter, an Annual Incentive Bonus is calculated based on the Eligible

---

[17]     Munnelly Affidavit at para. 14.

[18]     Munnelly Affidavit at para. 15.

[19]     Munnelly Affidavit at para. 16.

- 7 -

Executive's base salary times a bonus factor less any bonus payments received in the first three quarters, subject to certain caps.[20]

### (d) *CEO Bonus*

20.     Just Energy's CEO is not eligible for a quarterly short-term bonus under the Fiscal 2021 Bonus Plan. Rather, in November 2020, the Board approved an annual short-term bonus for the CEO based on an annual Base EBITDA target. If achieved (which, as set out below, it will not be), the bonus amount would be based on the CEO's base salary times a bonus factor, pro-rated between 5% and 150% depending on the Base EBITDA achieved and approved by the Board.[21]

### (e) *Bonus Payments Approved in Q3 of Fiscal 2021*

21.     At the Compensation Committee meeting on February 9, 2021, management reported that the Just Energy Group exceeded the Base EBITDA target set for the third quarter by approximately $15 million. At its February 10, 2021 meeting, on the recommendation of the Compensation Committee, the Board therefore approved a Q3 bonus pool in the amount of approximately $3.23 million to be paid to the Eligible Employees and Eligible Executives.[22] Based on the bonus pool approved by the Board, management then determined the individual bonus payments to be paid to ongoing Eligible Employees based on their performance during the relevant time period.

22.     The Just Energy Group publicly released its quarterly financial statements and announced its third quarter results on February 26, 2021. On March 10, 2021, these results were shared with

---

[20]   Munnelly Affidavit at para. 17.

[21]   Munnelly Affidavit at para. 18.

[22]   Munnelly Affidavit at para. 20.

- 8 -

employees at a townhall. As such, the Just Energy Group's employees are aware that the Just Energy Group has exceeded the Base EBITDA target set for the Q3 Bonuses.[23]

**(f)       *Q4 Bonuses Are Unlikely***

23.     In light of the current financial challenges facing the Applicants resulting from the Texas weather event, the response of the Texas regulators and the financial impact of these unforeseeable events on the Just Energy Group, the Just Energy Group will not meet the Base EBITDA target that was set for the fourth quarter of Fiscal 2021 under the Fiscal 2021 Bonus Plan. As a result, and through no fault of their own, Eligible Employees will very likely not receive any bonus for that quarter.[24]

24.     Eligible Executives will also not be entitled to receive the deferred portion of their bonuses for the first and second quarter of Fiscal 2021, which depends on the Just Energy Group meeting its annual EBITDA targets. Therefore, in aggregate, if this Court approves the payment of the Q3 Bonuses, they will have only received a small portion of the bonus they expected for Fiscal 2021.[25]

25.     Notably, the bonuses declared and paid under the 2021 Fiscal Year Bonus Plan are the only cash bonuses which the majority of Eligible Executives will have received since 2017. Executives did not receive any bonuses for Fiscal 2020. Executives entitled to a cash bonus for Fiscal 2019 almost all agreed to take the bonus in immediately vested restricted share units.[26]

26.     The CEO will not receive any bonus for Fiscal 2021 due to the Applicants' current financial

---

[23]   Munnelly Affidavit at para. 21.

[24]   Munnelly Affidavit at para. 22.

[25]   Munnelly Affidavit at para. 23.

[26]   Munnelly Affidavit at para. 24.

- 9 -

challenges. Like other executives, the Just Energy Group's CEO did not receive any bonus for Fiscal 2020 either.[27]

## PART III - ISSUES AND THE LAW

27.     The principal issues on this Application are whether:

(a)     this Court should grant the Stay extension;

(b)     this Court should approve the KERP; and

(c)     this Court should approve the payment of the Q3 Bonuses.

## A.     THE STAY EXTENSION SHOULD BE GRANTED

28.     On an application other than an initial application, s. 11.02(2) of the CCAA provides that the Court may make a stay order for any period that the court considers necessary, if the applicant satisfies the Court a) that circumstances exist that make the order appropriate, and b) that the applicant has acted, and is acting, in good faith and with due diligence.[28]

29.     The Applicants are seeking to extend the Initial Stay Period up to and including June 4, 2021. This Stay Period is necessary and appropriate in the circumstances to allow for continued steps to stabilize the Just Energy Group's business, to engage with stakeholders and to explore restructuring options.

30.     During the Initial Stay Period, the Applicants have acted in good faith and with due diligence. The Second Carter Affidavit outlines the steps taken by the Applicants since the granting of the Initial Order to stabilize their business and operations, including giving notice of these CCAA proceedings to affected parties and, in consultation with the Monitor, engaging in

---

[27]     Munnelly Affidavit at para. 25.

[28]     CCAA, s. 11.02(2).

- 10 -

discussions with key stakeholders, including Commodity Suppliers and ISO Services Providers, regulators, bonding companies, and creditors.[29]

## B.     THE KERP SHOULD BE APPROVED

31.     The approval of a KERP and related KERP Charge is in the discretion of the CCAA court. The authority to grant such a charge derives from the Court's general jurisdiction to make any order that the CCAA Court thinks appropriate.[30] KERPs have been approved in numerous CCAA proceedings.[31]

32.     As the Court held in *Walter Energy*, the factors to be considered by the Court in granting a KERP vary from case to case.  However, some factors are generally present.[32]

33.     Factors supporting a KERP and a related KERP charge have been held to include (a) the approval of the Monitor; (b) whether the beneficiaries of the KERP are likely to consider other employment opportunities if the KERP charge is not approved; (c) whether the beneficiaries of the KERP are crucial to the successful restructuring of the debtor company; (d) whether a replacement could be found in a timely manner should the beneficiary elect to terminate his or her employment with the debtor company; and (e) the business judgement of the board of directors of the debtor.[33]

---

[29]   Second Carter Affidavit at para. 48.

[30]   See *Re Mountain Equipment Co-operative*, 2020 BCSC 1586 [*MEC*] at para. 66, citing *Re US Steel Canada Inc.*, 2014 ONSC 6145 [*US Steel*] at para. 27.

[31]   See, for example, *Re Aralez Pharmaceuticals Inc.*, 2018 ONSC 6980 [Commercial List] [*Aralez*] at para. 57; *Re Target Canada Co.,* 2015 ONSC 303, at para. 59; *U.S. Steel* at paras. 28 to 33; *Re Nortel Networks Corp.,* 2009 CarswellOnt 1330 (S.C.J. [Commercial List]) at para. 4; *MEC* above at para. 71.

[32]   *Re Walter Energy Canada Holdings Inc.*, 2016 BCSC 107 [*Walter*] at para. 58, citing *Re Grant Forest Products* (2009), 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List]) [*Grant Forest*].

[33]   *Grant Forest*, above at para. 19. See also *Walter*, above at para. 59; *MEC*, above at para. 68.

- 11 -

34.     As Dunphy J. recently held in *Aralez*, three criteria underlie the factors applicable to approving a KERP or similar incentive program in an insolvency proceeding: (a) arm's length safeguards; (b) necessity; and (c) reasonableness of design.[34]  Within these parameters, the scope of the KERP and the amounts allocated to beneficiaries are both highly fact dependent, based on the needs of the particular CCAA debtor and the role of the beneficiaries in the business and the restructuring.

35.     In evaluating the criteria suggested by Dunphy J. in *Aralez*, the Court should defer to the business judgment of the debtor regarding the scope and quantum of the KERP where the process for designing the KERP has been fair and objectively reasonable and where the end result is also objectively reasonable.[35] The oversight of the Monitor in relation to the KERP design is of considerable importance. Also relevant is the support (or lack of objection) of secured creditors who are affected by the granting of a court-ordered KERP charge.[36]

36.     The revised KERP was developed by the Just Energy Group, with input from the Monitor, to facilitate and encourage the continued participation of senior management and other key employees of the Applicants who are required to guide the business through the restructuring and preserve value for stakeholders. The beneficiaries of the KERP are employees with significant experience and specialized expertise that cannot be easily replicated or replaced. These key employees will also have other, more certain employment opportunities and will be faced with a significantly increased workload during the restructuring process.[37]

---

[34]   *Aralez*, above at para. 30.

[35]   *Aralez*, above at paras. 27, 30, 36.

[36]   *Aralez*, above at para. 35.

[37]   Initial Order Affidavit at para. 151.

- 12 -

37.     To address feedback received from this Court during the Initial Order hearing, the Applicants have revised the KERP for executives so that the final payment is incentive-based as opposed to time-based. Specifically, under the revised KERP, executive KERP recipients will receive (i) 25% of their total KERP on the 180th day after the Filing Date, (ii) 25% of their total KERP on the 270th day after the Filing Date, and (iii) 50% of their total KERP only upon the completion of a Successful Restructuring.[38] Further, the final payment is not payable before September 20, 2021, even if a Successful Restructuring occurs before then.[39]

38.     The Just Energy Group believes that the revised KERP for executives will motivate these executives, who are critical to a successful going concern solution, to continue working at the company and to provide further support for the Just Energy Group's restructuring efforts.[40]

39.     For non-executive KERP recipients, the Just Energy Group has left the KERP design unchanged.  Such employees will receive: (i) 40% of their total KERP on the 180th day after the Filing Date; (ii) 40% of their total KERP on the 270th day after the Filing Date; and (iii) 20% of their total KERP 15 months after the Filing Date or the completion of a Successful Restructuring.[41]

40.     After careful consideration, the Just Energy Group concluded that the KERP payments for non-executive recipients should not include any performance-based conditions because this could result in such employees doubting whether they will receive their KERP payments for reasons

---

[38]    Second Carter Affidavit at para. 36.

[39]    Second Carter Affidavit at para. 37.

[40]    Second Carter Affidavit at para. 38.

[41]    Second Carter Affidavit at para. 39.

outside of their control, thereby hindering employee morale and retention, and undermining the effectiveness of the KERP.[42]

41.    The Applicants submit that the process for developing the KERP was objectively reasonable, and is the product of consultation with the Monitor and other stakeholders. In the business judgment of the Applicants, it is both objectively reasonable in scope and quantum and is necessary to facilitate the restructuring. As such, it should be approved.

## C.    PAYMENT OF THE Q3 BONUSES SHOULD BE APPROVED

42.    The Applicants request the approval of this Court to pay the Q3 Bonuses. This Court has the authority to approve their payment under its broad jurisdiction under section 11 of the CCAA. In particular, this Court has the authority to approve the payment of the Q3 Bonuses on the same basis as any pre-filing amount owing to a stakeholder whose supplies or services are critical to the debtor company's ability to restructure.[43]

### (a)    *Employee Compensation Permitted to be Paid*

43.    It is both permissible and appropriate for a debtor company to pay all compensation to employees owing in relation to both the pre-filing and the post-filing period.  Thus, the language of the model order provides that the Applicant is entitled to, but not required to pay (among other things) "all outstanding and future wages, salaries, employee and pension benefits … in each case incurred in the ordinary course of business and <u>consistent with existing compensation policies and arrangements</u>."[44] (emphasis added).

---

[42]    Second Carter Affidavit at para. 40.

[43]    See Initial Order Factum at paras. 98 to 100.

[44]    Model Order, clause 6(a).

44.     This language is reflected in the proposed ARIO, with the clarification that the wages that the Applicants are permitted to pay include the Q3 Bonuses, in accordance with the Fiscal 2021 Bonus Plan.[45] It is customary for CCAA orders to provide for the payment of both pre-filing and post-filing wage amounts, including bonuses.[46] These payments may be made alongside KERPs.[47]

45.     The rationale for such payments is similar to the rationale for a KERP. An employee of a debtor company seeking to restructure under the CCAA faces challenging circumstances – an obligation to continue working in an uncertain environment, often with new or expanded duties created by the restructuring. These factors create flight risk at a time when a debtor company may be least able to adapt to the loss of key participants in its workforce. The debtor company's discretion to pay all pre- and post-filing compensation owing to an employee assists in alleviating the hardship caused by these factors, thereby promoting employee retention.

**(b)      *Contractual Entitlement to Bonuses as an Integral Component of Compensation***

46.     The Q3 Bonuses are an integral part of the compensation package provided to the Applicants' employees.

47.     Certain key principles apply to the interpretation of an employment contract: (a) due to the importance of employment to a person's life, an employment contract is interpreted more liberally than a commercial contract;[48] (b) rarely is the employment contract found in a single written

---

[45]    ARIO, clause 10(a).

[46]    See, for example, *Arrangement relatif à Cirque du Soleil Canada inc.,* 2020 QCCS 1981, at para. 15 [*Cirque*]; *Arrangement relatif à Bloom Lake, g.p.l.,* 2015 QCCS 169, at para. 13; *Re Canwest Global Communications Corp.,* 2009 CarswellOnt 9398 (S.C.J. [Commercial List]), at para. 3; *Re Canwest Publishing Inc.*, 2010 CarswellOnt 18852 (S.C.J. [Commercial List]), at para. 9.

[47]    *Cirque*, above at para. 24.

[48]    See, for example, *Wood v Fred Deeley Imports Ltd.*, 2017 ONCA 158 at para. 26.

agreement with fixed terms and conditions;[49] and (c) employment agreements are interpreted to protect employees where possible.[50]

48.      Canadian courts have often considered whether a bonus is an integral component of an employee's compensation package in determining whether a wrongfully-dismissed employee is entitled to damages for bonus payments during the reasonable notice period following the termination of their employment. Factors that courts consider in determining whether a bonus is integral to the employee's compensation package include: whether the bonus was received each year; whether bonuses were required to remain competitive with other employers; whether bonuses had been awarded to the employee in the past; whether the employer had ever exercised its discretion not to award a bonus to the employee; whether the bonus was promoted as an integral part of the employee's compensation; and whether the bonus constituted a significant component of the employee's overall compensation.[51]

49.      In the Applicants' view, each of the applicable factors is satisfied in respect of the Q3 Bonuses. Bonuses have been paid in each of the past three quarters as announced, bonuses have historically been paid when the eligibility criteria have been met, and bonuses constitute a significant component of overall compensation.[52]

50.      Further, bonuses can be so fundamental to an employee's compensation that failure to provide bonuses can give rise to claims for constructive dismissal.[53] Accordingly, failure to pay

---

[49]    *Campbell v MacMillan Bloedel Ltd.*, 1978 CarswellBC 393 (S.C.) at paras. 15-16.

[50]    *O'Neill v General Motors of Canada Ltd.*, 2013 ONSC 4654 at para. 72.

[51]    *Gillies v. Goldman Sachs Canada Inc.*, 2000 BCSC 355 at para. 63; *Manastersky v. Royal Bank of Canada*, 2019 ONCA 609, at para. 107.

[52]    Munnelly Affidavit at para. 3-7, 14-17, 19, 33.

[53]    See for example, *Piron v. Dominion Masonry Ltd.*, 2013 BCCA 184.

the Q3 Bonuses could result in the Applicants' employees resigning from employment and later asserting damages for constructive dismissal.

      **(c)**     ***Statutory Entitlement to Bonuses as Wages***

51.    Similarly, under the *Employment Standards Act, 2000* (Ontario), bonuses are presumptively considered wages unless they are both dependent on the discretion of the employer and not related to hours, production or efficiency.[54] In an accompanying interpretation manual, it is stated that any bonuses related to " hours of work, production or the efficiency of the worker" are wages "even if the awarding of the bonus is otherwise discretionary".[55]

52.    The Q3 Bonuses are "wages" under the ESA, particularly given that: (a) the Eligible Employees and Eligible Executives worked for the entire bonus period and have remained employed through the proposed payment date; (b) the Q3 Base EBITDA target was exceeded, and (c) the Board approved the bonus payments in accordance with the plan terms. Further, the Q3 Bonuses for Eligible Employees are "related to" production and efficiency in at least two ways: they are tied to EBITDA (and thus corporate production/efficiency) as well as individual employee performance ratings (and thus personal production/efficiency). For Eligible Executives, the incentive-based bonus plan relates to quarterly and annual performance.

---

[54]   *Employment Standards Act, 2000,* S.O. 2000 c. 41[*ESA*], at s. 1(1) (definition of "wages").

[55]   Government of Ontario, "*Employment Standards Act* Policy and Interpretation Manual", <https://www.ontario.ca/document/employment-standard-act-policy-and-interpretation-manual/part-i-definitions>. See also *Bain v. UBS Securities Canada Inc.*, 2018 ONCA 190 at para. 24, in which the Court of Appeal affirmed the finding that the bonuses at issue were "wages" because they were based on employee performance, and although the bonus was discretionary, it was based on definite factors such as performance; *Re Newman Hattersley Co.*, 1982 CarswellOnt 3877 (Ont. ESB (Adjud.)) at paras. 9 to 12, in which a group incentive plan dependent on achieving of budget projections was found to be "wages".

- 17 -

53.     A failure of a debtor company to pay wages gives rise to potential personal liability for directors and officers of the company under both corporate and employment standards legislation.[56]

### (d)    *Payment of Q3 Bonuses is Critical to Employee Retention*

54.     The Q3 Bonuses are primarily payable to "Eligible Employees" and constitute a means of compensating "rank and file" employees who, unlike sales personnel, do not have the opportunity to earn commission as a reward for successful performance.[57] In this sense, the Q3 Bonus payments are designed to promote equity among different participants in the Applicants' workforce by ensuring various forms of incentive compensation are treated equally, an objective which will be defeated, to the likely detriment of employee morale and workforce cohesion, if the Q3 Bonuses are not paid.[58]

55.     Those Eligible Employees and Eligible Executives whose ratings entitle them to receive the Q3 Bonuses have worked extremely hard over the past few years in general – and in Q3 of Fiscal 2021 in particular – to help the Just Energy Group address its historical financial problems and meet its corporate performance targets.[59] The Q3 Bonuses payable to Eligible Employees and Eligible Executives relate entirely to the successful performance of the Just Energy Group's business during a time period *before* the Texas weather event and related actions taken by the Texas regulators that precipitated the need for the Applicants to seek protection under the CCAA.

---

[56]   *ESA*, ss. 80 to 81; *Canada Business Corporations Act*, RSC 1985, c. C-44, s.  119; *Business Corporations Act*, RSO 1990, c. B.16,  s. 131.

[57]   Munnelly Affidavit at paras. 12 and 32.

[58]   Munnelly Affidavit at para. 32.

[59]   Munnelly Affidavit at para. 29.

- 18 -

56.     The average bonus for such Eligible Employees is approximately $6,500. While the amount may not be significant in the context of this proceeding, it is a material amount for many such employees. Not receiving the Q3 Bonuses may result in personal hardship.[60] Moreover, the Q3 Bonuses are payable to employees who will be heavily relied on during these proceedings to help the Just Energy Group achieve a going concern solution.[61]

57.     The Applicants' Eligible Employees and Eligible Executives have earned the Q3 Bonuses, are aware of their entitlements to those bonuses, and expect to receive them.[62] The uncertainty regarding whether the payment of the Q3 Bonuses will be paid is already generating significant concern among the Eligible Employees, who have expressed their angst and worry at an employee townhall immediately following the filing.[63] If the Q3 Bonuses are not paid, this will create risks to employee morale and commitment at a crucial juncture for the ability of the Applicants to achieve a going-concern restructuring solution.

58.     The Just Energy Group experienced significant employee attrition in 2019 and 2020, prior to the Recapitalization. The quarterly bonus program was well received by employees when it was announced. The Applicants believe that shifting to a more transparent bonus model played a significant role in stemming that attrition. Failing to pay the Q3 Bonuses will undermine employees' trust in the program and management more generally, will be detrimental to this restructuring, and may once again give rise to significant employee attrition.[64]

---

[60]   Munnelly Affidavit at para. 33.

[61]   Munnelly Affidavit at para. 29.

[62]   Munnelly Affidavit at para. 21.

[63]   Munnelly Affidavit at para. 27.

[64]   Munnelly Affidavit at para. 30.

- 19 -

(e)      *No Inappropriate Overlap with the KERP*

59.      The KERP provides incentive payments for key executives and select employees of the Just Energy Group who are critical to a successful restructuring. However, the KERP alone is not sufficient to mitigate employee flight risk. The Applicants submit that, without making the broader Q3 Bonus payments in order to foster goodwill and encourage retention, the Just Energy Group will be vulnerable to continued, significant employee attrition. Such attrition could significantly impair the Just Energy Group's ability to successfully restructure.[65]

60.      There are only 42 proposed recipients of the KERP, whereas there are over 400 Eligible Employees and Eligible Executives under the Fiscal 2021 Bonus Plan.[66] Thus, while there is some overlap in that beneficiaries of the KERP are also eligible to receive Q3 Bonuses,[67] this overlap does not result in double compensation. The KERP was designed on the assumption that the Q3 Bonuses would be paid out. If management had thought that it would not be permitted to pay the Q3 Bonuses, the first KERP payments may well have been made earlier, the quantum of certain KERP payments may have been increased, and the number of proposed recipients expanded, on the basis that employees may be less willing to remain working for a CCAA debtor in exchange for a KERP payment that is many months away.[68]

---

[65]   Munnelly Affidavit at para. 30.

[66]   Munnelly Affidavit at para. 31.

[67]   Of the 42 proposed KERP recipients, 31 Eligible Employees and all 8 Eligible Executives are also proposed KERP recipients: Munnelly Affidavit, para. 31.

[68]   Munnelly Affidavit at para. 31.

- 20 -

## PART IV  -  NATURE OF THE ORDER SOUGHT

61.     For all of the reasons above, the Applicants submit that this Court should grant the relief

requested and issue the ARIO substantially in the form of the draft Order included in Tab 3 of the

Motion Record.

ALL OF WHICH IS RESPECTFULLY SUBMITTED this 18th day of March, 2021.


_____

per Marc Wasserman / Michael De Lellis / Jeremy Dacks

**SCHEDULE "A"**
**LIST OF AUTHORITIES**

| **Case Law** |
| --- |

1.  *Aralez Pharmaceuticals Inc., Re,* 2018 ONSC 6980 [Commercial List]

2.  *Bain v. UBS Securities Canada Inc.*, 2018 ONCA 190

3.  *Bloom Lake, g.p.l., Arrangement relatif à,* 2015 QCCS 169

4.  *Campbell v. MacMillan Bloedel Ltd.*, 1978 CarswellBC 393 (S.C.)

5.  *Canwest Global Communications Corp., Re,* 2009 CarswellOnt 9398 (S.C.J. [Commercial List])

6.  *Canwest Publishing Inc.*, *Re*, 2010 CarswellOnt 18852 (S.C.J. [Commercial List])

7.  *Cirque du Soleil Canada inc., Arrangement relatif à,* 2020 QCCS 1981

8.  *Gillies v. Goldman Sachs Canada Inc.*, 2000 BCSC 355

9.  *Grant Forest Products, Re* (2009), 57 C.B.R. (5th) 128 (Ont. S.C.J. [Commercial List])

10. *Manastersky v. Royal Bank of Canada*, 2019 ONCA 609

11. *Mountain Equipment Co-operative, Re,* 2020 BCSC 1586

12. *Newman Hattersley Co.*, *Re*, 1982 CarswellOnt 3877 (Ont. ESB (Adjud.))

13. *Nortel Networks Corp., Re,* 2009 CarswellOnt 1330 (S.C.J. [Commercial List])

14. *O'Neill v General Motors of Canada Ltd.*, 2013 ONSC 4654

15. *Piron v. Dominion Masonry Ltd.,* 2013 BCCA 184

16. *Target Canada Co., Re,* 2015 ONSC 303

17. *US Steel Canada Inc., Re,* 2014 ONSC 6145

18. *Walter Energy Canada Holdings Inc., Re,* 2016 BCSC 107

19. *Wood v. Fred Deeley Imports Ltd.*, 2017 ONCA 158

- 22 -

## SCHEDULE "B"
## TEXT OF STATUTES, REGULATIONS & BY-LAWS

### *Business Corporations Act*, RSO 1990, c. B.16

**Directors' liability to employees for wages**

**131 (1)** The directors of a corporation are jointly and severally liable to the employees of the corporation for all debts not exceeding six months' wages that become payable while they are directors for services performed for the corporation and for the vacation pay accrued while they are directors for not more than twelve months under the *Employment Standards Act*, and the regulations thereunder, or under any collective agreement made by the corporation.

### *Canada Business Corporations Act*, RSC, 1985, c. C-44

**Liability of directors for wages**

119(1) Directors of a corporation are jointly and severally, or solidarily, liable to employees of the corporation for all debts not exceeding six months wages payable to each such employee for services performed for the corporation while they are such directors respectively.

### *Companies' Creditors Arrangement Act*, RSC, 1985, c C-36

**General Power of Court**

11 Despite anything in the *Bankruptcy and Insolvency Act* or the *Winding-up and Restructuring Act*, if an application is made under this Act in respect of a debtor company, the court, on the application of any person interested in the matter, may, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, make any order that it considers appropriate in the circumstances.

[…]

**Stays, etc. – other than initial application**

11.02 … (2) A court may, on an application in respect of a debtor company other than an initial application, make an order, on any terms that it may impose,

> (a) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken in respect of the company under an Act referred to in paragraph (1)(a);

> (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the company; and

- 23 -

(c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the company.

**Burden of proof on application**

11.02 … (3) The court shall not make the order unless

(a) the applicant satisfies the court that circumstances exist that make the order appropriate; and

(b) in the case of an order under subsection (2), the applicant also satisfies the court that the applicant has acted, and is acting, in good faith and with due diligence.

***Employment Standards Act, 2000,* SO 2000, c. 41**

**Definitions**

1(1) In this Act …

"wages" means,

(a) monetary remuneration payable by an employer to an employee under the terms of an employment contract, oral or written, express or implied,

(b) any payment required to be made by an employer to an employee under this Act, and

(c) any allowances for room or board under an employment contract or prescribed allowances,

but does not include,

(d) tips or other gratuities,

(e) any sums paid as gifts or bonuses that are dependent on the discretion of the employer and that are not related to hours, production or efficiency,

(f) expenses and travelling allowances, or

(g) subject to subsections 60 (3) or 62 (2), employer contributions to a benefit plan and payments to which an employee is entitled from a benefit plan; ("salaire")

[…]

**Application of Part**

**80** (1) This Part applies with respect to shareholders described in section 79 only to the extent that the directors are relieved, under subsection 108 (5) of the *Business Corporations Act* or subsection 146 (5) of the *Canada Business Corporations Act*, of their liability to pay wages to the employees of the corporation.

- 24 -

[…]

**Directors' liability for wages**

**81** (1) The directors of an employer are jointly and severally liable for wages as provided in this Part if,

> (a) the employer is insolvent, the employee has caused a claim for unpaid wages to be filed with the receiver appointed by a court with respect to the employer or with the employer's trustee in bankruptcy and the claim has not been paid;

> (b) an employment standards officer has made an order that the employer is liable for wages, unless the amount set out in the order has been paid or the employer has applied to have it reviewed;

> (c) an employment standards officer has made an order that a director is liable for wages, unless the amount set out in the order has been paid or the employer or the director has applied to have it reviewed; or

> (d) the Board has issued, amended or affirmed an order under section 119, the order, as issued, amended or affirmed, requires the employer or the directors to pay wages and the amount set out in the order has not been paid.

**IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, C. C 36, AS AMENDED;**

**AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF JUST ENERGY GROUP INC. ET AL.**

Court File No. CV-21-00658423-00CL

**Applicants**

| | |
|---|---|
| | ***ONTARIO***<br>**SUPERIOR COURT OF JUSTICE**<br>**COMMERCIAL LIST**<br><br>PROCEEDING COMMENCED AT Toronto |
| | **FACTUM OF THE APPLICANTS** |
| | **OSLER, HOSKIN & HARCOURT LLP**<br>100 King Street West<br>1 First Canadian Place<br>Suite 6200, P.O. Box 50<br>Toronto ON  M5X 1B8<br><br>**Marc Wasserman** (LSO# 44066M)<br>Tel:     416.862.4908<br>Email:  mwasserman@osler.com<br><br>**Michael De Lellis** (LSO# 48038U)<br>Tel:     416.862.5997<br>Email:  mdelellis@osler.com<br><br>**Jeremy Dacks** (LSO# 41851R)<br>Tel:     416.862.4923<br>Email:  jdacks@osler.com<br><br><br>Lawyers to the Applicants |

**<u>Exhibit B</u>**

**Amended Initial Order**

Court File No. CV-21-00658423-00CL.

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**
**COMMERCIAL LIST**

| | | |
|---|---|---|
| THE HONOURABLE MR. | ) | FRIDAY, THE 19TH |
| | ) | |
| JUSTICE KOEHNEN | ) | DAY OF MARCH, 2021 |



IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF **JUST ENERGY GROUP INC.**, JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC, HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS LLC, FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP. AND JUST ENERGY (FINANCE) HUNGARY ZRT. (each, an "**Applicant**", and collectively, the "**Applicants**")

**AMENDED AND RESTATED INITIAL ORDER**
**(amending the Initial Order dated March 9, 2021)**

**THIS APPLICATION**, made by the Applicants, pursuant to the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36, as amended (the "**CCAA**"), was heard this day by judicial videoconference via Zoom in Toronto, Ontario due to the COVID-19 pandemic.

**ON READING** the affidavit of Michael Carter sworn March 9, 2021 and the Exhibits thereto (the "**First Carter Affidavit**"), the affidavit of Michael Carter sworn March 16, 2021 and the Exhibits thereto (the "**Second Carter Affidavit**"), the affidavit of Michael Carter sworn March 18, 2021 and the Exhibits thereto (the "**Third Carter Affidavit**"), the affidavit of Margaret Munnelly sworn March 16, 2021 and the Exhibits thereto (the "**Munnelly Affidavit**"), the pre-filing report of the proposed monitor, FTI Consulting Canada Inc. ("**FTI**"), dated March 9, 2021, the First Report of FTI in its capacity as the Court-appointed monitor of the Applicants (the "**Monitor**"), and on being advised that the secured creditors who are likely to be affected by the charges created herein were given notice, and on hearing the submissions of counsel for the Applicants and the partnerships listed in Schedule "A" hereto (the "**JE Partnerships**", and collectively with the Applicants, the "**Just Energy Entities**"), the Monitor, Alter Domus (US) LLC (the "**DIP Agent**"), as administrative agent for the lenders (the "**DIP Lenders**") under the DIP Term Sheet (as defined below), the DIP Lenders and such other counsel who were present, and on reading the consent of FTI to act as the Monitor,

**SERVICE**

1.      **THIS COURT ORDERS** that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**DEFINED TERMS**

2.      **THIS COURT ORDERS** that capitalized terms that are used in this Order shall have the meanings ascribed to them in Schedule "B" hereto or the First Carter Affidavit, as applicable, if they are not otherwise defined herein.

**APPLICATION**

3.      **THIS COURT ORDERS AND DECLARES** that the Applicants are companies to which the CCAA applies. Although not Applicants, the JE Partnerships shall enjoy the benefits of the protections and authorizations provided by this Order.

**PLAN OF ARRANGEMENT**

4.     **THIS COURT ORDERS** that the Applicants shall have the authority to file and may, subject to further order of this Court, file with this Court a plan of compromise or arrangement (hereinafter referred to as the "**Plan**")

**POSSESSION OF PROPERTY AND OPERATIONS**

5.     **THIS COURT ORDERS** that the Just Energy Entities shall remain in possession and control of their respective current and future assets, licenses, undertakings and properties of every nature and kind whatsoever, and wherever situate including all proceeds thereof (the "**Property**"). Subject to further Order of this Court, the Just Energy Entities shall continue to carry on business in a manner consistent with the preservation of their business (the "**Business**") and Property. The Just Energy Entities shall each be authorized and empowered to continue to retain and employ the employees, contractors, staffing agencies, consultants, agents, experts, accountants, counsel and such other persons (collectively "**Assistants**") currently retained or employed by them, with liberty to retain such further Assistants as they deem reasonably necessary or desirable in the ordinary course of business or for the carrying out of the terms of this Order.

6.     **THIS COURT ORDERS** that:

(a)     the Just Energy Entities shall be entitled to continue to utilize the central cash management system currently in place as described in the First Carter Affidavit or, with the consent of the Monitor, the DIP Agent and the DIP Lenders, replace it with another substantially similar central cash management system (the "**Cash Management System**") and that any present or future bank providing the Cash Management System (a "**Cash Management Bank**") shall not be under any obligation whatsoever to inquire into the propriety, validity or legality of any transfer, payment, collection or other action taken under the Cash Management System, or as to the use or application by the Just Energy Entities of funds transferred, paid, collected or otherwise dealt with in the Cash Management System, shall be entitled to provide the Cash Management System without any liability in respect thereof to any Person (as hereinafter defined) other than the Just Energy Entities, pursuant to the terms of the documentation applicable to the Cash Management System, and shall be, in its capacity as provider of the Cash

4

Management System, an unaffected creditor under any  Plan with regard to Cash Management Obligations. All present and future indebtedness, liabilities and obligations of any and every kind, nature or description whatsoever to a Cash Management Bank under, in connection with, relating to or with respect to any and all agreements and arrangements evidencing or in respect of  treasury facilities and cash management products (including, without limitation, all pre-authorized debit banking services, electronic funds transfer services, overdraft balances, corporate credit cards, merchant services and pre-authorized debits) provided by a Cash Management Bank to any Just Energy Entity, and any unpaid balance thereof, are collectively referred to herein as the "**Cash Management Obligations**";

(b)    during the Stay Period (as defined below), no Cash Management Bank shall, without leave of this Court: (i) exercise any sweep remedy under any applicable documentation (provided, for greater certainty, that the cash pooling and zero-balancing account services provided with respect to the JPMorgan accounts held by the U.S. Bank Account Holders may continue in the ordinary course); (ii) exercise or claim any right of set-off against any account included in the Cash Management System, other than set-off permitted pursuant to paragraph 8 against applicable Authorized Cash Collateral solely in respect of any Cash Management Obligations; or (iii) subject to paragraph 6(d)(ii), modify the Cash Management System;

(c)    any of the Cash Management Banks may rely on the representations of the applicable Just Energy Entities with respect to whether any cheques or other payment order drawn or issued by the applicable Just Energy Entity prior to, on, or subsequent to the date of this Order should be honoured pursuant to this or any other order of this Court, and such Cash Management Bank shall not have any liability to any party for: (i) relying on such representations by the applicable Just Energy Entities as provided for herein; or (ii) honouring any cheque (whether made before, on or after the date hereof) in a good faith belief that the Court has authorized such cheque or item to be honoured;

(d)    (i) those certain existing deposit agreements between the Just Energy Entities and the Cash Management Banks shall continue to govern the post-filing cash management relationship between the Just Energy Entities and the Cash Management Banks, and

that all of the provisions of such agreements shall remain in full force and effect; (ii)(A) changes to the Cash Management System in accordance with the Lender Support Agreement shall be permitted; and (B) the Just Energy Entities, with the consent of the Monitor, the DIP Agent, the majority of the DIP Lenders and the Cash Management Banks may, without further Order of this Court, implement changes to the Cash Management System and procedures in the ordinary course of business pursuant to the terms of those certain existing deposit agreements, including, without limitation, the opening and closing of bank accounts, where such changes are not otherwise implemented pursuant to paragraph 6(d)(ii)(A); (iii) all control agreements in existence prior to the date of this Order shall apply; and (iv) the Cash Management Banks are authorized to debit the Just Energy Entities' accounts in the ordinary course of business in accordance with the Cash Management System arrangements without the need for further order of this Court for all undisputed Cash Management Obligations owing to the Cash Management Banks;

(e)     the Cash Management Banks shall be entitled to the benefit of and are hereby granted a charge (the "**Cash Management Charge**") on the Property to secure the Cash Management Obligations due and owing and that have not been paid in accordance with the applicable Cash Management Arrangements (as defined in the Lender Support Agreement). The Cash Management Charge shall have the priority set out in paragraphs 53-55 herein; and

(f)     the Just Energy Entities are authorized but not directed to continue to operate under the merchant processing agreements with JPMorgan Chase Bank, N.A., Paymentech, LLC ("**Paymentech**") (collectively and as amended, restated, supplemented, or otherwise modified from time to time, the "**Merchant Processing Agreement**"). The Just Energy Entities are authorized to pay or reimburse Paymentech for fees, charges, refunds, chargebacks, reserves and other amounts due and owing from the Just Energy Entities to Paymentech (the "**Merchant Services Obligations**") whether such obligations are incurred prior to, on or after the date hereof, and Paymentech is authorized to receive or obtain payment for such Merchant Services Obligations, as provided under, and in the manner set forth in, the Merchant Processing Agreement, including, without limitation, by way of recoupment or set-off without further order of the Court.

7.      **THIS COURT ORDERS** that, except as specifically permitted herein, the Just Energy Entities are hereby directed, until further Order of this Court: (a) to make no payments of principal, interest thereon or otherwise on account of amounts owing by any of the Just Energy Entities to any of their respective creditors as of this date; (b) to grant no security interests, trust, liens, charges or encumbrances upon or in respect of any of the Property; and (c) to not grant credit or incur liabilities except in the ordinary course of the Business; provided, however, that the Just Energy Entities, until further order of this Court, are hereby permitted, subject to the terms of the Definitive Documents: (i) with the consent of the Monitor, to provide cash collateral ("**Authorized Cash Collateral**") to third parties (the "**Collateral Recipients**"), including to the Cash Management Banks in accordance with the Lender Support Agreement, with respect to obligations incurred before, on or after the date hereof, and to grant security interests in such Authorized Cash Collateral in favour of the Collateral Recipients, where so doing is necessary to operate the Business in the normal course during these proceedings;   (ii) subject to the terms of the Lender Support Agreement, to reimburse the reasonable documented fees and disbursements of one Canadian legal counsel, one U.S. legal counsel, one local counsel in Texas and one financial advisor to the agent (the "**CA Agent**") and the lenders (the "**CA Lenders**") under the Credit Agreement, whether incurred before or after the date of this Order; (iii) subject to the terms of the Lender Support Agreement, to pay all non-default interest and fees to the CA Agent and the CA Lenders in accordance with its terms; and (iv) to repay advances under the Credit Agreement solely for the purpose of creating availability under the Revolving Facilities in order for the Just Energy Entities to request the issuance of Letters of Credit under the Revolving Facilities to continue to operate the Business in the ordinary course during these proceedings, subject to: (A) obtaining the consent of the Monitor with respect to the issuance of the Letters of Credit under the Revolving Facilities; and (B) receipt of written confirmation from the applicable CA Lender(s) under the Credit Agreement that such CA Lender(s) will issue a Letter of Credit of equal value within one (1) Business Day thereafter. Capitalized terms used but not otherwise defined in this paragraph shall have the meanings ascribed thereto in the Credit Agreement.

8.      **THIS COURT ORDERS** that the holders of cash collateral provided by the Just Energy Entities prior to the date hereof or any Collateral Recipients of Authorized Cash Collateral (the foregoing, collectively, "**Cash Collateral**") shall be authorized to exercise any available rights of

set-off in respect of such Cash Collateral with respect to obligations secured thereby, whether incurred before, on or after the date hereof.

9. **THIS COURT ORDERS** that the Charges (as defined below) shall rank junior in priority to any liens, security interests and charges attached to Cash Collateral in favour of the holders thereof, and shall attach to the Cash Collateral only to the extent of any rights of any Just Energy Entity to the return of such Cash Collateral.

10. **THIS COURT ORDERS** that, subject to the terms of the Definitive Documents (as hereinafter defined), the Just Energy Entities shall be entitled but not required to pay the following amounts whether incurred prior to, on or after the date of this Order:

(a) all outstanding and future wages (including, without limitation, the Q3 bonus described in the Munnelly Affidavit), salaries, commissions, employee benefits, contributions in respect of retirement or other benefit arrangements, vacation pay and expenses payable on or after the date of this Order, in each case incurred in the ordinary course of business and consistent with existing compensation policies and arrangements;

(b) all outstanding and future amounts owing to or in respect of other workers providing services in connection with the Business and payable on or after the date of this Order, incurred in the ordinary course of business and consistent with existing arrangements;

(c) the fees and disbursements of any Assistants retained or employed by the Just Energy Entities in respect of these proceedings at their standard rates and charges, which, in the case of the Financial Advisor (as defined below) shall be the amounts payable in accordance with the Financial Advisor Agreement (as defined below);

(d) with the consent of the Monitor in consultation with the agent under the Credit Agreement (or its advisors), amounts owing for goods or services actually provided to any of the Just Energy Entities prior to the date of this Order by third parties, if, in the opinion of the Just Energy Entities, such third party is critical to the Business and ongoing operations of the Just Energy Entities;

(e) any taxes (including, without limitation, sales, use, withholding, unemployment, and excise) not covered by paragraph 12 of this Order, and whereby the nonpayment of

which by any Just Energy Entity could result in a responsible person associated with a Just Energy Entity being held personally liable for such nonpayment; and

(f)    taxes related to revenue, State income or operations incurred or collected by a Just Energy Entity in the ordinary course of business.

11.    **THIS COURT ORDERS** that, except as otherwise provided to the contrary herein and subject to the terms of the Definitive Documents, the Just Energy Entities shall be entitled but not required to pay all reasonable expenses incurred by the Just Energy Entities in carrying on the Business in the ordinary course after this Order, and in carrying out the provisions of this Order, which expenses shall include, without limitation:

(a)    all expenses and capital expenditures reasonably necessary for the preservation of the Property or the Business including, without limitation, payments on account of insurance (including directors and officers' insurance), maintenance and security services; and

(b)    payment for goods or services actually supplied to the Just Energy Entities following the date of this Order.

12.    **THIS COURT ORDERS** that the Just Energy Entities shall remit, in accordance with legal requirements, or pay:

(a)    any statutory deemed trust amounts in favour of the Crown in right of Canada or of any Province thereof or any other taxation authority which are required to be deducted from employees' wages, including, without limitation, amounts in respect of (i) employment insurance, (ii) Canada Pension Plan, (iii) Quebec Pension Plan, and (iv) income taxes;

(b)    all goods and services or other applicable sales taxes (collectively, "**Sales Taxes**") required to be remitted by the Just Energy Entities in connection with the sale of goods and services by the Just Energy Entities, but only where such Sales Taxes are accrued or collected after the date of this Order, or where such Sales Taxes were accrued or collected prior to the date of this Order but not required to be remitted until on or after the date of this Order; and

(c)     any amount payable to the Crown in right of Canada or of any Province thereof or any political subdivision thereof or any other taxation authority in respect of municipal realty, municipal business or other taxes, assessments or levies of any nature or kind which are entitled at law to be paid in priority to claims of secured creditors and which are attributable to or in respect of the carrying on of the Business by the Just Energy Entities.

**RESTRUCTURING**

13.     **THIS COURT ORDERS** that the Just Energy Entities shall, subject to such requirements as are imposed by the CCAA and subject to the terms of the Definitive Documents, have the right to:

(a)     permanently or temporarily cease, downsize or shut down any of their Business or operations;

(b)     terminate the employment of such of its employees or temporarily lay off such of its employees as it deems appropriate; and

(c)     pursue all avenues of refinancing, restructuring, selling and reorganizing the Business or Property, in whole or part, subject to prior approval of this Court being obtained before any material refinancing, restructuring, sale or reorganization,

all of the foregoing to permit the Just Energy Entities to proceed with an orderly restructuring of the Just Energy Entities and/or the Business (the "**Restructuring**").

**LEASES**

14.     **THIS COURT ORDERS** that until a real property lease is disclaimed  in accordance with the CCAA, the Just Energy Entities shall pay all amounts constituting rent or payable as rent under real property leases (including, for greater certainty, common area maintenance charges, utilities and realty taxes and any other amounts payable to the landlord under the lease) or as otherwise may be negotiated between the applicable Just Energy Entity and the landlord from time to time ("**Rent**"), for the period commencing from and including the date of this Order, twice-monthly in equal payments on the first and fifteenth day of each month, in advance (but not in arrears).  On

the date of the first of such payments, any Rent relating to the period commencing from and including the date of this Order shall also be paid.

15.     **THIS COURT ORDERS** that the Just Energy Entities shall provide each of the relevant landlords with notice of the relevant Just Energy Entity's intention to remove any fixtures from any leased premises at least seven (7) days prior to the date of the intended removal.  The relevant landlord shall be entitled to have a representative present in the leased premises to observe such removal and, if the landlord disputes the entitlement of a Just Energy Entity to remove any such fixture under the provisions of the lease, such fixture shall remain on the premises and shall be dealt with as agreed between any applicable secured creditors, such landlord and the relevant Just Energy Entity, or by further Order of this Court upon application by the Just Energy Entities on at least two (2) days notice to such landlord and any such secured creditors. If any Just Energy Entity disclaims the lease governing such leased premises in accordance with Section 32 of the CCAA, it shall not be required to pay Rent under such lease pending resolution of any such dispute (other than Rent payable for the notice period provided for in Section 32(5) of the CCAA), and the disclaimer of the lease shall be without prejudice to the Applicant's claim to the fixtures in dispute.

16.     **THIS COURT ORDERS** that if a notice of disclaimer is delivered pursuant to Section 32 of the CCAA, then (i) during the notice period prior to the effective time of the disclaimer, the landlord may show the affected leased premises to prospective tenants during normal business hours, on giving the relevant Just Energy Entity and the Monitor 24 hours' prior written notice, and (ii) at the effective time of the disclaimer, the relevant landlord shall be entitled to take possession of any such leased premises without waiver of or prejudice to any claims or rights such landlord may have against the relevant Just Energy Entity in respect of such lease or leased premises, provided that nothing herein shall relieve such landlord of its obligation to mitigate any damages claimed in connection therewith.

## NO PROCEEDINGS AGAINST THE JUST ENERGY ENTITIES, THE BUSINESS OR THE PROPERTY

17.     **THIS COURT ORDERS** that until and including June 4, 2021 or such later date as this Court may order (the "**Stay Period**"), no proceeding or enforcement process before any court, tribunal, agency or other legal or, subject to paragraph 18, regulatory body (each, a "**Proceeding**") shall be commenced or continued against or in respect of any of the Just Energy Entities or the

Monitor or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, except with the prior written consent of the Just Energy Entities and the Monitor, or with leave of this Court, and any and all Proceedings currently under way against or in respect of the Just Energy Entities or affecting the Business or the Property are hereby stayed and suspended pending further Order of this Court.

**NO EXERCISE OF RIGHTS OR REMEDIES**

18.      **THIS COURT ORDERS** that during the Stay Period, all rights and remedies of any individual, firm, corporation, organization, governmental unit, body or agency, foreign regulatory body or agency or any other entities (all of the foregoing, collectively being "**Persons**" and each being a "**Person**") against or in respect of the Just Energy Entities or the Monitor, or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended except with the written consent of the Just Energy Entities and the Monitor, or leave of this Court, provided that nothing in this Order shall: (i) empower the Just Energy Entities to carry on any business which the Just Energy Entities are not lawfully entitled to carry on, (ii) subject to paragraph 19, affect such investigations, actions, suits or proceedings by a regulatory body as are permitted by Section 11.1 of the CCAA, (iii) prevent the filing of any registration to preserve or perfect a security interest, or (iv) prevent the registration of a claim for lien.

19.      **THIS COURT ORDERS** that notwithstanding Section 11.1 of the CCAA, all rights and remedies of provincial energy regulators and provincial regulators of consumer sales that have authority with respect to energy sales against or in respect of the Just Energy Entities or their respective employees and representatives acting in such capacities, or affecting the Business or the Property, are hereby stayed and suspended during the Stay Period except with the written consent of the Just Energy Entities and the Monitor, or leave of this Court on notice to the Service List.

**NO INTERFERENCE WITH RIGHTS**

20.      **THIS COURT ORDERS** that during the Stay Period, no Person shall discontinue, fail to honour, alter, interfere with, repudiate, terminate or cease to perform any right, renewal right, contract, agreement, licence or permit in favour of or held by the Just Energy Entities except with

the written consent of the Just Energy Entities and the Monitor, leave of this Court or as permitted under any Qualified Support Agreement or the Lender Support Agreement.

**CONTINUATION OF SERVICES**

21.     **THIS COURT ORDERS** that during the Stay Period, except as permitted under any Qualified Support Agreement or the Lender Support Agreement, all Persons having oral or written agreements with any Just Energy Entity or statutory or regulatory mandates for the supply of goods and/or services, including without limitation all computer software, communication and other data services, centralized banking services, payroll services, insurance, transportation services, utility or other services to the Just Energy Entities or the Business, are hereby restrained until further Order of this Court from discontinuing, altering, interfering with or terminating the supply of such goods or services as may be required by the Just Energy Entities, and that the Just Energy Entities shall be entitled to the continued use of their current premises, telephone numbers, facsimile numbers, internet addresses and domain names, provided in each case, that the normal prices or charges for all such goods or services received after the date of this Order are paid by the Just Energy Entities in accordance with normal payment practices of the Just Energy Entities or such other practices as may be agreed upon by the supplier or service provider and the applicable Just Energy Entity and the Monitor, or as may be ordered by this Court.

**NON-DEROGATION OF RIGHTS**

22.     **THIS COURT ORDERS** that, subject to paragraph 30 but notwithstanding any other paragraphs of this Order, no Person shall be prohibited from requiring immediate payment for goods, services, use of leased or licensed property or other valuable consideration provided on or after the date of this Order, nor shall any Person be under any obligation on or after the date of this Order to advance or re-advance any monies or otherwise extend any credit to any of the Just Energy Entities. Nothing in this Order shall derogate from the rights conferred and obligations imposed by the CCAA.

**KEY EMPLOYEE RETENTION PLAN**

23.     **THIS COURT ORDERS** that the Key Employee Retention Plan (the "**KERP**"), as described in the Second Carter Affidavit and attached as Confidential Appendix "Q" thereto, is

hereby approved and the Just Energy Entities are authorized to make payments contemplated thereunder in accordance with the terms and conditions of the KERP.

24.    **THIS COURT ORDERS** that the key employees referred to in the KERP (the "**Key Employees**") shall be entitled to the benefit of and are hereby granted a charge on the Property (the "**KERP Charge**"), which charge shall not exceed the aggregate amount of C\$2,012,100 for Canadian dollar payments and US\$ 3,876,024 for U.S. dollar payments, to secure any payments to the Key Employees under the KERP. The KERP Charge shall have the priority set out in paragraphs 53-55 herein.

**LENDER SUPPORT AGREEMENT**

25.    **THIS COURT ORDERS** that the Lender Support Agreement is hereby ratified and approved and that, upon the occurrence of a termination event under the Lender Support Agreement, the CA Lenders may exercise the rights and remedies available to them under the Lender Support Agreement in accordance with the terms thereof.

**PRE-FILING SECURITY INTERESTS**

26.    **THIS COURT ORDERS** that any obligations secured by a valid, enforceable and perfected security interest upon or in respect of any of the Property pursuant to a security agreement which includes as collateral thereunder any Property acquired after the date of the applicable security agreement ("**After-Acquired Property**"), shall continue to be secured by the Property (including After Acquired Property that may be acquired by the applicable Just Energy Entities after the commencement of these proceedings) notwithstanding the commencement of these proceedings, subject to the priority set out in paragraphs 53-55 herein.

**COMMODITY SUPPLIERS**

27.    **THIS COURT ORDERS** that each Qualified Commodity/ISO Supplier shall be entitled to the benefit of and is hereby granted a charge (together, the "**Priority Commodity/ISO Charge**") on the Property in an amount equal to the value of the Priority Commodity/ISO Obligations. The value of the Priority Commodity/ISO Obligations shall be determined in accordance with the terms of the existing agreements or arrangements between the applicable Just Energy Entity and the Qualified Commodity/ISO Supplier or, in the event of any dispute, by the

14

Court. The Priority Commodity/ISO Charge shall have the priority set out in paragraphs 53-55 herein.

28.     **THIS COURT ORDERS** that the Commodity/ISO Supplier Support Agreements are hereby ratified, approved and deemed to be Qualified Support Agreements.

29.     **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to execute and deliver Qualified Support Agreements with any counterparty to a Commodity Agreement.

30.     **THIS COURT ORDERS** that upon the occurrence of an event of default under a Qualified Support Agreement, the applicable Qualified Commodity/ISO Supplier may exercise the rights and remedies available to it under its Qualified Support Agreement, or upon five (5) days' notice to the Just Energy Entities, the Monitor and the Service List, may apply to this Court to seek the Court's authorization to exercise any and all of its other rights and remedies against the Just Energy Entities or the Property under or pursuant to its Commodity Agreement or ISO Agreement and the Priority Commodity/ISO Charge, including without limitation, for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Just Energy Entities and for the appointment of a trustee in bankruptcy of the Just Energy Entities.

31.     **THIS COURT ORDERS** that the Monitor shall provide a report on the value of the Priority Commodity/ISO Obligations as of the last day of each calendar month by posting such report on the Monitor's Website (as defined below) within three (3) Business Days of such calendar month end.

**PROCEEDINGS AGAINST DIRECTORS AND OFFICERS**

32.     **THIS COURT ORDERS** that during the Stay Period, and except as permitted by subsection 11.03(2) of the CCAA, no Proceeding may be commenced or continued against any of the former, current or future directors or officers of the Just Energy Entities with respect to any claim against the directors or officers that arose before the date hereof and that relates to any obligations of the Just Energy Entities whereby the directors or officers are alleged under any law to be liable in their capacity as directors or officers for the payment or performance of such obligations, until a compromise or arrangement in respect of the Just Energy Entities, if one is

filed, is sanctioned by this Court or is refused by the creditors of the Just Energy Entities or this Court.

**DIRECTORS' AND OFFICERS' INDEMNIFICATION AND CHARGE**

33.    **THIS COURT ORDERS** that each of the Just Energy Entities shall jointly and severally indemnify their respective directors and officers against obligations and liabilities that they may incur as directors or officers of the Just Energy Entities after the commencement of the within proceedings, except to the extent that, with respect to any officer or director, the obligation or liability was incurred as a result of the director's or officer's gross negligence or wilful misconduct.

34.    **THIS COURT ORDERS** that the directors and officers of the Just Energy Entities shall be entitled to the benefit of and are hereby granted a charge (the "**Directors' Charge**") on the Property, which charge shall not exceed an aggregate amount of C$44,100,000, as security for the indemnity provided in paragraph 33 of this Order. The Directors' Charge shall have the priority set out in paragraphs 53-55 herein.

35.    **THIS COURT ORDERS** that, notwithstanding any language in any applicable insurance policy to the contrary, (i) no insurer shall be entitled to be subrogated to or claim the benefit of the Directors' Charge, and (ii) the Just Energy Entities' directors and officers shall only be entitled to the benefit of the Directors' Charge to the extent that they do not have coverage under any directors' and officers' insurance policy, or to the extent that such coverage is insufficient to pay amounts indemnified in accordance with paragraph 33.

**APPOINTMENT OF MONITOR**

36.    **THIS COURT ORDERS** that FTI is hereby appointed pursuant to the CCAA as the Monitor, an officer of this Court, to monitor the business and financial affairs of the Just Energy Entities with the powers and obligations set out in the CCAA or set forth herein and that the Just Energy Entities and their shareholders, officers, directors, and Assistants shall advise the Monitor of all material steps taken by the Just Energy Entities pursuant to this Order, and shall co-operate fully with the Monitor in the exercise of its powers and discharge of its obligations and provide the Monitor with the assistance that is necessary to enable the Monitor to adequately carry out the Monitor's functions.

37.     **THIS COURT ORDERS** that the Monitor, in addition to its prescribed rights and obligations under the CCAA, is hereby directed and empowered to:

(a)     monitor the Just Energy Entities' receipts and disbursements;

(b)     report to this Court at such times and intervals as the Monitor may deem appropriate with respect to matters relating to the Property, the Business, and such other matters as may be relevant to the proceedings herein;

(c)     assist the Just Energy Entities, to the extent required by the Just Energy Entities, in their dissemination to the DIP Agent, the DIP Lenders and their counsel of financial and other information in accordance with the Definitive Documents;

(d)     advise the Just Energy Entities in their preparation of the Just Energy Entities' cash flow statements and reporting required by the DIP Agent and DIP Lenders, which information shall be reviewed with the Monitor and delivered to the DIP Agent and DIP Lenders and their counsel in accordance with the Definitive Documents;

(e)     advise the Just Energy Entities in their development of a Plan and any amendments to a Plan;

(f)     assist the Just Energy Entities, to the extent required by the Just Energy Entities, with the holding and administering of creditors' or shareholders' meeting for voting on the Plan;

(g)     have full and complete access to the Property, including the premises, books, records, data, including data in electronic form, and other financial documents of the Just Energy Entities, wherever located and to the extent that is necessary to adequately assess the Just Energy Entities' business and financial affairs or to perform its duties arising under this Order;

(h)     be at liberty to engage independent legal counsel or such other persons as the Monitor deems necessary or advisable respecting the exercise of its powers and performance of its obligations under this Order; and

(i)     perform such other duties as are required by this Order or by this Court from time to time.

38.     **THIS COURT ORDERS** that the Monitor shall not take possession of the Property and shall take no part whatsoever in the management or supervision of the management of the Business and shall not, by fulfilling its obligations hereunder, be deemed to have taken or maintained possession or control of the Business or Property, or any part thereof.

39.     **THIS COURT ORDERS** that nothing herein contained shall require the Monitor to occupy or to take control, care, charge, possession or management (separately and/or collectively, "**Possession**") of any of the Property that might be environmentally contaminated, might be a pollutant or a contaminant, or might cause or contribute to a spill, discharge, release or deposit of a substance contrary to any federal, provincial or other law respecting the protection, conservation, enhancement, remediation or rehabilitation of the environment or relating to the disposal of waste or other contamination including, without limitation, the *Canadian Environmental Protection Act*, the Ontario *Environmental Protection Act*, the *Ontario Water Resources Act*, or the Ontario *Occupational Health and Safety Act* and regulations thereunder (the "**Environmental Legislation**"), provided however that nothing herein shall exempt the Monitor from any duty to report or make disclosure imposed by applicable Environmental Legislation. The Monitor shall not, as a result of this Order or anything done in pursuance of the Monitor's duties and powers under this Order, be deemed to be in Possession of any of the Property within the meaning of any Environmental Legislation, unless it is actually in possession.

40.     **THIS COURT ORDERS** that the Monitor shall provide any creditor of the Just Energy Entities and the DIP Agent and the DIP Lenders with information provided by the Just Energy Entities in response to reasonable requests for information made in writing by such creditor addressed to the Monitor. The Monitor shall not have any responsibility or liability with respect to the information disseminated by it pursuant to this paragraph. In the case of information that the Monitor has been advised by the Just Energy Entities is confidential, the Monitor shall not provide such information to creditors unless otherwise directed by this Court or on such terms as the Monitor and the Applicant may agree.

41.     **THIS COURT ORDERS** that, in addition to the rights and protections afforded the Monitor under the CCAA or as an officer of this Court, the Monitor shall incur no liability or

obligation as a result of its appointment or the carrying out of the provisions of this Order, save and except for any gross negligence or wilful misconduct on its part. Nothing in this Order shall derogate from the protections afforded the Monitor by the CCAA or any applicable legislation.

42.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor (including both U.S. and Canadian counsel for all purposes of this Order), and counsel to the Just Energy Entities (including both U.S. and Canadian counsel for all purposes of this Order) shall be paid their reasonable fees and disbursements, in each case at their standard rates and charges, whether incurred prior to, on, or subsequent to the date of this Order, by the Just Energy Entities as part of the costs of these proceedings. The Just Energy Entities are hereby authorized and directed to pay the accounts of the Monitor, counsel to the Monitor, and the Just Energy Entities' counsel on a weekly basis.

43.     **THIS COURT ORDERS** that the Monitor and its legal counsel shall pass their accounts from time to time, and for this purpose the accounts of the Monitor and its legal counsel are hereby referred to a judge of the Commercial List of the Ontario Superior Court of Justice.

**ADMINISTRATION CHARGE**

44.     **THIS COURT ORDERS** that the Monitor, counsel to the Monitor and counsel to the Just Energy Entities shall be entitled to the benefit of and are hereby granted a charge (the "**Administration Charge**") on the Property, which charge shall not exceed an aggregate amount of C$3,000,000 as security for their professional fees and disbursements incurred at their standard rates and charges, both before and after the making of this Order in respect of these proceedings. The Administration Charge shall have the priority set out in paragraphs  53-55 herein.

**DIP FINANCING**

45.     **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to obtain and borrow or guarantee, as applicable, pursuant a credit facility from the DIP Agent and the DIP Lenders in order to finance the Just Energy Entities' working capital requirements and other general corporate purposes, all in accordance with the Cash Flow Statements (as defined in the DIP Term Sheet) and Definitive Documents, provided that borrowings under such credit facility shall not exceed US$125,000,000 unless permitted by further Order of this Court.

46.    **THIS COURT ORDERS** that such credit facility shall be on the terms and subject to the conditions set forth in the CCAA Interim Debtor-in-Possession Financing Term Sheet between the Just Energy Entities, the DIP Agent and the DIP Lenders dated as of March 9, 2021 and attached as Appendix "DD" to the First Carter Affidavit (as may be amended or amended and restated from time to time, the "**DIP Term Sheet**").

47.    **THIS COURT ORDERS** that the Just Energy Entities are hereby authorized and empowered to execute and deliver such mortgages, charges, hypothecs and security documents, guarantees and other definitive documents (collectively with the DIP Term Sheet and the Cash Flow Statements, the "**Definitive Documents**"), as are contemplated by the DIP Term Sheet or as may be reasonably required by the DIP Agent and the DIP Lenders pursuant to the terms thereof, and the Just Energy Entities are hereby authorized and directed to pay and perform all of the indebtedness, interest, fees, liabilities and obligations to the DIP Agent and the DIP Lenders under and pursuant to the Definitive Documents as and when the same become due and are to be performed, notwithstanding any other provision of this Order. Notwithstanding any other provision in this Order, all payments and other expenditures to be made by any of the Just Energy Entities to any Person (except the Monitor and its counsel) shall be in accordance with the terms of the Definitive Documents, including in respect of payments in satisfaction of Priority Commodity/ISO Obligations.

48.    **THIS COURT ORDERS** that the DIP Agent and the DIP Lenders shall be entitled to the benefit of and are hereby granted a charge (the "**DIP Lenders' Charge**") on the Property, which DIP Lenders' Charge shall not secure an obligation that exists before this Order is made.  The DIP Lenders' Charge shall have the priority set out in paragraphs  53-55 hereof.

49.    **THIS COURT ORDERS** that, notwithstanding any other provision of this Order:

   (a)    the DIP Agent on behalf of the DIP Lenders may take such steps from time to time as it may deem necessary or appropriate to file, register, record or perfect the DIP Lenders' Charge or any of the Definitive Documents;

   (b)    upon the occurrence of an event of default under any of the Definitive Documents or the DIP Lenders' Charge, the DIP Agent or the DIP Lenders, as applicable, may immediately cease making advances or providing any credit to the Just Energy Entities

and shall be permitted to set off and/or consolidate any amounts owing by the DIP Agent or the DIP Lenders to the Just Energy Entities against the obligations of the Just Energy Entities to the DIP Agent and the DIP Lenders under the Definitive Documents or the DIP Lenders' Charge, make demand, accelerate payment and give other notices with respect to the obligations of the Just Energy Entities to the DIP Agent or the DIP Lenders under the Definitive Documents or the DIP Lenders' Charge, or to apply to this Court on five (5) days' notice to the Just Energy Entities, the Monitor and the Service List to seek the Court's authorization to exercise any and all of its other rights and remedies against the Just Energy Entities or the Property under or pursuant to the Definitive Documents and the DIP Lenders' Charge, including without limitation, for the appointment of a receiver, receiver and manager or interim receiver, or for a bankruptcy order against the Just Energy Entities and for the appointment of a trustee in bankruptcy of the Just Energy Entities; and

(c)     the foregoing rights and remedies of the DIP Agent and the DIP Lenders shall be enforceable against any trustee in bankruptcy, interim receiver, receiver or receiver and manager of the Just Energy Entities or the Property.

50.     **THIS COURT ORDERS AND DECLARES** that the DIP Agent, the DIP Lenders, the Qualified Commodity/ISO Suppliers and the Cash Management Banks shall be treated as unaffected in any Plan filed by the Applicants or any of them under the CCAA, or any proposal filed by the Applicants or any of them under the *Bankruptcy and Insolvency Act* of Canada (the "**BIA**"), with respect to any advances made under the Definitive Documents, the Priority Commodity/ISO Obligations or the Cash Management Obligations, as applicable.

**APPROVAL OF FINANCIAL ADVISOR AGREEMENT**

51.     **THIS COURT ORDERS** that the agreement dated February 20, 2021 engaging BMO Nesbitt Burns Inc. (the "**Financial Advisor**") as financial advisor to the Just Energy Entities and attached as Confidential Appendix "FF" to the First Carter Affidavit (the "**Financial Advisor Agreement**"), and the retention of the Financial Advisor under the terms thereof, is hereby ratified and approved and the Just Energy Entities are authorized and directed *nunc pro tunc* to make the payments contemplated thereunder in accordance with the terms and conditions of the Financial Advisor Agreement.

52.     **THIS COURT ORDERS** that the Financial Advisor shall be entitled to the benefit of and is hereby granted a charge (the "**FA Charge**") on the Property, which charge shall not exceed an aggregate amount of C$8,600,000 as security for the fees and disbursements and other amounts payable under the Financial Advisor Agreement, both before and after the making of this Order in respect of these proceedings. The FA Charge shall have the priority set out in paragraphs  53-55 herein.

**VALIDITY AND PRIORITY OF CHARGES CREATED BY THIS ORDER**

53.     **THIS COURT ORDERS** that the priorities of the Administration Charge, the FA Charge, the Directors' Charge, the KERP Charge, the DIP Lenders' Charge, the Priority Commodity/ISO Charge and the Cash Management Charge, as among them, shall be as follows:

> First – Administration Charge and FA Charge (to the maximum amount of C$3,000,000 and C$8,600,000, respectively), on a *pari passu* basis;
>
> Second – Directors' Charge (to the maximum amount of C$44,100,000);
>
> Third – KERP Charge (to the maximum amounts of C$2,012,100 and US$3,876,024);
>
> Fourth – DIP Lenders' Charge (to the maximum amount of the Obligations (as defined in the DIP Term Sheet) owing thereunder at the relevant time) and the Priority Commodity/ISO Charge, on a *pari passu* basis; and
>
> Fifth – Cash Management Charge.

54.     **THIS COURT ORDERS** that the filing, registration or perfection of the Administration Charge, the FA Charge, the Directors' Charge, the KERP Charge, the DIP Lenders' Charge, the Priority Commodity/ISO Charge or the Cash Management Charge (collectively, the "**Charges**") shall not be required, and that the Charges shall be valid and enforceable for all purposes, including as against any right, title or interest filed, registered, recorded or perfected subsequent to the Charges coming into existence, notwithstanding any such failure to file, register, record or perfect.

55.     **THIS COURT ORDERS** that, subject to paragraph 9, each of the Charges shall constitute a charge on the Property and such Charges shall rank in priority to all other security interests,

trusts, liens, charges and encumbrances, claims of secured creditors, statutory or otherwise (collectively, "**Encumbrances**") in favour of any Person (including those commodity suppliers listed in Schedule "A" hereto).

56.     **THIS COURT ORDERS** that except as otherwise expressly provided for herein, or as may be approved by this Court on notice to parties in interest, the Just Energy Entities shall not grant any Encumbrances over any Property that rank in priority to, or *pari passu* with, any of the Charges unless the Just Energy Entities also obtain the prior written consent of the Monitor, the DIP Agent on behalf of the DIP Lenders and the beneficiaries of the Administration Charge, the FA Charge, the Directors' Charge, the KERP Charge, the Priority Commodity/ISO Charge and the Cash Management Charge, or further Order of this Court.

57.     **THIS COURT ORDERS** that the Charges, the agreements and other documents governing or otherwise relating to the obligations secured by the Charges, and the Definitive Documents shall not be rendered invalid or unenforceable and the rights and remedies of the chargees entitled to the benefit of the Charges (collectively, the "**Chargees**") and/or the DIP Agent or the DIP Lenders thereunder shall not otherwise be limited or impaired in any way by (a) the pendency of these proceedings and the declarations of insolvency made herein; (b) any application(s) for bankruptcy order(s) issued pursuant to BIA, or any bankruptcy order made pursuant to such applications; (c) the filing of any assignments for the general benefit of creditors made pursuant to the BIA; (d) the provisions of any federal or provincial statutes; or (e) any negative covenants, prohibitions or other similar provisions with respect to borrowings, incurring debt or the creation of Encumbrances, contained in any existing loan document, lease, sublease, offer to lease or other agreement (collectively, an "**Agreement**") which binds any of the Just Energy Entities and notwithstanding any provision to the contrary in any Agreement:

(a)     neither the creation of the Charges nor the execution, delivery, perfection, registration or performance of the Definitive Documents shall create or be deemed to constitute a breach by any Just Energy Entity of any Agreement to which it is a party;

(b)     none of the Chargees shall have any liability to any Person whatsoever as a result of any breach of any Agreement caused by or resulting from the Just Energy Entities entering into the DIP Term Sheet, the creation of the Charges or the execution, delivery or performance of any of the other Definitive Documents; and

(c)   the payments made by the Just Energy Entities pursuant to this Order or the Definitive Documents, and the granting of the Charges, do not and will not constitute preferences, fraudulent conveyances, transfers at undervalue, oppressive conduct, or other challengeable or voidable transactions under any applicable law.

58.   **THIS COURT ORDERS** that any Charge created by this Order over leases of real property in Canada shall only be a Charge in the Just Energy Entities' interest in such real property leases.

**SERVICE AND NOTICE**

59.   **THIS COURT ORDERS** that the Monitor shall (i) without delay, publish in The Globe and Mail (National Edition) and the Wall Street Journal a notice containing the information prescribed under the CCAA, (ii) within five days after the date of this Order, (A) make this Order publicly available in the manner prescribed under the CCAA, (B) send, or cause to be sent, in the prescribed manner or by electronic message to the e-mail addresses as last shown on the records of the Just Energy Entities, a notice to every known creditor who has a claim against the Just Energy Entities of more than $1,000, and (C) prepare a list showing the names and addresses of those creditors and the estimated amounts of those claims, and make it publicly available in the prescribed manner, all in accordance with Section 23(1)(a) of the CCAA and the regulations made thereunder, provided that the Monitor shall not make the claims, names and addresses of the individuals who are creditors publicly available.

60.   **THIS COURT ORDERS** that the Monitor shall create, maintain and update as necessary a list of all Persons appearing in person or by counsel in this proceeding (the "**Service List**"). The Monitor shall post the Service List, as may be updated from time to time, on the Monitor's website as part of the public materials to be recorded thereon in relation to this proceeding. Notwithstanding the foregoing, the Monitor shall haven no liability in respect of the accuracy of or the timeliness of making any changes to the Service List.

61.   **THIS COURT ORDERS** that the E-Service Protocol of the Commercial List (the "**Protocol**") is approved and adopted by reference herein and, in this proceeding, the service of documents made in accordance with the Protocol (which can be found on the Commercial List website      at      http://www.ontariocourts.ca//scj/practice/practice-directions/toronto/eservice-

commercial/) shall be valid and effective service. Subject to Rule 17.05 this Order shall constitute an order for substituted service pursuant to Rule 16.04 of the Rules of Civil Procedure. Subject to Rule 3.01(d) of the Rules of Civil Procedure and paragraph 21 of the Protocol, service of documents in accordance with the Protocol will be effective on transmission. This Court further orders that a Case Website shall be established in accordance with the Protocol with the following URL - http://cfcanada.fticonsulting.com/justenergy (the "**Monitor's Website**").

62.     **THIS COURT ORDERS** that the Just Energy Entities, the DIP Agent or the DIP Lenders and the Monitor and their respective counsel are at liberty to serve or distribute this Order, any other materials and orders as may be reasonably required in these proceedings, including any notices, or other correspondence, by forwarding true copies thereof by prepaid ordinary mail, courier, personal deliver, facsimile or other electronic transmission to the Just Energy Entities' creditors or other interested parties and their advisors and that any such service, distribution or notice shall be deemed to be received: (a) if sent by courier, on the next business day following the date of forwarding thereof, (b) if delivered by personal delivery or facsimile or other electronic transmission, on the day so delivered, and (c) if sent by ordinary mail, on the third business day after mailing. For greater certainty, any such distribution or service shall be deemed to be in satisfaction of a legal or judicial obligation, and notice requirements within the meaning of clause 3(c) of the *Electronic Commerce Protection Regulations*, Reg. 81000-2-175 (SOR/DORS).

**FOREIGN PROCEEDINGS**

63.     **THIS COURT ORDERS** that the Applicant, Just Energy Group Inc. ("**JEGI**") is hereby authorized and empowered, but not required, to act as the foreign representative (in such capacity, the "**Foreign Representative**") in respect of the within proceedings for the purpose of having these proceedings recognized and approved in a jurisdiction outside of Canada.

64.     **THIS COURT ORDERS** that the Foreign Representative is hereby authorized to apply for foreign recognition and approval of these proceedings, as necessary, in any jurisdiction outside of Canada, including in the United States pursuant to chapter 15 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532.

**GENERAL**

65.     **THIS COURT ORDERS** that any interested party may apply to this Court to amend or vary this Order on not less than seven (7) days' notice to any other party or parties likely to be affected by the Order sought or upon such other notice, if any, as this Court may order; provided, however, that the Chargees, the DIP Agent and the DIP Lenders shall be entitled to rely on this Order as issued and entered and on the Charges and priorities set out in paragraphs 53-55 hereof, including with respect to any fees, expenses and disbursements incurred and in respect of advances made under the Definitive Documents or pursuant to the Qualified Support Agreement, as applicable, until the date this Order may be amended, varied or stayed. For the avoidance of doubt (i) no payment in respect of any obligations secured by the Priority Commodity/ISO Charge or the Cash Management Charge or made to the CA Lenders pursuant to the Lender Support Agreement, and (ii) none of the Authorized Cash Collateral, shall be subject to the terms of any intercreditor agreement, including any "turnover" or "waterfall" provision(s) therein.

66.     **THIS COURT ORDERS** that, notwithstanding paragraph 65 of this Order, the Just Energy Entities or the Monitor may from time to time apply to this Court to amend, vary or supplement this Order or for advice and directions in the discharge of their powers and duties under this Order or in the interpretation or application of this Order.

67.     **THIS COURT ORDERS** that nothing in this Order shall prevent the Monitor from acting as an interim receiver, a receiver, a receiver and manager, or a trustee in bankruptcy of the Just Energy Entities, the Business or the Property.

68.     **THIS COURT HEREBY REQUESTS** the aid and recognition of any court, tribunal, regulatory or administrative body or agency having jurisdiction in Canada or in the United States, to give effect to this Order and to assist the Just Energy Entities, the Monitor and their respective agents in carrying out the terms of this Order. All courts, tribunals, regulatory and administrative bodies and agencies are hereby respectfully requested to make such orders and to provide such assistance to the Just Energy Entities and to the Monitor, as an officer of this Court, as may be necessary or desirable to give effect to this Order, to grant representative status to JEGI, in any foreign proceeding, or to assist the Just Energy Entities and the Monitor and their respective agents in carrying out the terms of this Order.

26

69.    **THIS COURT ORDERS** that each of the Just Energy Entities and the Monitor be at liberty and are hereby authorized and empowered to apply to any court, tribunal, regulatory or administrative body or agency, wherever located, for the recognition of this Order and for assistance in carrying out the terms of this Order, and that JEGI is authorized and empowered to act as a representative in respect of the within proceedings for the purpose of having these proceedings recognized in a jurisdiction outside Canada.

70.    **THIS COURT ORDERS** that Confidential Appendices "FF" and "GG" to the First Carter Affidavit and Confidential Appendix "Q" to the Second Carter Affidavit shall be and are hereby sealed, kept confidential and shall not form part of the public record pending further Order of this Court.

71.    **THIS COURT ORDERS** that this Order and all of its provisions are effective as of 12:01 a.m. Eastern Standard/Daylight Time on the date of this Order.



**SCHEDULE "A"**

**JE Partnerships**

**Partnerships:**

- JUST ENERGY ONTARIO L.P.

- JUST ENERGY MANITOBA L.P.

- JUST ENERGY (B.C.) LIMITED PARTNERSHIP

- JUST ENERGY QUÉBEC L.P.

- JUST ENERGY TRADING L.P.

- JUST ENERGY ALBERTA L.P.

- JUST GREEN L.P.

- JUST ENERGY PRAIRIES L.P.

- JEBPO SERVICES LLP

- JUST ENERGY TEXAS LP

**Commodity Suppliers:**

- EXELON GENERATION COMPANY, LLC

- BRUCE POWER L.P.

- SOCIÉTÉ GÉNÉRALE

- EDF TRADING NORTH AMERICA, LLC

- NEXTERA ENERGY POWER MARKETING, LLC

- MACQUARIE BANK LIMITED

- MACQUARIE ENERGY CANADA LTD.

- MACQUARIE ENERGY LLC

- MORGAN STANLEY CAPITAL GROUP

28

- BP CANADA ENERGY MARKETING CORP.

- BP ENERGY COMPANY

- BP CORPORATION NORTH AMERICA INC.

- BP CANADA ENERGY GROUP ULC

- SHELL ENERGY NORTH AMERICA (CANADA) INC.

- SHELL ENERGY NORTH AMERICA (US), L.P.

## SCHEDULE "B"

## DEFINITIONS

"**Commodity Agreement**" means a gas supply agreement, electricity supply agreement or other agreement with any Just Energy Entity for the physical or financial purchase, sale, trading or hedging of natural gas, electricity or environmental derivative products.

"**ISO Agreement**" means an agreement pursuant to which a Just Energy Entity has reimbursement obligations to a counterparty for payments made by such counterparty on behalf of such Just Energy Entity to an independent system operator that coordinates, controls and monitors the operation of an electrical power system, and includes all agreements related thereto.

"**Lender Support Agreement**" means that certain Accommodation and Support Agreement dated as of March 18, 2021 and attached as Exhibit "A" to the Third Carter Affidavit, among the CA Agent, the CA Lenders and the Just Energy Entities, which agreement shall not be amended, restated or modified in any manner without the consent of the majority of the DIP Lenders and the Monitor.

"**Priority Commodity/ISO Obligation**" means amounts that are due and payable, at the applicable time, for: (i)(A) the physical supply of electricity or gas that has been delivered on or after March 9, 2021; (B) financial settlements on or after March 9, 2021; and (C) amounts owing under a confirmation or transaction that was executed on or after March 9, 2021 pursuant to a Commodity Agreement as a result of the termination thereof in accordance with the applicable Qualified Support Agreement; and (ii) for services actually delivered by a Qualified Commodity/ISO Supplier on or after March 9, 2021 pursuant to an ISO Agreement (but for greater certainty, excluding any amount owing for ISO services provided under an ISO Agreement on or before the date of this Order, whether or not yet due).

"**Qualified Commodity/ISO Supplier**" means any counterparty to a Commodity Agreement or ISO Agreement as of March 9, 2021 that has executed or executes a Qualified Support Agreement with a Just Energy Entity and refrained from exercising termination rights under the Commodity Agreement as a result of the commencement of the Proceedings absent an event of default under such Qualified Support Agreement.

30

"**Qualified Support Agreement**" means a support agreement between a Just Energy Entity and a counterparty to a Commodity Agreement, in form and substance satisfactory to the Just Energy Entities and the DIP Lenders, acting reasonably, which includes, among other things: (i) that such counterparty shall apply to the Court on five (5) days' notice to the Just Energy Entities, the Monitor and the Service List prior to exercising any termination rights under a Qualified Support Agreement; (ii) the obligation to supply physical and financial power and natural gas and other related services pursuant to any confirmations or transactions executed pursuant to a Commodity Agreement; and (iii) an agreement to refrain from exercising termination rights as a result of the commencement of the Proceedings absent an event of default under such support agreement.

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, C. C-36, AS AMENDED

Court File No:  CV-21-00658423-00CL

AND IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF JUST ENERGY GROUP INC., et al (collectively, the "**Applicants**")

|  | *Ontario* **SUPERIOR COURT OF JUSTICE COMMERCIAL LIST** Proceeding commenced at Toronto |
|---|---|
|  | **AMENDED & RESTATED INITIAL ORDER** |
|  | **OSLER, HOSKIN & HARCOURT, LLP** P.O. Box 50, 1 First Canadian Place Toronto, ON M5X 1B8  Marc Wasserman (LSO# 44066M) Michael De Lellis (LSO# 48038U) Jeremy Dacks (LSO# 41851R)  Tel: (416) 362-2111 Fax: (416) 862-6666  Lawyers for the Applicants |

## Exhibit C

**Endorsement**

**Malik, Waleed**

---

| | |
|---|---|
| **From:** | Koehnen, Mr. Justice Markus (SCJ) |
| **Sent:** | Friday, March 19, 2021 11:10 AM |
| **To:** | Malik, Waleed |
| **Cc:** | JUS-G-MAG-CSD-Toronto-SCJ Commercial List; Irving, Shawn; De Lellis, Michael; Dacks, Jeremy; Wasserman, Marc; Robert Thornton; Rebecca Kennedy; Puya Fesharaki; Jim.Robinson@fticonsulting.com; Paul.Bishop@fticonsulting.com; Rosenblat, Dave; Rachel Bengino |
| **Subject:** | Re: Just Energy Comeback - Sync.com Link and Confidential Exhibit |
| **Attachments:** | Just Energy 20210319.pdf; Counsel List (Just Energy) - March 19, 2021.DOCX |

**Email Endorsement**

1. Today was the comeback date in respect of an initial CCAA order that I issued in this matter on March 9, 2021.

2. The order today has either been consented to or is unopposed by approximately 72 different parties.  I have signed and attached the order requested as well as the counsel slip for today's hearing.

3. That a proceeding  involving so many parties in different jurisdictions is unopposed is a credit to the extraordinary hard work that underlies an order like this.  While I was not a party to that hard work, I appreciate the complexities of the issues and the competing interests of various stakeholders.  I congratulate all on their constructive approach to focusing on solving problems rather than viewing problems as barriers to progress.

4. I also extend my thanks to the Texas court for the speed with which it addressed this matter.

5. In addition to today's stay extension, today's application also addresses the KERP and the payment of Q3 bonuses that were not dealt with on March 9.  I am satisfied from the affidavit of Margaret Munnelly

sworn March 16, 2021 and the second affidavit of Michael Carter sworn March 16, 2021 that both the Q3 bonuses and the KERP should be approved.

6.   The Q3 bonuses are payable to approximately 400 employees of Just Energy.  The average bonus is approximately $6,500.  The vast majority of the employees benefiting from the bonus program are rank-and-file employees rather than senior executives.  Employees count on those bonuses as a core part of their income.  Failure to pay those bonuses could result in significant personal hardship.

7.   I am similarly satisfied that the KERP should be approved.  It is limited to senior employees whose continued participation with the company is essential to its restructuring.  The size of the incentive is proportionate to the amount of work that can be expected to be required of those individuals throughout the restructuring process.  The KERP itself is designed so that 50% of its benefit becomes payable only on completion of a successful restructuring.

8.    I note that no creditors oppose the KERP or the bonus payments.  The Monitor supports both.

9.   Today's proposed order also proposes increases to various charges.  The largest among these is the directors' charge which is increased to $44.1 million.  This reflects potential liabilities of $30.8 million for US sales tax, $6.3 million for wage and payroll related liability in Canada and the United States and $3.9 million in respect of US state income taxes.  The Monitor supports the increase in the charges and believes they are reasonable in the circumstances.

10. The Company also seeks the ability to post cash collateral in response to requests from regulators and bonding companies from time to time.  Just Energy operates in a highly regulated field that requires various levels of security.  It is required to post a number of surety bonds.  Both regulators and surety bond companies require security.  A failure to provide security would result in the disruption collapse of the business.  Requests for posting of cash collateral will be reviewed by the monitor.  The monitor supports the company's request in this regard.  In the circumstances,  the request to post cash collateral is reasonable and is approved.

11. The company also seeks authority to grant a cash management charge in favour of certain banks.  The charge will be subordinate to all other court order charges.  The charge has been negotiated with the banks in question, the DIP lenders and the Monitor who also supports the relief sought.

12. The company and the Monitor have filed cash flow statements which support extending the stay to a June 4, 2021.  I approve that extension.

**Justice Markus Koehnen**
Ontario Superior Court of Justice
361 University Ave.
Toronto, Ont.
M5G 1T3