**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>JUST ENERGY GROUP INC., <u>et al.</u>,<br><br>Debtors in a Foreign Proceeding.[1] | Chapter 15<br><br>Case No. 21-30823 (MI) |
| JUST ENERGY TEXAS LP, FULCRUM RETAIL ENERGY LLC, HUDSON ENERGY SERVICES LLC, and JUST ENERGY GROUP, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC. and the PUBLIC UTILITY COMMISSION OF TEXAS, INC.,<br><br>Defendants. | <br><br><br><br>Adv. Pro. _____ |

## <u>COMPLAINT</u>

Plaintiffs are Just Energy Texas LP, Fulcrum Retail Energy, LLC, Hudson Energy Services LLC ("**Hudson**"), and the foreign representative in the above-captioned chapter 15 cases (the "**Chapter 15 Cases**"), Just Energy Group, Inc. (collectively, "**Plaintiffs**" or "**Just Energy**," and, with their affiliated debtors in the Chapter 15 Cases, the "**Company**" or the "**Debtors**"). The Debtors are the subject of proceedings (the "**Canadian Proceedings**") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "**CCAA**") in the Ontario Superior Court of Justice, Commercial List (the "**Canadian Court**"). Plaintiffs bring this action by and through the foreign representative against Defendants Electric Reliability Council of Texas, Inc. ("**ERCOT**") and the Public Utility Commission of Texas (the "**PUCT**," and together with ERCOT, "**Defendants**"), and allege as follows:

---

[1]     The identifying four digits of Just Energy Group Inc.'s local Canada tax identification number are 0469. A complete list of debtor entities in these chapter 15 cases may be obtained at www.omniagentsolutions.com/justenergy.

## PRELIMINARY STATEMENT

1.      In February 2021, Texas experienced a historically severe winter storm ("**Winter Storm Uri**") that incapacitated most of its power-generating facilities.  As demand for electricity outpaced supply, ERCOT—the private entity that manages Texas's grid and wholesale electricity market—ordered deep cuts in electricity consumption in the form of forced outages.  In industry parlance, ERCOT ordered "load" to be "shed" to reduce strain on the power grid.  At the same time, ERCOT and its state regulator the PUCT also stunningly intervened in the market for wholesale electricity by setting prices *orders of magnitude* higher than what market forces ordinarily would produce.

2.      On February 15 and February 16, with little discussion and without prior notice or any opportunity for public comment, the PUCT issued its key Orders Directing ERCOT To Take Action And Granting Exception To Commission Rules (the "**PUCT Orders**") directing ERCOT to "ensure that firm load that is being shed in [Energy Emergency Alert ("**EEA**") Level 3] is being accounted for in ERCOT's scarcity pricing signals."  The PUCT did not tie the PUCT Orders to a fact-based analysis of the current market conditions or otherwise explain the reasoning behind its determination that energy prices should be set at the high-system-wide offer cap (the "**HCAP**").  Instead, it merely stated the economic truism that "[e]nergy prices should reflect scarcity of the supply" and opined without evidence that "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest."  In reality, scarcity was at its maximum because the storm had forced power generators offline—not because they were waiting for a higher market price.

3.      Nonetheless, following the PUCT's directive, ERCOT manually adjusted one of the input values to the Real-Time On-Line Reliability Deployment Price Adder—part of ERCOT's scarcity pricing mechanism—to impose a Real Time Settlement Point Price on February 15 at the HCAP of $9,000 per megawatt hour ("**MWh**") for more than eighty consecutive hours.  ERCOT also improperly calculated charges associated with various grid functions that support the

continuous flow of electricity, including for reserves.  The cost of these "ancillary services" as they are known in the power industry reached the unprecedented price of $25,000/MWh during the storm.

4.      The actions of the PUCT and ERCOT not only failed to solve the electricity shortage, but they also violated Texas law.  Neither the PUCT nor ERCOT possesses the substantive authority to set prices in the wholesale electricity market in this manner; the PUCT did not follow the statutorily-prescribed rule-making procedures; and the PUCT's actions were not supported by evidence as required by law.  The PUCT violated the Texas Administrative Procedure Act (the "**APA**") by setting prices without proper notice or making an evidentiary showing that the market's scarcity pricing signals were not working and that the inflated prices would accomplish their apparent intended purpose of stimulating power generation.  The PUCT also violated the Public Utility Regulatory Act (the "**PURA**"), which mandates that pricing must be the function of competitive forces—not regulatory fiat.

5.      Similarly, ERCOT's actions found no support under, and were inconsistent with its Standard Form Market Participant Agreement with each Plaintiff (collectively, the "**SFA**"), which incorporates by reference, and requires compliance with ERCOT's nodal protocols (the "**ERCOT Protocols**").  At the time of the storm, the ERCOT Protocols did not include firm load shed among the considerations relevant to determining whether scarcity pricing would be appropriate.  Yet, the PUCT and ERCOT impermissibly set the HCAP at $9,000/MWh based on firm load shed; charged prices for ancillary services that exceeded the HCAP of $9,000/MWh; and failed to allow prices to fall below $9,000/MWh when firm load shed ended.

6.      The economic consequences of the PUCT's and ERCOT's decisions were staggering.  Over only seven days in February, due to the prices that ERCOT set, the state's wholesale market consummated $55 billion in transactions—a level of volume it ordinarily would

take the market four years to realize.  The $9,000/MWh price was over four hundred times the average MWh price for 2020 of $22.00/MWh.[2]

7.     What is more, ERCOT left that price in place for 32 hours after it had rescinded all load shed instructions early in the morning of February 18—even though during that period, the asserted justification for the price intervention no longer applied.  After ordinary market forces were permitted to take over at 9:00 a.m. on February 19, the price per MWh dropped precipitously.

8.     The PUCT's and ERCOT's decision making during the storm has been met with widespread criticism as economically unsound and legally invalid.  On March 5, Potomac Economics, the PUCT's Independent Market Monitor ("**IMM**"), concluded that ERCOT's pricing intervention should have ended immediately at 12:00 a.m. on February 18 after load shed stopped and recommended that ERCOT correct real-time prices from that date and time until 9:00 a.m. on February 19.  According to the IMM, the "mistake" of keeping the inflated prices in place resulted in billions of additional, improper costs to the ERCOT market.  Then, on March 8, the Lieutenant Governor of Texas called on the PUCT and ERCOT to follow the IMM's recommendation, stating that correcting the "mistake will require an adjustment, but it is the right thing to do.  It will ultimately benefit consumers and is one important step we can take now to begin to fix what went wrong with the storm."  With respect to ancillary charges, Arthur D'Andrea, former Chair of the PUCT, remarked:  "I haven't talked to anyone yet who thought [ancillary costs] could get above $9,000.  That was surprising—I think, shocking—to a lot of us."  The IMM also has indicated ERCOT did not properly calculate ancillary charges.  The imprudence of the regulators' decisions is confirmed by the wave of lawsuits that have been filed and by laws passed by the Texas legislature designed to remedy the consequences of those decisions and to reform the way the PUCT and ERCOT function going forward.

---

[2]     U.S. Energy Information Administration, May 7, 2021 ("Average Texas electricity prices were higher in February 2021 due to severe weather storm") available at https://www.eia.gov/todayinenergy/detail.php?id=47876.

9.      The regulatory missteps of the PUCT and ERCOT also severely harmed the Texas energy market's participants—few more so than Just Energy.  Just six months earlier, Just Energy had completed a successful balance-sheet restructuring.  In February and March 2021, ERCOT floored Just Energy with invoices that its recently de-levered balance sheet could not withstand.  ERCOT's invoices demanded approximately $335 million for the week of February 13 through February 20.  An implied threat accompanied ERCOT's invoices:  if Just Energy failed to satisfy them, ERCOT and the PUCT would shutter Just Energy's business in Texas by exercising regulatory, contractual, and statutory remedies to transfer Just Energy's customers in Texas to a Provider Of Last Resort ("**POLR**") for no consideration.

10.      In order to protect against a forced eviction from Texas's retail electricity market, the loss of meaningful assets to a competitor, and the devastating impact on its creditors, employees, sureties, public shareholders, and customers, Just Energy had no choice but to pay the invoices under protest.  Those payments followed exhaustive efforts to mitigate the consequences of Defendants' actions, including submitting filings to ERCOT and the PUCT both individually and through the Texas Energy Association of Marketers; lobbying the Texas state legislature; commencing restructuring proceedings for the second time in six months, i.e., the Canadian Proceedings and Chapter 15 Cases; obtaining approval from both the Canadian Court and this Court to enter into a $125 million financing facility; and using the facility proceeds to pay ERCOT.[3]

11.      Just Energy paid ERCOT with a full reservation of rights as recognized by this Court.[4]  Regardless of whether ERCOT was paid the $335 million it invoiced for the week of

---

[3]      With respect to Plaintiff Hudson, ERCOT invoiced its qualified service entity (or "**QSE**") BP Energy Company ("**BP**").  BP satisfied those invoices and seeks reimbursement from Hudson pursuant to the parties Independent Electricity System Operating Scheduling Agreement.

[4]      See Order Granting Provisional Relief Pursuant To Section 1519 Of Bankruptcy Code [ECF No. 23] dated March 9, 2021 at p. 11 ("Additionally, the Court finds that any payments made to ERCOT are made subject to all of the Debtors' rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law.").

February 13 through February 20, ERCOT's "claim" has not been finalized, and certain of those transfers remain subject to challenge. Specifically, Plaintiffs challenge no less than $274 million (hereinafter, the "**Transfers**") out of the $335 million that ERCOT invoiced.

12.     Just Energy is entitled to relief under the Bankruptcy Code because the Transfers are subject to (a) avoidance as unauthorized post-petition transfers (11 U.S.C. § 549); (b) turnover (11 U.S.C. § 542); (c) setoff (11 U.S.C. §§ 553 and/or 558); (d) disallowance (11 U.S.C. §§ 502(b), 502(d)); and (e) avoidance under Canadian law or any other applicable law. The Transfers should be recovered and distributed to Just Energy's creditors. The Bankruptcy Code provides remedies because this Court did not approve the Transfers, and they are subject to avoidance on that basis alone. Nor could this Court ever have approved the Transfers when the invoices are based on the PUCT Orders, which themselves are unlawful under the APA and the PURA, and otherwise are inconsistent with the ERCOT Protocols and the SFA. *Alternatively*, even if the PUCT Orders are valid, Just Energy still has valid claims under the Bankruptcy Code because ERCOT could not have applied the $9,000/MWh price after 1:05 a.m. on February 18.

## JURISDICTION AND VENUE

13.     This proceeding involves the Debtors' assets located in the United States. Section 1521(a)(4) of the Bankruptcy Code provides that the Court may entrust the foreign representative with the "administration and realization of all or part of the debtors' assets within the territorial jurisdiction of the United States." Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or other laws of the United States." Section 1521(a)(7) of the Bankruptcy Code provides that the foreign representative may be granted "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." 11 U.S.C. § 1521(a)(7). The proceeding also involves causes of action to recover property that was transferred after the commencement of the case. Pursuant to section 1520(a)(2) of the Bankruptcy

Code, "[u]pon recognition of a foreign proceeding that is a foreign main proceeding … section [549 applies] to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States ….".

14.     The prosecution of this lawsuit also comports squarely with the objectives of chapter 15 as outlined in the Bankruptcy Code, including the "fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor" and the "protection and maximization of the value of the debtor's assets." 11 U.S.C. §§ 1501(a)(3), (a)(4).

15.     While Just Energy paid ERCOT, it did so under protest.  Regardless of whether ERCOT filed a formal proof of claim, in sum and substance, Just Energy's payment under protest of amounts ERCOT invoiced and demanded leaves ERCOT with a contingent "claim" against Just Energy that has not been finalized and only will be liquidated after the Court determines the proper amounts in this proceeding.

16.     Plaintiffs bring claims against the PUCT and ERCOT under sections 502(b), 502(d), 542(a), 549, 553 and/or 558 of the Bankruptcy Code as well as claims for avoidance under Canadian and any other applicable law.  These causes of action are "core" pursuant to 28 U.S.C. § 157(b) and include, among other things, the "recognition of foreign proceedings and other matters under chapter 15 of title 11," 28 U.S.C. § 157(b)(2)(P) and "requests for other relief covered under the provisions of chapter 15."[5]  They also are "core" because they involve "matters concerning the administration of the estate," 28 U.S.C. § 157(b)(2)(A); the "allowance or disallowance of claims," 28 U.S.C. § 157(b)(2)(B); "proceedings to determine, avoid, or recover fraudulent conveyances," 28 U.S.C. § 157(b)(2)(H); "orders to turn over property of the estate," 28 U.S.C. § 157(b)(2)(E); and "other proceedings affecting the liquidation of the assets of the

_____

[5]     In re British Am. Ins. Co. Ltd., 488 B.R. 205, 223 n.31 (Bankr. S.D. Fla. 2013).

7

estate or the adjustment of the debtor-creditor or equity security holder relationship," 28 U.S.C. § 157(b)(2)(O).

17.     At minimum, this Court has "related to" jurisdiction over this entire proceeding. Considering that proceeds realized from this action may fund distributions to creditors in the Canadian Proceedings, its outcome will have far more than just a conceivable effect on the foreign estate.

18.     Pursuant to Federal Bankruptcy Rule 7008, Plaintiffs consent to the entry of final orders or judgment by the Court.

19.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## PARTIES

20.     Plaintiff Just Energy Texas LP is a Texas limited partnership with its headquarters in Harris County, Texas.  Plaintiff Fulcrum Retail Energy LLC is a Texas company with its headquarters in Harris County, Texas.  Plaintiff Hudson is a New Jersey company with its headquarters in Harris County, Texas.  Plaintiff Just Energy Group, Inc. is a Canadian company with its headquarters in Toronto, Canada that has been appointed the Debtors' "foreign representative" as that term is defined under 101(24) of the Bankruptcy Code by both the Canadian Court and this Court.

21.     Plaintiffs (along with the other Debtors) commenced the Chapter 15 Cases and the CCAA Proceedings in the Canadian Court on March 9, 2021.  That same day, the Canadian Court appointed FTI Consulting Canada Inc. as Monitor.  Under the CCAA, rights can be exercised for the benefit of creditors of the Debtors.

22.     Defendant ERCOT is a membership-based § 501(c)(4) nonprofit corporation governed by its Board of Directors and subject to the oversight of the PUCT and the Texas Legislature.  It is the independent system operator for all the transmission and generation facilities

in the ERCOT market, which is located entirely within Texas.  It may be served with process at its principal place of business, 7620 Metro Center Drive, Austin, Texas 78744.

23.     Defendant the PUCT is an agency of the State of Texas.  The PUCT is a "State Commission" within the meaning provided in 47 U.S.C. §§ 153(41), 251 and 252.  The PUCT may be served with citation by serving the PUCT General Counsel, at 1701 N. Congress Avenue, Austin, Texas 78711-3326.

## FACTUAL ALLEGATIONS

### I.    BACKGROUND

#### A.    THE COMPANY

24.     The Company is a natural gas and electricity retailer currently operating in the United States and Canada.  Its principal line of business consists of purchasing electricity and natural gas commodities from certain large energy suppliers and re-selling them to residential and commercial customers.  The Company services more than 936,000 customers and provides employment to approximately 1,100 employees.  Texas is the Company's single largest market, representing 47% of its revenues in fiscal year 2020.

25.     Retailers like Just Energy fulfill a vital role in the ERCOT ecosystem.  Retail electricity providers purchase wholesale power from power-generating companies, trading companies, and wholesalers and re-sell that power to customers.  Retailers generally purchase most of their power in large, wholesale blocks—well in advance.  They then compete with other retailers to sell that power to consumers at a low cost, typically under fixed-price contracts.  Customers in locations within Texas where there is robust price competition benefit from the role played by retailers like the Company in the market.[6]

---

[6]     See Peter R. Hartley, Kenneth B. Medlock III & Olivera Jankovska, Electricity Reform And Retail Pricing In Texas, Center for Energy Studies (June 2017), https://www.bakerinstitute.org/media/files/files/55857030/ces-pub-txelectricity-060717_O6fiwZA.pdf.

26.     In September 2020, Just Energy completed a balance sheet recapitalization (the "**Recapitalization**") in Canada.  The Recapitalization was the culmination of a 15-month-long strategic review process and comprehensive plan to strengthen Just Energy's business.  The Recapitalization improved the Company's overall capital structure by:  (a) reducing its debt and obligations under preferred shares by approximately CAD $780 million; (b) raising over CAD $100 million of new equity; (c) reducing annual cash interest costs by approximately CAD $45 million; and (d) extending debt maturity dates.

27.     The Recapitalization was executed through a plan of arrangement under section 192 of the Canada Business Corporations Act, which was approved by the Canadian Court on September 3, 2020.  The Recapitalization also was recognized by this Court by the Honorable David R. Jones in the chapter 15 case styled In re Just Energy Group Inc., Case No. 20-34442 (DRJ) (Bankr. S.D. Tex.) on September 10, 2020.  Upon the consummation of the Recapitalization, the Company had CAD $138 million of total available liquidity.

## B.     THE PUCT, ERCOT, AND THE TEXAS ELECTRICITY MARKET

28.     The Texas Interconnection is one of the three main electricity grids in the United States that, for the most part, operates independently and with limited export and import capabilities.   The PUCT and ERCOT are solely responsible for managing the Texas Interconnection and wholesale electricity transactions that occur within the grid.

29.     ERCOT functions both as the technical operator for the Texas grid and a decision-making organization that creates rules for the wholesale electricity market.  ERCOT is responsible for scheduling power for more than 26 million people on a grid that connects over 46,500 miles of transmission lines and more than 680 generation units, accounting for 84,500 megawatts of installed generation capacity.

30.     Prices within the grid ordinarily are set by market forces.  ERCOT manages the flow of electricity by continually ordering generators to ramp-up or ramp-down production to

constantly match the amount of power demanded by consumers and maintain overall grid stability and reliability.   ERCOT also performs financial settlements for the competitive wholesale electricity market and enforces certain credit requirements.

31.     ERCOT is subject to regulation by the PUCT, a state agency that regulates the state's electric, water, and telecommunication utilities, implements respective legislation, and offers customer assistance in resolving consumer complaints.

32.     Each of the Plaintiffs (excluding the foreign representative) has a "Retail Electric Provider" certificate in Texas, is registered as a "Market Participant" in the ERCOT Market, and is party to a SFA with ERCOT.   To participate in the ERCOT market, each Plaintiff must be a party to an SFA and comply with the ERCOT's Protocols.

33.     If Plaintiffs are unable to pay ERCOT's invoices when due, ERCOT can suspend their market participation in as little as two days and transfer their customers to another energy provider, i.e., a POLR.   Failure to pay timely an ERCOT invoice also would give the PUCT grounds to initiate a proceeding to amend, suspend, or revoke Plaintiffs' Retail Electric Provider certificates.

### C.     WINTER STORM URI

34.     In February 2021, Winter Storm Uri brought extremely cold weather conditions to Texas.   Customer demand for electricity surged on February 13 and 14, pushing Texas's power grid to a new winter peak demand record, topping 69,000 megawatts.   This was more than 3,200 megawatts higher than the previous winter peak set in January 2018.

35.     While demand soared, supply plummeted as power plants were forced offline by the storm's impact.   As a result, demand threatened to exceed supply.   In the early hours of February 15, ERCOT declared an EEA Level 1, urging consumers to conserve power.   Within an hour, ERCOT elevated to an EEA Level 2, and only 13 minutes later, at 1:25 a.m., ERCOT

elevated to an EEA Level 3.  With the grid stressed, ERCOT ordered forced outages to reduce strain.

### D.   THE PUCT AND ERCOT RESPOND BY ARTIFICIALLY INFLATING PRICING

36.    The PUCT and ERCOT responded to the storm by intervening in the wholesale electricity market to impose draconian pricing on existing supply.  The PUCT Orders were issued on February 15 and February 16 and resulted in electricity prices being raised to the regulatory maximum of $9,000/MWh, a spike of as much as 30,000% above average market prices for that time of year.[7]

37.    By regulation, ERCOT power prices were **capped** during the relevant period at the HCAP of $9,000/MWh, but no regulation provides that the PUCT and ERCOT may **set** prices at this rate if ordinary market forces would produce a lower price.  The amount is a cap—not a rate that can be set artificially.[8]  The PUCT directed ERCOT to apply the system-wide offer cap of $9,000/MWh to **set** prices while firm load was being shed in an EEA3 load shed event.

38.    Similarly, firm load shed was not a scarcity-pricing trigger at the time under ERCOT Protocol 6.5.3.7.1 that could be used to justify the decision to set the real-time market price at $9,000/MWh.  Notwithstanding, the PUCT Orders capriciously concluded "[i]f customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest," prompting ERCOT to improperly set the price at the HCAP of $9,000/MWh.

---

[7]    Russell Gold & Katherine Blunt, Texas Grapples with Crushing Power Bills After Freeze, Wall. St. J. (Feb. 23, 2021, 10:59 AM), https://www.wsj.com/articles/texas-grapples-with-crushing-power-bills-after-freeze-11614095953.  Tim McGlaughlin, Texas Wholesale Electric Prices Spike More Than 10,000% Amid Outages, Reuters (Feb. 15, 2021, 9:17 AM), https://www.reuters.com/article/us-electricity-texas-prices/texas-wholesale-electric-prices-spike-more-than-10000-amid-outages-idUSKBN2AF19A.

[8]    16 T.A.C. §§ 25.505(g)(B)-(C).

39.     Mandating the market pricing at these levels by order was unprecedented.  For historical comparison, ERCOT real time prices averaged just $22.00 per MWh for February 2020.[9] If any for-profit entity had increased prices on the scale of what ERCOT did during a declared state of emergency, it would be widely recognized as price gouging under the law.  In point of fact, the Texas Attorney General sued another retailer, Griddy, for price gouging because Griddy passed through the $9,000/MWh price to consumers.

40.     The duration of the ERCOT-set price was equally unprecedented.  In ERCOT's history, prices had never before remained at the cap for anything close to eighty hours.  As depicted in the chart below, January 2018 was the first time in ERCOT history that prices ever even reached the $9,000/MWh cap—for a total of only ten minutes.[10]  In 2019, prices hit the cap, but only for a little more than two hours.[11]

41.     Historically, prices only ever hit the cap for a fraction of the more than eighty hours that the $9,000/MWh price was in place.  As reflected in the chart below, in 2012, 2013, and 2014 (when the cap ranged from $3,000/MWh at the beginning of 2012 to $7,000/MWh at the end of 2014), prices were at the cap for less than two hours each year.[12]

---

[9]     U.S. Energy Information Administration, May 7, 2021 ("Average Texas electricity prices were higher in February 2021 due to severe weather storm") ("Wholesale electricity prices in the Electric Reliability Council of Texas (ERCOT), Texas's primary grid operator, averaged $22 per megawatthour (MWh) in 2020") available at https://www.eia.gov/todayinenergy/detail.php?id=47876.

[10]    Potomac Economics, Ltd., 2018 State of the Market Report for the ERCOT Electricity Markets 23 (June 2019), https://www.potomaceconomics.com/wp-content/uploads/2019/06/2018-State-of-the-Market-Report.pdf.

[11]    Potomac Economics, Ltd., 2019 State of the Market Report for the ERCOT Electricity Markets 18 (May 2020), https://www.potomaceconomics.com/wp-content/uploads/2020/06/2019-State-of-the-Market-Report.pdf.

[12]    Potomac Economics, Ltd., 2014 State of the Market Report for the ERCOT Wholesale Electricity Markets 16 (July 2015), https://www.potomaceconomics.com/wp-content/uploads/2017/01/2014-ERCOT-State-of-the-Market-Report.pdf.



42.    Although the February 2021 winter storm has prompted comparisons to another winter storm that hit Texas ten years ago, in February 2011, the events of 2021 were different.  The chart above illustrates that eighty hours were spent at the cap in February 2021 versus 28.44 hours in 2011.[13]  And, the cap was only $3,000/MWh at the time, a third of 2021.  Critically, the 2011 prices were determined by the actual scarcity conditions in the market, rather than under orders issued by regulators, and as illustrated below, load shed lasted less than 8 hours—versus nearly 80 hours in 2021.



---

[13]    ERCOT News Release November 20, 2021 ("Winter power plant assessment under way, CREZ development on track for 2013 completion) available at http://www.ercot.com/news/releases/show/26348.

E.   FEBRUARY 18:  LOAD SHEDDING STOPS, BUT $9,000/MWH PRICE CONTINUES

43.   Temperatures warmed on February 17.  With that development, ERCOT was able to stop shedding load just after midnight on February 18—a fact about which market participants were notified.  No load shed directive under ERCOT Protocol 6.5.8.4.2(3) was in place after 1:05 a.m. on February 18.  After lifting load shed instructions, the ERCOT grid had ample resources online, and there was no justification for continuing to impose an artificial price of $9,000/MWh through administrative adjustments to the Real Time-Reliability Deployment Price Adder.[14]

44.   Despite a sufficient level of reserves, ERCOT failed to simultaneously return to the pricing mechanisms prescribed by the PUCT's Orders and the ERCOT Protocols.  Instead, it left the $9,000/MWh scarcity price in place for an additional 32 hours.[15]  When ERCOT finally allowed normal supply and demand forces to set the price of power on February 19, the trading price plummeted within one hour from $9,000/MWh to $27/MWh, later falling to less than $5/MWh.[16]

45.   On February 21, the PUCT issued an "Order Directing ERCOT to Take Action and Granting Exception to ERCOT Protocols" (the "**February 21 Order**").  The February 21 Order, among other things, authorized ERCOT to "[d]eviate from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments."  That same day, ERCOT issued a

---

[14]   ERCOT Market Notice M-C021521-03 Legal (Feb. 17, 2021) ("Once ERCOT is no longer instructing firm Load shed, the adjustment will be set to 0, as it would be in the previous implementation."), http://www.ercot.com/services/comm/mkt_notices/archives/5224.

[15]   Posting of ERCOT, to Legal Notifications (Feb. 16, 2021, 6:04 PM), http://www.ercot.com/services/comm/mkt_notices/archives/5221; Posting of ERCOT, to Legal Notifications; Operations (Feb. 19, 2021, 9:27 AM), http://www.ercot.com/services/comm/mkt_notices/archives/5228; Letter from Carrie Bivens, Vice President, ERCOT Indep. Mkt. Monitor Dir., Potomac Econs., Ltd. to Chairman Arthur C. D'Andrea & Commissioner Shelly Botkin, Pub. Util. Comm'n of Texas, at 1 (Mar. 4, 2021) [hereinafter IMM Letter], https://interchange.puc.texas.gov/Documents/51812_61_1114183.PDF.

[16]   Mark Watson, ERCOT Prices Plunge, but 34 GW Remain Offline, 166,000 Are Still Without Power, S&P Glob. (Feb. 19, 2021, 10:46 PM), https://www.spglobal.com/platts/en/market-insights/latest-news/electric-power/021921-ercot-prices-plunge-but-34-gw-remain-offline-166000-are-still-without-power.

notice stating: "ERCOT is temporarily deviating from Protocol deadlines and timing related to settlements, collateral obligations, and invoice payments while prices are under review."[17]  But, the next day, without explanation, ERCOT issued a second notice saying "ERCOT has ended its temporary deviation from protocol deadlines and timing related to settlements, collateral obligations, and invoice payments.  Invoices and settlement will be executed in accordance with Protocol language."[18]

### F.      ERCOT INCORRECTLY CALCULATED ANCILLARY CHARGES

46.     Just Energy has hedges in place to cover its ancillary services costs based on its normal share of electricity load in ERCOT.  But during the weather event, Just Energy's load share disproportionately increased.  The load share increase, combined with the much higher charges for ancillary services, resulted in significant additional costs.  On operating days February 15 to 20, ancillary services prices consistently exceeded the HCAP, at times approaching $25,000/MWh.  That hourly rate was a dramatic departure from ERCOT's historical prices for ancillary services.

47.     These excessive prices for ancillary services violated both ERCOT's preexisting rules and the PUCT Orders.  Nothing in the PUCT Orders suggests that the system-wide offer cap applies only to energy prices.  As noted by the IMM's March 1 recommendation, given that ancillary services reserves are procured to reduce the probability of losing load, the value of such reserves should not exceed the value of lost load ("**VOLL**"), which was $9,000 for the February 15 to February 20 operating days due to the PUCT's Orders.  Indeed, in its March 1 letter to the PUCT the IMM confirmed that the manner in which the ancillary service charges were calculated and assessed does not conform to past practice and noted that capping ancillary services prices at the system-wide offer cap would be more consistent with economic market design principles.[19]

---

[17]        ERCOT Market Notice M-A022221-01 (Feb. 22, 2021).

[18]        ERCOT Notice M-A022221-02 (Feb. 23, 2021).

[19]        Comments From IMM, PUC Project No. 51812 (Mar. 1, 2021).

G.    THE PUCT AND ERCOT ELEVATE SUPPLY SCARCITY INTO MARKET FAILURE

48.    The $9,000/MWh price triggered an energy market failure that massively harmed market participants with little or no offsetting benefits for consumers or the reliability of the grid. The artificial price did not result in additional power production. Generators were still burdened by frozen equipment and other weather-related issues, making substantial generation impossible, irrespective of price.

49.    On March 5, the IMM concluded, after investigation, that the $9,000/MWh price was improperly maintained for a full 32 hours after the load-shed events ended, resulting in billions in overcharges on February 18 and 19 alone. These overcharges exceed the total cost of power traded in real-time for the entire year in 2020.[20] The IMM recommended that the billions in overcharges for February 18 and 19 be reversed.[21] Lieutenant Governor Dan Patrick has publicly called for the PUCT to follow the IMM's recommendation and correct the unlawfully set prices.[22]

50.    On June 2, 2021, Vistra Corp. filed with the PUCT in connection with Project No. 51812 a study it commissioned from London Economics International LLC ("**LEI**"). LEI examined what real time energy prices would have been in the absence of the PUCT Orders and ERCOT's execution of those Orders. LEI found that between 22:15 on February 15th and 9:00 on February 19th, energy prices would have averaged $2,404/MWh if not for the PUCT Orders—significantly lower than the $9,000/MWh HCAP price.

---

[20]    Naureen S. Malik, Texas Watchdog Says Grid Operator Made $16 Billion Error, Bloomberg (Mar. 4, 2021, 1:07 PM), https://www.bloomberg.com/news/articles/2021-03-04/texas-watchdog-says-power-grid-operator-made-16-billion-error.

[21]    IMM March 4, 2021 Letter at 2 ("ERCOT recalled the last of the firm load shed instructions at 23:55 on February 17, 2021. Therefore, in order to comply with the Commission Order, the pricing intervention that raised prices to VOLL should have ended immediately at that time. However, ERCOT continued to hold prices at VOLL by inflating the Real-Time On-Line Reliability Deployment Price Adder for an additional 32 hours through the morning of February 19."). See also IMM Letter dated March 11, 2021 (following up on March 4 letter).

[22]    Russell Gold, Texas Lt. Governor Calls for Reversal of $16 Billion Blackout Overcharges, Wall St. J. (Mar. 8, 2021, 7:07 PM), https://www.wsj.com/articles/texas-lt-governor-calls-for-reversal-of-16-billion-blackout-overcharges-11615240985?mod=searchresults_pos2&page=1.

51.     The PUCT's and ERCOT's failed response also has spawned significant litigation. More than 150 individual lawsuits against ERCOT and other parties (as of June 10, 2021) were transferred to an MDL pretrial court.[23]   At least one court has found ERCOT's "massive errors" caused debts for "failed market participants" and rejected ERCOT's claims of sovereign immunity.[24]   There also have been several major bankruptcy filings in the wake of the storm, including the state's largest and oldest cooperative, Brazos River Electric, which filed for chapter 11 protection after receiving $1.9 billion of invoices—which it now is challenging in litigation against ERCOT[25]—as well as retailers Entrust Energy, Inc. (chapter 11), Griddy Energy (chapter 11), Liberty Power Holdings (chapter 11), and Brilliant Energy LLC (chapter 7).

H.     LEGISLATIVE RESPONSE AND UPLIFT BALANCE FINANCING SETTLEMENT

52.     Several significant pieces of legislation have been passed aimed at regulatory reform and redress that underscore the extent of the shortcomings in the PUCT's and ERCOT's response to the storm.   On June 8, 2021, Texas Governor Greg Abbott signed Senate Bill 2 and Senate Bill 3 into law which provide for changes to the governance of the PUCT and ERCOT and "relat[e] to preparing for, preventing, and responding to weather emergencies and power outages."[26]   Other bills have been signed into law to expand the membership of and change the

---

[23]   See Order of Multidistrict Litigation Panel, In re Winter Storm Uri Litig., No. 21-0313 (Tex. June 10, 2021), https://search.txcourts.gov/SearchMedia.aspx?MediaVersionID=e0e2a6dc-b8fa-4e74-8f56-4fefd281e972&coa=cossup&DT=DISPOSITION&MediaID=d3384293-5fb5-4d66-9803-bc4081572d8f.

[24]   See CPS Energy v. Elec. Reliability Council of Texas, Cause No. 2021CI04574 (288th District Court) (Temporary Restraining Order dated April 28, 2021); decision dated May 26, 2021.

[25]   See Brazos Elec. Power Cooperative, Inc., et al. v. Electric Reliability Council Of Texas, Inc., Adv. Proc. No. 21-03863 (DRJ) (Bankr. S.D. Tex.), ECF No. 173 (Debtors' First Amended Complaint Objecting To Electric Reliability Council Of Texas, Inc.'s Proof Of Claim And Other Relief).

[26]   S. 2, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB00002F.pdf#navpanes=0; S. 3, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB00003F.pdf#navpanes=0; see, e.g., Tex. Util. Code § 39.1513; Tex. Gov't Code § 411.301.

eligibility requirements for the PUCT[27]; require an independent annual audit of ERCOT with published results[28]; allow for the use of electric energy storage facilities by transmission and distribution utilities[29]; provide securitization financing for gas utilities[30]; and provide additional means for facilities to restore power during widespread outages.[31]  On June 16, 2021, Governor Abbot signed House Bill 4492 (the "**Securitization Bill**") which may provide for up to $2.1 billion of financing for certain uplift charges in excess of $9,000/MWh.[32]  On June 18, 2021, Governor Abbott signed Senate Bill 1580 which "enable[s] electric cooperatives to use securitization financing to recover extraordinary costs and expenses incurred" due to Winter Storm Uri.[33]

53.    Certain load service entities ("**LSEs**") recently reached a settlement with the PUCT and ERCOT relating to financing for the $2.1 billion designated by the Securitization Bill for uplift charges.  On July 16, 2021, ERCOT filed an application with the PUCT for "approval of a Debt Obligation Order authorizing the financing of up to $2.1 billion for the Uplift Balance, plus reasonable costs."[34]  On September 20, 2021, certain LSEs, including Just Energy, reached

---

[27]  S. 2154, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB02154F.pdf#navpanes=0; see, e.g., Tex. Util. Code § 12.051(a) (changing composition of the PUCT from three commissioners to five).

[28]  H.R. 2586, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB02586F.pdf#navpanes=0.

[29]  S. 415, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB00415F.pdf#navpanes=0.

[30]  H.R. 1520, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB01520F.pdf#navpanes=0; see Tex. Gov't Code § 1232.1072.

[31]  H.R. 2483, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB02483F.pdf#navpanes=0.

[32]  H.R. 4492, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/HB04492F.pdf#navpanes=0; see also Tex. Util. Code § 39.651; Tex. Util. Code § 39.652(4).

[33]  S. 1580, 87th Leg., Reg. Sess. (Tex. 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB01580F.pdf#navpanes=0; see also Tex. Util. Code § 41.151(a).

[34]  Unopposed Partial Stipulation And Settlement Agreement dated September 20, 2021, Item 293 (the "**Settlement Stipulation**"), at 1 filed before PUCT  in connection with Application Of ERCOT For A Debt Obligation Order To Finance Uplift Balances Under PURA Chapter 39, Subchapter N, For An Order Initiating A Parallel Docket, And For Good Cause Exception, Docket No. 52322 (the "**ERCOT Securitization Application**").

agreement with the PUCT and ERCOT on both an opt-out process for LSEs, e.g., certain municipalities, and on a methodology (attached as Schedule C to the Settlement Stipulation) to allocate financing proceeds on a load-ratio share basis among participating LSEs.  On October 13, 2021, the PUCT adopted a final debt obligation order approving the ERCOT Securitization Application.  ***Note***, to the extent Plaintiffs ultimately receive funds under the Securitization Bill from the $2.1 billion securitization facility that duplicate amounts requested in this lawsuit, they will take the necessary steps to avoid a double recovery, e.g., amending this complaint.

## I.     ERCOT INVOICES BURY JUST ENERGY

54.     Just Energy's most valuable assets are its customers.  Under Texas law, if a Retail Electricity Provider fails to make payments when due, ERCOT can revoke the provider's right to conduct activities in the ERCOT market and transfer their customers to a POLR (often at a higher rate for customers).  See 16 Tex. Admin. Code § 25.43; ERCOT Market Guide § 7.11.1.a.  Once that happens, the customers are lost.

55.     On March 3, 2021, Just Energy filed a Petition for Emergency Relief with the PUCT (the "**Petition**").[35]  In the Petition, Just Energy requested that the PUCT direct ERCOT to deviate from the deadlines and timing in its Protocols and Market Guides (as defined therein) related to settlements, collateral obligations, and invoice payments and to suspend the execution or issuance of invoices or settlements for intervals during the dates of February 13 through February 20, until issues raised by executive and legislative branches of Texas are resolved. Alternatively, Just Energy requested that the PUCT waive certain ERCOT Protocols to allow Just Energy to delay payment while exercising its rights under the ERCOT Protocols to dispute the invoiced payment amounts.

---

[35]  Just Energy's petition is attached to the Recognition Order as Exhibit A.

56.     For the period between February 13 and February 20, Just Energy has received invoices from ERCOT demanding payment of approximately $335 million.  Just Energy disputes no less than $274 million of these invoiced amounts.

57.     Lacking sufficient liquidity to satisfy the grossly overstated invoices, the Debtors commenced the Canadian Proceedings under the CCAA in the Canadian Court on March 9, 2021.  That same day, the Canadian Court approved a $125 million financing facility and authorized the payment of the disputed invoices to ERCOT.  The Debtors also filed the Chapter 15 Cases in this Court.  ERCOT had actual notice of, and formally appeared in the Debtors' bankruptcy cases.[36]

58.     The Court did not approve Just Energy's payment of the invoices.  Instead, on March 9, the Court entered an order granting the Debtors' provisional relief that makes clear "any payments made to ERCOT are made subject to [Just Energy's] rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law."  The order also states "[a]lthough the Court recognizes the authority to make payments to ERCOT as granted by the Canadian Order, this Court neither adds nor subtracts from any such authorization."  The Court entered an order of recognition on April 2, 2021, incorporating the same reservations set forth above.

59.     In total, the Transfers consist of payments made by Just Energy (and in the case of Hudson, BP) to ERCOT of no less than $274 million relating to both the imposition of a system-wide offer cap of $9,000/MWh and ancillary charges in response to invoices that Plaintiffs received relating to the week of February 13 through February 20.

## II.     LEGALITY OF THE PUCT'S AND ERCOT'S ACTIONS

60.     The PUCT Orders are not consistent with, and find no support under the ERCOT Protocols or the SFA, which incorporates the ERCOT Protocols by reference.  They also are

---

[36]    See, e.g., Notice Of Appearance And Request For Service Of All Notices, Pleadings, Orders And Other Papers [ECF No. 30] dated March 9, 2021 at 1 (filed by the law firm of Munsch Hardt Kopf & Harr, P.C. "on behalf of [ERCOT], a creditor and party-in-interest").

unlawful under, inter alia, (a) Texas' APA, Tex. Gov't Code §§ 2001.024, 2001.029, 2001.033, 2001.035, 2001.038, 2001.171, 2001.174, and 2001.176 and (b) PURA, Tex. Util. Code §§ 15.001, 39.001(c), 39.001(d), 39.151(d).

### A.    ERCOT PROTOCOLS AND THE SFA

61.    The ERCOT Protocols are incorporated by reference into the SFA.    The $9,000/MWh price finds no support in the ERCOT Protocols or the SFA.  Had the PUCT and ERCOT followed the ERCOT Protocols, a different and lower energy price would have been in effect.

62.    ERCOT Protocols in effect at the time of Winter Strom Uri did not consider firm load shed a valid consideration with respect to scarcity pricing.  ERCOT Protocol 6.5.7.3.1 (Determination Of Real-Time On-Line Reliability Deployment Price Adder) lists factors relevant to determining whether ERCOT's scarcity pricing mechanism is triggered and whether prices should be increased toward the HCAP of $9,000/MWh.  The version of ERCOT Protocol 6.5.7.3.1 in effect during Winter Storm Uri did *not* list firm load shed as a consideration for invoking scarcity pricing.  Notwithstanding ERCOT Protocol 6.5.3.7.1, the PUCT and ERCOT deemed firm load shed to be a scarcity-pricing trigger and increased the price to $9,000/MWh on that basis.

### B.    PUCT ORDERS ARE "RULES" UNDER TEXAS' APA

63.    The APA defines "rule" to mean: "(A) a state agency statement of general applicability that: (i) implements, interprets, or prescribes law or policy; or (ii) describes the procedure or practice requirements of a state agency; (B) includes the amendment or repeal of a prior rule; and (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures."  Tex. Gov't Code § 2001.003(6).  The PUCT is a "state agency" for the purposes of the APA.  See Tex. Gov't Code § 2001.003(7) (definition includes state commissions).  The PUCT Orders purport to speak for the PUCT and utilize its authority.  The PUCT Orders are more than a restatement of a formally

promulgated rule. They are a new directive to ERCOT, and they effectively amend the ERCOT scarcity pricing mechanism, promulgated at Tex. Admin. Code § 25.505(g) by forcing ERCOT to apply the system-wide offer **cap** of $9,000 per MWh to **set** prices in a load-shed situation. An agency's interpretation or application of existing promulgated rules themselves constitute "rules" under the APA when they have the effect of amending the existing rules or creating new rules.

### C.  PUCT ORDERS ARE GENERALLY APPLICABLE STATEMENTS

64.     The PUCT Orders are generally applicable statements that implemented, interpreted, or prescribed law or policy, <u>i.e.</u>, new scarcity pricing considerations for ERCOT. <u>See</u> Tex. Gov't Code § 2001.003(6)(A)(i). General applicability for the purposes of Tex. Gov't Code § 2001.003(6)(A) refers to "statements that affect the interest of the public at large such that they cannot be given the effect of law without public input."[37] The PUCT Orders affected the interests of the public in practice, <u>e.g.</u>, electricity prices available to market participants and, by extension, many electricity consumers.

65.     An agency statement "implements, interprets, or prescribes law or policy" when it reflects "[the agency's] construction and application" of existing regulations and "implements a broader policy judgment" by the agency.[38] The PUCT has authority to overrule ERCOT's determination of market clearing prices. <u>See</u> 16 Tex. Admin. Code § 25.501(a). The PUCT Orders are a specific construction and application of that authority to address scarcity issues surrounding Winter Storm Uri that implemented its broader policy judgment that "adjustments are needed to ERCOT prices to ensure they accurately reflect the scarcity conditions in the market."

### D.  PUCT ORDERS INCLUDE AMENDMENT OF PRIOR RULE

66.     The PUCT Orders "amen[d] or repea[l] a prior rule." Tex. Gov't Code § 2001.003(6)(A). An agency's interpretation or application of existing promulgated rules

---

[37]     <u>El Paso Hosp. Dist. v. Tex. Health & Hum. Servs. Comm'n</u>, 247 S.W.3d 709, 714 (Tex. 2008).

[38]     <u>Teladoc, Inc. v. Med. Bd.</u>, 453 S.W.3d 606, 614 (Tex. App—Austin 2014).

themselves constitute "rules" under the APA when they have "the effect of amending the existing rules, or of creating new rules, and the other requirements of the APA's 'rule' definition are met." Here, the PUCT Orders are "more than a restatement of a formally promulgated rule." They are a distinct prescription to ERCOT and effectively amend the ERCOT scarcity pricing mechanism, promulgated at Tex. Admin. Code § 25.505(g), by forcing ERCOT to consider load shed in its scarcity pricing determination and set energy prices at $9,000/MWh.[39]

67.    It is immaterial whether the PUCT issued the PUCT Orders in an emergency or intended to temporarily override ERCOT's scarcity pricing mechanism. There is no requirement that rules under the APA permanently amend or repeal a prior rule. On the contrary, the Court of Appeals has previously recognized ad hoc agency actions based on novel and exigent circumstances as "rules" for APA purposes.

### E.    PUCT ORDERS AFFECT PRIVATE RIGHTS

68.    The PUCT Orders do not include a statement regarding only the internal management or organization of the PUCT and instead directly affected private rights of ERCOT market participants and, by extension, electric consumers, e.g., rates at which electricity was available. Notably, the PUCT Orders were not issued as part of a contested matter before the PUCT. Nor were they an adjudication of the rights of particular parties. Rather, ERCOT market participants had a right to purchase electricity at rates determined under the scarcity pricing mechanism set out in the PUCT's rules at Tex. Admin. Code § 25.505(g). By substantially altering that mechanism, the PUCT impacted private rights.

### F.    $9,000/MWH PRICE VIOLATED THE APA

69.    The APA requires that agency orders adopting rules contain "reasoned justification" for the agency's decision on each rulemaking issue. Tex. Gov't Code § 2001.033(1). That

---

[39]    See Teladoc, 453 S.W.3d at 616; Tex. Dept. of Transp. v. Sunset Transp., Inc., 357 S.W.3d 691, 703 (Tex. App.—Austin 2011, no pet.).

justification must include "a summary of the factual basis of the rule as adopted which demonstrates a rational connection between the factual basis for the rule and the rule as adopted." Id. § 2001.033(1)(B).  Lack of substantial compliance with the reasoned justification requirement renders a rule "voidable" under Tex. Gov't Code § 2001.035(a).  If the Court in its discretion finds "good cause" to do so, it may "invalidate the rule or a portion of the rule, effective as of the date of the court's order."  Id. § 20010.40.

70.    The PUCT Orders are legally invalid because they interfere with or impair, or threaten to interfere with or impair, a legal right or privilege belonging to Plaintiffs.  Tex. Gov't Code § 2001.038(a).

71.    The PUCT violated the APA, including, without limitation, sections 2001.023, 2001.024, 2001.029, 2001.033, and 2001.035, and 16 Tex. Admin. Code § 25.362(c) by, among other things, failing to provide proper notice of its intent to adopt the PUCT Orders; disclose information required by the APA, e.g., an explanation of the order, rule, or proposed text; afford interested parties an opportunity to comment; articulate a reasoned justification or satisfactory evidentiary basis for its decision; or furnish information required in connection with emergency rulemaking.

72.    The PUCT Orders violate the APA because they lack any reasoned justification. The one reason given by the PUCT was its belief that prices being at less than the HCAP was "inconsistent with fundamental market design" because "[i]f customer load is being shed, scarcity is at its maximum, and the market price to serve that load should also be at its highest."  The PUCT provided no evidence to support its assertion that market's scarcity pricing signals were not working as intended, such as evidence that generators were not deploying because prices were too low, or that consumers were not curtailing use in response to the already objectively high prices of more than $1,200/MWh that were in effect on February 15, 2021 at the time of the PUCT Orders.

### G.      $9,000/MWh Price Violated PURA

73.      The PURA prohibits the PUCT from making rules "regulating competitive electric services, prices, or competitors or restricting or conditioning competition except as authorized by this title …," PURA § 39.001(c), and requires that the PUCT's rules "authorize or order competitive rather than regulatory methods … to the greatest extent feasible" and to be "practical and limited so as to impose the least impact on competition."  PURA § 39.001(d).

74.      The PUCT violated its substantive authority under the PURA and any substantive authority and procedural limitations of the Governor's Disaster Declaration in issuing the PUCT Orders.  It acted both outside of its authority and contrary to legally-required procedures.  The PUCT Orders violated the PURA, including sections 39.001(c) and 39.001(d), because they lacked any reasoned justification and displaced the forces of market competition.

75.      The PUCT Orders also violated the PURA because they set prices by regulatory fiat instead of market forces and without regard to actual scarcity conditions in the market.  The PUCT Orders directly contradict the PURA's mandate that prices should be a function of competition and not regulatory action.  Once ERCOT set pricing at $9,000/MWh, Just Energy had no feasible option but to buy electricity at prices that were unlawful, unjustifiable, and unrelated to ordinary market forces.  And, ERCOT's invoices include amounts for ancillary services that are either erroneously calculated or unreasonably applied in violation of ERCOT protocols.

### H.      Alternatively, PUCT Orders Expired On February 18

76.      Even if the PUCT Orders were a valid exercise of the PUCT's authority, they expired by their own terms as soon as firm load was no longer being shed.  The imposition of the $9,000/MWh cap after 1:05 a.m. on February 18, 2021 was illegal because it did not properly implement the PUCT Orders.

77.      The factual justification for the PUCT Orders was that: "*[i]f customer load is being shed*, scarcity is at its maximum, and the market price for the energy need to serve that load should

also be at its highest."  There is no rational connection between that factual justification and a rule that would direct ERCOT to continue scarcity pricing *in the absence of the load being shed*.  And, indeed, the plain language of the PUCT Orders commanded ERCOT only to ensure "*that firm load that is being shed* … is accounted for in ERCOT's scarcity pricing signals" (emphasis added).

78.     Absent load shed, ERCOT had no authority to set the price at $9,000/MWh after 1:05 a.m. on February 18—even assuming the PUCT Orders were valid.

79.     ERCOT continued imposing $9,000/MWh prices even after load shed ended. ERCOT ceased firm load shed at 11:55 p.m. on February 17, 2021, but refused to take any action to review or change the prices and instead continued imposing $9,000/MWh prices until 9 a.m. on Friday, February 19.  From and after 1:05 a.m. on February 18, continued imposition of the $9,000/MWh price was improper.

## III.    DEFENDANTS ARE NOT PROTECTED BY SOVEREIGN IMMUNITY

80.     ERCOT cannot sustain a sovereign-immunity defense because it is a private, membership-based corporation (certified and regulated by the PUCT) and not a governmental regulator.  In point of fact, ERCOT argued in 2014 that it was not a "governmental unit" and that the statutory scheme governing its oversight does not suggest any legislative intention to make ERCOT part of the government.[40]  ERCOT has since taken a contrary position in another case, but the issue has not yet been definitively resolved by the Texas Supreme Court.[41]  Notably, on May 26, 2021, the 288th District Court in Bexar County refused to dismiss a lawsuit against ERCOT on sovereign immunity grounds.[42]

---

[40]     See ERCOT Brief, HWY 3 MHP, LLC v. Elec. Reliability Council of Tex., Inc., No. 03-14-00303-CV at 24 (July 30, 2014).

[41]     Electric Reliability Council of Texas Inc. v. Panda Power Generation Infrastructure Fund LLC, No. 18-0781, 18-0792 (Tex. 2021).

[42]     See CPS Energy v. Elec. Reliability Council of Texas, Cause No. 2021CI04574Z (288th Judicial District).

81.     Even if ERCOT and the PUCT are government entities, any sovereign immunity has been waived pursuant to the Constitution's Bankruptcy Clause.  See, e.g., Central Virginia Community College v. Katz, 546 U.S. 356, 378 (2006) ("In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the in rem jurisdiction of the bankruptcy courts"); 11 U.S.C. § 106(a) ("[S]overeign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following:  (1) Sections … 502 … 525 … 542 … 549 … 553").

82.     Separately, section 2001.038 of the APA is a grant of original jurisdiction, and "it waives sovereign immunity."[43]

## CAUSES OF ACTION

### COUNT 1
### AGAINST ERCOT AND THE PUCT
**(Avoidance of Unauthorized Post-Petition Transfers – 11 U.S.C. § 549)**

83.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

84.     Under section 549 of the Bankruptcy Code, the Foreign Representative may avoid a transfer—"(1) that occurs after the commencement of the case; and (2) is not authorized under this title or by the court."  11 U.S.C. § 549(a).

85.     Pursuant to Federal Rule of Bankruptcy Procedure 6001, "[a]ny entity asserting the validity of a transfer under § 549 of the Code shall have the burden of proof."

86.     Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or other laws of the United States."  Pursuant to section 1520(a)(2) of the Bankruptcy Code, "[u]pon

---

[43]     Tex. Logos, LP. v. Tex. Dep't of Transp., 241 S.W.3d 105, 123 (Tex. App.-Austin 2007, no pet.).

recognition of a foreign proceeding that is a foreign main proceeding … section [549 applies] to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States …." Section 1521(a)(5) of the Bankruptcy Code entrusts the foreign representative with "the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States." Section 1521(a)(7) of the Bankruptcy Code authorizes the Court to grant "any additional relief that may be available to trustee, except for relief available under section 522, 544, 545, 547, 548, 550 and 724(a)." Authorizing the foreign representative to bring claims under section 549 of the Bankruptcy Code to recover the Transfers is appropriate when the lawsuit is consistent with the purposes of the chapter 15, including those identified in section 1501(a)(3) and (a)(4).

87.    Just Energy (and in the case of Hudson, BP) made the Transfers in response to invoices that Plaintiffs received relating to the week of February 13 through February 20.

88.    Approximately $193 million of the Transfers were made post-petition, after March 9, 2021, the date the Chapter 15 Cases were filed. They are subject to avoidance under section 549 of the Bankruptcy Code for several reasons, including the following—each of which provides an independent basis for recovery.

89.    *First*, the Court did not authorize the post-petition Transfers. Both the provisional and final recognition orders say "[a]ny payments made to ERCOT are made subject to all of the Debtors' rights to contest those payments, and all rights to receive a refund or credit as allowed by applicable law. Although the Court recognizes the authority to make payments to ERCOT as granted by the Final CCAA Order, this Cout neither adds nor subtracts from any such authorization."[44] Under the plain terms of section 549 of the Bankruptcy Code, transfers that are not "authorized under this title or by the Court" are subject to avoidance.

---

[44]    Order Granting Petition For (I) Recognition As Foreign Main Proceedings, (II) Recognition Of Foreign Representative, And (III) Related Relief Under Chapter 15 Of Bankruptcy Code [ECF No. 82] ¶ 30. See also Order Granting Provisional Relief Pursuant To Section 1519 Of Bankruptcy Code

90.    *Second*, there could not have been a basis to authorize the post-petition Transfers when, among other things, the invoices were grossly inflated and otherwise related to the $9,000/MWh price and ancillary services charges that were not consistent with, and find no support in the ERCOT Protocols and the SFA.

91.    *Third*, there could not have been a basis to authorize the post-petition Transfers when, among other things, the invoices were grossly inflated and otherwise related to the $9,000/MWh price and ancillary services costs set in response to the PUCT Orders that were illegal under, inter alia, the APA and the PURA.

92.    *Alternatively*, if the PUCT Orders are considered legal and valid, a portion of the Transfers still could not have been authorized and should be avoided under section 549 of the Bankruptcy Code.  Specifically, no less than approximately $220 million of the Transfers relate to the period after 1:05 a.m. on February 18, 2021, of which approximately $110 million was paid after the petition date.  The PUCT Orders expired by their own terms at that time, and ERCOT improperly implemented them.

93.    Based upon the foregoing, Plaintiffs are entitled to an order and judgment against ERCOT and the PUCT avoiding the post-petition Transfers.

### COUNT 2
### AGAINST ERCOT AND THE PUCT
#### (Disallowance of Claims – 11 U.S.C. §§ 502(b), 502(d))

94.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

---

[ECF No. 23] (same); Tr., Hr'g Mar. 9, 2021 at 20:17-23 ("[COURT] I'm going to want to understand whether this becomes irrevocable.  And if you're telling me that current contract or current regulations at ERCOT make it refundable, I'm going to want to see that.  And then I would include in my order that one of the reasons for doing it is that it's, in fact, refundable."); 21:15-18 ("[COURT] I also have a duty, if I'm going to approve at first-day hearings such a large payment in such a disputed situation as you have described … that I not make that irrevocable"); 23:13-15 ("[COURT] So hopefully, there can either be an agreement or I can get satisfied that it is refundable."); at 25:14-16 ("[COURT] [P]aying such a large amount of money until I get some confidence that it isn't irrevocable is an issue").

95.     Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or other laws of the United States."  Section 1521(a)(5) of the Bankruptcy Code entrusts the foreign representative with "the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States."  Section 1521(a)(7) of the Bankruptcy Code authorizes the Court to grant "any additional relief that may be available to trustee, except for relief available under section 522, 544, 545, 547, 548, 550 and 724(a)."  Authorizing the foreign representative to bring claims under section 502 of the Bankruptcy Code is appropriate when the lawsuit is consistent with the purposes of the chapter 15, including those identified in section 1501(a)(3) and (a)(4).

96.     ERCOT has had knowledge of the Debtors' bankruptcy filings since March 9, 2021 and has appeared as a creditor in the Chapter 15 Cases.  ERCOT sent the Debtors demands in writing for amounts allegedly due to ERCOT arising during the week of February 13, 2021 through February 20, 2021.  These demands constitute informal "proofs of claim" that are subject to disallowance under section 502(b) of the Bankruptcy Code.

97.     Moreover, to the extent any of the Transfers are avoided, either (a) in their full amount of not less than $274 million or, (b) *alternatively*, in the amount of approximately $220 million relating to the period after 1:05 a.m. on February 18, 2021, any formal or informal claims asserted by ERCOT and the PUCT against Plaintiffs should be disallowed in whole or in part pursuant to section 502(d) of the Bankruptcy Code.

## COUNT 3
## AGAINST ERCOT AND THE PUCT
### (Turnover—11 U.S.C. § 542(a))

98.     Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

99.     Section 542(a) of the Bankruptcy Code requires an entity in possession, custody, or control of property that may be used, leased, or sold under section 363 of the Bankruptcy Code to turn over such property to the trustee.

100.    Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or other laws of the United States."  Section 1521(a)(5) of the Bankruptcy Code entrusts the foreign representative with "the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States." Section 1521(a)(7) of the Bankruptcy Code authorizes the Court to grant "any additional relief that may be available to trustee, except for relief available under section 522, 544, 545, 547, 548, 550 and 724(a)."  Authorizing the foreign representative to bring claims under section 542(a) of the Bankruptcy Code is appropriate when the lawsuit is consistent with the purposes of the chapter 15, including those identified in section 1501(a)(3) and (a)(4).

101.    The Transfers constitute property that the Debtors, and specifically the foreign representative, Plaintiff Just Energy Group, Inc., may use, sell, or lease under section 363 of the Bankruptcy Code.

102.    Plaintiffs are entitled to the entry of an Order directing ERCOT and the PUCT to turn over the Transfers, either (a) in their full amount of not less than $274 million or, (b) *alternatively*, in the amount of approximately $220 million relating to the period after 1:05 a.m. on February 18, 2021.

### COUNT 4
### AGAINST ERCOT AND THE PUCT
**(Setoff—11 U.S.C. §§ 553 and/or 558)**

103.    Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

104.   Section 558 of the Bankruptcy Code preserves "any defense available to the debtor as against any entity other than the estate."  11 U.S.C. § 558.

105.   While section 553 of the Bankruptcy Code refers to the rights of setoff for creditors, see 11 U.S.C. § 553(a), the debtor's right to setoff is a defense that may be asserted under section 558 of the Bankruptcy Code.

106.   Section 1507(a) of the Bankruptcy Code says in part that "the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or other laws of the United States."  Section 1521(a)(5) of the Bankruptcy Code entrusts the foreign representative with "the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States."  Section 1521(a)(7) of the Bankruptcy Code authorizes the Court to grant "any additional relief that may be available to trustee, except for relief available under section 522, 544, 545, 547, 548, 550 and 724(a)."  Authorizing the foreign representative to assert rights of setoff is appropriate and consistent with the purposes of the chapter 15, including those identified in section 1501(a)(3) and (a)(4).

107.   Going forward, to the extent the Transfers are avoided or otherwise decreed unlawful, Just Energy is entitled to set off the amounts of the Transfers against future invoices from ERCOT or the PUCT, either (a) in their full amount of not less than $274 million or, (b) *alternatively*, in the amount of approximately $220 million relating to the period after 1:05 a.m. on February 18, 2021.

## COUNT 5
## AGAINST ERCOT
### (Canadian Companies Creditors Arrangement Act)

108.   Plaintiffs repeat and reallege the foregoing allegations as though they were fully set forth in this paragraph.

109.   On March 9, 2021, Plaintiffs filed for protection under the CCAA.  Under the CCAA, rights can be exercised for the benefit of creditors of the Debtors.

110.     Just Energy (and in the case of Hudson, BP) made certain of the Transfers pre-petition in response to invoices that Plaintiffs received relating to the week of February 14, 2021. The pre-petition Transfers, which total no less than approximately $81 million are recoverable under the CCAA or any other applicable law.

111.     The pre-petition Transfers were made in the days leading up to Plaintiffs' insolvency filings (under protest) only to avoid losing Plaintiffs' customers and participant status in the ERCOT market.  Moreover, Plaintiffs were financially vulnerable or insolvent on the dates that the pre-petition Transfers were made or became financially vulnerable or insolvent as a result of the pre-petition Transfers.

112.     *First*, the pre-petition Transfers should be avoided in their full amount ($81 million) because the invoices included charges for energy based on the artificial $9,000/MWh price set by ERCOT during Winter Storm Uri and ancillary services charges that were illegally and erroneously calculated under the APA and the PURA and find no support in the ERCOT Protocols or the SFA. Plaintiffs did not receive valuable or good consideration in exchange for the pre-petition Transfers, and they should be avoided and returned.

113.     *Alternatively*, if the PUCT Orders are considered legal and valid, a portion of the pre-petition Transfers still should be avoided and returned.  Plaintiffs received less than reasonably equivalent value for the no less than approximately $110 million in pre-petition Transfers that relate to the period after 1:05 a.m. on February 18, because, among other things, the PUCT Orders expired by their own terms at that time, and ERCOT improperly implemented them.

114.     Plaintiffs intended to delay creditor collection efforts when the pre-petition Transfers were made, preserving rights to challenge those Transfers at a later time.  The pre-petition Transfers had the effect of delaying creditor collections because Plaintiffs received inadequate consideration from ERCOT and do not have sufficient assets to repay creditors in full.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment in favor of Plaintiffs and against Defendants and:

A.      Grant relief under sections 502(d), 542(a), 549, 553, 558, 1507(a), 1520(a), and 1521(a)(7) of the Bankruptcy Code;

B.      Award recovery of all Transfers in an amount not less than $274 million;

C.      Award such other and further relief, in law and equity, as this Court deems just and proper; and

D.      Award damages to Plaintiffs in an amount to be proven at trial, including pre-judgment and post-judgment interest and attorneys' fees to the extent awardable.

Dated:  November 12, 2021
         New York, New York

QUINN EMANUEL URQUHART &
   SULLIVAN, LLP

_____

James C. Tecce (pro hac vice to be filed)
Lindsay M. Weber (pro hac vice to be filed)
51 Madison Avenue, 22nd Floor
New York, New York 10010

-and-

_____

Kate Kaufmann Shih
   Texas Bar No. 24066056
John Bash
Pennzoil Place
711 Louisiana St., Suite 500
Houston, TX 77002
Telephone: (713) 221-7000
Facsimile: (713) 221-7100

*Counsel to Plaintiffs*