IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 15 |
| JUST ENERGY GROUP INC., *et al* | Case No. 21-30824 (MI) |
| Debtors in a Foreign Proceeding,[1] | (Jointly Administered) |

### NOTICE OF FILING OF FINAL ENDORSEMENT

**PLEASE TAKE NOTICE** that, on March 9, 2021, Just Energy Group, Inc. in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors" or "Just Energy"), which are the subject of proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Ontario Superior Court of Justice, Commercial List (the "CCAA Proceedings" and such court, the "Canadian Court"), initiated the above-referenced chapter 15 case by and through its undersigned counsel.

**PLEASE TAKE FURTHER NOTICE** that, on November 18, 2021, Just Energy filed the *Final Endorsement* (the "Final Endorsement"), that amends the Debtor in Possession Financing Term Sheet, approving a transaction for the wind up of Just Energy Finance and approving a second key employee retention plan. The Final Endorsement also extends the stay from

---

[1] The identifying four digits of Debtor Just Energy Group Inc.'s local Canada tax identification number are 0469. Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/justenergy. The location of the Debtors' service address for purposes of these chapter 15 cases is: 100 King Street West, Suite 2360, Toronto, ON, M5X 1E1.

December 17, 2021 through February 17, 2022 A copy of the Final Endorsement is attached hereto as **<u>Exhibit A</u>**.

**PLEASE TAKE FURTHER NOTICE** that copies of all pleadings filed by the Foreign Representative may be obtained free of charge by visiting <u>www.omniagentsolutions.com/justenergy</u>, by visiting the Court's website at http://www.txs.uscourts.gov (a PACER login and password are required to retrieve a document), or upon written request to the Foreign Representative's United States counsel addressed to: (i) Kirkland & Ellis LLP, Attn.: Brian Schartz, Neil E. Herman, and Allyson B. Smith, 601 Lexington Avenue, New York, New York 10022; and (ii) Jackson Walker LLP, 1401 McKinney Street, #1900, Houston, Texas 77010, Attn: Matthew D. Cavenaugh and Genevieve M. Graham.

Houston, Texas
November 23, 2021

Respectfully Submitted,

*/s/ Matthew D. Cavenaugh*

| | |
|---|---|
| **JACKSON WALKER LLP** | **KIRKLAND & ELLIS LLP** |
| Matthew D. Cavenaugh (TX Bar No. 24062656) | **KIRKLAND & ELLIS INTERNATIONAL LLP** |
| Genevieve M. Graham (TX Bar No. 24085340) | Brian Schartz, P.C. (TX Bar No. 24099361) |
| 1401 McKinney Street, Suite 1900 | 609 Main Street |
| Houston, Texas 77010 | Houston, Texas 77002 |

JACKSON WALKER LLP
Matthew D. Cavenaugh (TX Bar No. 24062656)
Genevieve M. Graham (TX Bar No. 24085340)
1401 McKinney Street, Suite 1900
Houston, Texas 77010
Telephone:    (713) 752-4200
Facsimile:     (713) 752-4221
Email:           mcavenaugh@jw.com
                    ggraham@jw.com

*Co-Counsel to the Debtors and Debtors
in Possession*

KIRKLAND & ELLIS LLP
KIRKLAND & ELLIS INTERNATIONAL LLP
Brian Schartz, P.C. (TX Bar No. 24099361)
609 Main Street
Houston, Texas 77002
Telephone:    (713) 836-3600
Facsimile:     (713) 836-3601
Email:           brian.schartz@kirkland.com

-and-

Neil E. Herman (admitted *pro hac vice*)
Allyson B. Smith (admitted *pro hac vice*)
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:     (212) 446-4900
Email:           neil.herman@kirkland.com
                    allyson.smith@kirkland.com

*Co-Counsel to the Debtors and Debtors in Possession*

## Exhibit A

**Final Endorsement**

**CITATION:** *Just Energy Group Inc. et al.,* 2021 ONSC 7630
**COURT FILE NO.:** CV-21-00658423-00CL
**DATE:** 2021-11-18

**SUPERIOR COURT OF JUSTICE – ONTARIO (COMMERICAL LIST)**

**RE:** IN THE MATTER OF THE COMPANIES' CREDITORS ARRANGEMENT ACT, R.S.C. 1985, c. C-36, AS AMENDED

**AND:**

IN THE MATTER OF A PLAN OF COMPROMISE OR ARRANGEMENT OF JUST ENERGY GROUP INC., JUST ENERGY CORP., ONTARIO ENERGY COMMODITIES INC., UNIVERSAL ENERGY CORPORATION, JUST ENERGY FINANCE CANADA ULC, HUDSON ENERGY CANADA CORP., JUST MANAGEMENT CORP., JUST ENERGY FINANCE HOLDING INC., 11929747 CANADA INC., 12175592 CANADA INC., JE SERVICES HOLDCO I INC., JE SERVICES HOLDCO II INC., 8704104 CANADA INC., JUST ENERGY ADVANCED SOLUTIONS CORP., JUST ENERGY (U.S.) CORP., JUST ENERGY ILLINOIS CORP., JUST ENERGY INDIANA CORP., JUST ENERGY MASSACHUSETTS CORP., JUST ENERGY NEW YORK CORP., JUST ENERGY TEXAS I CORP., JUST ENERGY, LLC, JUST ENERGY PENNSYLVANIA CORP., JUST ENERGY MICHIGAN CORP., JUST ENERGY SOLUTIONS INC., HUDSON ENERGY SERVICES LLC, HUDSON ENERGY CORP., INTERACTIVE ENERGY GROUP LLC, HUDSON PARENT HOLDINGS LLC, DRAG MARKETING LLC, JUST ENERGY ADVANCED SOLUTIONS LLC, FULCRUM RETAIL ENERGY LLC, FULCRUM RETAIL HOLDINGS LLC, TARA ENERGY, LLC, JUST ENERGY MARKETING CORP., JUST ENERGY CONNECTICUT CORP., JUST ENERGY LIMITED, JUST SOLAR HOLDINGS CORP. AND JUST ENERGY (FINANCE) HUNGARY ZRT.

**BEFORE:** Koehnen J.

**COUNSEL:** *Jeremy Dacks, Marc Wasserman, Michael De Lellis, Shawn Irving and Emily Paplawski*, for the Just Energy Group

*Neil Herman and Allyson Smith*, U.S. Counsel to the Just Energy Group

*Jonah Davids and Michael Carter*, for the Just Energy Group

*Ryan Jacobs, Jane Dietrich and Alan Merskey*, Canadian Counsel to LVS III SPE XV LP, TOCU XVII LLC, HVS XVI LLC, and OC II LVS XIV LP in their capacity as the DIP Lenders

*David Botter, Sarah Schultz and Anthony Loring*, U.S. Counsel to LVS III SPE XV LP, TOCU XVII LLC, HVS XVI LLC, and OC II LVS XIV LP in their capacity as the DIP Lenders

    *Heather Meredith and James D. Gage*, Canadian Counsel to the Agent and the Credit Facility Lenders

    *Howard Gorman, Ryan Manns and Travis Torrence*, for Shell Energy North America (Canada) Inc. and Shell Energy North America (US)

\`    *Robert Kennedy and David Mann,* Canadian Counsel to BP Canada Energy Marketing Corp., for BP Energy Company, BP Corporation North America Inc., and BP Canada Energy Group ULC

    *Tyler Planeta*, for the Plaintiff, Stephen Gilchrist (in proposed securities class proceeding in SCJ at Toronto, File No. CV-19-627174-00CP)

    *Steven Wittels and Susan Russell*, U.S. Counsel for Fira Donin and Inna Golovan, in their capacity as proposed class representatives in Donin et al. v. Just Energy Group Inc. et al.

    *Bevan Brooksbank*, for Chubb Insurance Company of Canada and Zurich Insurance Company of Canada

    *Robert Thornton, Rebecca Kennedy, Rachel Bengino and Puya Fesharaki*, for FTI Consulting Canada Inc., as Monitor

    *Paul Bishop and Jim Robinson*, for FTI Consulting Canada Inc., as Monitor

    *John F. Higgins*, U.S. Counsel to FTI Consulting Canada Inc., as Monitor

**HEARD:**    November 10, 2021

## ENDORSEMENT

[1]    The applicants Just Energy Group Inc. and its affiliates bring two motions. The first is for an order extending the stay under the *Companies' Creditors Arrangement Act*,[1] amending its Debtor in Possession Financing Term Sheet, approving a transaction for the wind up of Just Energy Finance into Just Energy and approving a second key employee retention plan (the "Second KERP"). On the second motion, Just Energy and its relevant affiliates seek leave to sell shares in a private company. As part of that transaction one of the Just Energy affiliates would be wound up and dissolved. Doing so would allow Just Energy to capture over $6 million in tax benefits. Strictly speaking, however, the affiliate does not meet the solvency requirements that corporate law imposes before a corporation can be wound up. At the end of the hearing I approved orders granting the relief requested in respect of both motions with reasons to follow. These are those reasons.

---

[1] *Companies' Creditors Arrangement Act*, RSC 1985, c. C-36

# The First Motion

## I.  The Second KERP

[2]  The only contentious element of the first motion is Just Energy's proposal for a second KERP in the amount of $4,381,934.

### (a)  The Request for an Adjournment

[3]  Ian Wittels appeared as US counsel for a group of class action plaintiffs who have commenced a complaint in the United States.  The complaint alleges that one or more of the applicants has fraudulently overcharged American consumers for their energy needs.  He sought an adjournment to consider his position on the KERP and indicated that he may be objecting to it because it removes assets from the CCAA estate which could otherwise be used for the benefit of his clients.   I declined the adjournment.

[4]  The class action claim was filed in the US courts approximately 2 ½ years ago.  This was long before the CCAA proceeding began in early March 2021.  The class-action plaintiffs have therefore had the possibility to investigate matters and seek Canadian legal advice for some time.  They did not object to the first KERP that was approved in March 2021 and which provided for total payments of $6,679,625.

[5]  The motion materials for the second KERP were served seven days before the hearing.  The class action plaintiffs raised no objections until the hearing before me on November 10.  This is a large CCAA proceeding with a significant number of stakeholders who have appeared throughout, including at the hearing on November 10.

[6]  I was not given any satisfactory reason for which the class action plaintiffs were unable to raise concerns with the applicants or the Monitor before the hearing on November 10.  After declining the adjournment, I invited Mr. Wittels to make submissions opposing the Second KERP.

### (b)  Objections to the Second KERP

[7]  The factors to consider in determining whether to approve a KERP include (i) the approval of the Monitor; (ii) whether the beneficiaries of the KERP are likely to consider other employment opportunities if the KERP is not approved; (iii) whether the beneficiaries of the KERP are crucial to the successful restructuring of the debtor company; (iv) whether a replacement could be found in a timely manner should the beneficiary elect to terminate his or her employment with the debtor company; and (v) the business judgment of the board of directors of the debtor.  These factors were found to support the first KERP.  They are equally relevant in determining whether to approve the second KERP.

  (i)  Approval of the Monitor:

[8]     The Monitor supports the Second KERP.  Indeed, it was developed with input and feedback from the Monitor.

      (ii)     Likelihood of Employee Departures

[9]     The class action plaintiffs submit that the applicants have introduced no evidence that employees would actually leave without a Second KERP, and that any evidence in that regard is speculative.

[10]    The applicants have described the increased hardship that key employees have suffered since the commencement of the CCAA proceeding.  In addition to carrying on their regular duties as Just Energy employees, key employees have assumed the considerable burden of administering the CCAA proceedings and advancing the prospects of a plan.  This has been no easy task.  Just Energy is a highly regulated business. The company is subject to separate regulatory regimes in each state or province in which it operates.   It has complex commercial arrangements with suppliers and a number of secured and unsecured lenders.  The integrity of those arrangements in turn depends on Just Energy's compliance with regulatory requirements.  Developing a plan in these circumstances involves complex, detailed discussions with regulators, suppliers, and creditors.  These discussions have become even more cumbersome and time-consuming than they would ordinarily be because of the Covid 19 pandemic.  This has led Just Energy management to have serious concerns about employee burnout.

[11]    As a practical matter, it would be extremely difficult, if not impossible, to introduce hard evidence that employees will leave without a KERP.  As an equally practical matter, however, CCAA proceedings put employees into a highly vulnerable position.  They have no idea what will become of their employment at the end of the CCAA proceeding.  They do not know whether they will retain their positions or whether the enterprise will be merged with another entity which will rationalize its human resources requirements resulting in the termination of a significant number of key employees.  They do not know whether the Just Energy entity that emerges from the plan will have the same manpower needs as it currently has or whether it will also materially reassess its human resources requirements.  In those circumstances, it is very tempting for an employee to accept a position with another employer that seems to offer more job stability than an entity in CCAA proceedings can.  That creates a material risk of employee departures.

      (iii)    Are Beneficiaries of KERP Critical to a Successful Restructuring

[12]    Both the applicants and the Monitor believe the beneficiaries of the KERP are critical to the success of the restructuring.

[13]    The first KERP was approved in March. Since then no one has taken issue with the identity of the beneficiaries or their importance to a successful restructuring.

      (iv)    Ease of Replacing Departing Employees

[14] While employees can always be replaced, finding a replacement with equal skill and knowledge of Just Energy's business and operations is very difficult in the time pressured atmosphere of a CCAA proceeding.

[15] This is particularly so with Just Energy. As noted in paragraph 10 above, it is a complex, highly regulated business. That makes bringing new employees up to speed a more time-consuming process. Time in a CCAA proceeding translates into cost and potential prejudice to a plan.

    (v)    Business Judgment of the Board

[16] The Board of Just Energy has concluded that the Second KERP is required to promote a plan. The KERP extends well beyond senior management. This is not a situation of the Board keeping its friends in management happy. Rather, the KERP appears to be a considered plan to identify employees throughout the enterprise whose retention is important for the plan.

[17] In addition to the business judgment of the Board, I would add the business judgment of the creditors. The principal lenders and suppliers to Just Energy are highly sophisticated entities. They have no interest in having Just Energy dissipate its assets on wasteful employee bonus schemes. They do have an interest in recovering on their debt. They have concluded that the best way to do that at the moment is to proceed with the Second KERP. This includes unsecured lenders with loans of approximately (US) $300 million. Those are creditors with hard claims for monies already advanced. The class action plaintiffs, on the other hand have an unliquidated claim for damages in a class action that has not yet been certified, let alone tried.

[18] Mr. Wittels submits that there are millions of American consumers who have been disadvantaged by the allegedly fraudulent conduct of the applicants. In those circumstances, he submits that the court "should be putting the brakes" on payments to employees. He further submits that the plaintiffs' ability to recover on their $2 billion claim will be reduced if corporate funds are siphoned off by payments to employees under the Second KERP.

[19] The principle behind the KERP is not to deprive creditors of recovery but to improve creditor recovery by maintaining the applicant's ongoing business by retaining key employees.

[20] A KERP can be seen as an investment in the ongoing enterprise. If the investment is successful, there will be much more to distribute to creditors as a result of a plan than there would be without the KERP. Whether a plan might have been possible without a KERP can only be assessed after the fact. Entities in CCAA protection do not, however, have that luxury. They may equally find out after the fact that employees have fled leaving them incapable of advancing a plan. At that point it is too late to implement a KERP.

[21] Like any other investment, KERPs have risk. There is a risk that the KERP will not result in larger creditor recovery at the end of the day. The applicants served their motion on 400 parties including secured and unsecured creditors. All but the class action plaintiffs appear

[21]    to agree that the best way forward is to continue the CCAA proceeding with a Second KERP.

[22]    The First KERP was developed based on the expectation that the restructuring would be largely concluded but for regulatory approvals by the end of 2021. It was therefore structured to provide employees with payments in September and December 2021. The size and complexity of the proceeding have not allowed the plan to advance as much as Just Energy would have liked to. Approximately 80% of the payments on the first KERP have already been paid out. The balance will be paid out in December 2021 and March 2022.

[23]    Just Energy estimates that it requires employees to remain until at least June 2022. There is significant concern that the balance of the First KERP does not provide sufficient incentive for key employees to remain until June 2022.

[24]    The Second KERP is designed to incentivize employees to remain. It envisages paying retention bonuses to nonexecutive employees in March and September 2022. If a successful restructuring occurs before September, the final KERP would be paid at that time. Executive KERP recipients will receive one instalment in March 2022 and a second success-based payment on completion of a successful restructuring.

[25]    In light of the foregoing considerations, I am satisfied that the Second KERP should be approved.

### (c)    The Sealing Order

[26]    As part of the approval of the Second KERP, the applicants also seek an order sealing details of the amounts paid to individual employees.

[27]    In *Sherman Estate v. Donovan*,[2] the Supreme Court of Canada held at para. 38 that an applicant for a sealing order must establish that:

    (i)    court openness poses a serious risk to an important public interest;

    (ii)    the order sought is necessary to prevent this serious risk to the identified interest because reasonably alternative measures will not prevent this risk; and,

    (iii)    as a matter of proportionality, the benefits of the order outweigh its negative effects.

[28]    All 3 factors are satisfied here. The documents the applicants seek to seal contain the names of the KERP recipients and the amounts each will receive. Publicly disclosing employee compensation violates the privacy interest of those employees. The employees themselves have not initiated any court proceeding that would require production of that information.

---

[2] 2021 SCC 25

Broad publication of confidential income data could create risks for employee retention in this and other CCAA proceedings.

[29] In *Ontario Securities Commission v. Bridging Finance Inc.*[3] Chief Justice Morawetz recently granted a sealing order over the details of a KERP in similar circumstances. I am satisfied that it is equally appropriate to make that order here. The limitation on the open courts principle is minimal. The order is proportional. It benefits in protecting privacy interests of non-party employees outweigh the very limited impact on the open courts principle.

## II.     The Stay Extension

[30] There is no opposition to the request to extend the CCAA stay from December 17, 2021 to February 17, 2022. The court has discretion to extend the stay if circumstances exist that make doing so appropriate and if the applicant continues to act in good faith and with due diligence towards a plan.[4] I am satisfied from my review of the Fourth Report of the Monitor that the applicant is doing so. In addition, the Just Energy cash flows produced on the motion demonstrate that the applicants have sufficient funds to continue operations until February 17, 2022. As a result, I extend the stay until February 17, 2022.

## III.    The Amended DIP Term Sheet

[31] The applicants seek to extend the term of their DIP loan from December 31, 2021 to September 30, 2022. They do not seek to increase the amount of the loan. The extension involves payment of a 1% financing fee which amounts to a payment of approximately (US) $1,250,000.

[32] No one opposed the DIP extension. That said, the payment of the extension fee raises the same issues about potentially reducing the size of the estate available to the class action plaintiffs as does the Second KERP. I will therefore proceed on the basis that the class action plaintiffs oppose the DIP extension even though Mr. Wittels did not expressly raise that argument. I take this approach because it struck me that the class action plaintiffs may have become alive to the issues that the CCAA poses for them fairly late in the day.

[33] To the extent that a CCAA proceeding ultimately fails, there is always the risk that the cost of the financing fee associated with the extension will further diminish the pool of assets available for creditors. As with the KERP, however, the ultimate goal is to have more money available for creditors in a CCAA proceeding than would be available in a bankruptcy.

[34] Section 11.2 (4) provides that the court should consider, among other things, the following factors when considering interim financing:

---

[3] 2021 ONSC 4347 at paras. 25-27.
[4] CCAA, ss. 11.02(2) -11.02(3)

> (a) the period during which the company is expected to be subject to proceedings under the CCAA;
>
> (b) how the company's business and financial affairs are to be managed during the proceedings;
>
> (c) whether the company's management has the confidence of its major creditors;
>
> (d) whether the loan would enhance the prospects of a viable compromise or arrangement being made in respect of the company;
>
> (e) the nature and value of the company's property;
>
> (f) whether any creditor would be materially prejudiced as a result of the security or charge; and
>
> (g) the view of the monitor.

[35] Those factors are also appropriate to consider when considering amendments to DIP financing.[5]

[36] Applying those factors here, I am satisfied that the DIP extension should be approved.

[37] The applicants expect to finalize a plan some time between June and September of 2022. The applicants have the support of their creditors. To date, no creditor has spoken against the DIP extension or any other issue involving management of the Just Energy group. The expiry of the DIP facility on December 31, 2021 would put an end to Just Energy's ability to arrive at a plan. The extension of the DIP facility would considerably enhance the prospects of a viable plan. The monitor supports the extension of the DIP facility. The monitor specifically references the extension fee in its report and believes it to be reasonable. Just Energy continues to be a significant enterprise with hundreds of employees. The company has been moving in good faith towards a plan, but the business is of such a complexity that it has taken longer than initially anticipated. This is not surprising. The company is subject to a myriad of regulatory regimes across the United States and Canada. It has complex commercial arrangements with suppliers and a number of secured and unsecured lenders, the integrity of which in turn depends on Just Energy's compliance with regulatory requirements.

[38] In the foregoing circumstances, I am satisfied that the DIP loan should be extended.

## IV. The Just Energy Finance Transaction

---

[5] *Re Laurentian University of Sudbury*, 2021 ONSC 3545, at para. 39

[39]    The applicants seek court approval to undertake a transaction that would wind up JE Finance into Just Energy and subsequently file articles of dissolution in respect of JE Finance.  The applicants seek approval of the transaction because JE Finance and Just Energy are applicants in this proceeding and because paragraph 13 (c )  of the Second Amended and Restated Initial Order dated May 26, 2021 prevents the applicants from reorganizing a material portion of their business without court approval.

[40]    The ultimate objective of the Finance dissolution is to realize tax losses in Just Energy Hungary (a wholly owned subsidiary of JE Finance).  As part of the proposed transaction certain intercompany loans will be set off against each other and all remaining assets and liabilities of JE Finance will be rolled into Just Energy.  No creditors will be prejudiced by that transaction and no creditors oppose it.  The Monitor supports the transaction.

[41]    The transaction is consistent with the objectives of the CCAA, principally because it maximizes the value of the debtor's assets for the benefit of all stakeholders.  In those circumstances, I am satisfied that the JE Finance transaction and its subsequent dissolution should be approved.

## The Second Motion:  The ecobee Transaction

[42]    Just Management Corp. ("JMC") is a wholly owned subsidiary of Just Energy.  JMC owns shares in ecobee Limited ("ecobee").  ecobee has entered into a proposed transaction with Generac Power Systems Inc. which it proposes to conclude by way of a plan of arrangement.  JMC would like to support that transaction and seeks an order authorizing it to enter into a Support Agreement pursuant to which it would agree to be bound by the arrangement and would dispose of its ecobee shares pursuant to the arrangement.

[43]    The notice of motion seeking approval of the ecobee transaction was delivered only the day before the hearing.  The relief it seeks was, however, set out in an affidavit that was served a week earlier.  Given the nature of the transaction which is described below and the description of it in the earlier affidavit, I was prepared to consider it on November 10 despite the short notice.

[44]    Court approval is required because the Initial and subsequent Orders require court approval for any refinancing, restructuring, sale, or reorganization of the Just Energy entities' businesses.  A further issue arises because the *Canada Business Corporations Act*[6] (the "CBCA"), pursuant to which JMC is incorporated, makes dissolution available only to solvent corporations.  Given that JMC is an applicant in this proceeding and given that it will have transferred its only valuable asset, the ecobee shares, to Just Energy before dissolution, it fails to meet the solvency requirement for a dissolution.

---

[6] *Canada Business Corporations Act*, RSC 1985, c C-44

[45]   In deciding whether to grant authorization under subsection 36(1) of the CCAA for a sale of assets outside the ordinary course of business, the CCAA court will consider the following non- exhaustive factors:

> (a) whether the process leading to the proposed sale or disposition was reasonable in the circumstances;
>
> (b) whether the monitor approved the process leading to the proposed sale or disposition;
>
> (c) whether the monitor filed with the court a report stating that in its opinion, the sale or disposition would be more beneficial to the creditors than a sale or disposition under a bankruptcy;
>
> (d) the extent to which the creditors were consulted;
>
> (e) the effects of the proposed sale or disposition on the creditors and other interested parties; and
>
> (f) whether the consideration to be received for the assets is reasonable and fair, taking into account their market value.[45]

[46]   I am satisfied that those factors have been met.

[47]   Just Energy acquired the ecobee shares in 2012 for approximately $6.4 million. Just Energy has been trying to sell its ecobee shares for several years without success. As a result of the arrangement, Just Energy anticipates receiving approximately $61,000,000. Of that, approximately $18,000,000 will be received in cash on completion of the Arrangement. The remaining $43,000,000 will be received in publicly traded shares of Generac. Just Energy will be free to dispose of those shares immediately. They are not subject to any hold provision. In addition, if certain performance targets are met, Just Energy has the potential to receive an additional $10,000,000 of Generac shares in 2022 and 2023.

[48]   Ecobee has also been looking for a strategic transaction for quite some time. The Generac transaction is the best opportunity that has presented itself.

[49]   The Monitor approves the sale of the shares and has filed a report stating that, in its view, the sale of the shares would be more beneficial to creditors than any other transaction. No creditors oppose the transaction. The effect of the proposed sale is highly beneficial to creditors because it will inject significant amounts of cash into the CCAA estate.

[50]   Moreover, to some extent the question of approval of the sale of the shares is academic because they are subject to a drag along right which would compel Just Energy to sell the ecobee shares pursuant to any transaction that is approved by the ecobee board and a majority of the votes cast by each class of ecobee shareholders. The majority of each class has already committed to support the proposed Arrangement.

[51] This brings me to the proposed wind up and dissolution transaction that is proposed as part of the sale of the ecobee shares.

[52] The court has jurisdiction to approve the wind up and dissolution transactions pursuant to its general power to make appropriate orders under section 11 of the CCAA. As noted, however, certain aspects of the wind up and dissolution transaction raise further complications. Those include the following:

> (i) The stated capital of JMC will be reduced to zero. Although permitted by corporate law, it is potentially subject to a solvency test under section 38 (3) of the CBCA.
>
> (ii) JMC will purchase for cancellation preferred shares that Just Energy Ontario LP holds in JMC. Share repurchases are also subject to corporate solvency tests in subsection 34 (2) of the CBCA. In light of the fact that JMC is a co-guarantor of certain Just Energy indebtedness and is an applicant in this proceeding, the solvency test is most likely not satisfied.
>
> (iii) JMC will be voluntarily dissolved. Section 208 (1) of the CBCA prohibits a corporation that is insolvent from dissolving.

[53] Counsel have not been able to direct me to any caselaw or commentary about the policy rationale behind the CBCA's restrictions on insolvent corporations engaging in certain transactions. It would appear that the purpose of those restrictions is to protect creditors or other stakeholders from transactions that would deprive them of assets or other rights that would ordinarily be available to them under insolvency legislation.

[54] Those concerns do not arise here. The purpose of the winding up and dissolution transaction is to achieve approximately $6.6 million of tax savings that would otherwise not be available. The only assets of JMC are the ecobee shares and an interest in a dormant partnership that has no value. Those assets will be wound up into Just Energy. At the same time, Just Energy will assume any liabilities owed by JMC.

[55] In this case, blind application of the CBCA's solvency requirements would in fact undermine the purpose of those requirements. Oversight by the Monitor and the Court provides additional assurance that the interests of creditors in the dissolution will be protected.

[56] In that context, any solvency requirements contained in the CBCA are breached only if they are viewed in isolation and are divorced from the transactions as a whole. The end result generates a net benefit to the Just Energy estate by making more assets available than would otherwise be the case.

[57] Gascon J. (as he then was) came to a similar conclusion in *AbitibiBowater*[7] albeit without discussing the point. In that case, the Monitor's 22nd report dated November 19, 2009,

---

[7] Order in (*Re) AbitibiBowater Inc*. (23 November 2009), Montreal, 500-11-036133-094 (Que. S.C.).

noted that certain aspects of the proposed transaction violated the solvency provisions of the CBCA and the Quebec Company's Act. Gascon J. nevertheless issued an order which allowed the transaction to proceed "notwithstanding the provisions of any federal or provincial statute."[8]

[58]  Section 11 of the CCAA provides the court with broad remedial jurisdiction. It provides:

> **Despite anything in the Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act**, if an application is made under this Act in respect of a debtor company, **the court**, on the application of any person interested in the matter, **may**, subject to the restrictions set out in this Act, on notice to any other person or without notice as it may see fit, **make any order that it considers appropriate in the circumstances.**

[59]  The section gives the court express power to override the *Bankruptcy and Insolvency Act*[9] and the *Winding up and Restructuring Act*.[10] That power was also used to override the priority schemes in provincial statutes by according super priority to DIP lenders before super priority was enshrined in the CCAA.[11]

[60]  In *Century Services Inc. v. Canada (Attorney General)*[12] the Supreme Court of Canada observed that that judicial discretion has allowed the CCAA to adapt and evolve to meet contemporary business and social needs and that it has called on courts to innovate as restructurings become increasingly complex.

[61]  In *Rescue! The Companies' Creditors Arrangement Act*[13] Professor Janis Sarra noted that in determining whether and how to exercise its discretion the court should ask itself whether the order will

> "usefully further efforts to avoid the social and economic losses resulting from liquidation of an insolvent company, which extends to both the purpose of the order and the means it employs."[14]

[62]  That exercise requires the court to balance the interests of and prejudice to various stakeholders. Here, the only stakeholder who is potentially prejudiced is the CRA. It did not appear on the motion. It also has other means of protecting its interests by way of tax reassessments.

---

[8] *Ibid*. at para 12.
[9] *Bankruptcy and Insolvency Act*, RSC 1985, c B-3
[10] *Winding-up and Restructuring Act,* RSC 1985, c W-11
[11] *Skydome Corp., Re*, 1998 CarswellOnt 5922; 16 C.B.R. (4th) 118 at paras. 8-9, 13-14.
[12] 2010 SCC 60, [2010] 3 S.C.R. 379 at para 58, 61.
[13] 2d edition, Toronto: Carswell, 2013. The
[14] *Rescue!* at page 120

Case 21-30823   Document 153   Filed in TXSB on 11/23/21   Page 17 of 17

Page: 13

[63]  In circumstances where the proposed transaction would add value to the estate, would not prejudice any stakeholder of the CCAA and does not offend the interests that the CBCA seeks to protect by imposing insolvency requirements, I am satisfied that the winding up and dissolution transaction furthers the effort to avoid social and economic losses that would result from liquidation and should be allowed to proceed.

## Disposition

[64]  For the reasons set out above I signed orders on November 10, 2021 extending the stay under the CCAA, extending the DIP facility, approving the wind up of Just Energy Finance, approving the Second KERP, approving the sale of ecobee shares in proposed plan of arrangement and permitting the ancillary transactions set out in paragraph 52 above to occur, notwithstanding the insolvency of the corporations involved.

**Koehnen J.**

**Date:** 2021-11-18